**COPY**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

TAMPA DIVISION

CASE NO.: 8:24-CV-01793-TPB-AAS

MONDAMIN WILKINS,

Plaintiff

V.

PROGRESSIVE SELECT

INSURANCE COMPANY,

Defendant

DEPONENT:  DANIEL DOUCETTE

DATE:      JUNE 30, 2025

REPORTER:  HANNAH DECLERK



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

407.423.9900
Fax 407.841.2779
Toll Free 855-MYDEPOS

401 EAST JACKSON STREET,
SUITE 2370
TAMPA, FL 33602

315 EAST ROBINSON STREET,
SUITE 510
ORLANDO, FLORIDA 32801
CORPORATE

APPEARANCES

ON BEHALF OF THE PLAINTIFF, MONDAMIN WILKINS:
Delton Gunn V., Esquire
Lee D. Gunn IV, Esquire
Gunn Law Group, P.A.
401 East Jackson Street
Suite 3600
Tampa, Florida 33602
Telephone No.: (813) 228-7070
E-mail: dgunn@gunnlawgroup.com
        lgunn@gunnlawgroup.com
(Appeared via videoconference)

ON BEHALF OF THE DEFENDANT, PROGRESSIVE SELECT INSURANCE
COMPANY:
David Angley, Esquire
Blaise Antoniou, Esquire
Young Bill Boles Palmer Duke & Thompson
401 East Jackson Street
Suite 2950
Tampa, Florida 33602
Telephone No.: (813) 603-3006
E-mail: dangley@flalawyer.net
        pantoniou@flalawyer.net
(Appeared via videoconference)



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

INDEX

                                             Page

PROCEEDINGS                                    5

DIRECT EXAMINATION BY MR. ANGLEY               6

CROSS-EXAMINATION BY MR. GUNN                 166

REDIRECT EXAMINATION BY MR. ANGLEY            171

                        EXHIBITS

Exhibit                                       Page

   1 - Notice Of Duces Tecum                    8

   2 - Composite Of Materials                   9

   3 - Expert Report (Plaintiff Expert Witness

         Disclosure) Dated April 29, 2025      18

   4 - Supplemental Expert Report Provided on

         June 29, 2025                          18



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        **Toll Free 855-MYDEPOS**

STIPULATION

The deposition of DANIEL DOUCETTE was taken at MILESTONE REPORTING COMPANY, 315 EAST ROBINSON STREET, SUITE 510, ORLANDO, FLORIDA 32801, via videoconference in which all participants attended remotely, on MONDAY the 30th day of JUNE 2025 at 9:03 a.m. (ET); said deposition was taken pursuant to the FLORIDA Rules of Civil Procedure. It is agreed that HANNAH DECLERK, being a Notary Public and Court Reporter for the State of FLORIDA, may swear the witness and that the reading and signing of the completed transcript by the witness is not waived.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

PROCEEDINGS

THE REPORTER:  All right everyone.  So we are officially on the record so to get started, will all parties except for the witness, please state your appearance, how you are attending, and your location?

MR. GUNN:  Delton Gunn and Lee Gunn on behalf of Plaintiff.  We're appearing by Zoom video conference from our offices in Tampa, Florida.

MR. ANGLEY:  David Angley and Blaise Antoniou on behalf of Progressive, Defendant.  We are appearing via Zoom from our offices in Tampa, Florida.

THE REPORTER:  Perfect.  Thank you all so much. And Mr. Doucette, will you please state your full name for the record?

THE WITNESS:  Daniel R. Doucette.

THE REPORTER:  Wonderful.  And I was able to confirm Mr. Doucette's identity prior to going on the record.  Do all parties agree the witness is, in fact, Mr. Daniel Doucette?

MR. GUNN:  Yes.

MR. ANGLEY:  Defendant agrees.

THE REPORTER:  All right.  Wonderful.  Mr. Doucette, will you please raise your right hand to

 MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     www.**MILESTONEREPORTING**.com     **Toll Free 855-MYDEPOS**

be sworn in?

Do you solemnly swear or affirm the testimony you're about to give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS:  I do.

THE REPORTER:  All right.  Counsel, you may begin.  Thank you.

DIRECT EXAMINATION

BY MR. ANGLEY:

Q.   Good morning, Mr. Doucette.

A.   Good morning.

Q.   As I mentioned a moment ago, my name's David Angley.  I represent Progressive, and I'll be conducting your deposition here today.  Can you please state and spell your full name for the record.

A.   Daniel R. Doucette, D-O-U-C-E-T-T-E.

Q.   And can you tell me your professional address, sir?

A.   My professional address, 16800 West Greenfield Avenue, Suite 124 Brookfield, Wisconsin.

Q.   Okay.  And do you also -- do you have an office in Florida?

A.   I do.

Q.   And what is that address?

A.   Right now, it's 528 Southeast 33rd Street in

 MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Cape Coral.  It's in my home.  I'm in a temporary home because my home on Sanibel was pretty well destroyed by Hurricane Ian, and we're still rebuilding it, but this is the home in the meantime, and I have an office in the home.

Q.   And I'm sorry to hear about the issues with the hurricane.

A.   It was a mess.

Q.   I hope it gets smoothed out for you soon.

A.   I keep thinking soon is quickly, but it's -- it goes on and on forever, so one of these days we'll get back there.

Q.   So and then the Florida address you provided you -- it's the home office, correct?

A.   It is.

Q.   Is there a particular split of time between the Wisconsin office and the Florida office?

A.   No, I'm -- my residence here is here in Florida.  It used to be in Wisconsin.  And then I don't know, 15, 20 years ago, I moved down here permanently. I keep my Wisconsin office because that's where my staff works.

And other than Florida, the area where I work, the geography that I work in the most is Wisconsin.  So I keep that as well.  I get up there -- there's no set

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

schedule anymore.

Q. And we're here today because you've been disclosed as an expert witness for the Plaintiff Mondamin Wilkins in this bad faith action, correct?

A. That's correct.

Q. And it's my understanding you've been retained by Mr. Wilkins to provide expert testimony regarding Progressive's handling of his uninsured motorist claim arising from a July 26th, 2019, motor vehicle accident, correct?

A. That's correct.

Q. Did you receive a notice of deposition duces tecum to be here today?

A. I did.

Q. And we'll mark that as Exhibit 1.

And there are 19 categories of -- well, the deuce is tecum, there's 19 categories of information that were sought, correct?

(Exhibit 1 was marked for identification.)

A. I believe that's right. I'm just pulling it up.

BY MR. ANGLEY:

Q. Sure. And your -- through counsel, I received approximately 234 pages of material. Do you know if documents responsive to each request have been produced



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    www.**MILESTONEREPORTING**.com    Toll Free **855-MYDEPOS**

to my office?

A.   I don't know that each request was responded to.  We responded to those that I had information or material that was responsive.

Q.   Okay.  I guess I'll ask it a better way.  To the extent there is a responsive material that exists to any of the requests, was that provided to Counsel, and then to your understanding, produced through Counsel?

A.   It was.

Q.   And we'll mark that as Exhibit 2, composite Exhibit 2.

And do you have any documents in your position besides what was produced to our office that would be responsive?

(Exhibit 2 was marked for identification.)

MR. GUNN:  Form.

THE WITNESS:  No.  I believe you have everything other than the notes I made last night, as I went back through the file, just summarizing my thoughts.

BY MR. ANGLEY:

Q.   Okay.  And I guess if we could get those notes produced, so once the deposition's over.  So are there any materials being withheld from production?

A.   Not that I'm aware of.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

MR. GUNN:  David, we are withholding e-mails that were exchanged between our office and Dan Doucette as he did not rely on any of our communications informing his opinions and they are work product.

MR. ANGLEY:  Okay.  I guess, can we get a privilege log for that then?

MR. GUNN:  Sure.

MR. ANGLEY:  Yeah.

MR. GUNN:  And, David, I don't think any of those e-mails would be responsive to the requests as written.  I read the request for any correspondence to be limited to materials that were relied upon in formation of his opinions.

MR. ANGLEY:  Okay.  We can --

MR. GUNN:  We'll discuss off the depo, but just, yeah.  I don't want to agree to produce a privilege log if I later bring that up with you.

BY MR. ANGLEY:

Q.  Let me just share my screen with you, sir. This is Exhibit 1.  This is the deuces tecum.  Well, this is the response to the deuces tecum that we received.

For number 1, you provided a list of the materials that you reviewed; is that correct?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

A.    Yes, we did.

Q.    But I -- did you provide the actual all of the materials themselves or just a list of that material, which you reviewed?

A.    No.  Just the list as you know, there's thousands of pages of documents in here, and -- that were produced to me from the case itself.  I did not reproduce those.  I simply produced a list of those.

Q.    Okay.  And then you provided a supplemental report, correct, for number 2?

A.    Yes.

Q.    And number 3, again, a -- you provided a list of materials that you reviewed?

A.    I did.

Q.    And number 4, you provided a resume, a CV?

A.    I did.

Q.    And you provided, again, for number 5, a list of materials reviewed?

A.    I did.

Q.    Number 6, you provided us your billing records or time sheets, whatever time that took?

A.    I did.

Q.    And you also provided what's called a Claim Review and Document Summary and Abstract for Additional Notes.  What's that?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

A.   That's a -- there's an individual in my office by the name of Greg Himebauch, H-I-M-E-B-A-U-C-H.  He is a retired insurance attorney.  He worked in the industry for about 35 years.  He is an independent contractor that works for me as necessary.  His role is to take a case when we first get it and do a very, very high-level pass.

If you look at the Case Review and Document Summary, it identifies the parties, the Court, the venue, the attorneys, and some real basic information that'll review the complaint, but he doesn't form opinions or issue reports.

Q.   And did -- and Mr. -- what was his last name?  I'm sorry.

A.   Himebauch.

Q.   Himebauch.  And Mr. Himebauch performed that service for you in connection with this case?

A.   He did.

Q.   Okay.  How many hours did he spend?  Is that -- is his hours income passed within the time sheet that we received?

A.   No, the time sheet is mine.  I don't have his time sheet.  We don't have an integrated billing system of any sort.  What we do is that at any timekeeper just keeps track of their time.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

And then when it comes time to bill, when we get around to it, my assistant will contact everybody, grab the time sheets and create a bill.  And we don't have that time sheet yet, so I don't know how much time he has in.

Q.   Good.  And is that something that you're billing to Mr. Wilkins, or is that something that you handle yourself?

A.   No, it would be included.  When we do a bill, his time will be shown separately on the bill as it goes to the attorneys.

Q.   I guess I'd just ask for an updated bill when that becomes available.

And on number 11, you refer to some course material and claims operations that were cited in your expert report.  Did you rely on anything other than what you identified as in your expert report?

A.   I did not.

MR. GUNN:  Form.

BY MR. ANGLEY:

Q.   Did you review any cases in connection with your expert report and opinions?

A.   No.  Not specifically with respect to my work in this case, no.

Q.   Okay.  Did you do anything to prepare for

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

today's depositions?

A.   Yes.  I reviewed my file, had a brief conversation with Attorney Gunn, and that's about it.

Q.   Okay.  When you say you "reviewed" your file, what did you specifically review?

A.   Well, I literally, I go back, and I start by reading my report, and then I go and I read my notes, which you'll have a copy of.

And then as I said last night, as I do my final review, I just kind of jot down thoughts or concepts that come to mind, kind of refreshing what, you know, the material that I've reviewed some time ago now.

Q.   Okay.  Any particular documents that you reviewed in reviewing the file?

A.   No, I started with my -- as I said, with my report.  The -- in this case, I also, in -- after my report and before last night, I reviewed the additional depositions that came in, which I think I've listed somewhere -- yeah, in my supplemental report, think I listed the extra depositions that I had reviewed.  So I have done that over the last several days as well.

Q.   Do you recall the supplemental deposition, the additional depositions you reviewed?

A.   It was Mr. Wilkins -- his second deposition was actually broken into two parts.  I think he had --



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      www.**MILESTONEREPORTING**.com      Toll Free **855-MYDEPOS**

there was a technical of a problem of some sort. I reviewed Ms. Crawford, Gorman Rodriguez, and Attorney Sartez.

Q. Okay. Anything else?

A. No.

Q. And you mentioned you spoke with Attorney Gunn. Which Attorney Gunn did you speak with? There's Mr. Delton Gunn and Mr. Lee Gunn.

A. The primary conversation was Mr. Delton Gunn. I think Lee Gunn was on it very briefly.

Q. Okay. When did that occur?

A. Actually, it was, I think Friday, Thursday or Friday.

Q. Okay. How long?

A. Not very long, 15 minutes, 20 minutes.

Q. And then did they provide you with any guidance as to the substance of any of your opinions?

A. They did not.

Q. Who initially contacted you about serving as an expert in this matter?

A. I believe Mr. Delton Gunn.

Q. Okay. And when were you first contacted?

A. Well, you have somewhere in the material, we've given you my retainer agreement. It would've been right then. I can get you the date.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

Q.   I have it.  It looks like you signed it on -- it's on Page 152 through 153 of the materials we received.  And it looks like you signed it on March 18th, 2025, does that sound correct?

A.   Yes.

Q.   Okay.  But would you have been first contacted on or around March 18th, 2025?

A.   That'd be correct.

Q.   And when you were retained by Mr. Gunn's law firm, did he or any member of the law firm provide you with any guidance or instructions as to the substance or what you were to testify about?

A.   He did not.  He simply indicated that it was a UM claim against Progressive and asked me if I would review the claim file and offer any thoughts or opinions I might have.

Q.   And what was the scope of your attention?

A.   To do just that, to review the depositions and the claim information that would be forwarded to me. And having done that, offer any opinions they might have as to whether Progressive was acting within the custom and practice of the industry.

Q.   What do you consider your area of expertise to be?

A.   Insurance in general.  And specifically with

 MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

respect to this case claim handling practices.

Q. Okay. Do you consider Florida Insurance bad faith law to be an area of your expertise?

A. I do. I would put it a little differently. I don't consider myself a Florida lawyer nor a legal expert in Florida. I consider myself a Florida claim handling expert, not a legal expert.

Q. Okay. What's the distinction between the two?

A. One, you're testifying as to the actual legal requirements and legal interpretations. And in the second case, you're testifying according to the custom and practice in the industry, there are many times related, but require a little different expertise and a little different approach.

Q. Okay.

A. I don't typically cite case law, and maybe even statutes that -- for the basis of my opinions. I cite custom and practice.

Q. So you're not offering any legal opinions as it pertains to Mr. Wilkins' uninsured motor -- or first party bad faith action?

A. I am not.

Q. All right. We'll mark your -- one second.

And you provided an expert report in this matter and a supplemental report, correct?



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     www.**MILESTONEREPORTING**.com     Toll Free 855-MYDEPOS

A.   That is correct.

Q.   I'll mark your expert report as Exhibit 3. That'll be Plaintiff's Expert Witness Disclosure, which was provided on April 29th, 2025.  And I'll mark your supplemental expert report as 4, which was provided to my office on the -- yesterday evening.

And do you have a copy of both in front of you, sir?

(Exhibit 3 was marked for identification.)

(Exhibit 4 was marked for identification.)

A.   I have a copy of my report.  I'm pulling up a copy of my supplemental.

BY MR. ANGLEY:

Q.   So focusing first on the April 29th, 2025, report, and I can share my screen at any point if you want me to, it enclosed also a CV and a testimony list, correct?

A.   That's correct.

Q.   And then in response to the duces tecum, you also produced a CV.  Is there any difference between the CV that was attached to your April 29th report versus what was produced to us yesterday evening?

A.   There shouldn't be.  I haven't changed my CV in years.

Q.   Okay.  And your CV, is that Exhibit 1 of your



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

expert report?

A. Yes.

Q. My understanding based on your CV, is that you obtained a BS in business administration in 1971; is that correct?

A. That's correct.

Q. Okay. And after obtaining your bachelor's degree, did you immediately go to law school, or did you do something else in the interim?

A. Got married and then went to law school.

Q. And then so 19 -- in 1971 you began law school at the University of Wisconsin?

A. I did.

Q. And graduated in 1974; is that correct?

A. That is correct.

Q. And then you were admitted to -- were -- after graduating law school, were you admitted to the Wisconsin Bar?

A. I was.

Q. All right. Had -- are you admitted or were you admitted to practice in any other states?

A. I was never admitted, I practiced pro hac vice in a number of different states.

Q. Were you ever licensed to practice law in the State of Florida?



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    **Toll Free 855-MYDEPOS**

A.   I was not.

Q.   Okay.  How about how many times did you pro hac vice in the State of Florida?

A.   I believe I only had one case in Florida.

Q.   Okay.  What kind of case was it?

A.   It was an aviation crash and one of the plaintiffs had a collateral part of the action in Florida, and I was defending the primary action in another state.

Q.   Okay.  So what was your role in that case?

A.   I was the primary Defense attorney for the airline.

Q.   Okay.  And then there was some ancillary part of the case that was in the State of Florida?

A.   That's correct.

Q.   What year did this case occur?

A.   I would guesstimate in the mid-'80s.

Q.   Okay.  Ever pro hac vice in the State of Florida to handle an insurance bad faith case?

A.   I have not.

Q.   All right.  Did you ever apply to the State of Florida to be to be licensed?

A.   I did not.

Q.   Have you ever been reprimanded by the Wisconsin Bar or the Wisconsin Supreme Court?



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

A.   I have not.

Q.   Any bar grievances filed with the Wisconsin Bar or Supreme Court?

A.   Never.

Q.   Are you Board-certified or were you Board-certified?

A.   I was not.  That was a concept that developed later, quite honestly.

Q.   Any other licenses or certifications?

A.   No.

Q.   Okay.  Any other insurance designations or coursework?

A.   Quite a bit of coursework.  No other designations.  So I took both the AIC course and the CPCU course, and actually the CLU course.  I did that. If you look at my resume, part of my background includes an internship at an insurance company, and the internship was a combination of actual hands-on work and study.

And the process was, you took the AIC, and you took the CPCU primarily.  I did -- I never sat for those certification exams, because at the time I took them, you had to have a certain number of years of actual experience in the industry before you could sit for the exams, and I didn't have it at that time.

MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

It was originally my intent to go on to business school and get a master's in insurance and then come back to the company. Instead, I switched courses, went to law school, and never ended up sitting for the actual exams.

Q. All right. So that was in the 19 -- looking at your CV, that was in the 1967 to 1971 timeframe?

A. That's when I took the courses, yes.

Q. Right. And that was -- what -- you said it was an interim, what was the insurance agency or entity that you worked for?

A. I refer to it as Milwaukee Insurance Group. It was a combination of companies. We had a mutual company as our parent. They were the primary owners of a publicly traded holding company. The holding company owned a number of insurance companies.

And for the first part of my career, that was the group that I was associated with. Part way through my career we affiliated with a group called Unitrin Trinity, now primarily known as Kemper. And at that point we had 40 companies writing insurance in every state except Alaska and Hawaii, so it changed over the years.

Q. Sure. But focusing on that 1967 to 1971 time period, that's when you did the coursework we referred



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.**MILESTONEREPORTING**.com          Toll Free **855-MYDEPOS**

to.  And you said some abbreviations, can you tell me what those abbreviations stood for?

A.    Sure.  AIC, is Associate in Claims.  It's a multi-module course.  Probably the most sought after designation for a claim's handler.  It is -- some people would call it a master's in claims handling.

And the other course that I referenced was CPCU, Chartered Property Casualty Underwriter, is was also a multi-module course.  It focuses on policy interpretation, policy laws, more of the underwriting side of the business rather than the claim side.

Q.    Okay.  And you also referenced a CLU course?

A.    Yeah, that's simply the equivalent, but it's in the life insurance industry.  One of our companies was a life insurance company.

Q.    And were these state specific or nationwide?

A.    These are national courses.  There is no state designation.  If you get your AIC certification, it doesn't have a subset, Florida or Wisconsin.  It's simply your AIC.

Q.    And again, you did -- you said you'd complete the coursework for each one of those?

A.    Yes.

Q.    But did not obtain the designation, correct?

A.    I did not.  I -- as I said, I couldn't take



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

the exam at that point.  I think it was like -- I think for the CPCU, you had to have five years of career experience.  And I believe AIC was three years and I didn't have either at that time.

Q.   And then after 1971, when your internship ended, you never redid that coursework.  You never went back and redid the coursework, correct?

A.   I did not.  By then I had gone on the law.

Q.   Sure.  And the time period in which you completed that coursework was the 1967 to 1971 timeframe?

A.   That's when I first read the materials, yes. I've read them many times since then, but that was my first exposure to it.

Q.   Sure.  And the materials probably have changed quite a bit over the years; fair to say?

A.   Not as much as you would think.  Certainly, but there's been updates and changes as laws have changed, but a lot of the AIC material is focused on what's a proper investigation, how to negotiate those types of things don't necessarily change radically over the years.

Q.   Okay.  So focusing on your work experience, you mentioned the internship at Milwaukee Insurance Group, and you were there from 1967 to '71.  What



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

generally were your -- what was your role as an intern, what was your job duties?

A.   Well, over the years it advanced.  At the beginning, coursework was always a part of it.  Part of every day you were expected to spend time in the library.  They had a -- they had their own education department that ran that part of the program.

And then the rest of it, you started by simply watching a very experienced claim adjuster handle claims.  Slowly start doing more of your own.  So you go from watching them, to them watching you, and then eventually you're handling claims on your own.

Q.   And did you, kind of -- did that trajectory happen for you through that internship?

A.   It did.  By the end of the process, I was handling my own claims as if I was a regular adjuster.

Q.   And this was in the State of Wisconsin, correct?

A.   I was based in Wisconsin cases, I handled weren't necessarily in Wisconsin.

Q.   Did you handle any Florida claims during this period?

A.   Not that -- not during that period, no.

Q.   And were these bodily injury claims or uninsured motors claims?



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

A.   They could be both of those, plus property. The group of companies was a, you would call it, mainstream insurance.  At that time, we wrote auto, homeowners, a lot of contractors' business, things of that sort.

Q.   And did these claims that you handled as an intern, were any of these like attorney represented or injury claims?

A.   Certainly.  By the end they would've been -- they would've included attorney representative claims.

Q.   And then you attended law and then you stopped the internship to go to -- when you went to law school, correct?

A.   That's correct.

Q.   And then from 1971 to '74, you worked at the McCusker Law Office; is that accurate?

A.   That's correct.

Q.   And that was in Madison, Wisconsin?

A.   It was.

Q.   And did you work there through the three years of law school?

A.   I did.

Q.   And what did you -- it indicates your job title as Law Clerk/Investigator?

A.   Yes.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

Q.    What were your duties there?

A.    It was a small law firm.  There were three lawyers, sometimes four, and he specialized in complex product liability cases or complex accident cases.  He was a plaintiff's firm.

And my role was both to support some of the legal research, but also actually act like an investigator.  I would go to the scenes, take pictures, interview witnesses.  The types of steps any investigator would handle in a bodily injury claim.

Q.    Any other job duties while you worked there?

A.    No.  I mean, the investigative role could be very broad, but it was whatever needed to be done on a case, pick up police reports, like I said, interview witnesses, take pictures, whatever they needed.

Q.    And then following law school in 1974, you returned to Milwaukee Insurance Group; is that correct?

A.    I did.

Q.    And that was in the role of as an attorney?

A.    It was.  My title was technically Associate Counsel.  My job duties were that of a claim manager and litigation supervisor.

Q.    Okay.  What do you -- can you, kind of, tell me what you mean, "litigation supervisor and claim manager"; what is that?



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      www.**MILESTONEREPORTING**.com      Toll Free 855-MYDEPOS

A.   Claim manager in the company, at that time, meant that you had your own caseload, but that you also had other adjusters reporting to you.  So you supervised their work, worked with them as they handled their cases, but you also would have your own caseload.  The litigation supervisor part was that if a case ended up in litigation, as all insurance companies do, you typically hire outside Counsel or some use inside Counsel, but you would hire outside Counsel in our case. And I would be the liaison to outside Counsel on a claim that was pending against the company.

Q.   Okay.  So focusing on the claim manager aspect of your role during that time period, were these -- you were handling -- you had, like, direct claims that you handled, and then you had a group of other adjusters that reported to you, correct?

A.   That's correct.  That's correct.

Q.   How many adjusters were reporting to you during that timeframe?

A.   I recall there were three and sometimes four.

Q.   Okay.  And approximately how many direct claims were you handling during that timeframe?

A.   Boy, rough guess would be 50.

Q.   What percentage would you say of your work as a claims manager was supervision versus the direct

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

handling of claims yourself?

A. I would say it's about 50/50.

Q. And were these Wisconsin claims?

A. Not necessarily. They would be -- in that role, at that time, they would be primarily Wisconsin claims in terms of my claim manager role. But in terms of supervisor, not necessarily.

Q. Just were focusing on claims manager role. In that role, what -- were any of those claims, Florida claims?

A. Not at that time.

Q. Okay. So for the claims on the -- as the claims manager aspect of things, were these bodily injury claims, uninsured motors claims or combination?

A. Combination. We didn't separate them by adjuster.

Q. Okay. So no -- as a claims manager in that role, you weren't either handling directly Florida claims or supervising Florida claims; fair to say?

A. Not at that time. That's correct.

Q. So then you also had the litigation supervisor role that we were talking about, right?

A. Yes.

Q. And you basically testified you were act as a liaison between the company -- the insurance company and



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.**MILESTONEREPORTING**.com          **Toll Free 855-MYDEPOS**

outside Counsel that may be retained?

A.    That's correct.

Q.    So in that capacity, did that involve any Florida insurance claims?

A.    I don't recall any at that point.

Q.    Did -- in either your role as a claims manager or litigation supervisor for that time period, did any -- well, strike that.

So no claims for the litigation supervisor or claims manager role?  No Florida claims for either role in the 1974 to 1976 time period?

A.    Not that I recall.

Q.    And then in 19 -- let's see here.  Sorry, got myself -- so following law school, you basically had two employers.  You had a law firm and the insurance company, correct?

A.    Yes.  With the understanding that the insurance company morphed over time and became very different in terms of our structure and where we wrote and things of that sort.  But yes, that's true.

Q.    But in broad speaking terms, the entities you worked for after law school would be, one was a law firm, and one was an insurance company?

A.    That's correct.

Q.    So the law firm, again, taking -- it's what's



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        **Toll Free 855-MYDEPOS**

now referred to or known as Hinshaw & Culbertson, correct?

A. It is now called Hinshaw & Culbertson, yes.

Q. And during the timeframe in which you worked there, it probably had various different names or DBAs or things of that nature?

A. It did. It was -- when I joined them, it was Kluin, Dunphy, Hankin and McNulty. Then it became Kluin, Dunphy, Hinshaw, Culbertson, and then eventually Hinshaw & Culbertson.

Q. Okay. That's a good memory of the various names.

A. Yeah, major events.

Q. Yeah. So you started at -- I'm just going to call it "Hinshaw" for short; if that's okay?

A. Sure.

Q. You started at Hinshaw in 1976?

A. I did.

Q. And why switch from the associate Counsel role to work at Hinshaw in '76?

A. I loved the Courtroom. I found myself -- in law school, I -- one of the things Wisconsin was noted for at that time was trial practice. If you wanted to be a trial lawyer, that would be a good school to go to. I enjoyed that work and I wanted to give it a shot. I

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

was, I guess you could say ambivalent between the insurance world and legal, which is why I had originally intended to get an MBA and insurance, then changed my mind, went to law school.  Both careers called to me, and I thought that I wanted to give law a shot.

Q.   All right.  And then you worked at Hinshaw from 1976 to 1988?

A.   '88, '89 and actually had one last trial in '89.

Q.   So there's some carryover into 1989?

A.   There was.  When I made the decision to leave, I had a very major injury case coming up and the client contacted my law firm to ask whether there'd be some way to work out so that I could still handle it, because I'd handled it for several years.  And we worked out an arrangement with the insurance company where I could start at the insurance company, but go back to try the case, which I did.

Q.   Okay.  And then after that point, your work at Hinshaw ceased?

A.   Yes.

Q.   And what were your practice areas while working at Hinshaw?

A.   Well, when I started, I was a young man on the totem pole, and you did whatever the senior partners



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

wanted to give you.  And that meant a lot of auto accident cases.  Some of them were property damage.  The whole range that a defense firm might have, I pretty much got.

And then as my career progressed, I ended up focusing on two primary areas -- well, three, insurance coverage, professional responsibility, professional liability, and aviation.  During that time, I was one of the founders of a legal malpractice company on behalf of the State Bar.  And I got into that because I had been doing a lot of professional liability work, and I got into aviation because I'm a pilot by hobby.

Q.   Okay.  And those three areas, what was, kind of, the breakdown, percentage wise, as to your areas of -- you know, your percentage of practice?

A.   Boy, that's pretty hard because it -- I mean, as you know, you have a major case that comes up for trial and you are 100 percent focused on it for a while. I would say probably 50 percent was professional liability, either legal malpractice or insurance agents, Arizona missions work, 25 percent insurance coverage cases, and then 25 percent would be aviation.  That's just a rough approximation.

Q.   And then the insurance cases you handled, were those on behalf of the insurance company, the defendant



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.**MILESTONEREPORTING**.com          **Toll Free 855-MYDEPOS**

or the claimant, the plaintiff?

A. I would say it was 90 percent insurance company. We were -- you -- we'd be known as the defense firm and our policy was, you didn't take cases against your clients. So the plaintiff opportunities we had were few and far between to find a case that we wanted to take that wasn't against one of our clients, but I had a few of those.

Q. Sure. What type of Plaintiff cases did you handle while at Hinshaw?

A. I handled a couple bodily injury cases. There were two quad cases that I handled. There was a property case where a home -- family's home had burned to the ground, and they were having trouble with their insurer. But by and large, I was doing Defense work.

Q. And in the context of handling the defensive insurance claims, were you retained by the insurance company to represent the insured?

A. Certainly. I did a good deal of that. And also, on occasion, represent the insurance company.

Q. And when you represented the insurance company, was that in connection -- what kind of claims were those?

A. They could -- Wisconsin's unique and it's a direct-action state. So the insurance company is a



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

named party.  And if there is no conflict or coverage questions of any sort, you obviously can use the same lawyer.  If there was any type of coverage question, you couldn't.  And so you'd split the coverage, and sometimes I had the insured, and sometimes I had the insurance company.

Q.   Were you ever directly retained by the insurance company to defend against an uninsured motorist claim?

A.   Certainly.

Q.   And did you handle any insurance bad-faith claims while at Hinshaw?

A.   I did.

Q.   Approximately, how many?

A.   There weren't a lot.  You're talking the mid-'80s.  Bad faith was just really, kind of, catching hold.  A lot of the noteworthy decisions were in the mid-'80s, particularly in our area of practice.  So they came, but I don't -- I wouldn't say it was a major part of my practice at that point.

Q.   Did you -- and were those -- the bad-faith claims you handled at Hinshaw, were those based in Wisconsin law or Florida law?

A.   I don't recall a Florida bad faith case that I was handling as a lawyer.  I handled some Wisconsin.  I



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.**MILESTONEREPORTING**.com          Toll Free **855-MYDEPOS**

believe I handled an Illinois, one or two.

Q.   Okay.  So while at Hinshaw, did you -- let me ask, I guess the reversed.

While at Hinshaw, did you handle any Florida insurance bad-faith claim or lawsuit?

A.   Not that I recall.

Q.   Have you ever defended an insurance company in Florida in a bad faith case?

A.   No, not as a lawyer.

Q.   Have you ever tried a bad faith case in Florida as an attorney on the case?

A.   No.

Q.   While at Hinshaw, how many cases did you try to verdict?

A.   Oh, a lot.  Particularly, in my early years, you know, the cases might be a day or two trial.  You know, they weren't necessarily -- as a younger lawyer, you're not getting the most substantial cases.  I was in Court regularly.  I don't have a good number.  But --

Q.   Sure

A.   -- it's a lot.

Q.   Did you ever try an insurance bad-faith claim to trial?

A.   Yes.

Q.   Or to -- I mean, rephrase that.  That was a


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

bad question.

Q. Did you ever try an insurance bad-faith claim through a jury verdict?

A. Yes.

Q. Okay. And how many times?

A. I would say a couple. Handful.

Q. And those were the Wisconsin, Illinois claims that -- in bad-faith claims that you handled while at Hinshaw?

A. That's correct.

Q. Do you recall the last one, the year and the timeframe?

A. Well, it would be before 1988, but I don't remember just when.

Q. Okay. And then while at Hinshaw, you mentioned you acted as a claims department for a captive legal malpractice company; right?

A. Yes.

Q. And what was your role?

A. I was -- well, I was one of the founders of the company. It was called Wisconsin Lawyers Mutual Insurance Company. At that time, legal malpractice insurance became very, very challenging to obtain in the marketplace.

So I and a couple of other Wisconsin lawyers,



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

on behalf of the State Bar, decided to form our own legal malpractice company.  We went to London, and we got the reinsurance we needed from the London Syndicates.  We capitalized the company by selling bonds to the lawyers in the State of Wisconsin, and we got the company up and running since the syndicate that -- I mean, the -- the -- the company was 100 percent reinsured in London.  It didn't carry any significant risk itself, and the company in London did not have any U.S. claim operations.

So they then hired myself and indirectly my firm, and we were the claim operations.  So if a claim was turned in, we'd investigate, negotiate.  If necessary, litigate.

Q.   Okay.  Were any policies or claims written for the State of Florida?

A.   No, this was strictly a Wisconsin based company.

Q.   And what was your role?

A.   Well, as I said, I was essentially the claim department -- the outside claim department for the company.

Q.   And those were all Wisconsin claims?

A.   The risk would've been written in Wisconsin. They weren't necessarily Wisconsin claims.  One of them

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

was Hawaiian claim that took us to Hawaii, something like 16 times over the course of the case. Typically, scheduled in January and February.

Q. But none out of the State of Florida?

A. I don't recall any of the plaintiffs being in the State of Florida, no.

Q. And then my understanding is, in 1988, you -- or what -- kind of mentioned 1988, and there was some trail off into 1989, you returned to the Milwaukee Insurance Group?

A. That's correct.

Q. And then why did you switch from Hinshaw to go back to the insurance company?

A. Two things happened. One, they approached me and asked me to come back. Two, the nature of the work I was doing, particularly aviation work, was taking me all over the country. I was gone for extended periods of time, coupling that with the legal malpractice work, which had me over in London regularly, because that's where the underwriters were. I was gone from home a lot and I had a couple of young kids at the time, and I was looking to change lifestyle a bit and actually stay home more. And so I, at first, said no to the group and then we kept talking, and I eventually decided to accept the position of Vice President of Legal.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

Q.   Okay.  And so that's --

A.   Yeah.

Q.   That's the role you took on in 1988 or -- and/or early 1989?

A.   That's correct.

Q.   And then after you left Hinshaw, was that the end of your career as far as practicing law?

A.   Yes.

Q.   And you mentioned before from 1988 to 1999, you were the Vice President of Claims at the Milwaukee Insurance Group; correct?

A.   Yes.

Q.   And what were your job duties as the Vice President of Claims?

A.   Well, essentially, the entire department reports to you.  When I first came back, I also took on a number of cases as a frontline claim handler.  I did that primarily because in the period of time that I had been gone, claim systems had changed, process had changed.  Our group had grown and added companies, and I wanted to handle claims myself to get a feel for the systems, how everything was working, that type of thing. But my main role would've been supervising the claim department, doing everything from running the audit function, running the round table, to supervising

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

various adjusters and/or supervisors themselves responsible for everything from overseeing the claim manuals and the creation of those to process.  You name it, everything happens at your level.

Q.   And what -- how many direct claims were you handling as the Vice President of Claims in the 1988 to 1990 time period?

A.   I only did that at the beginning part.  As I said, that was more just for me to refamiliarize myself with systems and practices.

I probably handled maybe a total of 30 or 40, just to, kind of, get my feet wet again.  And the rest of my time was supervisory.

Q.   And then once you, kind of, felt you kind of got your feet wet, you stopped direct handling of claims?

A.   I was no longer the frontline adjuster, that's correct.

Q.   And during that time period, were you supervising the handling of any Florida insurance claims?

A.   Yes, we had -- we've always had Florida claims early on at like at this period of time, say in the 8 -- 1989, 1990, '91.  We found ourselves in Florida in three ways.  First of all, at that time, we were still

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

primarily a Northern States company.  We wrote throughout the Midwest, Colorado.  We had an Arizona office.  But we were primarily Wisconsin, Michigan, Illinois, Minnesota, Iowa, Nebraska, Michigan, and a lot of those people go to Florida in the winter.  And if they are down here and they get in an accident, we had to adjust and handle those claims according to Florida law.  So we certainly had Florida claims.

We also had them -- because we had a lot of long-haul truckers and long-haul truckers can end up anywhere.  And they certainly ended up in Florida and we had our share of Florida claims.  So we had that exposure.  And then in 1992, I think it was '91 or '92.  We acquired another company.  This one was called Alpha.  And they actually had operations in Florida.  They had an underwriting office in Florida.  And it was -- for us it was somewhat unusual, in that they operated -- that company operated through an MGA, a Managing General Agent.  The rest of our group operated through independent agents.

A managing general agent has much more authority.  They can accept risks, they can settle claims, they can do many things on your behalf, that was new to us.  So as we were acquiring the company, I actually came down and led the due diligence team.  We

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

went through all their claims to get an idea of how they were handling them, whether their process in handling them was compatible with our philosophy.  And then post-acquisition I kept that I kept the Florida claims as a direct report for the same reason.  It was an unusual structure in our group, and we were a little uncomfortable with it to begin with.  So I kept a very close eye, and I kept that as a personal area of responsibility.

Q.   Okay.  That -- so we were kind of talking about the vice president of claims role in 1988 to '99.

A.   Right.

Q.   You just mentioned 1992.  When you -- when your group acquired the -- it was Alpha; is that correct?

A.   Alpha, A-L-P-H-A.

Q.   Well, that was 1992.  You were the Chief Executive Officer of the Milwaukee Insurance Group at that point in time, correct?

A.   But the claim department still reported to me, I didn't have a Vice President of Claims.

Q.   Okay.  So you were still handling or overseeing the claims department, but were you during that time period directly -- were you a frontline adjuster for any Florida claims?

 MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

A.    No.

Q.    Were you ever a frontline adjuster for any Florida injury claim?

A.    No.

Q.    So your role as in any Florida insurance claim would've been supervisory in nature?

A.    That's correct.

Q.    All right.  So '99 -- 1988 to 1999, the Vice President of Claims role, you didn't handle directly any Florida insurance claims.  About what percentage of the claims you supervised were Florida insurance claims?

A.    I just guess at 10 percent.  I don't have any log or any type of tracking that I did.

Q.    And then 1999 -- 1990 to 1991, you were the chief operating officer, correct?

A.    Yes.  All that meant was that the underwriting department began to reply -- report to me.  So I picked up another department, so they broadened the title.

Q.    So you maintained the oversight of the claims department and basically picked up oversight of the underwriting department?

A.    Until the very end I pretty much had the claim department.  Until the day I retired, I ran the round tables.  I ran the audits, just because of my background.  It's a bit unusual for a CEO to come up the



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

claims side of a company.  Most CEOs come up the finance side or the marketing side, I came up the claims side, so I kept the part of the business that I knew the best closer to me.

Q.    Sure.  So and then 1991 to 2005, you were the Chief Executive Officer?

A.    That's correct.

Q.    And what were your job roles as the Chief Executive Officer?

A.    Pretty much the same.  I still kept the round table and the audit functions.  I was now supervising the supervisors in the claim department or the -- what we call them -- at that time, we switched title arrangements, but I think we called them line managers. Because we also started splitting out the various lines of business.  So workers comp had a separate unit now, property had a separate unit now.  That wasn't the case in the beginning.

So I was CEO, I had the underwriting department.  I had basically the whole company reported to me in one fashion or another.  Except in most areas, I had an either a vice president or in the case of our subsidiaries, a president in between myself and the frontline operations.  The exception remained the claim department.


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Q. All right. So and during that timeframe as Chief Executive Officer, that's when the company acquired Alpha?

A. Yes.

Q. And how often -- and you said you traveled to Florida as part of the due diligence of that transaction?

A. Yes.

Q. Did you return back to Florida to directly oversee any of the claims departments in Florida?

A. Certainly, at times. I -- it was my practice to get out to all the branch offices frequently. And the Florida operation essentially became a branch office.

Q. So kind of what I asked earlier, but during this kind of timeframe, when you acquired Alpha, what percentage of the claims that the company handled came out of Florida?

A. Same answer. I don't know for sure. I don't have any tablet or any tally that I could check. I would say it probably remained in that 10 percent range.

Q. So the -- fair to say the majority of the claims that the company handled or policies written or primarily north, was it probably a northern company?

A. In '92 or when?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Q.   During the -- well kind of tell me.  Like, how did that change over time?  Kind of where -- how did that work?

A.   Well, it changed considerably.  Particularly in 1995, we became affiliated with a group.  As I said, at that time, they were called Unitrin.  Unitrin was a New York Stock Exchange company that had two major divisions, property casualty and life.  And we entered into a very complex transaction with them.  They were a stock company.  Our parent company was a mutual company, and stock company can't buy a mutual company.  It's owned by the policy holders.  So we worked out an affiliation agreement.  We did cross quota shares, cross service agreements.  We basically blended operations without complete ownership exchange.

When that happened, we picked up a substantial presence in the south.  Their biggest state was Texas, Carolinas, Florida.  So we -- we -- we increased our exposure in the south quite a bit and in the west.  So it changed every -- almost every year it was changing as we continually grew our group and changed our makeup.

Q.   Okay.  So from 1990 to 1995, around 10 percent Florida claims and then after the transaction with Unitrin; is that right?

A.   Unitrin, now it's Kemper.  It's called Kemper

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

now.

Q.   We can call it Kemper for sure.  The makeup of the breakdown of claims changed based on that acquisition or that transaction?

A.   It did.  My responsibility didn't change a great deal.  Again, we had to walk a fine line between the mutual business and the stock business.  The stock company obviously had shareholders.  We had to make absolutely sure, for all the various regulators, that we weren't favoring the shareholders at the expense of the mutual policy holders.  And so that required us to maintain some independence and operations and some discreet service areas.

So I basically kept the same group I had as my responsibility, picked up some additional claim responsibility on some of the Unitrin or Kemper group. And then they also handled a lot of their stuff alone because we couldn't directly manage it as a mutual company.

Q.   The majority of those claims out of Florida, were they being handled by your group or through Kemper?

A.   Our group.

Q.   So and then in 2005 through 2011, you were chairman of the Milwaukee Insurance Company?

A.   Yes.



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Q.   Okay.   And what were your job duties as chairman?

A.   I would -- you'd call it executive chairman. At that time, we had also picked up another company called First Nonprofit, which is not a nonprofit company.  It writes nonprofits.  So it wrote social service agencies primarily.  And there we had exposure to sexual abuse claims, counseling claims, things of that sort.  And so we kept that under our umbrella.  I managed that company, our group of companies, and pretty much kept my role with the claim department.  As I said earlier, until I retired, I ran the round table and ran the audit function.

The audit function gave me the opportunity to go visit a lot of branch offices.  When we audit our branch office, it's always a multi-day trip.  We'd go there, review the claims, meet with all the various personnel.  And then usually you have an educational component as well, and it kind of prompted me to get out and about to the various offices.  So I kept that function.

Q.   Okay.   How often would you travel to Florida for that function?

A.   Probably twice a year.

Q.   And that was from the 2005 to 2011 time

 MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

period?

A. Yes.

Q. Okay. And then in 2011, you retired from Milwaukee Insurance Group?

A. I did.

Q. And in 2012, you opened Doucette & Associates?

A. I did.

Q. And was the company was originally located in Wisconsin?

A. It was.

Q. And based on your earlier testimony, you have a Florida residence and an office in your residence. When did you open the Florida residence/office?

A. 1998, I started as a snowbird. Since we had operations now, many more operations in the south, it was less important that I'd be based in Wisconsin. And so we bought a place down here and we'd spend more and more time down here. And I'd leave from here to go visit for instance, the Florida office or the South Carolina office or whatever. And over the years that eventually became a full-time residency in Florida. And I kept a summer home in Wisconsin and I sold that, I think in 2007, something like that. And since then, I've been a full-time resident.

Q. Since 2007, you've been a Florida full-time



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

resident?

A.   Yes.

Q.   Okay.  So the -- when you opened Doucette & Associates, was it primarily based out of Wisconsin or was it primarily based out of Florida?

A.   It -- I launched it from Wisconsin, in the sense that I had an office up there.  As I said, the staff that I have was all there.  And I knew the lawyers and the legal community much, much better in Wisconsin than I did in any other state.  So I kind of started putting feelers out in Wisconsin, but that quickly grew and started involving Florida work pretty quickly.

Q.   How long would you say you -- your work was Wisconsin based before you began handling as an insurance expert, Florida claims?

A.   I would guess a couple of months, not very long.

Q.   Long and then Doucette & Associates.  Can you tell me what is Doucette & Associates and what do you do there?

A.   An insurance consulting firm that focuses on two aspects -- two primary aspects of insurance, coverage questions and bad faith.  It also -- we've done a decent amount of work in professional liability as well, just because of my background.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

So the coverage is not necessarily litigation based.  It typically involves a very complex commercial loss where the insured might be looking for some guidance as to what parts of this policy apply, how we proceed, what do we do.  And then the bad faith litigation is, as you know, involved in litigation and claims that the company didn't follow appropriate practices.

Q.   Okay.  And you mentioned staff -- or does Doucette & Associates have any employees?

A.   We have -- I have one employee, Pat Bottoni.  She's been my assistant for 47 years or so.  She's both a paralegal and an administrative assistant.  She's the only paid W2 employee.

Q.   Okay.  And you mentioned Mr. -- misplaced his name.  Greg I'll call him.  So are there other employees?

A.   There are no other -- there are other employees.  I do have a paralegal, the same type of situation.  She used to be head of the aviation paralegal team when I was a law practice, and I've known her for many years.  She's retired and she will work part-time as needed.  Her role is almost exclusively limited to summarizing depositions.

Q.   Okay.  So you have one direct employee and


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

then how many other -- do you have other independent contractors that work for Doucette & Associates?

A.   Not -- there's one other paralegal.  It's actually a firm that I've used only a -- the paralegal that I'm talking about.  Her name is Deb Ciszewski, C-I-S-Z-E-W-S-K-I.  If she's busy or since she's retired, she seems to travel quite a bit, if I can't access her services, there's another firm I use, but they aren't -- they're just a for hire, a paralegal firm.

Q.   And then what a -- and you also mentioned Greg earlier, right?  As an associate attorney who sometimes assists you?

A.   Yes.

Q.   Does he assist on most cases or is it an at-need or at-call basis?

A.   At call.  It depends, or he -- he's most likely get involved in a bad faith case where we get retained and the next day, we get 10,000 pages of documents because of the history of the file.  The professional liability work, I tend to do by myself, the coverage work, I tend to do by myself.

Q.   Okay.  And so in this case, you got retained in on March -- on or about March 18th, 2025, and your report was April 29th, 2025, right?

A.   Yes.



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Q.   Any other employees of the firm, whether 1099 or W2?

A.   No.

MR. ANGLEY:  All right.  Mr. Doucette, we've been going for about an hour.  Why don't we take a five-minute break?

THE WITNESS:  All right.

THE REPORTER:  Sounds good.

(A recess was taken.)

THE REPORTER:  All right, everyone.  The time now is 10:13 a.m.  Eastern Time and we are back on the record.  Thank you.

BY MR. ANGLEY:

Q.   All right.  Mr. Doucette, we're back from a brief break.  And before the break we were talking about you starting Doucette & Associates and the work you kind of do there generally.  Do you recall that?

A.   I do.

Q.   So and you mentioned the kind of the primary areas of Doucette & Associates was, and correct me if I'm mistaken, one part insurance coverage questions and the other part bad faith litigation?

A.   And it -- and it's another piece of professional liability, Arizona missions work.

Q.   Professional liability.  Thank you.  So can

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

you kind of explain to me the specific work you do as a consultant in insurance coverage questions or bad faith litigated matters?

A.    Well, first of all, they overlap.  When I talked about coverage, I'm talking -- I'm trying to focus on those coverage questions where someone will come to me and say, look, I just had a major fire.  I just had this catastrophic loss of some sort.  Can you work with us on the policy and, you know, kind of tell us what is covered, what isn't, how we should proceed, who we should talk to.  It's kind of a step one in a major loss, I guess.  They're looking for some help trying to navigate through it.

Bad faith, as you know, is litigation-based claiming that the insurance company did something inappropriate in the handling of the claim.  There are times when coverage is included in that type of analysis.  It may be the company denied coverage and the issue is, it's an unfair denial.  So it they can overlap.

The Arizona missions work, in addition to my insurance -- well, it is part of my insurance background.  At one point, I owned an insurance agency. And a good part of my legal practice as I mentioned was professional liability for four years or so, I was the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          Toll Free **855-MYDEPOS**

chairman of DRI's agents and brokers liability committee. I wrote some books. I did a lot of speaking around the country. So that has -- that background has brought me into some litigation that's strictly Arizona missions-based, not bad faith.

Q. And what's the kind of the percentage breakdown as part of your work at Doucette & Associates between those three areas?

A. I would say coverage is 10 percent E&O, maybe 15, and the balance would be bad faith litigation.

Q. So that'd be 75 percent bad faith litigation as for -- as a -- working as an expert?

A. That's a rough estimate, but that'd be accurate, yes.

Q. And when you work as in the bad faith litigation aspect of your work, you're typically hired by attorneys for one of the parties?

A. That's correct.

Q. Either the lawyers retain you to represent an insurance company who's being sued, or you could be retained by the insured or the judgment creditor pursuing the insurance company for the bad faith action?

A. It can be that, yes.

Q. Note, the latter would be the plaintiff. And the former would be the defendant in the context of a

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

bad faith action in a standard kind of situation?

A.   Typically, yes.  Sometimes the bad faith is a counterclaim to a declaratory judgment action, but typically.

Q.   Sometimes counterclaims, coverage, you know, deck actions and things of that nature, but your standard bad faith action, the plaintiff is typically an insured or judgment creditor and the defendant is typically the insurance company?

A.   That'd be correct.

Q.   So kind of with that generalized understanding, what -- can you tell me the percentage of the work you do as an expert witness in bad faith matters on behalf of Plaintiff versus Defendant?

A.    It varies obviously as cases come in, but it -- it's always run in the area 55 to 60 percent for the plaintiff or the insured or creditor and 40 percent for the insurance company.

Q.   Okay.  And then we were talking about generally your work at Doucette & Associates.  What percentage of your practice does the -- does your expert work consist of?

A.   I'm confused.  If you take all three of those categories and call those experts, the coverage, the -- then 100 percent of my work is that area.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Q.   Okay.

A.   I only work part-time.  I'm semi-retired.

Q.   Semi -- how busy are you semi-retired, sir?

A.   Well, it -- I'm 100 percent occupied every other week, I think is the way it feels like.  About 50-hour weeks, followed by a week with the grandkids.  So it -- you know, it varies, but I would say, generally, it's probably about 50 to 70 percent of my time is working.

Q.   Sure.  So 100 percent of your work at Doucette & Associates is as an expert within one of those three categories, those general categories that the firm does?

A.   Yes.

Q.   All right.  And when I mean "firm," I'm referring to Doucette & Associates.

A.   I gather that, yes.

Q.   So then 100 percent of your income derived from Doucette & Associates is as an expert witness?

A.   Yes.  Well, yes.

Q.   And then earlier we were discussing some of the insurance bad faith cases you handled as an attorney. And those were in the State of Wisconsin or Illinois primarily, I believe, correct?

A.   That's correct.

Q.   And in those cases, were you representing the



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

insurance company or the insured or judgment creditor?

A.    In those cases, it'd be for the insurance company.

Q.    Have you ever directly handled any UM claim since founding Doucette & Associates in 2012?

A.    By "directly," you mean as a lawyer or as a --

Q.    As a claims professional.  Like a --

A.    Yes, I did.  I've had them -- I've had uninsured motors claims where I've been retained to evaluate a file that involved an uninsured motorist claim.

Q.    Sure.

A.    But it's as an expert, not as a handling lawyer.

Q.    Okay.  Or -- and not as an -- a claims professional, like a frontline claims adjuster or a manager or supervisor in some capacity, your role as an expert?

A.    Since 2012, I haven't operated as a claims adjuster for any company.

Q.    Okay.  Have you ever lectured on the topic of good faith claims handling or insurance bad faith in the State of Florida or related to Florida claims?

A.    I don't believe so.

Q.    What about outside the State of Florida or



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    Toll Free 855-MYDEPOS

Florida claims?

A.   I would've touched on it.  I used to do a lot of speaking around the country.  Many times, it was on Defense tactics, Defense techniques, how to minimize exposure for carriers, things of that sort.  And you -- and bad faith would've been a piece of a much bigger presentation.

Q.   Okay.  Have you ever authored or co-authored any articles on the subject of bad faith or claims handling?

A.   Not specifically on bad faith.  Claims handling, again, yes, but it would be part of a broader topic.  So for instance, a number of my publications were on sports injury litigation, football injuries, hockey injuries.  And I'd be talking about claims handling in that area.  You might touch on bad faith, but it wouldn't be the focus.  It'd be a small piece of a bigger presentation.

Q.   Yeah, and were those articles you mentioned focused on the State of Florida?

A.   They were pretty much national.

Q.   And --

A.   They were published in the ABA journals or in DRI journals.  So they were intended for a national audience.



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Q.   Okay.  So those articles were written or concern the topic of sports injury claims?

A.   Well, no.  I've done other presentations that talk about defense of insurance matters, and they weren't only limited to sports.  Some might be professional liability.  Some were legal mal, you know, just general how to handle a case type of discussions.  And if we hit bad faith, it would always be a small subset of the bigger topic.

Q.   Have you published any articles since 2012?

A.   No, I have -- I've done no publishing since I started Doucette & Associates.

Q.   Have you given any seminars since 2012?

A.   Same answer.  Not since I started Doucette & Associates.

Q.   So any publications or presentations would've been either in connection with your work at Hinshaw or the insurance company?

A.   Most of the formal presentations would've been in connection with Hinshaw.  They -- as you know, lawyers use those things sometimes as public relations and as an insurance executive, if you don't have that same motivation.

Q.   Have you ever directly adjusted a Florida uninsured motors claim?



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

A.   Not as a first party adjuster, no.

Q.   Okay.  And I don't think I asked earlier, but have you ever held a Florida adjuster's license?

A.   I have not.

Q.   All right.  Looking at your expert report, and I'm -- again, I'm happy to share on the screen, but if you have it in front of you --

A.   I do.

Q.   Got you.  On Exhibit 2, you provide a -- it's titled Doucette Testimony since January 1st, 2021?

A.   Yes.

Q.   And this lists a total of the cases you've been deposed in and the cases you've been given trial testimony in, correct?

A.   Correct.

Q.   And is this an up-to-date list?

A.   I believe there's one additional -- let me see what the last deposition was.  I believe there's been one other deposition.

Q.   Okay.  One other deposition.  Do you know the name of the case?

A.   Jimenez v. Progressive.

Q.   And is that a bad faith action?

A.   Yes.

Q.   Okay.  And who are you and what was your role?



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     www.**MILESTONEREPORTING**.com     Toll Free 855-MYDEPOS

What's your role in that case?

A.   I was retained as a -- in a similar role as this on behalf of the policy holder.  That's not a Florida case.

Q.   What state is that of?

A.   That was the Wisconsin case.

Q.   And is it a bad faith action?

A.   Yes.

Q.   Okay.  First party or third party?

A.   First party.

Q.   And you're -- you were retained by the policy holder, Mr. or Mrs. Jimenez?

A.   Yes.

Q.   Okay.  And you've provided a deposition testimony in that case?

A.   I just did, yes.

Q.   So in the deposition section, there's a total of 48 cases; is that correct?

A.   I didn't count them.  I'll take your word for it.

Q.   And then in the trial testimony section, there's 15.  Are there any other cases that you've been retained as an expert but not testified at deposition or trial?

A.   Certainly.



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        **Toll Free 855-MYDEPOS**

Q.   How -- approximately how many?

A.   I haven't counted them.  Some of them are brand new and I'm just getting them.  Some are primarily have my work done, but I just haven't been deposed. Some went away before we got to the deposition stage.

Q.   Out of the cases listed in your testimony trial list -- well, let me ask you this: Have you been retained by the Lee -- by the Gunn Law Group in the past, prior to this case?

A.   There was one other case, but I don't think I was deposed.

Q.   Okay.  What's the name of that case?

A.   Kesler.  I think K-E-S-S-L-E-R.

MR. GUNN:  It's one S.

MR. ANGLEY:  I'm sorry?

MR. GUNN:  There's one S in Kesler, K-E-S-L-E-R.

BY MR. ANGLEY:

Q.   Kesler.  And is that a bad-faith claim?

A.   Yes.

Q.   And is that out of the State of Florida?

A.   Yes.

Q.   First party or third party?

A.   I believe it's first party.

Q.   And you're -- you've been retained by Mr. or

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Mrs. Kesler as an expert?

A.   Yes.

Q.   And you don't believe you've been deposed in that case?

A.   I don't recall a deposition, and it's not on my list.  So if I was, it slipped through the cracks, but I don't think so.

MR. GUNN:  You have not, sir.

THE WITNESS:  I have not been deposed.

MR. ANGLEY:  Thank you, Mr. Gunn.

BY MR. ANGLEY:

Q.   And any other cases where you've been retained by the Lee Gunn -- Lee -- excuse me.

Any other cases where you've been retained by the Gunn Law Group, other than the Kesler matter and Mr. Wilkins?

A.   No.

Q.   Okay.  So looking at your testimony list, sometimes I can tell.  I just want to kind of walk through generally with -- these with you, one by one.

For the -- do you have the list in front of you?  Do -- can you see it?

A.   Yes.

Q.   So the first case is Rohn, O -- R-O-H-N, v. State Farm, correct?



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

A.   Yes.

Q.   And you represented -- you were the expert witness on behalf of the plaintiff in that case?

A.   Yes.

Q.   And is that case currently pending?

A.   No, I believe that's been resolved.

Q.   Do you know how it was resolved?

MR. GUNN:  Form.

THE WITNESS:  It was settled.  I don't -- I never -- I -- one of the frustrating parts of this business is you never find out what the settlement was, but it settled.

BY MR. ANGLEY:

Q.   Okay.  And do you have a copy of your deposition transcript in that case?

A.   No, I don't.  I tend not to keep depositions.

Q.   Okay.  And then the next one, Valencia, you were retained on behalf of the plaintiff, correct?

A.   Yes.

Q.   And that was in the State of Wisconsin?

A.   It was.

Q.   And do you know how that one resolved?

A.   That also settled.

Q.   Okay, settled.

Do you have a copy of your deposition

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

transcript?

A.    No.

Q.    Okay.  Then the Muller case, that was out of the State of North Dakota, correct?

A.    Yes.

Q.    You were retained on behalf of the defendant?

A.    Yes, that's -- Nodak is the name for North Dakota Insurance Company.

Q.    Okay.  And what's the status of that case?

A.    It's long gone, settled.

Q.    And then Teague v. State Farm, T-E-A-G-U-E.

You were retained on behalf of the plaintiff, correct?

A.    I was.

Q.    And that was a Florida case?

A.    It was.

Q.    And was that a bad-faith action?

A.    Yes, I believe it was.

Q.    And the three before it, Muller, Valencia, Rohn, were those bad-faith actions?

A.    Rohn was.  Valencia -- I'm not sure about Valencia.  It was kind of a strange case.  The home had a fire, which wasn't that significant.  But in putting the fire out, so much water was used that it undermined the foundations of the building and the building



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        Toll Free **855-MYDEPOS**

collapsed, and there was a question as to whether that was covered and how.

I remember dealing with the coverage question. I don't remember if there was a bad-faith question there or not.

Q.   Okay.  And then so the Teague case, do you -- did you keep -- let me just ask you generally.  I'd like to kind of short circuit some of these questions.

For the 48 cases listed in the deposition -- or all the cases listed in the deposition section, do you have transcripts of any of those depositions?

A.   I doubt it, unless perhaps the case is still active and looking like it's going to trial.  Otherwise, we don't keep it.

Q.   Okay.  To the extent you do have transcripts of any of those cases, I'd ask for the -- those to be produced pursuant to the duces tecum?

A.   All right.  I can search the files.  I don't know offhand if we have any of them.

Q.   Sure.  So Teague, that was a -- was that a first or a third-party, bad-faith action?

A.   I don't recall.

Q.   Okay.  Status of the Teague case?

A.   Pardon me?  I missed that.

MR. GUNN:  Yeah.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

THE WITNESS:  I missed --

MR. GUNN:  You cut out, David.

BY MR. ANGLEY:

Q.   What's the status of the Teague case?

A.   It is resolved.

Q.   Okay.  Was that via settlement?

A.   Yes, unless they appear down below, all of them would either still be open or settled.  Down below, meaning the section of Trial Testimony.

Q.   Got you.  Because there's some -- there'll be some crossover between the deposition list and the trial list, right?

A.   Yes.

Q.   And the Moultrop v. Geico, M-O-U-L-T-R-O-P, that's a Florida case.  Was that a bad-faith action?

A.   It was.

Q.   First or third party?

A.   Both.  Geico was the -- or the insurance company.  The insured driver was both sued by the third party and turned in a UM claim.  The Geico adjuster on the UM claim took the position that it was 100 percent the insured's fault, and the Geico adjuster on the liability claim took the position that it was 100 percent the third party's fault.

Q.   So in that case, how did that one resolve?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

A.    Settled somehow.

Q.    Okay.  And then North Point Insurance v. Pollock, you represented -- who did you -- who were you -- what was your role in that case?

A.    Manning was a driver, as I recall.  That was a DJ action.  As I recall, what I -- little -- some of this is very foggy, but as I recall that, the primary Defendant had gone bankrupt.  No one could find anybody in the case, and North Point decided to move for declaratory judgment.

Q.    Okay.  So in the context of that case, the plaintiff was the insurance company, and were you retained on behalf of the policyholder or insured?

A.    Yes.

Q.    Okay.  And how did the DJ resolve?

A.    I don't remember.  The case is gone, but I don't remember precisely what happened.

Q.    All right.

And then Decamp, D-E-C-A-M-P, that's a Florida case, correct?

A.    Yes.

Q.    And you were retained on behalf of the plaintiff?

A.    I was.

Q.    And was that an insurance bad-faith claim?

 MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

A.    Yes.

Q.    And was that first or third party?

A.    I think that's a third-party case.

Q.    Okay.  And did -- what's the status of that claim?

A.    I believe it went up on appeal and came back down, and then I think it got resolved because I haven't heard anything recently.

Q.    And when you say, "resolved," do you mean, like, a settlement?

A.    Yeah.  I'm not doing anything active on it, so I --

Q.    Okay.  And then Kutchera, K-U-T-C-H-E-R-A?

A.    Yes.

Q.    And that's a Wisconsin case?

A.    It is.

Q.    And you were retained on behalf of the plaintiff?

A.    Yes.

Q.    And is that a first party or is that -- is this an insurance bad-faith case, and if so, was it first party or third party?

A.    That was a coverage case.

Q.    Coverage.  And what's the status of that one?

A.    Again, it's resolved.  Settled.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

Q.    Okay.  The reason why I ask for clarification when you say, "resolved" because some -- resolution can be Summary Judgment, jury verdict, you know, other ways of resolving outside of settlement.  So if you could just say settlement, that will tell me that the parties kind of -- my understanding with that would be that the parties reached a negotiated resolution, fair?

A.    Yeah, I just don't always know why it resolves.

Q.    Oh, sure.  No, no, no.  It's just -- I'm just asking what you know.

Hancock, that's in the State Florida Court, and who are you retained by?

A.    Florida Farm Bureau.

Q.    And is that the insurance company?

A.    Yeah.

Q.    And is this a bad-faith case, and if so, is it first party or third party?

A.    It was a third-party, bad-faith case.

Q.    Okay.  And what's the status of that one?

A.    It went to trial with the defense verdict.

Q.    Okay.

A.    Which --

Q.    And then Auto Owners v. Sun Valley, you were retained on behalf of Sun Valley; is that correct?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

A.    Yes.

Q.    And that's in the State of Wisconsin?

A.    It was.

Q.    And what kind of case is that?

A.    Sun Valley is a condominium complex, and it suffered a very, very significant hailstorm causing millions of damage of judgment.  There was a disagreement as to the damage.  Sun Valley demanded appraisal, and Auto Owners refused the appraisal.

Q.    Okay.  So you're -- Sun Valley in this context would be the policyholder or the insured?

A.    Yes.

Q.    Okay.  And how about Scow, S-C-O-W, v. Century National, you're retained on behalf of Scow, correct?

A.    Yes.

Q.    And that's out of the State of Illinois?

A.    Yes.

Q.    And is that -- what kind of case is that?

A.    That was a semi-truck that ran over a pedestrian.  The case was assigned to a brand-new lawyer who, without any supervision, decided to take on a very prominent Plaintiff's lawyer, and he got badly beaten. And the case against the insurance company was essentially you didn't hire a competent Counsel.

Q.    Okay.  So failure to provide an adequate

 MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

defense type action?

A. Yes.

Q. And what's the status of that case?

A. I forget how it resolved, but it's no longer active. I think it settled.

Q. Okay. Let me ask you this, sir.

In looking at your deposition testimony list, from where I can determine your representation, it looks about 40 out of the 48 cases, you either represent the plaintiff or the insured, any reason to disagree?

A. No. If that's what you counted, I agree. For reasons I've never understood, more of the cases on the plaintiff's side seem to go to trial.

Q. So based on your last -- your deposition testimony at least through the last -- since January 1st, 2021, about 80 some-odd percent has been on behalf of the plaintiff or policyholder?

A. The cases where I was deposed in, yes --

Q. Right.

A. -- which isn't necessarily reflective of the total cases I have.

Q. Yeah, that was the question.

The cases you've been deposed in, about 80 percent have been on behalf of the plaintiff or policyholder, right?



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

A.   Yes, and I'm just glancing at the trial list. It's different in the trial.  It looks like it's much more balanced.  I don't have any idea why.

Q.   And in the trial list, it looks, from my count at least, about ten out of the 15 were on behalf of the plaintiff or policyholder, right?

A.   I didn't do the math, but I don't have any reason to doubt you.

Q.   Okay.  And going back to your trial and testimony list, the Butterfield case, that's a Florida case, correct?

A.   It was actually a multi-jurisdictional case, it was a life-insurance case.

Q.   Okay.  Life Insurance.

And that you were retained on behalf of the plaintiff, insured policyholder?

A.   Yes, I was.

Q.   And then L-A-H-A-M, is that a bad-faith claim?

A.   No, I think that was just coverage.

Q.   Coverage.  All right.  And then what about W-O- P-S-H-A-L-L v. Travelers, is that a bad-faith claim?

A.   I believe that's a bad-faith claim.

Q.   Okay.  First party or third party?

A.   I think third party.

Q.   And you were retained on behalf of the

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

insurance company?

A. I was.

Q. And what's the status of that one?

A. I believe it's still to come to trial.

Q. Okay. And then what about Sauk Creek Condominium? Sauk is S-A-U-K, v. Owner's Insurance, looks like a Wisconsin case. What's that case about, and what's your role?

A. Another large hail loss, the same issue as Sun Valley Auto Owners, refused to go to appraisal in a very large hail loss.

Q. So a coverage question?

A. Yes, coverage and, I think, bad faith as well.

Q. Okay. And then what about Kinsale Insurance v. Pride of St. Lucie? That's a Florida case. Who were you retained by and what kind of case was -- is it?

A. The Pride of St. Lucie is actually the insured. It's a bar shooting that went up on appeal and I believe it just was reversed, so it's coming back down.

Q. Okay. Who was the appeal favorable to?

A. Pride of St. Lucie. The Judge -- as I recall, the Judge dismissed it on Summary Judgment and an appellate Court reversed.

Q. Okay. And then what about Console v.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Progressive, what kind of case is that?

A.    I don't recall.  It's a -- it's an injury case. I don't recall if that was a UM or BI.

Q.    An underlying injury case or a bad faith action?

A.    Bad faith case.

Q.    And you were retained on behalf of Progressive; is that correct?

A.    Correct.

Q.    And what's the status of that case?

A.    Resolved, I think.  As I recall, that one, we had a very nominal settlement.

Q.    Okay.  And Seminole Village v. Auto Owners, Wisconsin case, you were obtained by Seminole Village; is that correct?

A.    Yes.

Q.    What kind of case is that and what's your --

A.    Another -- the three condominium cases you see right there were all semi-related.  They all came out of the same monster storm, all against the same insurance company, and they took the same action in each of them.

Q.    So --

A.    Sauk --

Q.    -- Sauk Creek, Seminole Village, and --

A.    Seminole.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

Q.   -- there's one other one we mentioned earlier?

A.   Sun Valley.

Q.   Sun Valley.  And then what about E-C-K, Eck v. State Farm, what kind of case and who were you retained by?

A.   That's also a property -- the storm loss case. I was retained by the plaintiff.

Q.   Okay.

A.   And I believe that's resolved.

Q.   And then what about Parsons v. Hartford, what kind of case is that and who are you retained by and what's the status?

A.   I was retained by the plaintiff.  It's a property damage case.

Q.   Okay.  And status?

A.   I believe it's resolved.

Q.   Okay.  Wood v. Progressive, who are you retained by, what kind of cases is it, and what's the status?

A.   It's a -- again, I'm sometimes unsure as I look at these, whether it was an UM or a third party, but it was an injury case.  It went to trial twice with a plaintiff's verdict.

Q.   Okay.  And its current status?

A.   I don't -- I think it's done.  They -- I don't



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.**MILESTONEREPORTING**.com          **Toll Free 855-MYDEPOS**

believe they appealed the verdict.

Q.   Okay.  And when you said, "injury case,"
that'll be -- is that an insurance bad faith action?

A.   Yes.

Q.   Okay.  And then Fridman v. Safeco.  Is that an
insurance bad faith case --

A.   Yes.

Q.   -- who you were retained by and what's the
status?

A.   It was an insurance bad faith case.  I was
retained by Safeco, and it's gone to trial, and it's
done.

Q.   Okay.  And same questions for each one of
these, if that helps, but how about the Jenkins matter?

A.   That's a medical mal case based in Utah with
portions of the case in Georgia and I believe some of it
down here in Florida.  It's still active.

Q.   Okay.  And then the Erie v. Meridian case?

A.   Well, I don't know how to categorize that one.
It was primarily a fight between the primary layer and
an excess layer.  It had to do with a guy driving a
Lamborghini at 130 miles an hour or something, and there
was a street racing exclusion, and whether this was
actually street racing.  And it was mainly coverage, but
it involved primarily a dispute between the carriers.



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

394636 Doucette Daniel 06-30-2025    Page 80

Q.   Okay.  And what's the status?

A.   That's done.  I think they settled that.

Q.   Okay.  And then Sacred Heart.  Who were you retained by, what kind of case is it, and what's the status?

A.   I was retained by the Avera.  Avera is a group of hospitals.  Sacred Heart is a specific hospital.  It is also a medical malpractice case.  It involved an Iranian doctor who came to the states and performed a whole series of complicated spinal surgeries, which resulted in most of the patients becoming paralyzed. And when he got sued, he disappeared, went back to Iran, and there was this huge fight among the various insurance entities and the hospitals as to what's covered and who covers it.

Q.   And Gonzalez v. Progressive, you were retained by the plaintiff in that case?

A.   Yes.  I think that -- as I recall, that's an UM claim and the main issue deals with the insurance agent. As I recall, the agent took the position that the UM rejection form had been signed, and it hadn't been.

And post-accident, he attempted to coerce the individual into signing it and backdating it. Progressive was pretty much of a silent participant.  It was mainly against the agent, and there's a settlement,



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

and I don't know what it is.

Q. Okay. And the next one, American Insurance v. Pine Terrace?

A. Huge hail loss out in Boulder, Colorado. So severe, it killed most the animals in the zoo next to the -- this is -- this involves a resort, and properties called The Boulders and it was a fight with their insurance company, both coverage and bad faith.

Q. Sure. What about Weil, was that an insurance bad faith case? W-E-I-L.

A. Yes.

Q. Okay. And you were retained on behalf of the plaintiff in that case and --

A. The unique thing there is it was a police squad and an individual. And it turned out partway through the case, that the police officer admitting completely lying on his report. And it all got very messy, and the case settled.

Q. Okay. And then Elias v. USAA, you retained on behalf of the plaintiff. Was that an insurance bad-faith claim?

A. Yes.

Q. Okay. What's the status?

A. That also went up on appeal. I think it came back down and got resolved. I haven't heard anything



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

about it for a while, so --

Q.   Okay.  Focusing kind of on the insurance bad faith ones, what about Harbor, was that an insurance bad-faith claim?

A.   I believe it was.  It was another hail loss. I think they denied it for late notice.  And the issue was the damage was to the roofs and no one -- you know, it's a major complex that no one been up the roofs for a while.  Wisconsin, as many states, if you're going to deny for late notice, you have to show prejudice, and I think that's what the fight was about.

Q.   And were you retained on behalf of the plaintiff in that case?

A.   I was.

Q.   And then Ackley retained on behalf of the plaintiff, was that an insurance bad-faith claim?

A.   No, not -- well, it had to do with the fact that -- it was a slip-and-fall case.  Continental, the insurer, didn't believe the insured's version of the accident to the extent that they referred him for fraud. He was arrested, incarcerated, and then it turned out that it wasn't fraud and there were witnesses.  And I believe Continental has settled that.

Q.   Okay.  And the Murphy case, you were retained on behalf of the plaintiff, what kind of case is that?

 MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

A.   I was retained by Progressive in Murphy.

Q.   Oh, I'm sorry.  My apologies.  Was that an insurance bad-faith claim?

A.   Yes.

Q.   And what's the status?

A.   I think it's gone because I'm not doing anything on it, and that's a couple years ago that the deposition took place, so I believe that one settled as well.

Q.   And then Harmony House, you were retained on behalf of Northfield?

A.   Insurance Company, yes.  That was a Hurricane Irma loss.

Q.   Okay.  Was that a dec action?

A.   No, I think it was a bad faith case.

Q.   Okay.  And that was out of Florida, correct?

A.   Yes.

Q.   And then Hennessy Bar v. Mesa, you were retained on behalf of Mesa; is that correct?

A.   Yes.

Q.   What kind of case was that?

A.   A barroom shooting.

Q.   And was that a coverage question case?

A.   Bad faith.

Q.   Bad faith.  What about Booth, bad-faith case?



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

A.    No, that was coverage.  It had to do with -- the guy was a logger, and a piece of equipment suffered a lightning strike, scrambling the CPU unit that runs the machinery.  And it was both against the insurance company, but primarily against the agent.  I -- I -- I'd categorize that as an EO claim.  It turned out he didn't have the right insurance to cover the specialty equipment he had.

Q.    And then what about Smart v. Farmers, you were retained by Farmers; is that correct?

A.    Yes.

Q.    And what kind of case is that?

A.    Bodily injury, bad faith.

Q.    Okay.  And the status?

A.    To be tried this fall.

Q.    Okay.  And what about Benton United v. Church Mutual?  You were retained on behalf of Benton.

A.    Yes, that was a lightning loss to a church.

Q.    Okay.  What about Oney v. Progressive?  You were retained on behalf of the plaintiff, Oney, is that an insurance bad-faith claim?

A.    That's -- that's a personal injury case.

Q.    Okay.  And what's the status?

A.    That was tried, Plaintiff's verdict.

Q.    Okay.  And then PTI v. Rivas, you were

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

obtained on behalf of PTI.  What kind of case was that and what's the status?

A.   That's a Hurricane Irma claim --

Q.   Okay.

A.   -- property damage.

Q.   And then Zakia Raymond v. State Farm, you're retained on behalf of the plaintiff, Mr. and Mrs. Raymond.

What's the status and what kind of case is it?

A.   It's a bad faith case and it's still active.

Q.   Okay.  And then Gonzalez v. PTI, you were retained on behalf of PTI.  What's the status of the case and what kind of case was it?

A.   Property damage, it's still active.

Q.   Campbell v. Progressive, you were retained on behalf of Campbell.  What's the status and what kind of case?

A.   Bodily injury, drunk driver going the wrong way on the freeway, bad faith, and I believe that's resolved.

Q.   Okay.  And Wilshire Insurance v. Airport Restaurant and Bates, retained on behalf of Airport Restaurant.

What's the status and what kind of case is it?

A.   Bad-faith coverage, bar fight.



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Q.   And S&R Egg Farm v. Liberty Mutual Insurance Company, retained on behalf of SNR.  What's the status and what kind of case is it?

A.   Huge fire loss.  This was an egg producer with multiple laying barns and storage barns.  And anyway, they all burned to the ground, and it was a big coverage fight between multiple layers of excess carriers.

Q.   And what about Muller v. Progressive, retained on behalf of Muller.  What kind of case and what's the status?

A.   Bodily injury.  I believe that's a third-party case.  And to my knowledge, it's still active.

Q.   And third party, bad faith, you mean?

A.   Yes.

Q.   And then what about Simpson v. PTI?

A.   Another Hurricane Irma case, both property damage and bad faith.

Q.   All right.  Status?

A.   Going to trial, I believe, next month.

Q.   All right.  I appreciate you walking me through those.  I know it's, you know, not the funnest part of the deposition.  But trial testimony, you have the -- you have your cases listed here, Brink v. Direct General, you were retained by Brink.

Was -- did that result in a plaintiff's

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

verdict or a defense verdict?

A. The first trial resulted in a defense verdict, the second trial resulted in a plaintiff's verdict.

Q. Okay. So the first time, the jury disagreed with your opinions, and then the second time, they agreed with your opinions?

MR. GUNN: Form.

THE WITNESS: I'm not sure that's fair. The first time, the Judge basically took it away from the jury.

BY MR. ANGLEY:

Q. Okay.

A. And then on appellate -- at the appellate level, they ruled that his instructions and whatnot were incorrect. They sent it back with instructions on how to instruct the jury, and having done that, it was a plaintiff's case -- Plaintiff's verdict.

Q. All right. And then what about Horseman v. State Farm, you were retained on behalf of State Farm. What was the result of that trial?

A. It has not gone to trial -- or it did go to trial, what I meant, sorry. That was a defense verdict.

Q. Okay. And Horaria v. Safeco, what's the result of the trial?

A. That case, we tried it, and they settled at



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

mid-trial.

Q.   Okay.  Moultrop, you testified earlier, I think, it was a plaintiff verdict; is that correct?

A.   Moultrop was a defense verdict, I think.

Q.   Okay.  And what about Hughes, Plaintiff verdict or Defense verdict?

A.   Huge Plaintiff verdict with a million dollars of punitives.

Q.   And Sun Valley?

A.   Huge Plaintiff verdict with half a million dollars of punitives.

Q.   And Heikka, H-E-I-K-K-A?

A.   That was an initially a directed verdict for the plaintiff.  It's been reversed on appeal.

Q.   And what about Wopshall, W-O-P-S-H-A-L-L?

A.   We started that trial and then I don't even know what happened, but all of a sudden, I was told the trial was adjourned and -- well, I know what happened. I was going to testify by video then I had a conflict with the trial date.  And so they took my testimony for use at trial and then before the trial actually happened the Judge bounced it and it's in the process of being rescheduled.

Q.   Okay.  We talked about -- you have Brink twice because of the two different trials and you have Wood



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

twice because of the two different trials that we talked about earlier, right?

A.   Yes.

Q.   And then Hancock, what was the result of that one?

A.   Defense verdict.

Q.   McNamara (phonetic), the result of that one?

A.   That was originally a hung jury.  Oh, in fact, that is a hung jury.  We're going to have to retry that one.

Q.   Okay.  And then Oney?

A.   Plaintiff verdict.

Q.   And then Fridman?

A.   Plaintiff verdict.

Q.   Are there any cases where you have testified at trial or deposition -- well, let me ask you: Have you ever offered an expert opinion in the case and the Court granted Summary Judgment against the person that you were offering the opinion on behalf of?

A.   The only one I could think of is the Heikka case, and that was reversed.

Q.   Okay.  Have you ever been struck by a Court as an insurance bad faith expert?

A.   Never on insurance topics, no.

Q.   Have you ever been stricken as an expert in

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

other contexts?

A.    Well, there are two.  If you check, there are two cases that'll come up.  One of them is a Florida case called Hawthorn v. Auto Owners.  Horrendous accident.  I -- a Daubert Motion was filed.  The Court absolutely allowed me to testify in all areas of insurance.

I was restricted in that I could not testify as to how Facebook entries are authenticated, which is a good thing, because I don't have any idea how they're authenticated.  I had no intention of testifying in that area, but the plaintiffs were wanting to be cautious, I guess.

And the other one is a case called Sirius, S-I- R-I-U-S.  It's a Wisconsin case.  It involves an international health insurer that wrote a policy on a young missionary.  He happened to be skiing in the Grand Tetons, in what's called a couloir, C-O-L-L-I-E-I-E-U-R, or I-U-R I guess it is, which are those shoots that you see.

I was retained to talk about the coverage question.  During my deposition it came out that I do a lot of back country skiing, helicopter skiing, things of that sort.  And they moved to strike me as a ski expert, which was good because I wasn't intending to testify as

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

a ski expert, I was testifying as an insurance expert.

Q.   Okay.  But those -- any other cases where your testimony has either been excluded or limited?

A.   There was one other one where the -- it was strictly a coverage case and the Court ruled that he didn't want any expert testimony, that coverage was going to be a question of law, and he prohibited all parties from introducing testimony.  It had nothing to do with my specific report or my specific qualifications.  He just didn't want to hear from any expert.

Q.   And my understanding is you're charging $475 per hour for your testimony here today?

A.   That's correct.

Q.   And is there a difference in what you charge for testimony versus your expert work in preparing -- reviewing file materials, preparing a report, things of that nature?

A.   There is not, I charge by the hour for whatever I'm doing.

Q.   Okay.  And how much time have you billed so far?

A.   You've got the time sheet, I don't have it in front of me.

Q.   Sure.  I'll show you.  It is on Page 210 of



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

Exhibit 2.  This is what -- does this look like the time sheet that you've -- that you have for this case so far?

A.   Yes.

Q.   So it reflects a total of 24 hours; is that correct?

A.   Yes, there's some additional time for the last two days.

Q.   How much --

A.   I would say --

Q.   -- additional time have you put in that's not reflected here?

A.   Yeah.  This is just over the -- primarily over the weekend when I prepared, I'd say another four hours.

Q.   Okay.  So let's say this reflects 24, you said another four, so that's 28 total?

A.   That -- that's a guess.  I don't have -- again, I don't have my sheet in front of me.

Q.   Sure.  Let's say it's 28.  That would be approximately $13,300?

A.   Something like that, yes.

Q.   Okay.  But as of June 18th, 2025, it was 24 hours for a total of $11,400?

A.   Yes.

Q.   And then there's also some time that's needed to be submitted for Greg and his work; is that correct?

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

A.    Yes.

Q.    And he bills -- how much does he bill at?

A.    $250 an hour.

Q.    Do you know how much approximately -- how much time approximately he has spent on the file?

A.    I have no idea, I haven't seen his time sheet.

Q.    Okay.  And then there's also, do you bill separately for your paralegal assistance?

A.    I do.

Q.    And how much is that?

A.    $150 an hour.

Q.    And has -- your paralegal does she have any time that is yet to be billed on this file?

A.    I haven't seen her bills at all.  She would've summarized the depositions in this case.  I have not seen her timesheet.

Q.    So there's some time that will come from her as well in connection with her work?

A.    Yes.

Q.    Other than you, who specifically worked on Mr. Wilkins file?

A.    Nobody, other than to the extent I described Mr. Himebauch and Ms. Ciszewski's time.  They -- both of them are -- neither of them reach opinions, neither of them writes reports, neither of them testifies.  They



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

are strictly background, they help me with organization and in cases with the deposition's summaries.

Q.    So to the extent when those bills are ready or provided to Plaintiff, I'd ask that they get produced to us as well.  Your bill for $11,400, is that -- has that been paid?

A.    I haven't submitted it as a bill.

Q.    That was just a timesheet that --

A.    Yes.

Q.    -- for what would be a responsive to the subpoena?

A.    Yes.

Q.    So my understanding is, your opinion in this case is based on insurance custom and practice; is that correct?

A.    That's correct.

Q.    What does that -- what is custom and practice? What does that mean?

A.    The way I try to describe it is that an insurance company has to follow all of the laws and the laws could consist of statutes, code, or case law.  Many times, those put a duty on an insurance company that is not precise.  So they'll say things like, you must respond promptly, you must do a thorough investigation.

But there isn't enough detail to understand

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

what that means in practical situations so the insurance industry over time adopts a series of actions that are created to see that they fulfill their obligations as an insurance company and to avoid bad faith or other complications.  The way I -- the short term is that the laws tell the insurance company what they have to do, custom and practice tell them how they're doing it, how they should be doing it.

Q.   Okay.

A.   So a review of claim handling practices and the way they comply with the law.

Q.   Sure.  So what insurance custom and practice did you apply to render your opinions in this case?

A.   Well, there's quite a few of them.  You start with the most basic and that is that an insurance company has an obligation to investigate.  Investigate is an active verb, not a passive verb.  So it requires the insurance company to take affirmative steps to try to determine the facts that underline the case so they can properly evaluate it.

The carrier really has three major duties, investigate, evaluate, and negotiate if appropriate. You can't do anything until you've investigated because you don't have the facts.  So the primary obligation, the first obligation, is to investigate.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

I feel that Progressive failed terribly in this case. There was no proactive investigation, it was strictly reactive.

Q. Okay. So in reaching -- we'll get to your conclusions in a bit. But in looking at insurance, if I say insurance standards, would -- is that a fair way to kind of describe it?

A. Yes, as long as you don't interpret that to necessarily mean precise legal language.

Q. Sure. So for custom and practice, did you apply the standards that existed in 2019 and 2020 to this claim?

A. Yes.

Q. And then how did you know what the insurance custom and practice was in 2019 and 2020?

A. First of all, I was part of the industry. I've been doing this work during that timeframe. Secondly, the authoritative sources that I quote are not recent. They existed at the time of this claim handling.

And the basics of this case aren't something that has changed dramatically over the years. This isn't like a novel duty that's been imposed upon the insurance company. Here you have the most basic obligations possible and that's to investigate and fairly evaluate. And that hasn't changed in decades.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Q.   So the insurance -- are the insurance industry standards you relied on to render your opinions in this case written down anywhere?

A.   To the extent they are written down, I've cited two of the most prominent authorities.  One of them is the AIC material that I talked about earlier.  This is training manuals for claims adjusters.  And the other one is a book called Claims Operations, A Practical Guide, and that's put out by IRMA, International Risk Management Institute.

They are one of the foremost resource support organizations to the insurance industry.  And they're both looked upon as very common authoritative works.

Q.   And are those Florida specific manuals or guideline standards that you relied on in your report?

A.   They are not.  One way to look at it is if you're a claim adjuster, 90 percent of what you do, it doesn't matter what state you're in.  The basics in investigating, the basics in negotiating, the basics in evaluating, are the same, whether you're in Georgia or Florida.

Each state typically has some tweaks to the basic laws.  A good example in Florida is the Powell obligation.  Most states don't have a Powell type of doctrine.  But you still investigate and evaluate using

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

the same basic tools.  So these are national manuals, national books, that are well known and well respected in the industry.

Q.   So are your opinions regarding insurance industry standards in this claim based on Nationwide standards or Florida specific standards?

A.   They are national standards that apply to Florida as well.  There is nothing in Florida that exempts an insurance company from forming a proper investigation.

Q.   Sure.  I don't think that was necessarily the nature of my question: But did you rely on any specific Florida guidelines, manuals, written standards, or anything like that informing your opinions?

A.   Not that I sought out separately.  I've been involved in enough Florida cases and have read enough Florida law to know that these principles that I refer to are equally applicable in Florida.

Q.   You would agree with me that there's not a master set of documents that list insurance industry standards in Florida, correct?

A.   There is not.  The closest you'll get is the AIC material and it's not Florida specific.  It would cover the 90 percent or so of what an adjuster should do that would be applicable no matter what state you're in.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Q.   Okay.  Are you aware of a single set of claim manuals or claims materials that dictate to insurance companies the manner in which they must handle claims in Florida?

A.   Again, I go back and say the closest you'll get to a general manual would be the AIC material.

Q.   Okay.  But outside of that, nothing in Florida that's state specific that basically provides or dictates the handling of claims?

A.   There is no book you can pull off the shelf and say, this is the black letter law and everything in adjuster must do in Florida.  You'll find articles, you'll find periodicals that mention it, there are bulletins.  There's many, many, many articles, but there is no one book you can pull that capitalizes all of these standards.

Q.   You will agree with me that each insurance company in Florida is free to create its own claims manuals as opposed to being obligated to use one standard manual that every company is bound by?

A.   That's true so long as the manual doesn't provide for something that's contrary to the law or custom and practice.

Q.   Sure.  And then the manual can also go beyond what's required by custom and practice or Florida law,



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

right?

A.   It can.

Q.   You would agree with me that whether an insurance company acts in bad faith is determined by Florida law and not whether they complied with their own policies and procedures?

A.   That's typically true.

Q.   Okay.  And is your opinion based on your interpretation of Florida law as it relates to bad faith or just insurance industry standards?

A.   That's hard to answer in the way you phrased it.  Insurance industry standards include how to anticipate and avoid bad faith, how to handle it properly in order to avoid bad faith, but that's also a general standard.  So it's not specific to bad faith, but it's proper claim handling would avoid bad faith.

Q.   So there's like -- there's general precepts under the law that influence or form insurance custom and practice?

A.   Yes.

Q.   Okay.  And then the source for those precepts are Florida courts and Florida law interpreting and describing what good faith duties are in the State of Florida?

A.   Generally, that's true, yes.



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

Q.   So in forming your opinions, did you rely on any specific cases -- Florida cases?

A.   I did not go and research or cite any specific case.  I am familiar with most of the major cases in Florida.  I've been part of a number of them.

Q.   But you didn't apply any specific case to your opinions?

A.   I did not take any specific case and attempt to apply it to this set of facts, no.

Q.   And then the Standard of Review section, which begins on Page 3 of your report, what specific sources did you rely upon for your recitation of the standard of review?

A.   Well, the part where I start citing things, I go right to the Jury Instruction 404.4, which kind of is a high-level summary of what bad faith is.  And then I break that down by going into the quotes, both from the claims operations and the AIC, taking that kind of general principle and applying it specifically to investigations and what should be done.

Q.   And, Mr. Doucette, that was in the section that -- what you just described, that's in the section titled Basic Good Faith Duties of an Insurance Company?

A.   Yes.

Q.   I'm talking about the Standard of Review

 MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

section before that.  Are there any particular sources you relied upon for your recitation of the Standard of Review?

A.   No.  I think it describes pretty much what you and I have been talking about, how I reach the definition, if you will, of custom and practice, what it's derived from, and then how my background fits into that.

Q.   Okay.  So no particular -- no specific or direct source you can point me to for the Standard of Review section?

A.   Nothing that I cited or consulted.  I could -- if you needed, there's all kinds of articles that would describe essentially what I'm saying there.

Q.   And then what you started to talk about earlier, Basic Good Faith Duties of an Insurance Company, you cite the Florida juries -- Florida Jury Instruction 404.4, right?

A.   Yep.

Q.   And we've already talked about the AIC article and the claims operations article that you cite in this section, right?

A.   Yeah.

Q.   And those are national generalized claims handling documents versus Florida specific?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

A.   Well, as I said, they're national, but there's nothing specific to Florida that would exempt and/or indicate that those aren't applicable to Florida cases as well.  They're pretty general principles on how to investigate.

Q.   So for the -- on Page 4, at the top where you kind of started, you testified about it before.  "Custom and practice begins with an understanding of the laws that apply to the insurance industry."

Doesn't that show that the determination of bad faith is a determination based on Florida law and not necessarily whether or not insurance standards were violated?

MR. GUNN:  Form.

THE WITNESS:  Well, as you understand, I'm sure, if we get to a jury, I'm not going to be allowed by most Judges to testify that Progressive acted in bad faith.  That's the ultimate question that goes to the jury, and they will interpret 404.4 and however it's modified for this case to reach that conclusion.

I can't directly address the ultimate question, so I address the question of custom and practice and whether what they did was appropriate under the circumstances.  And then it's up to the lawyers and

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

the jury to interpret that and apply it to good

faith/bad faith and make their determination.

BY MR. ANGLEY:

Q.   Earlier, you mentioned, and it's in your
report on Page 4, in many ways the laws provide what
must be done, and custom and practice provides the
"how," right?

A.   Yes.

Q.   But doesn't the "how" also depend on the
venue, the type of claim, and the discreet circumstances
of that claim at issue?

A.   It could.  So I mentioned earlier Powell.
Powell is unique to Florida.  If this was a standard
Powell case, you would -- this section would be written
a little differently and I would approach it
differently.  But this isn't, so it's my opinion in this
case that the issues are pretty fundamental to an
insurance company acting anywhere.

Q.   So for the Standard of Review section and the
Basic Good Faith Duties of an Insurance Company section,
any other sources or materials you relied on in -- for
those sections, other than what we've discussed already?

A.   My 40 years of experience in the insurance
industry.

Q.   Okay.  And you say in the -- it's on Page 6.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

It's in the Good Faith Duty section.  You say, "Could was always within Progressive's control."

Is it your position that "could" is satisfied because an insurance company can simply tender its policy limits?  But how about --

A.    Yeah.

Q.    But what if the claim is not valued at policy limits?

A.    The "could" in this case reflects the fact that this is a first-party uninsured motorist case, not a third-party case where the tendering of the limits in an appropriate time, like, for instance, during the CRN, would eliminate the bad-faith case, because there is no third party to continue to pursue.  That's very different than a third-party case.

So the "could," yes, it was always within Progressive's power to resolve the case by offering their limits.  The question they're fighting with is should they have?

Q.    Well, isn't that definition a little broad under could?  What if there -- you know, what if there's no coverage or liability, or what if the evaluation of the claim shows that it's not reasonably evaluated at policy limits?

A.    Those to me --



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     www.**MILESTONEREPORTING**.com     Toll Free **855-MYDEPOS**

Q.   Is it your position that an insurance company should just tender the policy limits in response to a CRN, even if it's not in the policy limits?

A.   No, those to me come under the question of should.  They could have resolved it, but if there's no coverage at all, the answer would be they should not have resolved it.

Q.   Okay.  So could is something they can do it if they so choose, but the should is whether or not it's warranted based on the particular merits of a -- of the claim?

A.   Right.  And the difference, as I said with the third party, is the "could" isn't always there.  Could the case resolve with the tender of the limits?  The answer may be no because there would be continued pursuit of the insured by a third party.  That's different in a first-party case.

Q.   So in your initial report, was -- did anyone assist you in writing either your April 29th, 2025, report or the supplemental report?

A.   No, I typed every word of it.

Q.   And do the reports identify the facts and data that you considered in forming your opinions?

A.   As I labeled it there, it's a brief summary of facts.  I'm not attempting to recite every single fact



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        Toll Free **855-MYDEPOS**

that might be mentioned or could come up.  I -- I'm assuming the parties that are reading this are familiar with the case.  I'm just trying to give some context to my opinions.

Q.   Okay.  Between your April 29th report and your supplemental report, does -- did they contain a complete statement of all the opinions you will express and the basis and reasons for them?

A.   I believe they do.

Q.   Okay.  Any other opinions or -- outside of those two reports?

A.   Not that I can think of at this point.

Q.   Are there any assumptions that -- when you say not that any you can think of at this point, is that because you think you may have future opinions?  Or what do you mean by that?

A.   I don't know for sure that discovery is done. If there's additional depositions, additional documents, additional testimony that I would consider, I would certainly weigh that.  I'm not even aware if there's other depositions scheduled, so I just don't know.

Q.   Are there any assumptions that Mr. Gunn or his law firm provided that you relied on in forming the opinions in this case?

A.   None.



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

Q.   In Exhibit 3 of your initial report, you provide a list of materials that you reviewed?

A.   Yes.

Q.   And is that a complete list of all the materials you reviewed in connection with your report and supplemental report, or were there some additional materials that you --

A.   There was additional materials for my supplemental report, and I listed those, I believe. Primarily depositions that hadn't yet been taken when I did my original report.

Q.   Okay.  Any other materials that you relied on following the April 29th report for your supplemental report other than the depositions you referenced in the supplemental report?

A.   No.

Q.   Did --

A.   And the exhibits -- sorry.  And the exhibits to those depositions.

Q.   Okay.  Did you review the -- in connection with your expert opinion, did you review the materials that were produced by the plaintiff in this case?

A.   I believe so.

Q.   Okay.  All of them, some of them?

A.   I reviewed everything I received, and if it's

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**
407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

on my list, it's been reviewed.

Q. Did you review the materials that were produced by the Tragos Law Firm in discovery?

A. Yes.

Q. Did you reviewed the material produced by Progressive in discovery?

A. I did.

Q. Did you review the material produced by Amica through discovery?

A. I believe I looked at that briefly.

Q. All right. In your initial report, there's a fact section which begins on Page 6?

A. Yes.

Q. Titled Brief Summary of the Facts?

A. Yeah.

Q. And I think you mentioned earlier, it's fair to say this is not a breakdown of every single event that may have happened on the claim, but more of a key summary of events that you found to be pertinent or important to your opinions?

A. I write this attempting to provide enough facts to create context for my opinions. I'm not trying to recite everything that happened or every bit of testimony or every fact that's been developed.

Q. And at the time you wrote this report, did --



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    www.**MILESTONEREPORTING**.com    **Toll Free 855-MYDEPOS**

you didn't have any deposition testimony available to you, correct?

A.   I believe that's right.  I think I had -- well, let's see.  I thought I had the underlying depositions.

Q.   Well, let me ask a more specific question: At the time you wrote this report, did you have any deposition transcripts taken in the bad-faith action?

A.   I don't believe so.  I believe all the ones I had at that time were from the underlying case.

Q.   On Page 8 of the fact section, at the bottom paragraph, you have a statement that Mr. Wilkins was being considered by an ACDF procedure.  Do you see that there?

MR. GUNN:  Form.

THE WITNESS:  I do.

BY MR. ANGLEY:

Q.   And it states this would include the notation that Mr. Wilkins was being considered for an ACDF, and yet no mention is made of the possible surgery, right?

A.   Yes.

Q.   But that's not a completely accurate summary of that record, is it?  That refers to an October 19th, 2019, date of service with Dr. Hayes?

MR. GUNN:  Form.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

BY MR. ANGLEY:

Q.   And you state that all treatment modalities would need to be fail -- would need to fail before Mr. Wilkins would even be considered for surgery?

A.   Yes, I think we're saying the same thing. You're -- I think you're drawing a distinction between the failure first of conservative message before the ACDF would be considered versus -- I -- my point is it's mentioned in the records.  It was in there as a possibility, certainly.

Q.   Right.  It -- your point is mentioned in the records, but the context in which it's mentioned, isn't that important for how it's evaluated?

A.   Oh, I disagree.

Q.   So the mere mention of a surgery, whether or not it's recommended or just being considered, is there a distinction in your mind between a mere mention of a surgical procedure versus something in the records that show that it's being considered, scheduled, agreed to proceed forward?  Is there any delineation or discrete difference?

A.   There isn't a bright line.  The way I look at it, if you've handled enough back, neck cases, I'm generically calling them, you know, whiplash type cases, you go up the scale of severity from the case that is a



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

treat and release with nothing additional to a case that now involves perhaps chiropractic manipulation and physical therapy.  The next step typically gets into orthopedic involvement with injections and then ultimately surgery.  So it's a timeline scale that goes up.

          The fact that it's mentioned in a very early stage is a signal that this is not a treat and release and go home type of surgery, or I'm sorry, not surgery, patient, that there is the potential for a more serious situation to evolve.  The fact that he's even mentioning it is not the same as saying, I scheduled it, but it kicks up the severity a notch.

     Q.   So there is a distinction, in your mind, between it being considered versus scheduled?

     A.   Sure, absolutely.

     Q.   And in this case, it's accurate that following that mention of the ACDF in the records, Mr. Wilkins continued conservative care for a period of time?

     A.   He did.

     Q.   And during the pre-suit period, Mr. Wilkins filed a lawsuit against Progressive, right, in the underlying action?

     A.   He did.

     Q.   And that was on February 11th of 2020?



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

A.    I believe that's about right.

Q.    Prior to the pre-suit time period, that October 19th, 2019, date of service record from Dr. Hayes, that was the only time an ACDF procedure was ever mentioned, correct?

A.    During the pre-suit period, that's correct.

Q.    And then do you know if all the pre-suit, whether all the treatment records were, all of Mr. Wilkins' treatment records were sent to Progressive?

A.    I would say that, as I read it, that's somewhat confusing.  The attorneys believe they sent everything. Progressive initially said they didn't get it.  Then there's references that they asked for more, they've received more.  It's very hard reading the record at this stage to know precisely what record they were looking at when.

But part of my overall opinion is a lot of that issue rests with Progressive, their lack of initiative or lack of proactive investigation, puts them in a position where they're not apparently happy with the status of the records that they have.

Q.    Did you ever see that the October 28th, 2019, date of service record with Trinity Spine was ever transmitted to Progressive?

A.    I -- it's hard to tell.  I saw records that



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

were sent.  The record, when they say that, both -- at both ends, both from the attorneys' side and from the Progressive side, nobody then does an index of what came in at that time.  They say additional records came in, reviewed additional records.  They rely heavily on the absence of the word "permanency."  Well, the only way they could rely on that is if they were looking at those doctor's records.

Q.   So you would agree with me that an insurance company can only evaluate the information it receives, or it can reasonably obtain and -- in the handling of a UM claim such as Mr. Wilkins?

A.   And in this case, the emphasis is on the second part.  They could reasonably obtain a whole lot of information that they didn't bother to get in this case.

Q.   Did you see that Progressive sent Mr. Wilkins a medical authorization?

A.   They did as part of the PIP package.

Q.   Did Mr. Wilkins execute it and return it?

A.   That's also somewhat confusing.  I think the attorney said he thought it returned.  Progressive says they didn't, but then again, Ms. Crawford, the handling adjuster, says she never even bothered to look at it.  Doesn't know whether it was signed or was there and that



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

she never asked for one, so --

Q. Right. So did you see anything in the document section from the Tragos firm that showed executed medical authorization?

A. I'm sorry, say that again?

Q. During the -- you reviewed the -- Mr. Wilkins' attorney's file for this?

A. Yes.

Q. In their file did you see an executed version of the medical authorization that Progressive transmitted to Mr. Wilkins?

A. I did not.

Q. On Page 9 of the fact section, you indicate that in the second paragraph from the top "Yet, the record was very clear that conservative treatment had failed, and pain injections were the only treatment available" but we established a bit ago that at this timeframe, Mr. Wilkins was still undergoing conservative treatment, right?

A. Do you consider ejections conservative treatment?

Q. Well, that's not my question, sir: He was still treating with his physical therapy chiropractor, right, at this point in time?

A. At which point? In December of '19?



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    www.MILESTONEREPORTING.com    **Toll Free 855-MYDEPOS**

Q. In December of '19. He hadn't ceased his conservative treatment, right?

A. I believe at some point it was suspended because of COVID. I don't know exactly when the suspension took place, but December of '19, he had also seen Dr. Hayes and doctor -- is it Salid [sic]?

Q. Saldin, I believe, yes.

A. Okay.

Q. Did he -- whether it was suspended, did he continue conservative treatment? Either --

A. I believe he did --

Q. -- after? So my question is more that conservative treatment was continuing through this time period?

A. I believe it was continuing along with additional treatments.

Q. Okay. So what's the basis then for your statement that conservative treatment had failed if Mr. Wilkins was continuing to undergo conservative treatment?

A. Because the doctor's reports say that in view of the fact that conservative treatment has failed, we're going to start injections.

Q. Okay. So then why do you have an understanding of then why Mr. Wilkins would continue

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

conservative treatment if his doctors believed it had failed?

A.   You'd have to ask him.  But my understanding is in most cases they try to now coordinate both, on the theory that conservative treatment, whether it's chiropractic or massage or physical therapy can't really hurt you, but that it's not solving the problem by itself.  So they've stepped up to a different level now doing various injections.

Q.   And those -- and Progressive got those injections, those occurred on October 28th and December 2nd of 2019, to your understanding?

A.   Yes, I believe there was five or six overall and different types.

Q.   I want to focus on the pre-suit period for right now.  So the -- in the pre-suit phase of the claim, Mr. Wilkins underwent cervical injections on October 28th and December 2nd of 2019, correct?

A.   I believe that's right.

Q.   Okay.  Then based on the records that were submitted -- and then Mr. Wilkins, he's, through his attorneys, filed a Civil Remedy Notice, correct?

A.   They did.

Q.   And that was dated or accepted by the Florida Department of Financial Services on November 27th of



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

2019, correct?

A. Yes.

Q. And is your understanding of Civil Remedy Notice, the insurance company has a 60-day window to effectuate a cure?

A. Yes.

Q. So during the CRN cure window, that 60 days, based on the records submitted to Progressive during that time period, what specific treatment was Mr. Wilkins scheduled to undergo?

A. At that time, he was undergoing injections and conservative treatment.

Q. Okay.

A. And the additional injections had been mentioned but wasn't scheduled or on the calendar at this time.

Q. So outside the injections that he underwent and the conservative treatment, was he scheduled for any future treatment outside of what we've kind of already discussed?

A. I believe the injections had been given and left open as to whether additional injections were going to be needed.

Q. Sure. But was anything scheduled?

A. Not that I know of.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

Q.   Based on the records, had Mr. Wilkins decided one way or another, whether or not he would undergo additional injections or procedures?

A.   At that point, I don't know that he'd had.

Q.   Okay.  On Page 9, again on the third paragraph from the top, you have a sentence that starts, "Treatment continued through early 2020."  Do you see that paragraph?

A.   Yes, sir.

Q.   And then it ends, and then it discusses an offer of $17,000 made by Progressive?

A.   Yes.

Q.   And that offer was made in the litigation, right?  After Mr. Wilkins had filed suit?

A.   Yes.

Q.   Okay.  And you indicate throughout this entire time, the Tragos firm consistently indicated that their demand remained at $50,000.  Do you see that?

A.   I do.

Q.   What's the basis for that statement?

A.   Because I never saw any indication -- I saw indications that they had demanded 50 in their early letter and had never moved off of that.

Q.   Did you see in the claim file materials that you reviewed that showed that Tragos, the Tragos firm,

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

had communicated that Mr. Wilkins was unwilling to settle for the policy limits as early as February of 2021?

A.    2020.

Q.    2020?

A.    I would have to go back and double check the date, but I know at some point the claim notes reflect that conversation.

Q.    So that -- and that conversation occurred well before the offer of $17,000, correct?

A.    I would have to go back and double check the date of the conversation, I don't recall it as I sit here.

Q.    Sure.  Okay, I'll show you the claim notes, sir.  It's Bates stamp PRG 1 through 255.  Do these look familiar to you?

A.    Yes.

Q.    And these are a copy of the claim notes that was produced.  There's a conversation documented on February 21st, 2020, at 10:02 a.m.  Do you see it?

A.    Yes.

Q.    And that's by Ms. Crawford, who was the Progressive adjuster at that point in time?

A.    She was.

Q.    And she indicates that she made an outbound

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

call to the attorney to follow-up on offers.  "Assistant spoke with attorney, and he stated they are not accepting policy limits at this time."

A.    That's the note says, yes.

Q.    And that offer of $17,000, that was in June of 2020.  So about four months later, right?

A.    Yes.

Q.    Okay.  So fair to say that the Tragos firm was not maintaining a demand at $50,000 at the time Progressive offered $17,000?

A.    I'm not sure I understand that because they hadn't -- the Tragos firm hadn't said they would take anything less than 50.

Q.    Right.  The note we just looked at, the Tragos firm, communicated that they were not settling for policy limits of $50,000.  So in other words, they were not accepting $50,000 to settle Mr. Wilkins' claim?

A.    That's what they were saying at that point, yes.

Q.    Right.  And then in your fact section you say, "Throughout this entire time, the Tragos firm consistently indicated that their demand remained at $50,000."  So my question --

A.    My point --

Q.    Go ahead, sir.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

A.    I was going to say my point is that they've
never indicated they would reduce it off of the limits.

Q.    Okay.

A.    They never wrote a letter saying we'll take 40
or we'll take 35 or anything of that sort.

Q.    Sure.  But I guess my question is: Weren't
they communicating to Progressive that they wouldn't
take the
50?

A.    That's what that note would indicate.

Q.    Right.  So isn't it inaccurate to say that
they were consistently indicating that their demand
remained at 50?  Their demand wasn't 50, they weren't
going to accept 50 at that point.

A.    Well, I think if you put it together with the
testimony, what they've acknowledged all along is that
if Progressive had offered its $50,000 limits in an
appropriate timely basis, they would've settled the case
because there's nothing else to be gained.  At this
point now you're in litigation.  I don't know what they
were thinking other than what that note reflects.

Q.    Right.  So I -- what you're saying is we --
Progressive -- I'm not talking about what Progressive
could have done earlier.  My focus is on this statement.
I'm talking about the timeframe in which you were

 MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

indicating that the demand remained at 50.

What period of time in the fact section were you specifically referring to?

A.   I think what I'm trying to say there isn't precisely what you're interpreting.  I'm trying to say that at no time did they indicate they would accept less than 50.

Q.   Right.  So -- but for what time period?

A.   From that point on, I don't think they ever indicated they'd take less than 50.

Q.   Right.  But they also indicated as early as February 21st, 2020, that they would not accept the $50,000 at that point or after?

A.   That's what the note says.  I don't know that that's the reality.  We're all aware of attorneys that make statements that, you know, try to draw a line in the sand and then you -- sand and then you negotiate.

Q.   And what about -- did you review Mr. Wilkins' testimony in this case?

A.   I did.

Q.   And didn't he testify that he was not willing to accept policy limits at the point he filed suit?

A.   I believe he said that, yes.  And at the same time, the attorneys would've talked to him if they had felt there was no bad-faith case and 50 had been

 MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

offered.  I don't know any Plaintiff's attorney that typically pursues an empty pocket, if there's nothing to be gained.  Meaning if Progressive had paid its 50 and done it in a way that would've avoided any allegations of bad faith, there's no incentive for anybody to continue any claim against Progressive.

Q.   So if -- so, for example, if Progressive had cured the CRN by tendering the $50,000 UM policy limits?

A.   If Progressive had paid the 50 during the timeframe of the CRN, the case would've ended.

Q.   Right.  So now, but now in the context of your fact section and what we're talking about now, we're past -- the CRN has expired, right?

A.   Yes.

Q.   Mr. Wilkins filed suit, and he has communicated to Progressive that he is no longer willing to settle for policy limits, accurate?

A.   Yes, yes.

Q.   So at the time Progressive increased its offers to 17,000, 25,000, and ultimately 50,000, Mr. Wilkins was not willing to accept those offers at that point in time?

A.   Well, you'd have to ask Mr. Wilkins.  I don't believe the offer was made such that they would have to consider it.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Q.   Well, didn't Mr. Wilkins testify he wouldn't accept policy limits after filing suit?

A.   He did testify.  And I also know the reality and Mr. Sartes' testimony that if it had happened at a point where they didn't feel they had a bad-faith case, they would've accepted it because there's nothing else to pursue.

Q.   Right.  But that's not what we're talking about in the context of this particular claim, right?  The time.  I'm focusing on the facts and circumstances of this claim.  There's an expired CRN.

A.   Yes.

Q.   Mr. Wilkins filed suit.

A.   Yes.

Q.   Progressive makes offers after that point?

A.   They stair stepped the offers, yes.

Q.   Right.  And Mr. Wilkins wasn't willing to accept policy limits after he filed the lawsuit?

A.   He didn't accept the offers that were made.  And he's made the comment, that you've referenced in his deposition.  What I'm saying is, I don't know what would've happened in reality if, in February, Progressive had put its $50,000 on the table.

Q.   Right.  Well, in February, wasn't his attorney communicating to Progressive that they were not willing



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

to accept policy limits, based on the note we just --

MR. GUNN:  Form --

THE WITNESS:  That's what the note says.

MR. GUNN:  Form --

THE WITNESS:  And as I've said, and you know, that doesn't necessarily mean negotiations aren't possible.  In just about every case I've ever seen, somebody draws a line in the sand that isn't necessarily a final line.

BY MR. ANGLEY:

Q.   So is it your testimony or opinion that Progressive's -- that Progressive shouldn't rely on the statements and communications it receives from Mr. Wilkins' attorney?

MR. GUNN:  Form.

THE WITNESS:  My testimony is that Progressive should have done what was appropriate throughout the handling of this case.  And if it meant offering the full limits, you offer the full limits no matter what the attorney has said.  You don't know for sure whether he would take it or not, despite his prior comment, because if -- unless he believes there's a valid good -- or bad-faith case, he's going to take the 50 if that's all there is.

BY MR. ANGLEY:



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Q.   Once the CRN expired, did Mr. Wilkins ever communicate verbally or in writing to Progressive that he'd settle his claim in exchange for payment of the $50,000 UM policy limits?

A.   I don't -- I didn't see that proactively and I also didn't see it the other around.  I didn't see Progressive until the very, very end offer 50.

MR. ANGLEY:  Okay.  So -- all right.  Mr. Doucette, let's take another five-minute break here. We've been going for about an hour-and-a-half.

THE WITNESS:  All right.

THE REPORTER:  Sounds good.

(A recess was taken.)

THE REPORTER:  All right, everyone.  We are back on the record.

And Counsel, you may proceed.  Thank you.

BY MR. ANGLEY:

Q.   All right.  Mr. Doucette, we were just going over the facts section of your report, and I'd like to skip to Page 10, where it states -- there's a section titled Opinions and Discussion.

A.   Yes.

Q.   And the opinions section, are those your -- the opinions you've arrived at in this case?

A.   Supplemented by the supplemental report.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Q.   And then there's the supplemental report, which basically discloses two additional opinions, correct?

A.   Yes, it does.

Q.   Okay.  And then you have a discussion section as well.  And is there any, like -- the opinions list out your opinions A through E, and then you have your supplemental report.  And then how does that relate to the discussion section?

A.   Well, my opinions are there for clarity as to what kind of the bullet points are, and then the discussion discusses the basis for those opinions and as I relate to the facts that I've previously cited.  So that's --

Q.   So the opinions kind of list it out, and then the discussions are what forms the basis of the opinions?

A.   Explains the opinions, yes.

Q.   Okay.  Can you tell me on Page 10, I want to go -- it looks like you have an overarching opinion, "Progressive failed to settle this matter when it could and should have done so, contrary to the custom and practice in the industry."

Is that an opinion or is that an overarching kind of statement based upon A through E?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

A.   A through E feed the overall statement.  I would say it's an opinion, with -- and the others are sub-opinions or subsets of that opinion.

Q.   So the main opinion is, "Progressive failed to settle this matter when it could and should have done so, contrary to the custom and practice in the industry."  And then A through E are subsets of that general opinion?

A.   Yes.

Q.   Okay.  So can you tell me what the factual basis is for your statement that, "Progressive failed to settle this matter when it could and should have done so, contrary to the custom and practice in the industry"?

A.   The case could and should have been settled at the time that the CRN had been filed.  It obviously could have, as we discussed earlier, that Progressive had the -- had it within its ability to pay the 50,000. If you had paid that during the pendency of the CRN, the case would've ended.

It didn't do so, because it failed in a number of various ways.  It failed to investigate.  As I said earlier, to me and all the literature you can read, investigation is a proactive activity on the part of an insurance company.  They are supposed to go out and get

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

facts that they need in order to properly evaluate it.

They cannot sit back and simply rely on a -- on the plaintiff's lawyer to give them everything that might be required.  They -- in this case, I believe Ms. Crawford had trouble identifying anything she did proactively, except that she reviewed the PIP record. And to me, that's not proactive.  That's reviewing records that have already found your way -- or in the -- their way into your file.  Coupled with that is the failure to use very readily --

Q.   Mr. Doucette, if I could just interrupt you, I just want to kind of go section by section.  So that's the Section A, right, "Failed to properly and thoroughly investigate the claim"?

A.   Yeah, they didn't do an investigation.

Q.   Okay.  Any other facts or bases for your opinion that Progressive failed to properly and thoroughly investigate the claim?

A.   Well, I think the other ones all relate to it as well.  So properly investigating the claim would involve using the investigative tools that are at your disposal, which is really Point 2.

Q.   That's point -- that's Section B, right?

A.   Yes.

Q.   Okay.  So I just want to go section by



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

section. That way, I can kind of keep things straight. So for B, what is your opinion there and what's the factual basis for that opinion?

A.   My opinion there is that since this is a first- party claim, Progressive had the right to utilize any number of tools which they failed to use.  They complained during their depositions that, for instance, they never had information about permanency.  They never had information about causation.  They didn't know this, or they didn't know that.  All of that is stuff and material that they could have obtained had they properly investigated the claim.  They have the ability to use medical authorizations.  As you said, the PIP, one apparently was not signed and returned.  Well, Ms. Crawford, the uninsured motorist adjuster, didn't even know they had it, never checked it, doesn't know whether it was signed or not, and never sought one herself.  If obtaining records was critical to their evaluation, they have an obligation to use the tool that's available, and a medical authorization would've been one.

Mr. Sartes said that if he had been asked and told that they never got the signed authorization back, he would've seen to it that they had gotten one.  They have the opportunity to use many review tools that don't involve the insured, such as a record review, a peer-to-



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

peer review.  They could have submitted the MRIs and the records they did have to a doctor of their choice and simply said, Tell me what you think, what are we looking at, what are the complications likely.

Again, overriding all of this, and we haven't mentioned yet, is that Mr. Wilkins was already a paraplegic.  That is not a typical situation for an adjuster to handle, where you have a pre-existing condition that renders the claimant paraplegic, and now you've got the other part of his spine being significantly damaged with four herniations.  That isn't necessarily in the common knowledge base of most adjusters, and it would've called for expert review, expert input, expert assistance.  They could have done a record review.  They could have done a peer-to-peer. They could have done a CME at any time they wanted.  If they had all of these questions, if they had asked Mr. Wilkins to undergo a CME just, for instance, during the period of the CRN, he would've had to do so.  And then they would've had their own doctor who could have opined on permanency and causation, and they didn't do that.

They didn't use an EUO.  If they had -- for instance, they kept raising the question of, Was this really caused by the accident?  Despite acknowledging they had absolutely no evidence that there was any prior



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        **Toll Free 855-MYDEPOS**

existing injury to this area, they could have clarified that by simply having an EUO and ask him, Did you ever hurt your upper back, did you -- you know, and all the questions you'd want to know.  That was never used.  So the investigation, as I said, didn't exist despite their right to use all of these tools, which would've answered any of the questions they might have had.

Q.    Okay.  And anything else on -- for Section B?

A.    No.

Q.    And what about Section C, "Exhibited bias and unfair treatment in the way it evaluated the injuries and medical specialists"?

A.    They did two, in my mind, remarkable things. They admitted that they had absolutely no evidence that there was any prior injury involved.  They ran an ISO search right away, that came back negative.  All of the documents that Mr. Wilkins filled out, such as his PIP application, indicated no prior injury to this area. The doctors' reports all indicate in their history that there was no prior injury, and yet with nothing to substantiate it, they raised the question of whether this was even caused by the accident.

Ms. Crawford several times repeated the phrase, "I don't even know if this was the result of the accident."  Well, if that's a factor in your evaluation,



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

and you have zero evidence to base it on, you're speculating, and you're doing nothing but speculating, and that's inappropriate.  I think I say in the beginning of my report, an insurance company can resist a claim, but they have to have something to base that resistance upon, and here they had absolutely nothing except pure speculation.

The same holds true with their view of permanency.  First of all, you have to almost intentionally look the other way to think that this is anything but a permanent injury.  And although the doctors don't use the magic word, "permanency," everything about the report would tell any seasoned adjuster that this is a permanent injury.

You have four herniations.  Herniations can on occasion resolve, but that usually happens in the first couple of months of treatment.  And if it hasn't resolved spontaneously by four or six, eight months, it's highly, highly unlikely that it's going to.  Particularly, as you start using injections to manage pain, the injections don't cure the injury.  They manage the pain of the injury.  And there is nothing in the records at any time that indicates this is progressing towards a complete healing.  So you have failed -- the reports in October and December say conservative

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

messages -- methods.  I'm sorry, conservative methods have failed.  Well, what is it that Progressive thought was going to happen?

Was this somehow miraculously going to resolve a year-and-a-half afterwards, even though all conservative message -- methods had failed?  There's nothing in the record that indicates this is resolving or getting better, and yet they somehow reached the conclusion that this may not be permanent.  And they seem to be resting a good part of their defense and their testimony on the lack of the magic word, "permanent" in the records.

Q.   Yeah.

A.   If you review those records and put it in context with the lack of progress during the treatment, you are left with the inescapable conclusion in my mind that it is in all likelihood permanent.  If you don't think it is, then you get a CME to give you that evidence, and now you've got something to stand on.  But your adjuster, with no medical training, no medical input of any sort, in a very complex injury situation, for her to speculate that this wasn't permanent, with absolutely nothing to base that on, is in my mind unfair and bias.  It's looking for an escape rather than looking for a fair evaluation.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Q.    Okay.

A.    The instructions that I cited from the AIC manual tell the adjuster that he has to thoroughly investigate and fairly evaluate, giving credibility to those that support the claim, not looking for a way out of the claim.  Here, everything supported the claim, it supported causation, and it supported permanency.  And they simply speculated in their evaluation that neither were present, and it affected their evaluation.  I consider that bias and unfair.

Q.    All right.  Anything else on -- under C?

A.    No.

Q.    And how about D, "Failed to fully consider all the injuries and symptoms demonstrated by the medical records"?

A.    They note in their records, they observed that there's four herniations.  They have the record that indicates if conservative measures fail, an ACDF would be considered.  They have records indicating that conservative measures are failing.  The -- I think it was -- the December record clearly states that all conservative treatment has failed, and that's why they're going to injections.  And they don't consider the permanent nature of it, and they don't consider the possibility that this was an ACDF case.  Although,

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        **Toll Free 855-MYDEPOS**

because of his prior paraplegia, the doctors concluded that it was too high a risk and they weren't going to do it.

        But the fact that it reached a point where they would have in a normal circumstance is very significant. And that's never mentioned.  I mean, the evaluations are sparse in terms of recognition of what's actually happening here and they're sparse in the sense of trying to recognize the significant complication that an upper body injury creates when a person is already a paraplegia.

        Q.    Okay.  Anything else under D?

        A.    No.

        Q.    And then E?

        A.    Each one of the offers they did make was at the very, very lowest end of what I would already call it, inadequate range.  The most glaring example of it is when they finally get authority to offer the policy limits, and they know the demand was at least the limits, if they would've taken it, we've discussed the question there, but they now have authority to offer policy limits and she offers $25,000, one half of the limits.  That's just low ball.  That makes no sense at that point, in a case that you've been incapable of resolving, you now have full authority, and you offer

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

one half of your authority.

Q. Okay. The -- true that Mr. Wilkins testified, he was not willing to accept policy limits at that point in time?

A. We went through that, yes. And I wrote everything to add to it other than you don't know for sure unless you make the offer.

Q. Sure. All right, anything else under E?

A. No.

Q. And then you have your supplemental report. What was the date of this report? When did you draft it? I didn't see a date.

A. It was yesterday.

Q. June 29th?

A. Yes.

Q. And then there's two additional supplemental opinions, fair?

A. Yes.

Q. And then the first one is related to Mr. Wilkin's willingness to settle -- or unwillingness to settle for policy limits?

A. Yes. My point there is that if that -- that is not a complete bar as it might be in a third-party case. Because during the period of the CRN, certainly, Progressive could have wrapped the entire case up by



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

simply making the limits offer tendering their limits, and there'd be nothing left to dispute because the bad faith would be cured during the CRN.

So I'm trying to draw a distinction there that his statement in a third-party case would be extremely significant in a first party case, it's less so.  And then the second part of that is the release.  Since this is a first party case, there is no third party.  You're not protecting your insured.  Typically, in a third-party case, you get the release because that's the only way you can truly obtain protection for your insured. Here, the only party that benefits from the release is, in fact, Progressive, they're releasing themselves. They're having their insured sign a release that releases them.

They already know that a CRN has been filed. They already know that there's been allegations of bad faith.  And in order to give Mr. Wilkins the benefit to which he's entitled under his first party contract, they were requesting that in order to receive those payments, he also sign a release, basically giving up his bad-faith case, and I believe that's inappropriate.

Q.   Any other opinions other than what you've discussed here today?

A.   No.



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

Q.   Any other factual basis for the opinions you've described here today?

A.   No.

Q.   All right.  In connection with your expert work, are you familiar with Cadle and the line of cases that follow Cadle?

A.   Not by name.

Q.   Are you familiar with the tort threshold in Florida?

A.   In terms of both permanency or scarring, that's what you're referring to?

Q.   Sure, yeah.  Florida statute 627727, Subsection

2.  The requirement -- what's your under -- let me just ask you generally: What's your understanding of what the tort threshold is in the State of Florida?

A.   Essentially, there has to be a permanent injury and or scarring and or death -- significant scarring and or death.

Q.   So in this -- and that requirement's also listed in Mr. Wilkin's UM Policy, correct?

A.   Yes.

Q.   It's in the -- I believe Section 3 or the Uninsured Motorist section of his policy.

A.   It is in there.  I couldn't tell you which

MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

section right now.

Q.   And is your understanding of the tort threshold that in order to be entitled to non-economic damages in connection with the UM claim, you must -- you -- there must be a breach of the tort threshold?

A.   Yes.

Q.   And that can come through permanency, scarring, disfigurement, any other items identified in the policy and the statute?

A.   Yes.

Q.   Through the time period of the CRN, you would agree with me that Mr. Wilkins never submitted any information to Progressive wherein a medical doctor specifically stated that he had a permanent injury within a reasonable degree of medical probability?

A.   Those precise words are not in any of the reports and I -- it's my opinion they don't have to be.

Q.   So it's your opinion under Insurance Industry Custom Practice that a medical doctor does not have to provide that specific statement or a similar statement in order for there to be a tort threshold breach in connection with the UM claim?

A.   No, that's not what I'm saying.  I'm saying that that is the plaintiff burden.  The injured party has to prove that in order to recover those damages.

 MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

There is no requirement that a treating physician in his medical notes at the treatment stage of a case has to put those magic words into his report.

Q.   Okay.  So 2 parts, you agree that it's the burden of the claimant in this case, Mr. Wilkins, to prove the permanency?

A.   Yes, before non-economic damages could be awarded.

Q.   Right.  And then the second part of your opinion, there is the -- what you refer to as "magic words" don't have to be included in those records or materials that are submitted to the insurance company for review?

A.   They do not.  There's nothing that says they have to be in the records.  It has to be part of the proof, which obviously they managed in this case because of the verdict they received.

Q.   Right.

A.   But that's also where the lack of tools that -- or the tools that weren't used, come into play.  They wouldn't have had that kind of opinion if they had pursued those tools.

Q.   Sure.  So it wasn't in the medical records that was submitted.  That specific statement wasn't in the medical records, we agree on that.  Wasn't in -- was

 MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.MILESTONEREPORTING.com       Toll Free 855-MYDEPOS

that specific statement contained in any other records submitted to Progressive during the CRN timeframe or --

A.   Those specific magic words, as I call them, were not.  But the indications in the medical records would lead any experienced adjuster to assume you're dealing with a permanent injury.

Q.   You're not a medical doctor, correct, sir?

A.   I am not a medical doctor, no.

Q.   Okay.  Are you offering an opinion that Progressive should have deduced a permanent injury by looking at Mr. -- by looking at Mr. Wilkins' medical records when his own treating physicians did not provide a specific permanency opinion anywhere?

A.   It's my opinion, not as a doctor, but as an experienced claim adjuster, who undoubtedly would've seen, probably hundreds of back and neck injuries, that you're taught how to read the language.  Although I'm not a medical doctor, I've taken a number of medical courses designed for adjusters, everything from how to read medical records to types of diagnoses to expect, things of that sort.  And you learn to read the records for certain situations here.  You don't have a strain, sprain, or a bulge.  You have four different herniations demonstrated by two separate sets of MRIs.

Herniations are what I would consider in the



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

more serious category of back injuries.  They are not
bulges, they are not strains, they're herniations.
There's a rupture of the disc part, and those most often
either lead to surgery or to some type of permanent
impairment.  Everything in these records indicated that
it was very serious that conservative measures were not
using -- working, that they had failed, I think the
doctor says.

And you as an adjuster are now looking at
that, let's say in December.  And you've got to ask
yourself, what is going to happen to this injury?  It's
not getting better, they've done the massage, they've
done the PT, they've done the chiro, they've done
injections, and it's not getting better.  What could
possibly lead you to believe that it's transitory, and
is going to self-resolve?  It isn't.  Common sense would
tell you that you are probably looking at a permanent
injury, and if you have any doubt at all, that's where
you rely on your CME.

Q.   So based on the records submitted, Progressive
was obligated to deduce a permanent injury?

A.   I believe, unless they had any proof to the
contrary, yes.  Here again, if they had had a medical
review that says, No, this is going to resolve, here's
why.  They had a CME that said, No, I don't believe it's



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

permanent, here's why.  Now you've got something of substance that you can point to.  They had none of that. They just assumed it wasn't permanent because the magic word wasn't used.  And I don't think you can assume when you read these records that it's not going to be permanent.

Q.   If Mr. Wilkins had a permanent injury within a reasonable degree of medical probability, wouldn't you anticipate his medical doctors providing that opinion?

A.   Not in treatment notes.  If they were writing a report to submit to Court, yes, I would expect it. These are the treatment notes.  These are not intended to be used.  They're not writing those thinking that you're going to read them as a defense lawyer.  They're writing these to keep a patient's record.  This isn't the report.

Q.   In your experience as a -- in the industry, isn't it common that treating physicians will write in the actual medical records a permanency opinion?

A.   I have seen some do that, I have seen some not do that.  I have seen some not even mention the word "permanency" until they write a formal report, if they do.

Q.   Was a formal report as you, kind of, are describing it provided to Progressive during the CRN

 MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        Toll Free **855-MYDEPOS**

period where in a medical doctor provided a permanency opinion?

A.   Not that I saw.

Q.   Did any of Mr. Wilkins treating physicians causally relate the cervical herniations to the July 26th, 2019, automobile accident within the CRN period?

MR. GUNN:  Form.

THE WITNESS:  I would answer the same way.  Did they specifically say this injury was caused by the accident?  No.  But if you read the report and put it together with what Progressive already knew, meaning they had run an ISO check, and the ISO check had come up negative.  They admitted they had absolutely no indication that there had been any prior injury.  The medical reports, I think almost all of them start by saying since the date of the accident Mr. Wilkins has experienced, and then they go on and describe the symptoms.  They all by verbiage relate it to the auto accident.  None of them ever mentioned anything beyond the auto accident.  And Mr. Wilkins, in his various forms that he filled out, always said he had no prior injuries of this sort.  And in the  forms he filled out, he said the same thing.

So there is -- they do not use again, these



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

precise words, this was caused -- the -- caused by
the motor vehicle accident.  The context of those
reports clearly indicate they were treating it as if
it was an auto injury accident and equally important
there is zero evidence to support a non-causal
relationship.

BY MR. ANGLEY:

Q.   The two parts -- we agree that no medical
doctor within the CRN timeframe specifically stated this
acts -- these cervical spine injuries were caused by the
July 26th, 2019, accident.  Yes, no?

A.   They did not use those words.

Q.   But in your opinion, based on those records
that were submitted to Progressive, Progressive should
have deduced that and come to that conclusion?

A.   Absolutely.  Particularly, like I said, they
did an ISO search that was negative.  They had no
information indicating from any source that anything
else could have caused it.  And to then conclude that
the accident didn't cause it, is just sheer speculation
and not an appropriate part of the evaluation.

Q.   You would agree with me in insurance custom
and practice that a finding of permanency does not turn
on what Mr. Wilkins believes subjectively?

A.   That would be true.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

Q.    And you would agree that a finding of permanency does not turn on what his attorneys subjectively believe to be the case?

A.    I agree.

Q.    You would agree under insurance custom and practice the determination or the standard of whether the injury and permanency can be established -- the -- let me rephrase that.

The standard in insurance custom and practice is whether the injury and permanency can be established within a reasonable degree of medical probability, correct?

A.    Yes.

Q.    And that finding requires a medical doctor's opinions, correct?

A.    Yes.

Q.    And you would agree that if the doctors who -- you would agree, that the doctors who treated Mr. Wilkins during the CRN time period and those records, we've already agreed that that specific statement was not included in any of those records that were submitted to Progressive?

A.    The treatment notes don't contain that phrase, which you would typically find in a formal report.  I tried to draw the distinction.  These notes aren't court

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

reports.  These are the daily treatment notes that a doctor is creating as he's treating the patient. They're for treatment purposes, and he did not use those precise words, but the facts in my mind speak for themselves.

Q.   You would agree that a diagnostic study that showed a disc bulge or herniation by itself does not establish permanency absent medical correlation or testimony?

A.   Like there's a lot of what ifs I could put in there.  If you simply saw an MRI with a herniation and you had no other information, no other background, you don't know what if any treatments have been tried, it would be an open question.  But I would also come back to what I said earlier, as someone that has reviewed thousands of back and neck injuries, herniations are a more serious category than other types of back injuries.

Q.   And are you substituting your experience in connection with reviewing neck and back injury claims for the opinions of Mr. Wilkins' treating physicians based on what their specific records show?

MR. GUNN:  Form.

THE WITNESS:  No, because I'm not trying to say what the doctor should have done, I'm saying what the claim adjuster in proper handling should have realized in reading the records.



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

BY MR. ANGLEY:

Q.   During the CRN time period Mr. Wilkins was never scheduled for surgery, correct?

A.   He was not.

Q.   He never agreed to undergo surgery, correct?

A.   Not during the CRN, no.

Q.   During the CRN period there was no real indication that Mr. -- whether Mr. Wilkins would, in fact, proceed forward with surgery?

MR. GUNN:  Form.

THE WITNESS:  It was unknown at that time.

BY MR. ANGLEY:

Q.   To your mind and your -- based on your opinion, Mr. Wilkins' willingness or unwillingness to settle in connection with his UM claim doesn't impact your opinion given that it's a first-party claim?

A.   I can't say it doesn't impact it.  And I considered it, and I looked at it and then in putting it into context as a first-party claim I come back to the fact that certainly during the CRN his willingness to settle wouldn't have been a determining factor in whether -- in terms of whether or not a bad-faith case could exist.

Q.   And what about outside the CRN cure period as in after the timeframe in which it expired?

 MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     www.MILESTONEREPORTING.com     **Toll Free 855-MYDEPOS**

A.   From that point on I understand what he said, and my reaction is, until you put the offer on the table, you'll never know for sure.  Because I've seen many lawyers and many Plaintiffs say, I will not settle for X and then as the case goes on if an offer's put there, they might.

Q.   Okay.  And what in this particular record is that -- based on the record we have in this case, the testimony and the file materials, anything you may have reviewed, what specific piece of record evidence can you point to you to support that statement in connection with this particular claim?  I understand you're saying that as a general concept, but specifically --

A.   Well, only that his attorney said that if the offers had happened, he certainly would've talked to Mr. Wilkins.

Q.   Okay.

A.   I don't know the outcome.  But as I said, we've all seen situations where it settles even when someone said they weren't going to.

Q.   So the fact that Mr. Wilkins explicitly testified he wouldn't accept policy limits you think could have changed or maybe would've changed if Progressive had tended the policy limits?

A.   I'm simply saying -- well during the CRN it



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

would've --

Q.   Outside the CRN period?

A.   I'm saying I don't know, and no one knows because the offer wasn't made.

Q.   Well, the offer was made in December of 2020, correct?

A.   Yes.

Q.   And it was not accepted, correct?

A.   Correct.

Q.   It was safe to say that when Progressive made the offer.  Mr. Wilkins wasn't going to accept it?

A.   I think when I discussed it earlier, I talked about a timely and appropriate offer.  By the time they made the offer it was too late.

Q.   After the CRN expired all the demands that Mr. Wilkins made to Progressive, those were for amounts above the policy limits, correct?

A.   I believe they were.

Q.   Did you see in the file materials in November of 2020 Defense Counsel for Progressive, I believe, Wicker Smith, sent a letter to Mr. Sartes to solicit an updated demand and try to coordinate a settlement conference?

A.   I vaguely remember that, yes.

Q.   And in response Mr. Wilkins made a demand for



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900       www.**MILESTONEREPORTING**.com       Toll Free 855-MYDEPOS

$200,000?

A.   I recall that.

Q.   In your supplemental report you also talk about the release, correct?

A.   I do.

Q.   And Progressive sent a proposed release in connection with its December 24th, 2020, tender of the UM policy limits?

A.   Yes.

Q.   And a proposed release -- a proposed -- it was a proposed release, correct?

A.   Yes, it was.

Q.   Which, in other words, in these -- I believe the letter used the phrase or compare -- paraphrasing but that the settlement was not contingent or conditioned upon the execution of any particular form of release, right?  Something to that effect.

MR. GUNN:  Form.

THE WITNESS:  I recall having the understanding that they were open to adjustments to the wording but not to the fact that a release was part of the settlement.

BY MR. ANGLEY:

Q.   But Progressive desired a release of some type, but the specific language and form that it took



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

was subject to discussion and negotiation?

A.   Yes, except it's my understanding that always would've -- ultimately, if they had gotten to that point, released Progressive.  They were the only party being discussed.

Q.   Right.  Did Mr. -- did Attorney Sartes ever, specifically, write back and say, I object to this line or that line or this language or I'll -- we'll provide a release that is more simplified?  Any direct negotiation between Attorney Sartes and Progressive as to the form or format of the release?

A.   I don't believe he did, and I wouldn't expect him to because I don't think the issue was specific. The language of the release, it was the concept of Progressive being released which would eliminate the bad-faith claim.

Q.   And that's because -- right.  So the issue of the release was because Mr. Wilkins intended to sue Progressive for a bad-faith claim?

MR. GUNN:  Form.

THE WITNESS:  I can't speak to his intent, and I don't know what they were thinking at that point. I just know that I've seen this happen before and there -- there's no attorney I know of in that spot that would sign a release eliminating the bad-faith



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        Toll Free **855-MYDEPOS**

claim for no consideration if they thought they had a reasonable bad- faith claim.

BY MR. ANGLEY:

Q. Right. So the total amount available under the policy for UM was $50,000, correct?

A. That's correct.

Q. And is it your opinion under insurance custom and practice that Progressive was obligated to offer more than policy limits to resolve Mr. Wilkins' UM claim?

A. No.

Q. Is it your opinion under insurance custom and practice that the request for any kind of release was improper?

A. In this particular case I don't know if "improper" is the correct word. It would complicate, delay, and in my mind result in a rejection of an offer even if the offer had been appropriate and timely. Because the CRN had expired, to that extent a bad-faith claim was potentially viable, and you're not going to release Progressive for $0 if you think you've got a valuable claim.

Q. Sure. So during the CRN timeframe -- when the CRN was -- the CRN time period, Progressive never sent a proposed release, right?

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

A.   No.

Q.   Right.  So when Progressive tendered the policy limits of $50,000 it sent the proposed release?

A.   Yes.

Q.   And the reason why the claim didn't ultimately settle is not because of the proposed release, it's because Mr. Wilkins wasn't willing to settle his claims against Progressive in exchange for the $50,000 UM policy limits anymore at that point, correct?

MR. GUNN:  Form.

THE WITNESS:  You can ask Mr. Sartes or Mr. Wilkins.  I'm not reading their minds.  I'm just telling you what I can read in the file.

BY MR. ANGLEY:

Q.   From what you can read in the file, the offer wasn't accepted because Mr. Wilkins and Mr. Sartes didn't want to release that bad-faith claim that they believe they had against Progressive?

A.   Certainly not for $0.  I believe when they made a demand for $200,000 the assumption was that they were going to obtain the limits and then some payment towards a bad-faith claim.

Q.   So that would be $50,000 of UM policy settlements and potentially $150,000 in extra contractual monies?



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

A.   I'm assuming that's what he had in mind because the policy was limited to $50,000.

Q.   So again, that's objective evidence that Mr. Wilkins had no intention of settling his claim anymore for the $50,000 UM policy limits?

A.   No, it's objective evidence that he was negotiating and putting a number out there that it was going to put pressure on Progressive.  I don't know what it means in terms of his ultimate willingness to settle.

Q.   And when Progressive put its number out there of $50,000 that wasn't accepted?

A.   $50,000 combined with the release was not accepted.

Q.   Is it your opinion under insurance custom and practice that -- well, I mean, it's my understanding that your opinion under insurance custom and practice is that Progressive during the CRN time period should have undertaken an EUO, and CME, a records review, one of those tools I think you called them, correct?

A.   No later than during the CRN, yes.

Q.   Isn't it also appropriate under insurance custom and practice to rely on the information that's being submitted by the claimant?

A.   I think the standard in the insurance industry is trust to verify.  So for instance, the demand letter



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

asserted permanency, it mentioned the ACDF, and it mentioned the likely ongoing nature of the injury.  And that was received well before the CRN was filed.  And if they had issues with any one of those aspects, they should have utilized something in their tool basket to clarify their position.

As I said, they can resist it, but they have to have something to point to.  And here they use the -- a negative inference in both permanency and causation and they believe there wasn't either because it wasn't specifically mentioned with certain magic words in the treatment reports.  That's not appropriate.

Q.   In the discussion section of your report on Page 11, I'll give you a second to get there, the third paragraph from the top.  There's a paragraph that starts, "There is no mention of the fact."  Do you see it?

A.   Yes.

Q.   So there -- I -- it appears to me that it's referencing two different time periods.  So earlier --

A.   Yes.

Q.   -- we were talking about October -- well, I think Progressive got the medical record in December, but it was an October 19th -- or maybe November.  The October 19th, 2019, record from Dr. Hayes where he


MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

references the ACDF, right?

A.   Yes.

Q.   Then much later, I believe in June of 2020, Mr. Wilkins was determined to not be a surgical candidate, right?

A.   Yes.  I believe the doctor said he would've done an ACDF except for his prior paraplegia makes him a high-risk candidate.

Q.   So in that section you're kind of blurring those two timeframes?

MR. GUNN:  Form.

THE WITNESS:  My point is -- yes, but my point is that ACDF was out there early on and discussed later on.  And nowhere in the claim notes do I see an adjuster saying clearly if the ACDF had happened, it would be a permanent injury.  You're talking about sometimes hardwares in the spine, but certainly discs are removed and they're -- you're -- it -- if you have an ACDF, there's no question you've got a permanent injury.  And the fact that it had been mentioned earlier and mentioned later is never considered.  It's never evaluated that way.

And likewise with this -- what's going to happen if they don't do the ACDF and conservative measures aren't working and injections aren't



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

working, what's going to happen to the injury?  It's -- the -- I don't know if they thought it was going to spontaneously disappear a year later or what. But then to conclude it wasn't permanent, it doesn't fit the facts.

BY MR. ANGLEY:

Q.   At the point it was determined Mr. Wilkins was not a surgical candidate in June of 2020, he had already -- he, through his attorney's, they had already expressed he was not willing to accept policy limits to the Progressive adjusters, correct?

A.   Yes.

Q.   Bear with me one second.  On the Page 11, the paragraph above that beginning with the word, "Although."  Do you see it?

A.   Yes.

Q.   Are you offering an expert opinion on how Mr. Wilkins' alleged cervical injuries would complicate his life?

A.   I'm not offering a medical opinion at all. I'm offering a very common-sense opinion that I would expect an adjuster to have included in their analysis. Cervical injuries of this sort have a significant impact on people's lives under the best of circumstances.

Here you have an individual that was already a

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

paraplegic, he's in a wheelchair, so he's using his upper body, his arms, and his shoulder strength more than you or I would as we walk around.  And I never saw anyone try to look at that from the point of view of this isn't an ordinary claimant, this is someone who already has another situation, that means this injury is going to be more difficult to accommodate than normal. He -- he -- he doesn't have the movement and the flexibility that others might have, but I never saw anyone look at that and say, How does four herniations in the cervical area affect someone who's also paralyzed from the waist down?  What do they do?  How do they get around in a wheelchair?  How is that going to affect his ability to lift himself in and out of things?

        To me, that's a part of this case that never really got fairly considered.

    Q.    During the CRN time period, did -- were any medical records submitted to Progressive that offered any medical opinion on that issue that you're, kind of, offering an opinion on?

    A.    I'm not offering a medical opinion.  I'm trying to say that as a -- I mean, the one thing adjusters don't lose -- or they shouldn't lose when they become an adjuster is your common sense.  And if you look at this type of situation, it doesn't take a



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

medical doctor to tell me that Mr. Wilkins's response and accommodation of the cervical herniations is going to be more complicated than someone who wasn't already wheelchair-bound.

Q.   Right.  And my question isn't -- is whether one of Mr. Wilkins treating providers offered an opinion like that in the records submitted to Progressive during the CRN timeframe?

A.   I didn't see one.  But again, as an adjuster, you bring your experience to a case, and we've all seen cases where you ended up with life care plans and things of that sort.  And I would anticipate that this very issue would become a section of the life care plan, talking about how he would have to do certain things to accommodate it.  You try to anticipate where the claim is going.

Q.   You mentioned a life care plan.  Was any life care plan or future cost estimate provided to Progressive during the CRN time period?

A.   No, I specifically said you try to anticipate where it would be going and what will happen.  And if this case got to that point, I would've expected a life care plan to address the complications that this created to someone already bound to a wheelchair.

Q.   On Page 12 of your report, you reference a --



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

in the second paragraph, that the value of injury was $45,000. Do you see that?

A.    Yes.

Q.    Do you know what you're referring to?

A.    At that point, I think I added the 10 from the primary carrier, the 10 from the PIP, and an offer of 25.

Q.    Okay.  So this is referring to the June 2020 time period -- or no.  Excuse me -- the July 2020 time period where the $25,000 was -- $25,000 offer was made by Progressive?

A.    It is part of my comment that this was always undervalued.

Q.    Okay.  I just didn't know where the $45,000 came from, so just trying to --

A.    It actually, if I -- it actually should be $45,500.  I guess there was a $500 Med-Pay component, as well.

Q.    What -- earlier, you talked about the evaluation ranges and that you offered an -- you had made a statement or opinion about how Progressive offered at the very bottom of the evaluation ranges.  Do you recall that?

A.    Yes, I do.

Q.    And is it your opinion in insurance industry

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

custom and practice that it's violated when an evaluation range is established, and the adjuster makes an offer at the bottom end of the range?

A.   No, I think it is typical to begin your discussions in the lower end of your range.  I think once or twice, they're actually below the lowest end of the range, but you begin down there, and you move up during discussions, or you move up even without discussions.

And I know there's a cliche that you don't like to bid against yourself, but the real issue should be, what do you have to put out there to fairly evaluate the claim, whether you're bidding against yourself or not? And if I've got a wide range and I make an offer in the lower end of the range that doesn't -- isn't accepted, before I shut the door, I would move up to the higher end of the range and see if that gets any interest.

Q.   On Page 12, you also state that, in July of 2020, faced with a policy limit demand of $50,000.  Do you see that?  It's in the second to bottom paragraph.

A.   Yes.

Q.   There was no open demand for the $50,000 policy limits at this point in time, correct?

A.   There wasn't an open demand, no.  I -- I'm



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

more focused on that -- the change that, finally, they say, yes, it's worth our limits, and instead of offering their limits, she offers half of it.

Q.   But at that point in time, there was no demand for $50,000?

A.   No, not a specific demand.  I don't -- that's probably a -- slightly inaccurate.  I meant to say that he still hadn't come below 50.  She has authority for 50, and, for reasons I don't understand, she offers half of that.

Q.   All right.  Mr. Doucette, we've been -- I've been going for a bit.  Take a five-minute break, let me look at my notes, and probably get you wrapped up here.

A.   All right.

THE REPORTER:  Sounds good, y'all.

(A recess was taken.)

THE REPORTER:  All right, everyone.  The time now is 12:47 p.m.  Eastern Time, and we are back on the record.  Thank you.

BY MR. ANGLEY:

Q.   Mr. Doucette, we're back from a break.  Is there any -- do you have any other opinions other than -- well, is there any -- are there any opinions that you have that we haven't discussed today?

A.   Certainly not any major opinions and nothing I



MILESTONE | REPORTING  COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

can think of.

Q.   Okay.   As -- you know, the reason why I ask is, I'm sure you know, don't want any undisclosed opinions at trial, so I just want to -- that's the reason for the question.  So to the extent there are supplemental opinions, we'd ask, you know, that any additional opinions be rendered in writing and provided to our office.

But just to confirm, no other opinions other than what we talked about today?

A.   Not at this point, no.

MR. ANGLEY:  Okay.  All right, sir.  I don't have any further questions, and I do appreciate your time here today and hope you have a nice vacation.

THE WITNESS:  Thank you.  I think I will.

CROSS-EXAMINATION

BY MR. GUNN:

Q.   All right, Mr. Doucette, just a couple of follow-up questions and we'll get you on your way.  So first, we talked a lot about the fact that this is a first-party UM case and there are different obligations of insurance carriers in the first-party context, correct?

A.   Yes.

Q.   All right.  Did Progressive ever make payment



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

of any claim benefits to Mr. Wilkins without condition?

A.   No.

Q.   Did Progressive ever agree to confess to judgment in the UM/UIM case at any point in time prior to verdict?

A.   No.

Q.   Does Progressive's condition of release on all offers pursuant to the policy violate Progressive's good-faith obligations under Florida law?

MR. ANGLEY:  Form.  Calls --

THE WITNESS:  It does in my opinion, in the sense that they're putting their interests ahead of their insured's by requiring them to release them from potentially improper actions before obtaining the benefits of a contract that was already in existence.

BY MR. GUNN:

Q.   I'm sorry, I missed the first part of your answer there with the objection.  If you could --

A.   I believe I said -- well, rather than guess again --

MR. GUNN:  Madam Court Reporter, could you read back the first part of his response there?

THE REPORTER:  Absolutely.  Standby.

MR. GUNN:  Just make sure the form objection to

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900      www.MILESTONEREPORTING.com      Toll Free 855-MYDEPOS

the, I guess, second re-asking just for the purposes
of the record.

MR. ANGLEY:  The objection is continuing.

You just want to re-ask the question?  It

may ---

MR. GUNN:  Sure.

MR. ANGLEY:  -- go faster.

THE REPORTER:  Sorry about that.  Did you want

the first --

MR. ANGLEY:  No problem.

THE REPORTER:  -- whole thing.  So I was trying

to get the whole thing, but --

MR. GUNN:  That's all right.  I'll --

(The requested answer was read back.)

BY MR. GUNN:

Q.   All right.  Yes, let me start that part over.

So Mr. Doucette, did -- every offer in this
case that Progressive made, did you understand that that
was conditioned upon execution of a general release?

MR. ANGLEY:  Object to the form.

THE WITNESS:  I believe it was.

BY MR. GUNN:

Q.   Okay.  Does Progressive's insistence on a
general form of release, which would encompass claims
beyond those two benefits of UM/UIM payment under the

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

policy, violate industry standard and practice and violate Progressive's good-faith obligations under Florida law?

MR. ANGLEY: Object to the form of the question.

THE WITNESS: In my mind, it does. Because it puts their interests ahead of its insured's by basically saying, yes, we will pay you the benefits to which you're entitled by contract, but only if you release us from improper acts that may have occurred during the handling of the claim. So it puts their release as the condition upon paying benefits that don't have that as a contingent provision in the policy.

BY MR. GUNN:

Q. And is that opinion based upon both industry custom and practice and your understanding of Florida law?

MR. ANGLEY: Object to the form.

THE WITNESS: It is.

BY MR. GUNN:

Q. And would both bases stand independent of one another? Obviously, Florida law informs Progressive's good-faith obligations and claim handling. You explained that a lot at the beginning of your



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    **Toll Free 855-MYDEPOS**

deposition.

But I just want to make it clear, you're not expressing a legal opinion in stating that conclusion?

MR. ANGLEY:  Form.

THE WITNESS:  It is not a legal opinion.  I think it's a fairly universal principle, not limited to Florida, that an insurance company can't put its interest ahead of its insured's.

BY MR. GUNN:

Q.   And to complete the thought, by conditioning on release of claims, outside of those to benefits, you believe Progressive is doing so?

MR. ANGLEY:  Form.

THE WITNESS:  It is.

BY MR. GUNN:

Q.   All right.

A.   It -- the contract requires the payment of certain benefits by contract, and they're reading into that an additional requirement that in order to get those benefits, you have to release us from possible bad-faith behavior.

Q.   And that language does not appear anywhere in the contract, that condition of release of bad-faith claims?

A.   It is not part of the contract.



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

Q.   Sir -- and you prepared two reports in relation to this matter, correct?

A.   I did.

MR. GUNN:  And Madam Court Reporter were both of those reports -- or David, were they both attached as exhibits?

THE REPORTER:  Yes, they were.  They were attached as 3 and 4.

MR. GUNN:  Great, great.

BY MR. GUNN:

Q.   You've been testifying for about four hours now, sir.  Does any of your testimony today lead you to believe that changes or amendments are necessary to your report?

A.   Not at this point, no.

Q.   Are all of the opinions contained within both of these reports still relevant to this case?

MR. ANGLEY:  Form.

THE WITNESS:  They are.

MR. GUNN:  All right.  I don't have any further questions.  Thank you for your time.  David may have some brief follow-up.

REDIRECT EXAMINATION

BY MR. ANGLEY:

Q.   Yep.  Mr. Doucette, under insurance industry

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

custom and practice, is an insurance company required to confess judgment?

A.    No.

Q.    Okay.  Under insurance company -- excuse me.

Under insurance industry custom and practice, is an insurance company required to tender amounts above the policy limits?

MR. GUNN:  Form.

THE WITNESS:  No.

BY MR. ANGLEY:

Q.    Okay.  Same question, but is an insurance company required to accept offers above the policy limits?

A.    They are not required to do so.

Q.    Under insurance industry custom and practice, is an insurance company required to, for example in this claim, pay Mr. Wilkins, the $50,000 in UM benefits and permit a bad-faith action to proceed forward?

A.    I think that -- if I understand your question, you're asking me whether they would be required to pay what's owed under the policy under policy and still allow a bad faith action to proceed?

Q.    Yes.

A.    Then my action is, yes, you do.  You can't condition a justifiable payment under a policy for

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602

407.423.9900        www.MILESTONEREPORTING.com        Toll Free 855-MYDEPOS

benefits that are earned, if you want to put it that way, upon a condition that doesn't exist in the policy and one that puts the insurance company's interests ahead of its insured.

MR. ANGLEY:  Okay.  That's all I got.

MR. GUNN:  All right.  Thank you.

THE REPORTER:  All right.  Thank you.  So before we go off the record, really fast, so let's start with Mr. Doucette.  Are we reading or waving today?

THE WITNESS:  Reading.

THE REPORTER:  All right.  What is a good e-mail address for you to send the transcript to?

THE WITNESS:  Dan@doucetteassociates --

THE REPORTER:  Got it.

THE WITNESS:  -- .com.  So it's last name, associates.com.

THE REPORTER:  You got it, yep. Dan@doucetteassociates.com.  Perfect.

And then Mr. Angley, do we want the transcript today?

MR. ANGLEY:  Yes, we do.  Thank you.

THE REPORTER:  All right.

MR. ANGLEY:  We --

THE REPORTER:  Sorry.  Go ahead.  I'm sorry.



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

MR. ANGLEY: Yes. We will be ordering, and then can you give me a price quote for expedited orders?

THE REPORTER: Absolutely. When you say, "expedited," do you know how many days you're looking to get this back?

MR. ANGLEY: Probably by the end of the week.

THE REPORTER: End of week? Okay. So we'll say by -- well, Friday's a holiday. Say -- we'll aim for -- is July 3rd; does that work?

MR. ANGLEY: Probably.

THE REPORTER: Well, I guess the holiday's Thursday, right? So --

MR. ANGLEY: Depends on your work, I guess.

MR. GUNN: Yeah, July 4th is Friday.

THE REPORTER: It is Friday? Okay. So I was right. So is the 3rd, okay?

MR. ANGLEY: Yeah.

THE REPORTER: Okay. Awesome. Sorry about that confusion. And then would you like electronic delivery? Does that work?

MR. ANGLEY: Electronic is fine.

THE REPORTER: All right. And, Mr. Gunn, did you want a copy of the transcript today, or the same thing? Did you want to get an estimate first?



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

MR. GUNN:  Copy, standard delivery is fine.

THE REPORTER:  Copy and standard?  You got it.
When you say "standard," electronic, is that okay
too with you?

MR. GUNN:  Correct, yeah.  And I heard -- do
you guys do, like, extras like that summary thing,
or stuff like that, that I got to tell you guys --

THE REPORTER:  Absolutely.

MR. GUNN:  -- in time, I don't want?

THE REPORTER:  You don't want it?

MR. GUNN:  I don't want it.

THE REPORTER:  Okay.  Perfect.

MR. GUNN:  Okay.  Thank you.

THE REPORTER:  Of course.  You don't want it?
Yes, Mr. Angley?  Sorry.

MR. ANGLEY:  I don't need the AI summary, or
whatever.

THE REPORTER:  Okay.  Now it does come
complimentary for the person who orders it, if we do
go over an hour.  So if you want it, you can have
it.  If not, it's okay.  It's up to you.

MR. ANGLEY:  We'll take it then.

THE REPORTER:  Okay.

MR. ANGLEY:  I don't --

THE REPORTER:  Perfect.

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900     www.MILESTONEREPORTING.com     Toll Free 855-MYDEPOS

MR. ANGLEY:  I don't know about -- I don't know how much I trust what it's getting down.

THE REPORTER:  Oh, okay.  Oh, okay.  All right. Are we in agreement to go off the record?

MR. GUNN:  Yes.

MR. ANGLEY:  Yes, ma'am.

(Deposition concluded at 12:59 p.m. ET)



MILESTONE | REPORTING  COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF ORANGE

     I, the undersigned, certify that the witness in the foregoing transcript personally appeared before me and was duly sworn.

Identification:  Produced Identification



_____

HANNAH DECLERK

Court Reporter, Notary Public

Commission Expires: 01/16/2028

Commission No. #HH 481563

MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

C E R T I F I C A T E

STATE OF FLORIDA)

COUNTY OF ORANGE)


     I, HANNAH DECLERK, Court Reporter and Notary Public for the State of Florida at Large, do hereby certify that I was authorized to and did report the foregoing proceeding, and that said transcript is a true record of the said proceeding.


     I FURTHER CERTIFY that I am not of counsel for, related to, or employed by any of the parties or attorneys involved herein, nor am I financially interested in said action.


Submitted on: July 3, 2025.




_____

HANNAH DECLERK

Court Reporter, Notary Public




MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

407.423.9900          www.MILESTONEREPORTING.com          Toll Free 855-MYDEPOS

ERRATA


PAGE      LINE                        CHANGE      REASON

I have read the entire transcript of my deposition taken in the captioned matter or the same has been read to me.I request that the following changes be entered upon the record for the reasons indicated. I have signed my name to the Errata Sheet and authorize you to attach the changes to the original transcript.

_____          _____

Date                          NAME



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

**MILESTONE I REPORTING COMPANY**

TOMORROW'S TECHNOLOGY TODAY

**407.423.9900**
**Fax 407.841.2779**
**Toll Free 855-MYDEPOS**

**July 03, 2025**

**Daniel Doucette**
dan@doucetteassociates.com

RE:     Deposition of **Daniel Doucette** taken on 6/30/2025
        **Mondamin Wilkins v. Progressive Select Insurance Company**

Dear Mr. Doucette,

## IMPORTANT NOTICE FOR DEPOSITION TRANSCRIPT READ AND SIGN

It is suggested that the review of this transcript be completed within 30 days of your receipt of this letter, as considered reasonable under Federal Rules*.

_____     **Attorney - Copy of Transcript Enclosed:**   Signature of the Deponent is required.   Please have the deponent make any corrections/changes necessary on the Errata Sheet ONLY, sign name on the form where indicated.   Please return ONLY the original signed Errata Sheet to our offices within 30 days from the date of this memorandum.   If you have any questions, please call our offices.

_____     **Attorney - No Copy Ordered:**   Since you did not request a copy of the transcript, it will be necessary for the Deponent to call our offices to arrange for an appointment to read and sign the transcript of the Deposition within 30 days of this memorandum.

  X     **Deponent:**   At the time of your deposition, you did not waive your right to read and sign the transcript of your testimony, therefore, attached please find a copy of the transcript and Errata Sheet.   Please read the transcript, make any corrections necessary on the Errata Sheet ONLY, sign the bottom of the Errata Sheet, and return it within 30 days from the date of this memorandum.   Please call our offices if you have any questions.

_____     **Deponent:**   At the time of your deposition, you did not waive your right to read and sign the transcript of your testimony, therefore, it is necessary for you to come to our offices to read and sign same.   Please call Milestone Reporting Company to arrange for an appointment at your earliest convenience.

_____     The errata sheet(s) and Notary Certificate(s) have not been received by our office in the allotted time period. The original transcript has been filed with the appropriate court or counsel.

Thank you for your attention to this matter.

No. 394636                                  Reporter:

cc: Delton Gunn, Esquire
David Angley, Esquire

Waiver:
I, Daniel Doucette (RC), hereby waive the reading and signing of my deposition transcript.

_____          _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
Deponent Signature                                    Date

*Federal Civil Procedure Rule 30 (e) / Florida Civil Procedure Role 1.310 (e)

400 North Ashley Drive, Suite 2600          315 East Robinson Street , Suite 510          4651 Salisbury Road, 4th Floor
**TAMPA, FL 33602**                              **ORLANDO, FL 32801**                        **JACKSONVILLE, FL 32256**
                                              **CORPORATE**
                                    **WWW.MILESTONEREPORTINGCOMPANY.COM**

**$**

**$0** 155:21 156:19

**$11,400** 92:22 94:5

**$13,300** 92:19

**$150** 93:11

**$150,000** 156:24

**$17,000** 119:11 120:10 121:5,10

**$200,000** 153:1 156:20

**$25,000** 137:22 163:10

**$250** 93:3

**$45,000** 163:2,14

**$45,500** 163:17

**$475** 91:12

**$50,000** 119:18 121:9,16,17,23 122:17 123:13 124:8 125:23 127:4 155:5 156:3,8,23 157:2,5,11,12 164:20,23 165:5 172:17

**$500** 163:17

**0**

**01/16/2028** 177:18

**1**

**1** 3:10 8:15,19 10:21,24 120:15

**10** 44:12 46:21 47:22 56:9 127:20 128:19 163:5,6

**10,000** 53:18

**10:02** 120:20

**10:13** 54:11

**100** 33:18 38:7 57:25 58:4,10,17 69:21,23

**1099** 54:1

**11** 13:14 158:14 160:13

**11th** 112:25

**12** 162:25 164:19

**12:47** 165:18

**12:59** 176:7

**124** 6:20

**130** 79:22

**15** 7:20 15:15 56:10 63:22 75:5

**152** 16:2

**153** 16:2

**16** 39:2

**166** 3:5

**16800** 6:19

**17,000** 124:20

**171** 3:6

**18** 3:13,15

**18th** 16:4,7 53:23 92:21

**19** 8:16,17 19:11 22:6 30:13 115:25 116:1,5

**1967** 22:7,24 24:10,25

**1971** 19:4,11 22:7,24 24:5,10 26:15

**1974** 19:14 27:16 30:11

**1976** 30:11 31:17 32:7

**1988** 32:7 37:13 39:7,8 40:3,9 41:6 43:11 44:8

**1989** 32:10 39:9 40:4 41:24

**1990** 41:7,24 44:14 47:22

**1991** 44:14 45:5

**1992** 42:13 43:13,17

**1995** 47:5,22

**1998** 50:14

**1999** 40:9 44:8,14

**19th** 110:23 113:3 158:24,25

**1st** 62:10 74:16

**2**

**2** 3:11 9:10,11,15 11:10 62:9 92:1 130:22 140:14 142:4

**20** 7:20 15:15

**2005** 45:5 48:23 49:25

**2007** 50:23,25

**2011** 48:23 49:25 50:3

**2012** 50:6 59:5,19 61:10,13

**2019** 8:9 96:11,15 110:24 113:3,22 117:12,18 118:1 146:6 147:11 158:25

**2020** 96:11,15 112:25 119:7 120:4,5,20 121:6 123:12 152:5,20 153:7 159:3 160:8 163:8,9 164:20

**2021** 62:10 74:16 120:3

**2025** 1:21 3:13,15 4:7 16:4,7 18:4,14 53:23,24 92:21 106:19 178:17

**210** 91:25



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**   **www.MILESTONEREPORTING.com**   **Toll Free 855-MYDEPOS**

**21st** 120:20 123:12

**228-7070** 2:5

**234** 8:24

**24** 92:4,14,21

**24th** 153:7

**25** 33:21,22 163:7

**25,000** 124:20

**255** 120:15

**26th** 8:9 146:6 147:11

**27th** 117:25

**28** 92:15,18

**28th** 113:22 117:11,18

**29** 3:13,15

**2950** 2:11

**29th** 18:4,14,21 53:24 106:19 107:5 108:13 138:14

**2nd** 117:12,18

---
3
---

**3** 3:12 11:12 18:2,9 101:11 140:23 171:8 178:17

**30** 1:21 41:11

**30th** 4:6

**315** 4:4

**32801** 4:5

**33602** 2:5,11

**33rd** 6:25

**35** 12:4 122:5

**3600** 2:4

**3rd** 174:10,17

---
4
---

**4** 3:14 11:15 18:5,10 103:6 104:5 171:8

**40** 22:21 41:11 57:17 74:9 104:23 122:4

**401** 2:4,10

**404.4** 101:15 102:18 103:19

**47** 52:12

**48** 63:18 68:9 74:9

**481563** 177:19

**4th** 174:15

---
5
---

**5** 3:3 11:17

**50** 28:23 33:19 58:5,8 119:22 121:13 122:9,13,14 123:1,7,10,25 124:3,9 126:24 127:7 165:8,9

**50,000** 124:20 129:18

**50/50** 29:2

**510** 4:4

**528** 6:25

**55** 57:16

---
6
---

**6** 3:4 11:20 104:25 109:12

**60** 57:16 118:7

**603-3006** 2:12

**60-day** 118:4

**627727** 140:12

---
7
---

**70** 58:8

**71** 24:25

**74** 26:15

**75** 56:11

**76** 31:20

---
8
---

**8** 3:10 41:23 110:11

**8:24-CV-01793-TPB-AAS** 1:4

**80** 74:16,23

**80s** 35:16

**813** 2:5,12

**88** 32:8

**89** 32:8,9

---
9
---

**9** 3:11 115:13 119:5

**9:03** 4:7

**90** 34:2 97:17 98:24

**91** 41:24 42:13

**92** 42:13 46:25

**99** 43:11 44:8

---
A
---

**a.m** 4:7 54:11 120:20

**ABA** 60:23

**abbreviations** 23:1,2

**ability** 129:18 131:12 161:14

**able** 5:18

**absence** 114:6

**absent** 149:7

**absolutely** 48:9 90:6 112:16 132:25 133:14 134:6 135:23 146:14 147:16 167:24 174:4 175:8

**Abstract** 11:24

**abuse** 49:8

**accept** 39:24 42:22 122:14 123:6,12,22 124:21 125:2,18,19 126:1 138:3 151:22 152:11 160:10 172:12

**accepted** 117:24 125:6 152:8 156:16 157:11,13



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**       **www.MILESTONEREPORTING.com**       Toll Free 855-MYDEPOS

164:16

**accepting**
121:3,17

**access** 53:7

**accident** 8:9
27:4 33:2 42:6
82:20 90:5
132:24
133:22,25
146:6,10,17,19
,21
147:2,4,11,20

**accommodate**
161:7 162:15

**accommodation**
162:2

**according** 17:11
42:7

**accurate** 26:16
56:14 110:22
112:17 124:17

**ACDF** 110:13,19
111:8 112:18
113:4
136:18,25
158:1
159:1,7,13,15,
19,24

**Ackley** 82:15

**acknowledged**
122:16

**acknowledging**
132:24

**acquired** 42:14
43:14 46:3,16

**acquiring** 42:24

**acquisition**
43:4 48:4

**act** 27:7 29:24

**acted** 37:16
103:18

**acting** 16:21
104:18

**action** 8:4
17:21 20:7,8
56:22 57:1,3,7
62:23 63:7
67:17 68:21
69:15 70:6
74:1 77:5,21
79:3 83:14
110:8 112:23
172:18,22,24
178:15

**actions** 57:6
67:20 95:2
167:14

**active** 68:13
71:11 74:5
79:17 85:10,14
86:12 95:17

**activity** 129:24

**acts** 100:4
147:10 169:10

**actual** 11:2
17:9 21:18,23
22:5 145:19

**actually** 14:25
15:12 21:15
27:7 32:8
39:22 42:15,25
53:4 75:12
76:17 79:24
88:21 137:8

163:16 164:6

**add** 138:6

**added** 40:20
163:5

**addition** 55:21

**additional**
11:24 14:17,23
48:15 62:17
92:6,10
107:18,19
108:6,8 112:1
114:4,5 116:16
118:14,22
119:3 128:2
138:16 166:7
170:19

**address**
6:17,19,24
7:13 103:22,23
162:23 173:13

**adequate** 73:25

**adjourned** 88:18

**adjust** 42:7

**adjusted** 61:24

**adjuster**
25:9,16 29:16
41:17 43:25
44:2 59:16,20
62:1 69:20,22
97:17 98:24
99:12 114:24
120:23 131:15
132:8 134:14
135:20 136:3
143:5,15 144:9
149:24 159:15
160:22 161:24
162:9 164:2

**adjusters**
28:3,15,18
41:1 97:7
132:13 143:19
160:11 161:23

**adjuster's** 62:3

**adjustments**
153:20

**administration**
19:4

**administrative**
52:13

**admitted**
19:16,17,20,21
,22 133:14
146:13

**admitting** 81:16

**adopts** 95:2

**advanced** 25:3

**affect**
161:11,13

**affected** 136:9

**affiliated**
22:19 47:5

**affiliation**
47:13

**affirm** 6:2

**affirmative**
95:18

**afterwards**
135:5

**against** 16:14
28:11 34:4,7
35:8 73:23
77:20 80:25
84:4,5 89:18





MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    **Toll Free 855-MYDEPOS**

112:22 124:6 156:8,18 164:11,13

**agencies** 49:7

**agency** 22:10 55:23

**agent** 42:19,21 80:20,25 84:5

**agents** 33:20 42:20 56:1

**ago** 6:12 7:20 14:12 83:7 115:17

**agreed** 4:9 87:6 111:19 148:20 150:5

**agreement** 15:24 47:13 176:4

**agreements** 47:14

**ahead** 121:25 167:12 169:7 170:8 173:4,25

**AI** 175:16

**AIC** 21:14,20 23:3,18,20 24:3,19 97:6 98:23 99:6 101:18 102:20 136:2

**aim** 174:10

**airline** 20:12

**Airport** 85:21,22

**Alaska** 22:22

**allegations**

124:4 139:17

**alleged** 160:18

**allow** 172:22

**allowed** 90:6 103:17

**alone** 48:17

**Alpha** 42:14 43:14,16 46:3,16

**A-L-P-H-A** 43:16

**already** 102:20 104:22 118:19 130:8 132:6 137:10,16 139:16,17 146:11 148:20 160:8,9,25 161:6 162:3,24 167:15

**am** 17:22 101:4 143:8 178:12,14

**ambivalent** 32:1

**amendments** 171:13

**American** 81:2

**Amica** 109:8

**among** 80:13

**amount** 51:24 155:4

**amounts** 152:16 172:6

**analysis** 55:18 160:22

**ancillary** 20:13

**and/or** 40:4 41:1 103:2

**Angley** 2:9 3:4,6 5:10,23 6:9,13 8:22 9:21 10:6,9,15,19 13:20 18:13 54:4,13 64:15,18 65:10,11 66:13 69:3 87:11 104:3 110:17 111:1 126:10,25 127:8,17 147:7 150:1,12 153:23 155:3 156:14 160:6 165:20 166:12 167:10 168:3,7,10,20 169:4,19 170:4,13 171:18,24 172:10 173:5,20,22,24 174:1,7,11,14,18,22 175:15,16,22,24 176:1,6

**animals** 81:5

**answer** 46:19 61:14 100:11 106:6,15 146:8 167:19 168:14

**answered** 133:6

**anticipate** 100:13 145:9

162:12,15,20

**Antoniou** 2:9 5:10

**anybody** 70:8 124:5

**anymore** 8:1 156:9 157:4

**anyone** 106:18 161:4,10

**anything** 13:16,25 15:4 71:8,11 81:25 83:7 95:23 98:14 115:2 118:24 121:13 122:5 130:5 133:8 134:11 136:11 137:12 138:8 146:20 147:18 151:9

**anyway** 86:5

**anywhere** 42:11 97:3 104:18 143:13 170:22

**apologies** 83:2

**apparently** 113:20 131:14

**appeal** 71:6 76:18,21 81:24 88:14

**appealed** 79:1

**appear** 69:7 170:22

**appearance** 5:5

**APPEARANCES** 2:1

**appeared** 2:7,13



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     www.**MILESTONEREPORTING**.com     Toll Free **855-MYDEPOS**

177:7

**appearing**
5:8,12

**appears** 158:19

**appellate** 76:24
87:13

**applicable**
98:18,25 103:3

**application**
133:18

**apply** 20:21
52:4 95:13
96:11 98:7
101:6,9 103:9
104:1

**applying** 101:19

**appraisal** 73:9
76:10

**appreciate**
86:20 166:13

**approach** 17:14
104:15

**approached**
39:14

**appropriate**
52:7 95:22
103:24 105:12
122:18 126:17
147:21 152:13
155:18 157:21
158:12

**approximately**
8:24 28:21
35:14 64:1
92:19 93:4,5

**approximation**

33:23

**April** 3:13
18:4,14,21
53:24 106:19
107:5 108:13

**area** 7:23 16:23
17:3 35:18
43:8 57:16,25
60:16 90:12
133:1,18
161:11

**areas** 32:22
33:6,13,14
45:21 48:13
54:20 56:8
90:6

**aren't** 53:8
96:20 103:3
126:6 148:25
159:25

**arising** 8:9

**Arizona** 33:21
42:2 54:24
55:21 56:4

**arms** 161:2

**arrangement**
32:16

**arrangements**
45:14

**arrested** 82:21

**arrived** 127:24

**article**
102:20,21

**articles**
60:9,19
61:1,10
99:12,14

102:13

**aspect** 28:12
29:13 56:16

**aspects** 51:22
158:4

**asserted** 158:1

**assigned** 73:20

**assist** 53:14
106:19

**assistance** 93:8
132:14

**assistant** 13:2
52:12,13 121:1

**assists** 53:12

**associate** 23:3
27:20 31:19
53:11

**associated**
22:18

**Associates** 50:6
51:4,18,19
52:10 53:2
54:16,20 56:7
57:20
58:11,15,18
59:5 61:12,15

**associates.com**
173:17

**assume** 143:5
145:4

**assumed** 145:3

**assuming** 107:2
157:1

**assumption**
156:20

**assumptions**
107:13,22

**at-call** 53:15

**attach** 179:20

**attached** 18:21
171:6,8

**attempt** 101:8

**attempted** 80:22

**attempting**
106:25 109:21

**attended** 4:6
26:11

**attending** 5:5

**attention** 16:17

**attorney** 12:3
14:3 15:2,6,7
20:11 26:7,10
27:19 36:11
53:11 58:22
114:22 121:1,2
124:1 125:24
126:14,20
151:14
154:6,10,24

**attorneys** 12:10
13:11 56:17
113:11 114:2
117:22
123:15,24
148:2 178:14

**attorney's**
115:7 160:9

**audience** 60:25

**audit** 40:24
45:11
49:13,14,15



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

**audits** 44:24

**authenticated** 90:9,11

**authored** 60:8

**authoritative** 96:18 97:13

**authorities** 97:5

**authority** 42:22 137:18,21,25 138:1 165:8

**authorization** 114:18 115:4,10 131:20,22

**authorizations** 131:13

**authorize** 179:20

**authorized** 178:8

**auto** 26:3 33:1 72:24 73:9 76:10 77:13 90:4 146:19,20 147:4

**automobile** 146:6

**available** 13:13 110:1 115:17 131:19 155:4

**Avenue** 6:20

**Avera** 80:6

**aviation** 20:6 33:8,12,22 39:16 52:20

**avoid** 95:4 100:13,14,16

**avoided** 124:4

**awarded** 142:8

**aware** 9:25 99:1 107:20 123:15

**away** 64:5 87:9 133:16

**Awesome** 174:19

---
B
---

**bachelor's** 19:7

**backdating** 80:23

**background** 21:16 44:25 51:25 55:23 56:3 94:1 102:7 149:11

**bad** 8:4 17:2,21 20:19 35:16,24 36:8,10 37:1 51:23 52:5 53:17 54:22 55:2,14 56:5,10,11,15, 22 57:1,2,7,13 58:21 59:22 60:6,9,11,16 61:8 62:23 63:7 76:13 77:4,6 79:3,6,10 81:8,10,20 82:2 83:15,24,25 84:13 85:10,19 86:13,17 89:23

95:4 100:4,9,13,14, 15,16 101:16 103:11,18 124:5 139:2,17,21 155:2 172:22

**bad-faith** 35:11,21 36:5,22 37:2,8 64:19 67:17,20 68:4,21 69:15 70:25 71:21 72:17,19 75:18,21,22 82:4,16 83:3,25 84:21 85:25 105:13 110:8 123:25 125:5 126:23 150:22 154:16,19,25 155:19 156:17,22 170:21,23 172:18

**badly** 73:22

**balance** 56:10

**balanced** 75:3

**ball** 137:23

**bankrupt** 70:8

**bar** 19:18 20:25 21:2,3 33:10 38:1 76:18 83:18 85:25 138:23

**barns** 86:5

**barroom** 83:22

**base** 132:12 134:1,5 135:23

**based** 19:3 25:19 35:22 38:17 48:3 50:11,16 51:4,5,14 52:2 74:14 79:15 94:14 98:5 100:8 103:11 106:10 117:20 118:8 119:1 126:1 128:25 144:20 147:13 149:20 150:13 151:8 169:16

**bases** 130:16 169:22

**basic** 12:10 95:15 96:23 97:23 98:1 101:23 102:16 104:20

**basically** 29:24 30:14 44:20 45:20 47:14 48:14 87:9 99:8 128:2 139:21 169:8

**basics** 96:20 97:18,19

**basis** 17:17 53:15 107:8 116:17 119:20 122:18 128:12,16 129:11 131:3 140:1

**basket** 158:5



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      Toll Free 855-MYDEPOS

**Bates** 85:22 120:15

**Bear** 160:13

**beaten** 73:22

**became** 30:18 31:8 37:23 46:13 47:5 50:21

**become** 161:24 162:13

**becomes** 13:13

**becoming** 80:11

**begin** 6:7 43:7 164:4,7

**beginning** 25:4 41:8 45:18 134:4 160:14 169:25

**begins** 101:11 103:8 109:12

**behalf** 2:2,8 5:7,11 33:9,25 38:1 42:23 57:14 63:3 66:3,18 67:6,12 70:13,22 71:17 72:25 73:14 74:16,24 75:5,15,25 77:7 81:12,20 82:12,15,25 83:11,19 84:17,20 85:1,7,12,16,2 2 86:2,9 87:19 89:19

**behavior** 170:21

**believe** 8:20 9:17 15:21 20:4 24:3 36:1 58:23 59:24 62:17,18 64:24 65:3 66:6 67:18 71:6 75:22 76:4,19 78:9,16 79:1,16 82:5,19,23 83:8 85:19 86:11,19 107:9 108:9,23 109:10 110:3,9 113:1,11 116:3,7,11,15 117:13,19 118:21 123:23 124:24 130:4 139:22 140:23 144:15,22,25 148:3 152:18,20 153:13 154:12 156:18,19 158:10 159:3,6 167:20 168:21 170:12 171:13

**believed** 117:1

**believes** 126:22 147:24

**benefit** 139:18

**benefits** 139:12 167:1,15 168:25 169:8,13 170:11,18,20

172:17 173:1

**Benton** 84:16,17

**besides** 9:13

**best** 45:3 160:24

**better** 9:5 51:9 135:8 144:12,14

**beyond** 99:24 146:20 168:25

**BI** 77:3

**bias** 133:10 135:24 136:10

**bid** 164:11

**bidding** 164:13

**bigger** 60:6,18 61:9

**biggest** 47:17

**bill** 2:10 13:1,3,9,10,12 93:2,7 94:5,7

**billed** 91:21 93:13

**billing** 11:20 12:23 13:7

**bills** 93:2,14 94:3

**bit** 21:13 24:16 39:22 44:25 47:19 53:7 96:5 109:23 115:17 165:12

**black** 99:11

**Blaise** 2:9 5:10

**blended** 47:14

**blurring** 159:9

**Board** 21:5

**Board-certified** 21:5

**bodily** 25:24 27:10 29:13 34:11 84:13 85:18 86:11

**body** 137:10 161:2

**Boles** 2:10

**bonds** 38:4

**book** 97:8 99:10,15

**books** 56:2 98:2

**Booth** 83:25

**bother** 114:15

**bothered** 114:24

**bottom** 110:11 163:22 164:3,21

**Bottoni** 52:11

**bought** 50:17

**Boulder** 81:4

**Boulders** 81:7

**bounced** 88:22

**bound** 99:20 162:24

**Boy** 28:23 33:16

**branch** 46:12,13 49:15,16

**brand** 64:3



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

**brand-new** 73:20

**breach** 141:5,21

**break** 54:6,15
  101:17 127:9
  165:12,21

**breakdown** 33:14
  48:3 56:7
  109:17

**brief** 14:2
  54:15 106:24
  109:14 171:22

**briefly** 15:10
  109:10

**bright** 111:22

**bring** 10:18
  162:10

**Brink** 86:23,24
  88:24

**broad** 27:13
  30:21 105:20

**broadened** 44:18

**broader** 60:12

**broken** 14:25

**brokers** 56:1

**Brookfield** 6:20

**brought** 56:4

**BS** 19:4

**building** 67:25

**bulge** 143:23
  149:6

**bulges** 144:2

**bullet** 128:11

**bulletins** 99:14

**burden** 141:24

142:5

**Bureau** 72:14

**burned** 34:13
  86:6

**business** 19:4
  22:2 23:11
  26:4 45:3,16
  48:7 66:11

**busy** 53:6 58:3

**Butterfield**
  75:10

**buy** 47:11

———————
C
———————

**Cadle** 140:5,6

**calendar** 118:15

**Campbell**
  85:15,16

**candidate**
  159:5,8 160:8

**capacity** 30:3
  59:17

**Cape** 7:1

**capitalized**
  38:4

**capitalizes**
  99:15

**captioned**
  179:17

**captive** 37:16

**care** 112:19
  162:11,13,17,1
  8,23

**career** 22:17,19
  24:2 33:5 40:7

**careers** 32:4

**Carolina** 50:20

**Carolinas** 47:18

**carrier** 95:21
  163:6

**carriers** 60:5
  79:25 86:7
  166:22

**carry** 38:8

**carryover** 32:10

**case** 1:4 11:7
  12:6,8,17
  13:24 14:16
  17:1,11,16
  20:4,5,10,14,1
  6,19 27:14
  28:6,9
  32:12,18 33:17
  34:6,13 35:24
  36:8,10,11
  39:2 45:17,22
  53:17,22 61:7
  62:21
  63:1,4,6,15
  64:9,10,12
  65:4,24
  66:3,5,15
  67:3,9,15,22
  68:6,12,23
  69:4,15,25
  70:4,9,11,16,2
  0
  71:3,15,21,23
  72:17,19
  73:4,18,20,23
  74:3
  75:10,11,12,13
  76:7,15,16
  77:1,3,4,6,10,

14,17
  78:4,6,11,14,2
  2
  79:2,6,10,15,1
  6,18 80:4,8,17
  81:10,13,16,18
  82:13,18,24,25
  83:15,21,23,25
  84:12,22
  85:1,9,10,13,1
  7,24
  86:3,9,12,16
  87:17,25
  89:17,21
  90:4,14,15
  91:5 92:2
  93:15 94:14,21
  95:13,19
  96:2,20 97:3
  101:4,6,8
  103:20
  104:14,17
  105:9,10,11,13
  ,15,17
  106:14,17
  107:3,24
  108:22 110:10
  111:25
  112:1,17
  114:13,16
  122:18
  123:19,25
  124:10 125:5
  126:7,18,23
  127:24
  129:15,20
  130:4 136:25
  137:24
  138:24,25
  139:5,6,8,10,2
  2 142:2,5,16

 MILESTONE │ REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      www.**MILESTONEREPORTING**.com      **Toll Free 855-MYDEPOS**

148:3 150:22 151:5,8 155:15 161:15 162:10,22 166:21 167:4 168:18 171:17

**caseload** 28:2,5

**cases** 13:21 25:19 27:4 28:5 33:2,22,24 34:4,9,11,12 36:13,16,18 40:17 53:14 57:15 58:21,25 59:2 62:12,13 63:18,22 64:6 65:12,14 68:9,10,16 74:9,12,18,21, 23 77:18 78:18 86:23 89:15 90:3 91:2 94:2 98:16 101:2,4 103:3 111:23,24 117:4 140:5 162:11

**casualty** 23:8 47:8

**catastrophic** 55:8

**catching** 35:16

**categories** 8:16,17 57:24 58:12

**categorize** 79:19 84:6

**category** 144:1

149:16

**causally** 146:5

**causation** 131:9 132:21 136:7 158:9

**cause** 147:20

**caused** 132:24 133:22 146:9 147:1,10,19

**causing** 73:6

**cautious** 90:12

**ceased** 32:20 116:1

**Century** 73:13

**CEO** 44:25 45:19

**CEOs** 45:1

**certain** 21:23 143:22 158:11 162:14 170:18

**certainly** 24:17 26:9 34:19 35:10 42:8,11 46:11 63:25 107:20 111:10 138:24 150:20 151:15 156:19 159:18 165:25

**CERTIFICATE** 177:1

**certification** 21:22 23:18

**certifications** 21:9

**certified** 21:6

**certify** 177:6

178:7,12

**cervical** 117:17 146:5 147:10 160:18,23 161:11 162:2

**chairman** 48:24 49:2,3 56:1

**challenging** 37:23

**change** 24:21 39:22 47:2 48:5 165:1 179:3

**changed** 18:23 22:22 24:15,19 32:3 40:19,20 47:4,20,21 48:3 96:21,25 151:23

**changes** 24:18 171:13 179:18,21

**changing** 47:20

**charge** 91:15,19

**charging** 91:12

**Chartered** 23:8

**check** 46:20 90:2 120:6,11 146:12

**checked** 131:16

**chief** 43:17 44:15 45:6,8 46:2

**chiro** 144:13

**chiropractic** 112:2 117:6

**chiropractor** 115:23

**choice** 132:2

**choose** 106:9

**church** 84:16,18

**C-I** 53:5

**circuit** 68:8

**circumstance** 137:5

**circumstances** 103:25 104:10 125:10 160:24

**Ciszewski** 53:5

**Ciszewski's** 93:23

**cite** 17:16,18 101:3 102:17,21

**cited** 13:15 97:5 102:12 128:13 136:2

**citing** 101:14

**Civil** 4:8 117:22 118:3

**claim** 8:8 11:23 16:14,15,19 17:1,6 23:11 25:9 27:10,21,24 28:1,10,12 29:6 35:9 36:5,22 37:2 38:10,12,20,21 39:1 40:17,19,23 41:2 43:20



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

44:3,5,22
45:12,24 48:15
49:11 55:16
59:4,11 61:25
64:19
69:20,21,23
70:25 71:5
75:18,21,22
80:19 81:21
82:4,16 83:3
84:6,21 85:3
95:10 96:12,19
97:17 98:5
99:1 100:16
104:10,11
105:7,23
106:11 109:18
114:12 117:17
119:24
120:7,14,18
121:17 124:6
125:9,11 127:3
130:14,18,20
131:5,12 134:5
136:5,6
141:4,22
143:15 149:24
150:15,16,19
151:12
154:16,19
155:1,2,10,20,
22 156:5,17,22
157:4 159:14
162:15 164:13
167:1
169:11,24
172:17

**claimant** 34:1
132:9 142:5
157:23 161:5

**claiming** 55:15

**claims** 13:15
23:6
25:10,12,16,21
,24,25
26:6,8,10
28:14,22,25
29:1,3,6,8,9,1
0,12,13,14,17,
19 30:4,6,9,10
34:17,22
35:12,22
37:7,8,16
38:15,23,25
40:21
41:5,16,21,22
42:7,8,12,23
43:1,4,11,23,2
5 44:10,11,19
45:1,2
46:10,17,23
47:23 48:3,20
49:8,17 51:15
52:7
59:7,9,15,16,1
9,22,23
60:1,9,15 61:2
97:7
99:2,3,9,18
101:18
102:21,24
149:18 156:7
168:24
170:11,24

**claim's** 23:5

**Claims** 23:3
40:10,14 41:6
43:21 44:9
60:11 97:8

**clarification**

72:1

**clarified** 133:1

**clarify** 158:6

**clarity** 128:10

**clear** 115:15
170:2

**clearly** 136:21
147:3 159:15

**Clerk/
Investigator**
26:24

**cliche** 164:10

**client** 32:12

**clients** 34:5,7

**close** 43:8

**closer** 45:4

**closest** 98:22
99:5

**CLU** 21:15 23:12

**CME** 132:16,18
135:18
144:19,25
157:18

**co-authored**
60:8

**code** 94:21

**coerce** 80:22

**collapsed** 68:1

**collateral** 20:7

**C-O-L-L-I-E-I-
E-U-R** 90:18

**Colorado** 42:2
81:4

**com** 173:16

**combination**
21:18 22:13
29:14,15

**combined** 157:12

**comes** 13:1
33:17

**coming** 32:12
76:19

**comment** 125:20
126:22 163:12

**commercial** 52:2

**Commission**
177:18,19

**committee** 56:2

**common** 97:13
132:12 144:16
145:18 161:24

**common-sense**
160:21

**communicate**
127:2

**communicated**
120:1 121:15
124:16

**communicating**
122:7 125:25

**communications**
10:4 126:13

**community** 51:9

**comp** 45:16

**companies**
22:13,16,21
23:14 26:2
28:7 40:20



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

49:10 99:3

**company** 1:12 2:8 4:4 21:17 22:3,14,15 23:15 28:1,11 29:25 30:16,18,23 32:16,17 33:9,25 34:3,18,20,22, 25 35:6,8 36:7 37:17,21,22 38:2,4,6,7,9,1 8,22 39:13 42:1,14,18,24 45:1,20 46:2,17,23,24 47:7,10,11 48:8,19,24 49:4,6,10 50:8 52:7 55:15,18 56:20,22 57:9,18 59:1,3,20 61:18 67:8 69:19 70:12 72:15 73:23 76:1 77:21 81:8 83:12 84:5 86:2 94:20,22 95:4,6,16,18 96:23 98:9 99:18,20 100:4 101:23 102:17 104:18,20 105:4 106:1 114:10 118:4 129:25 134:4 142:12 170:7 172:1,4,6,12,1

6

**company's** 173:3

**compare** 153:14

**compatible** 43:3

**competent** 73:24

**complained** 131:7

**complaint** 12:11

**complete** 23:21 47:15 107:6 108:4 134:24 138:23 170:10

**completed** 4:12 24:10

**completely** 81:17 110:22

**complex** 27:3,4 47:9 52:2 73:5 82:8 135:21

**complicate** 155:16 160:18

**complicated** 80:10 162:3

**complication** 137:9

**complications** 95:5 132:4 162:23

**complied** 100:5

**complimentary** 175:19

**comply** 95:11

**component** 49:19 163:17

**composite** 3:11

9:10

**concept** 21:7 151:13 154:14

**concepts** 14:11

**concern** 61:2

**conclude** 147:19 160:4

**concluded** 137:1 176:7

**conclusion** 103:21 135:9,16 147:15 170:3

**conclusions** 96:5

**condition** 132:9 167:1,7 169:12 170:23 172:25 173:2

**conditioned** 153:16 168:19

**conditioning** 170:10

**condominium** 73:5 76:6 77:18

**conducting** 6:13

**conference** 5:9 152:23

**confess** 167:3 172:2

**confirm** 5:19 166:9

**conflict** 35:1 88:19

**confused** 57:23

**confusing** 113:11 114:21

**confusion** 174:20

**connection** 12:17 13:21 34:22 61:17,20 93:18 108:5,20 140:4 141:4,22 149:18 150:15 151:11 153:7

**conservative** 111:7 112:19 115:15,18,20 116:2,10,13,18 ,19,22 117:1,5 118:12,18 134:25 135:1,6 136:18,20,22 144:6 159:24

**consider** 16:23 17:2,5,6 107:19 115:20 124:25 136:10,13,23,2 4 143:25

**considerably** 47:4

**consideration** 155:1

**considered** 106:23 110:13,19 111:4,8,16,19 112:15 136:19 150:18 159:22 161:16



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

**consist** 57:22
94:21

**consistently**
119:17 121:22
122:12

**Console** 76:25

**consultant** 55:2

**consulted**
102:12

**consulting**
51:21

**contact** 13:2

**contacted**
15:19,22 16:6
32:13

**contain** 107:6
148:23

**contained** 143:1
171:16

**context** 34:16
56:25 70:11
73:10 107:3
109:22 111:12
124:11 125:9
135:15 147:2
150:19 166:22

**contexts** 90:1

**Continental**
82:18,23

**contingent**
153:15 169:13

**continually**
47:21

**continue** 105:14
116:10,25
124:6

**continued**
106:15 112:19
119:7

**continuing**
116:13,15,19
168:3

**contract** 139:19
167:15 169:9
170:17,18,23,2
5

**contractor** 12:4

**contractors**
26:4 53:2

**contractual**
156:25

**contrary** 99:22
128:22
129:6,13
144:23

**control** 105:2

**conversation**
14:3 15:9
120:8,9,12,19

**coordinate**
117:4 152:22

**copy** 14:8
18:7,11,12
66:14,25
120:18 174:24
175:1,2

**Coral** 7:1

**correct** 7:14
8:4,5,10,11,18
10:25 11:10
16:4,8 17:25
18:1,17,18
19:5,6,14,15

20:15 23:24
24:7 25:18
26:13,14,17
27:17 28:16,17
29:20
30:2,16,24
31:2 37:10
39:11 40:5,11
41:18 43:15,19
44:7,15 45:7
54:20 56:18
57:10 58:23,24
62:14,15 63:18
65:25 66:18
67:4,13 70:20
72:25 73:14
75:11
77:8,9,15
83:16,19 84:10
88:3 91:14
92:5,25
94:15,16 98:21
110:2 113:5,6
117:18,22
118:1 120:10
128:3 140:21
143:7
148:12,15
150:3,5
152:6,8,9,17
153:4,11
155:5,6,16
156:9 157:19
160:11 164:24
166:23 171:2
175:5

**correlation**
149:7

**correspondence**
10:12

**cost** 162:18

**couloir** 90:18

**counsel** 6:6
8:23 9:7,8
27:21
28:8,9,10 30:1
31:19 73:24
127:16 152:20
178:12

**counseling** 49:8

**count** 63:19
75:4

**counted** 64:2
74:11

**counterclaim**
57:3

**counterclaims**
57:5

**country** 39:17
56:3 60:3
90:23

**COUNTY** 177:4
178:4

**couple** 34:11
37:6,25 39:21
51:16 83:7
134:17 166:18

**Coupled** 130:9

**coupling** 39:18

**course** 13:14
21:14,15
23:4,7,9,12
39:2 175:14

**courses** 22:3,8
23:17 143:19

**coursework**

MILESTONE │ REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

21:12,13 22:25 23:22 24:6,7,10 25:4

**court** 1:1 4:10 12:9 20:25 21:3 36:19 72:12 76:24 89:17,22 90:5 91:5 145:11 148:25 167:22 171:4 177:17 178:6,24

**Courtroom** 31:21

**courts** 100:22

**cover** 84:7 98:24

**coverage** 33:7,21 35:1,3,4 51:23 52:1 53:21 54:21 55:2,5,6,17,18 56:9 57:5,24 68:3 71:23,24 75:19,20 76:12,13 79:24 81:8 83:23 84:1 85:25 86:6 90:21 91:5,6 105:22 106:6

**covered** 55:10 68:2 80:14

**covers** 80:15

**COVID** 116:4

**CPCU** 21:15,21 23:8 24:2

**CPU** 84:3

**cracks** 65:6

**crash** 20:6

**Crawford** 15:2 114:23 120:22 130:5 131:15 133:23

**create** 13:3 99:18 109:22

**created** 95:3 162:23

**creates** 137:10

**creating** 149:2

**creation** 41:3

**credibility** 136:4

**creditor** 56:21 57:8,17 59:1

**Creek** 76:5 77:24

**critical** 131:18

**CRN** 105:12 106:3 118:7 124:8,10,13 125:11 127:1 129:16,19 132:19 138:24 139:3,16 141:11 143:2 145:25 146:6 147:9 148:19 150:2,6,7,20,24 151:25 152:2,15 155:19,23,24 157:17,20 158:3 161:17 162:8,19

**cross** 47:13

**CROSS-EXAMINATION** 3:5 166:16

**crossover** 69:11

**Culbertson** 31:1,3,9,10

**cure** 118:5,7 134:21 150:24

**cured** 124:8 139:3

**current** 78:24

**currently** 66:5

**custom** 16:21 17:11,18 94:14,17 95:7,12 96:10,15 99:23,25 100:18 102:6 103:7,23 104:6 128:22 129:6,13 141:19 147:22 148:5,9 155:7,12 157:14,16,22 164:1 169:17 172:1,5,15

**cut** 69:2

**CV** 11:15 18:16,20,21,23,25 19:3 22:7

---
D
---

**daily** 149:1

**Dakota** 67:4,8

**damage** 33:2 73:7,8 78:14 82:7 85:5,14 86:17

**damaged** 132:11

**damages** 141:4,25 142:7

**Dan** 10:2

**Dan@doucetteass ociates** 173:14

**Dan@doucetteass ociates.com** 173:19

**dangley@flalawy er.net** 2:12

**Daniel** 1:20 4:3 5:17,21 6:16

**data** 106:22

**date** 1:21 15:25 88:20 110:24 113:3,23 120:7,12 138:11,12 146:16 179:25

**dated** 3:13 117:24

**Daubert** 90:5

**David** 2:9 5:10 6:12 10:1,10 69:2 171:5,21

**day** 4:6 25:5 36:16 44:23 53:18

**days** 7:11 14:21 92:7 118:7 174:5



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

**DBAs** 31:5

**deal** 34:19 48:6

**dealing** 68:3 143:6

**deals** 80:19

**death** 140:18,19

**Deb** 53:5

**dec** 83:14

**decades** 96:25

**Decamp** 70:19

**D-E-C-A-M-P** 70:19

**December** 115:25 116:1,5 117:11,18 134:25 136:21 144:10 152:5 153:7 158:23

**decent** 51:24

**decided** 38:1 39:24 70:9 73:21 119:1

**decision** 32:11

**decisions** 35:17

**deck** 57:6

**declaratory** 57:3 70:10

**DECLERK** 1:22 4:9 177:16 178:6,23

**deduce** 144:21

**deduced** 143:10 147:15

**defend** 35:8

**defendant** 1:13 2:8 5:11,23 33:25 56:25 57:8,14 67:6 70:8

**defended** 36:7

**defending** 20:8

**defense** 20:11 33:3 34:3,15 60:4 61:4 72:21 74:1 87:1,2,22 88:4,6 89:6 135:10 145:14 152:20

**defensive** 34:16

**definition** 102:6 105:20

**degree** 19:8 141:15 145:8 148:11

**delay** 155:17

**delineation** 111:20

**delivery** 174:21 175:1

**Delton** 2:2 5:7 15:8,9,21

**demand** 119:18 121:9,22 122:12,13 123:1 137:19 152:22,25 156:20 157:25 164:20,23,25 165:4,6

**demanded** 73:8

119:22

**demands** 152:15

**demonstrated** 136:14 143:24

**denial** 55:19

**denied** 55:18 82:6

**deny** 82:10

**department** 25:7 37:16 38:21 40:15,24 43:20,23 44:17,18,20,21,23 45:12,20,25 49:11 117:25

**departments** 46:10

**depend** 104:9

**depends** 53:16 174:14

**depo** 10:16

**DEPONENT** 1:20

**deposed** 62:13 64:4,11 65:3,9 74:18,23

**deposition** 4:3,7 6:14 8:12 14:22,24 62:18,19,20 63:14,17,23 64:5 65:5 66:15,25 68:9,10 69:11 74:7,14 83:8 86:22 89:16 90:22 110:1,8

125:21 170:1 176:7 179:16

**depositions** 14:1,18,20,23 16:18 52:24 66:16 68:11 93:15 107:18,21 108:10,14,19 110:5 131:7

**deposition's** 9:23 94:2

**derived** 58:17 102:7

**describe** 94:19 96:7 102:14 146:18

**described** 93:22 101:22 140:2

**describes** 102:4

**describing** 100:23 145:25

**designation** 23:5,18,24

**designations** 21:11,14

**designed** 143:19

**desired** 153:24

**despite** 126:21 132:24 133:5

**destroyed** 7:2

**detail** 94:25

**determination** 103:10,11 104:2 148:6

**determine** 74:8

MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     Toll Free 855-MYDEPOS

95:19

**determined**
100:4 159:4
160:7

**determining**
150:21

**deuce** 8:17

**deuces** 10:21,22

**developed** 21:7
109:24

**dgunn@gunnlawgr oup.com** 2:6

**diagnoses**
143:20

**diagnostic**
149:5

**dictate** 99:2

**dictates** 99:9

**difference**
18:20 91:15
106:12 111:21

**different**
17:13,14 19:23
30:19 31:5
75:2 88:25
89:1 105:15
106:17
117:8,14
143:23 158:20
166:21

**differently**
17:4 104:15,16

**difficult** 161:7

**diligence** 42:25
46:6

**direct** 3:4 6:8

28:14,21,25
41:5,15 43:5
52:25 86:23
102:10 154:9

**direct-action**
34:25

**directed** 88:13

**directly** 29:18
35:7 43:24
44:9 46:9
48:18 59:4,6
61:24 103:22

**disagree** 74:10
111:14

**disagreed** 87:4

**disagreement**
73:8

**disappear** 160:3

**disappeared**
80:12

**disc** 144:3
149:6

**disclosed** 8:3

**discloses** 128:2

**Disclosure** 3:13
18:3

**discovery**
107:17
109:3,6,9

**discreet** 48:13
104:10

**discrete** 111:20

**discs** 159:18

**discuss** 10:16

**discussed**

104:22 118:20
129:17 137:20
139:24 152:12
154:5 159:13
165:24

**discusses**
119:10 128:12

**discussing**
58:20

**discussion**
127:21
128:5,9,12
154:1 158:13

**discussions**
61:7 128:16
164:5,8,9

**disfigurement**
141:8

**dismissed** 76:23

**disposal** 130:22

**dispute** 79:25
139:2

**distinction**
17:8 111:6,17
112:14 139:4
148:25

**DISTRICT** 1:1,2

**DIVISION** 1:3

**divisions** 47:8

**DJ** 70:6,15

**doctor** 80:9
116:6 132:2,20
141:13,19
143:7,8,14,18
144:8 146:1
147:9 149:2,23

159:6 162:1

**doctors** 117:1
133:19 134:12
137:1 145:9
148:17,18

**doctor's** 114:8
116:21 148:14

**doctrine** 97:25

**document** 11:24
12:8 115:3

**documented**
120:19

**documents** 8:25
9:12 11:6
14:13 53:19
98:20 102:25
107:18 133:17

**dollars** 88:7,11

**done** 14:21
16:20 27:13
51:23 61:3,11
64:4 78:25
79:12 80:2
87:16 101:20
104:6 107:17
122:24 124:4
126:17 128:22
129:5,12
132:14,15,16
144:12,13
149:23 159:7

**door** 164:16

**double** 120:6,11

**doubt** 68:12
75:8 144:18

**Doucette** 1:20
4:3



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

5:15,17,21,25
6:10,16 10:3
50:6
51:3,18,19
52:10 53:2
54:4,14,16,20
56:7 57:20
58:10,15,18
59:5 61:12,14
62:10 101:21
127:9,18
130:11
165:11,21
166:18 168:17
171:25 173:9

**D-O-U-C-E-T-T-E**
6:16

**Doucette's** 5:19

**Dr** 110:24 113:3
116:6 158:25

**draft** 138:11

**dramatically**
96:21

**draw** 123:16
139:4 148:25

**drawing** 111:6

**draws** 126:8

**DRI** 60:24

**DRI's** 56:1

**driver** 69:19
70:5 85:18

**driving** 79:21

**drunk** 85:18

**duces** 3:10 8:12
18:19 68:17

**due** 42:25 46:6

**Duke** 2:10

**duly** 177:8

**Dunphy** 31:8,9

**during** 25:21,23
28:13,19,22
31:4 33:8
41:19 43:23
46:1,15 47:1
90:22 96:17
105:12 112:21
113:6 115:6
118:7,8 124:9
129:19 131:7
132:18 135:15
138:24 139:3
143:2 145:25
148:19
150:2,6,7,20
151:25 155:23
157:17,20
161:17
162:7,19 164:8
169:11

**duties** 25:2
27:1,11,21
40:13 49:1
95:21 100:23
101:23 102:16
104:20

**duty** 94:22
96:22 105:1

----

**E**

**E&O** 56:9

**earlier** 46:15
49:12 50:11
53:11 58:20
62:2 78:1 88:2
89:2 97:6

102:16
104:4,12
109:16 122:24
129:17,23
149:14 152:12
158:20 159:21
163:19

**early** 36:15
40:4 41:23
112:7 119:7,22
120:2 123:11
159:13

**earned** 173:1

**East** 2:4,10 4:4

**Eastern** 54:11
165:18

**Eck** 78:3

**E-C-K** 78:3

**education** 25:6

**educational**
49:18

**effect** 153:17

**effectuate**
118:5

**egg** 86:1,4

**eight** 134:18

**either** 24:4
29:18 30:6,10
33:20 45:22
56:19 61:17
69:8 74:9 91:3
106:19 116:10
144:4 158:10

**ejections**
115:20

**electronic**

174:20,22
175:3

**Elias** 81:19

**eliminate**
105:13 154:15

**eliminating**
154:25

**else** 15:4 19:9
122:19 125:6
133:8 136:11
137:12 138:8
147:19

**E-mail** 2:6,12

**e-mails** 10:1,11

**emphasis** 114:13

**employed** 178:13

**employee**
52:11,14,25

**employees**
52:10,17,19
54:1

**employers** 30:15

**empty** 124:2

**enclosed** 18:16

**encompass**
168:24

**enjoyed** 31:25

**entered** 47:8
179:18

**entire** 40:15
119:16 121:21
138:25 179:16

**entities** 30:21
80:14

**entitled** 139:19



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    www.**MILESTONEREPORTING**.com    Toll Free 855-MYDEPOS

141:3 169:9

**entity** 22:10

**entries** 90:9

**EO** 84:6

**equally** 98:18 147:4

**equipment** 84:2,8

**equivalent** 23:13

**Erie** 79:18

**Errata** 179:1,20

**escape** 135:24

**Esquire** 2:2,3,9

**essentially** 38:20 40:15 46:13 73:24 102:14 140:17

**establish** 149:7

**established** 115:17 148:7,10 164:2

**estimate** 56:13 162:18 174:25

**ET** 4:7 176:7

**EUO** 132:22 133:2 157:18

**evaluate** 59:10 95:20,22 96:25 97:25 114:10 130:1 136:4 164:12

**evaluated** 105:23 111:13 133:11 159:22

**evaluating** 97:20

**evaluation** 105:22 131:18 133:25 135:25 136:8,9 147:21 163:20,22 164:2

**evaluations** 137:7

**evening** 18:6,22

**event** 109:17

**events** 31:13 109:19

**eventually** 25:12 31:9 39:24 50:21

**everybody** 13:2

**everyone** 5:2 54:10 127:14 165:17

**everything** 9:18 40:22,24 41:2,4 99:11 108:25 109:23 113:12 130:3 134:13 136:6 138:6 143:19 144:5

**evidence** 132:25 133:14 134:1 135:19 147:5 151:10 157:3,6

**evolve** 112:11

**exactly** 116:4

**exam** 24:1

**EXAMINATION** 3:4,6 6:8 171:23

**example** 97:23 124:7 137:17 172:16

**exams** 21:22,25 22:5

**except** 5:4 22:22 45:21 130:6 134:7 154:2 159:7

**exception** 45:24

**excess** 79:21 86:7

**exchange** 47:7,15 127:3 156:8

**exchanged** 10:2

**excluded** 91:3

**exclusion** 79:23

**exclusively** 52:23

**excuse** 65:13 163:9 172:4

**execute** 114:20

**executed** 115:4,9

**execution** 153:16 168:19

**executive** 43:18 45:6,9 46:2 49:3 61:22

**exempt** 103:2

**exempts** 98:9

**Exhibit** 3:9 8:15,19 9:10,11,15 10:21 18:2,9,10 62:9 92:1

**Exhibit 1** 18:25

**Exhibit 3** 108:1

**Exhibited** 133:10

**exhibits** 3:8 108:18 171:6

**exist** 133:5 150:23 173:2

**existed** 96:11,19

**existence** 167:16

**existing** 133:1

**exists** 9:6

**expect** 143:20 145:11 154:12 160:22

**expected** 25:5 162:22

**expedited** 174:2,5

**expense** 48:10

**experience** 21:24 24:3,23 104:23 145:17 149:17 162:10

**experienced** 25:9 143:5,15 146:17

**expert** 3:12,14



MILESTONE REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**   **www.MILESTONEREPORTING.com**   Toll Free 855-MYDEPOS

8:3,7
13:16,17,22
15:20
17:6,7,24
18:2,3,5 19:1
51:15 56:12
57:13,21
58:11,18
59:13,18 62:5
63:23 65:1
66:2
89:17,23,25
90:24
91:1,6,11,16
108:21
132:13,14
140:4 160:17

**expertise** 16:23
17:3,13

**experts** 57:24

**expired** 124:13
125:11 127:1
150:25 152:15
155:19

**Expires** 177:18

**explain** 55:1

**explained**
169:25

**Explains** 128:18

**explicitly**
151:21

**exposure** 24:14
42:13 47:19
49:7 60:5

**express** 107:7

**expressed**
160:10

**expressing**
170:3

**extended** 39:17

**extent** 9:6
68:15 82:20
93:22 94:3
97:4 155:19
166:5

**extra** 14:20
156:24

**extras** 175:6

**extremely** 139:5

**eye** 43:8

---
F
---

**Facebook** 90:9

**faced** 164:20

**fact** 5:21 82:17
89:8 105:9
106:25
109:12,24
110:11
112:7,11
115:13 116:22
121:20 123:2
124:12 137:4
139:13
150:9,20
151:21 153:21
158:16 159:20
166:20

**factor** 133:25
150:21

**facts** 95:19,24
101:9
106:22,25
109:14,22
125:10 127:19

128:13
130:1,16 149:4
160:5

**factual** 129:10
131:3 140:1

**fail** 111:3
136:18

**failed** 96:1
115:16
116:18,22
117:2 128:21
129:4,11,21,22
130:13,17
131:6 134:24
135:2,6
136:13,22
144:7

**failing** 136:20

**failure** 73:25
111:7 130:10

**fair** 24:16
29:19 46:22
72:7 87:8 96:6
109:16 121:8
135:25 138:17

**fairly** 96:25
136:4 161:16
164:12 170:6

**faith** 8:4
17:3,21 20:19
35:16,24
36:8,10 51:23
52:5 53:17
54:22 55:2,14
56:5,10,11,15,
22 57:1,2,7,13
58:21 59:22
60:6,9,11,16
61:8 62:23

63:7 76:13
77:4,6
79:3,6,10
81:8,10,21
82:3
83:15,24,25
84:13 85:10,19
86:13,17 89:23
95:4
100:4,9,13,14,
15,16,23
101:16,23
102:16
103:11,18
104:2,20 105:1
124:5
139:3,18,22
155:2 172:22

**faith/bad** 104:2

**fall** 84:15

**familiar** 101:4
107:2 120:16
140:5,8

**family's** 34:13

**Farm** 65:25
67:11 72:14
78:4 85:6 86:1
87:19

**Farmers** 84:9,10

**fashion** 45:21

**fast** 173:8

**faster** 168:7

**fault** 69:22,24

**favorable** 76:21

**favoring** 48:10

**February** 39:3
112:25



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    **Toll Free 855-MYDEPOS**

**feed** 129:1

**feel** 40:21 96:1 125:5

**feelers** 51:11

**feels** 58:5

**feet** 41:12,15

**felt** 41:14 123:25

**fight** 79:20 80:13 81:7 82:11 85:25 86:7

**fighting** 105:18

**file** 9:19 14:2,4,14 16:15 53:19 59:10 91:17 93:5,13,21 115:7,9 119:24 130:9 151:9 152:19 156:13,15

**filed** 21:2 90:5 112:22 117:22 119:14 123:22 124:15 125:13,18 129:16 139:16 158:3

**files** 68:18

**filing** 125:2

**filled** 133:17 146:22,23

**final** 14:10 126:9

**finally** 137:18 165:1

**finance** 45:1

**Financial** 117:25

**financially** 178:14

**finding** 147:23 148:1,14

**fine** 48:6 174:22 175:1

**fire** 55:7 67:23,24 86:4

**firm** 16:10 27:2,5 30:15,23,25 32:13 33:3 34:4 38:12 51:21 53:4,8,9 54:1 58:12,14 107:23 109:3 115:3 119:17,25 121:8,12,15,21

**first** 12:6 15:22 16:6 17:20 18:14 22:17 24:12,14 39:23 40:16 41:25 49:5 55:4 62:1 63:9,10 64:23,24 65:24 68:21 69:17 71:2,20,22 72:18 75:23

120:2,20 123:12 125:22,24

87:2,4,9 95:25 96:16 111:7 131:5 134:9,16 138:19 139:6,8,19 166:20 167:18,23 168:9 174:25

**first-party** 105:10 106:17 150:16,19 166:21,22

**fit** 160:5

**fits** 102:7

**five** 24:2 117:13

**five-minute** 54:6 127:9 165:12

**flexibility** 161:9

**Florida** 1:2 2:5,11 4:5,8,10 5:9,13 6:22 7:13,17,19,23 17:2,5,6 19:25 20:3,4,8,14,19 ,22 23:19 25:21 29:9,18,19 30:4,10 35:23,24 36:4,8,11 38:16 39:4,6 41:20,22,24 42:5,7,8,11,12 ,15,16 43:4,25 44:3,5,10,11

46:6,9,10,13,1 8 47:18,23 48:20 49:22 50:12,13,19,21 ,25 51:5,12,15 59:23,25 60:1,20 61:24 62:3 63:4 64:21 67:15 69:15 70:19 72:12,14 75:10 76:15 79:17 83:16 90:3 97:14,21,23 98:6,8,13,16,1 7,18,21,23 99:4,7,12,18,2 5 100:5,9,22,24 101:2,5 102:17,25 103:2,3,11 104:13 117:24 140:9,12,16 167:9 169:3,17,23 170:7 177:3 178:3,7

**focus** 55:6 60:17 117:15 122:24

**focused** 24:19 33:18 60:20 165:1

**focuses** 23:9 51:21

**focusing** 18:14 22:24 24:23 28:12 29:8 33:6 82:2



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

125:10

**foggy** 70:7

**follow-up** 121:1
166:19 171:22

**football** 60:14

**foregoing** 177:7
178:8

**foremost** 97:11

**forever** 7:11

**forget** 74:4

**form** 9:16 12:11
13:19 38:1
66:8 80:21
87:7 100:18
103:14
110:15,25
126:2,4,15
146:7 149:21
150:10
153:16,18,25
154:10,20
156:10 159:11
167:10,25
168:20,24
169:4,19
170:4,13
171:18 172:8

**formal** 61:19
145:22,24
148:24

**format** 154:11

**formation** 10:14

**former** 56:25

**forming** 98:9
101:1 106:23
107:23

**forms** 128:16
146:21,23

**forward** 111:20
150:9 172:18

**forwarded** 16:19

**foundations**
67:25

**founders** 33:9
37:20

**founding** 59:5

**fraud** 82:20,22

**free** 99:18

**freeway** 85:19

**frequently**
46:12

**Friday** 15:12,13
174:15,16

**Friday's** 174:9

**Fridman** 79:5
89:13

**front** 18:7 62:7
65:21 91:24
92:17

**frontline** 40:17
41:17 43:24
44:2 45:24
59:16

**frustrating**
66:10

**fulfill** 95:3

**full** 5:15 6:15
126:19 137:25

**full-time**
50:21,24,25

**fully** 136:13

**function** 40:25
49:13,14,21,23

**functions** 45:11

**fundamental**
104:17

**funnest** 86:21

**future** 107:15
118:19 162:18

--- G ---

**gained** 122:19
124:3

**gather** 58:16

**Geico**
69:14,18,20,22

**general** 16:25
42:18,21 58:12
61:7 86:24
99:6 100:15,17
101:19 103:4
129:8 151:13
168:19,24

**generalized**
57:11 102:24

**generally** 25:1
54:17 57:20
58:7 65:20
68:7 100:25
140:15

**generically**
111:24

**geography** 7:24

**Georgia** 79:16
97:20

**gets** 7:9 112:3

164:17

**getting** 36:18
64:3 135:8
144:12,14
176:2

**given** 15:24
61:13 62:13
118:21 150:16

**giving** 136:4
139:21

**glancing** 75:1

**glaring** 137:17

**gone** 24:8
39:17,20 40:19
67:10 70:8,16
79:11 83:6
87:21

**Gonzalez** 80:16
85:11

**good-faith**
167:9 169:2,24

**Gorman** 15:2

**gotten** 131:23
154:3

**grab** 13:3

**graduated** 19:14

**graduating**
19:17

**Grand** 90:17

**grandkids** 58:6

**granted** 89:18

**great** 48:6
171:9

**Greenfield** 6:19

**Greg** 12:2 52:16


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    Toll Free 855-MYDEPOS

53:10 92:25

**grew** 47:21
51:11

**grievances** 21:2

**ground** 34:14
86:6

**group** 2:3
22:12,18,19
24:25 26:2
27:17 28:15
39:10,23
40:11,20 42:19
43:6,14,18
47:5,21
48:14,16,21,22
49:10 50:4
64:8 65:15
80:6

**grown** 40:20

**guess** 9:5,22
10:6 13:12
28:23 32:1
36:3 44:12
51:16 55:12
90:13,19 92:16
122:6 163:17
167:20 168:1
174:12,14

**guesstimate**
20:17

**guidance** 15:17
16:11 52:4

**Guide** 97:9

**guideline** 97:15

**guidelines**
98:13

**Gunn** 2:2,3 3:5

5:7,22 9:16
10:1,8,10,16
13:19 14:3
15:7,8,9,10,21
64:8,14,16
65:8,10,13,15
66:8 68:25
69:2 87:7
103:14 107:22
110:15,25
126:2,4,15
146:7 149:21
150:10 153:18
154:20 156:10
159:11 166:17
167:17,22,25
168:6,13,15,22
169:15,21
170:9,15
171:4,9,10,20
172:8 173:6
174:15,23
175:1,5,9,11,1
3 176:5

**Gunn's** 16:9

**guy** 79:21 84:2

**guys** 175:6,7

---
H
---

**hac** 19:22
20:3,18

**hail** 76:9,11
81:4 82:5

**hailstorm** 73:6

**half** 88:10
137:22 138:1
165:3,9

**Hancock** 72:12

89:4

**hand** 5:25

**Handful** 37:6

**handle** 13:8
20:19 25:9,21
27:10 32:14
34:10 35:11
36:4 40:21
42:7 44:9 61:7
99:3 100:13
132:8

**handled** 25:19
26:6 28:4,15
32:15 33:24
34:11,12
35:22,25 36:1
37:8 41:11
46:17,23
48:17,21 58:21
59:4 111:23

**handler** 23:5
40:17

**handling** 8:8
17:1,7 23:6
25:12,16
28:14,22
29:1,18 34:16
35:25
41:6,15,20
43:2,22 51:14
55:16 59:13,22
60:10,12,16
95:10 96:19
99:9 100:16
102:25
114:11,23
126:18 149:24
169:11,24

**hands-on** 21:18

**Hankin** 31:8

**HANNAH** 1:22 4:9
177:16
178:6,23

**happen** 25:14
135:3 144:11
154:23 159:24
160:1 162:21

**happened** 39:14
47:16 70:17
88:17,18,21
90:17
109:18,23
125:4,22
151:15 159:15

**happens** 41:4
134:16

**happy** 62:6
113:20

**Harbor** 82:3

**hard** 33:16
100:11
113:14,25

**hardwares**
159:17

**Harmony** 83:10

**Hartford** 78:10

**haven't** 18:23
59:19 64:2,4
71:7 81:25
93:6,14 94:7
132:5 165:24

**having** 16:20
34:14 87:16
133:2 139:14
153:19

**Hawaii** 22:22



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     www.**MILESTONEREPORTING**.com     Toll Free 855-MYDEPOS

39:1

**Hawaiian** 39:1

**Hawthorn** 90:4

**Hayes** 110:24 113:4 116:6 158:25

**head** 52:20

**healing** 134:24

**health** 90:16

**hear** 7:6 91:10

**heard** 71:8 81:25 175:5

**Heart** 80:3,7

**heavily** 114:5

**he'd** 119:4 127:3

**Heikka** 88:12 89:20

**H-E-I-K-K-A** 88:12

**held** 62:3

**helicopter** 90:23

**help** 55:12 94:1

**helps** 79:14

**Hennessy** 83:18

**hereby** 178:7

**herein** 178:14

**here's** 144:24 145:1

**herniation** 149:6,10

**herniations**

132:11 134:15 136:17 143:23,25 144:2 146:5 149:15 161:10 162:2

**herself** 131:17

**he's** 53:16 112:11 117:21 125:20 126:23 139:19 149:2 161:1

**HH** 177:19

**high** 137:2

**higher** 164:17

**high-level** 12:6 101:16

**highly** 134:19

**high-risk** 159:8

**Himebauch** 12:2,15,16 93:23

**H-I-M-E-B-A-U-C-H** 12:2

**Hinshaw** 31:1,3,9,10,15,17,20 32:6,20,23 34:10 35:12,22 36:2,4,13 37:9,15 39:12 40:6 61:17,20

**hire** 28:8,9 53:9 73:24

**hired** 38:11 56:16

**history** 53:19 133:19

**hit** 61:8

**hobby** 33:12

**hockey** 60:15

**hold** 35:17

**holder** 63:3,12

**holders** 47:12 48:11

**holding** 22:15

**holds** 134:8

**holiday** 174:9

**holiday's** 174:12

**home** 7:1,2,4,5,14 34:13 39:20,22 50:22 67:22 112:9

**homeowners** 26:4

**honestly** 21:8

**hope** 7:9 166:14

**Horaria** 87:23

**Horrendous** 90:4

**Horseman** 87:18

**hospital** 80:7

**hospitals** 80:7,14

**hour** 54:5 58:6 79:22 91:13,19 93:3,11 175:20

**hour-and-a-half** 127:10

**hours** 12:19,20

92:4,13,22 171:11

**House** 83:10

**huge** 80:13 81:4 86:4 88:7,10

**Hughes** 88:5

**hundreds** 143:16

**hung** 89:8,9

**hurricane** 7:3,7 83:12 85:3 86:16

**hurt** 117:7 133:3

---

I

**Ian** 7:3

**I'd** 13:12 32:14 50:16,18 60:15 68:7,16 84:5 92:13 94:4 127:19

**idea** 43:1 75:3 90:10 93:6

**identification** 8:19 9:15 18:9,10 177:10

**identified** 13:17 141:8

**identifies** 12:9

**identify** 106:22

**identifying** 130:5

**identity** 5:19

**ifs** 149:9

**I'll** 6:13 9:5



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    Toll Free 855-MYDEPOS

18:2,4 52:16
63:19 91:25
120:14 154:8
158:14 168:13

**Illinois** 36:1
37:7 42:4
58:23 73:16

**I'm** 7:1,6,18
8:20 9:25
12:14 18:11
31:14 33:12
53:5 54:21
55:5 57:23
58:2,4,14 62:6
64:3,15 67:21
71:11 72:10
75:1 78:20
83:2,6 87:8
91:20 101:25
102:14
103:15,16
106:25
107:1,3,20
109:22 111:23
112:9 115:5
121:11
122:23,25
123:4,5
125:10,21
135:1 139:4
141:23 143:17
149:22,23
151:25 152:3
156:12 157:1
160:20,21
161:21 164:25
166:3 167:18
173:25

**immediately**
19:8

**impact**
150:15,17
160:23

**impairment**
144:5

**important** 50:16
109:20 111:13
147:4

**imposed** 96:22

**improper**
155:14,16
167:14 169:10

**inaccurate**
122:11 165:7

**inadequate**
137:17

**inappropriate**
55:16 134:3
139:22

**incapable**
137:24

**incarcerated**
82:21

**incentive** 124:5

**include** 100:12
110:18

**included** 13:9
26:10 55:17
142:11 148:21
160:22

**includes** 21:16

**income** 12:20
58:17

**incorrect** 87:15

**increased** 47:18

124:19

**independence**
48:12

**independent**
12:4 42:20
53:1 169:22

**index** 3:1 114:3

**indicate** 103:3
115:13 119:16
122:10 123:6
133:19 147:3

**indicated** 16:13
119:17 121:22
122:2
123:10,11
133:18 144:5
179:19

**indicates** 26:23
120:25 134:23
135:7 136:18

**indicating**
122:12 123:1
136:19 147:18

**indication**
119:21 146:14
150:8

**indications**
119:22 143:4

**indirectly**
38:11

**individual** 12:1
80:23 81:15
160:25

**industry** 12:3
16:22 17:12
21:24 23:14
95:2 96:16

97:1,12
98:3,5,20
100:10,12
103:9 104:24
128:23
129:7,14
141:18 145:17
157:24 163:25
169:1,16
171:25
172:5,15

**inescapable**
135:16

**inference** 158:9

**influence**
100:18

**information**
8:17 9:3 12:10
16:19
114:10,15
131:8,9 141:13
147:18 149:11
157:22

**informing** 10:4
98:14

**informs** 169:23

**initial** 106:18
108:1 109:11

**initially** 15:19
88:13 113:12

**initiative**
113:19

**injections**
112:4 115:16
116:23
117:9,11,17
118:11,14,17,2
1,22 119:3



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**       **www.MILESTONEREPORTING.com**       **Toll Free 855-MYDEPOS**

134:20,21 136:23 144:14 159:25

**injured** 141:24

**injuries** 60:14,15 133:11 136:14 143:16 144:1 146:23 147:10 149:15,16 160:18,23

**injury** 25:24 26:8 27:10 29:14 32:12 34:11 44:3 60:14 61:2 77:2,4 78:22 79:2 84:13,22 85:18 86:11 133:1,15,18,20 134:11,14,21,22 135:21 137:10 140:18 141:14 143:6,10 144:11,18,21 145:7 146:9,15 147:4 148:7,10 149:18 158:2 159:16,20 160:1 161:6 163:1

**input** 132:14 135:21

**inside** 28:8

**insistence** 168:23

**instance** 50:19 60:13 105:12

131:7 132:18,23 157:25

**instead** 22:3 165:2

**Institute** 97:10

**instruct** 87:16

**Instruction** 101:15 102:18

**instructions** 16:11 87:14,15 136:2

**insurance** 1:12 2:8 12:3 16:25 17:2 20:19 21:11,17 22:2,10,12,16, 21 23:14,15 24:24 26:3 27:17 28:7 29:25 30:4,15,18,23 32:2,3,16,17 33:6,20,21,24, 25 34:2,17,20,21, 25 35:6,8,11 36:5,7,22 37:2,22,23 39:10,13 40:11 41:20 43:18 44:5,10,11 48:24 50:4 51:15,21,22 54:21 55:2,15,22,23 56:20,22 57:9,18 58:21 59:1,2,22

61:4,18,22 67:8 69:18 70:2,12,25 71:21 72:15 73:23 75:14 76:1,6,14 77:20 79:3,6,10 80:13,19 81:2,8,9,20 82:2,3,16 83:3,12 84:4,7,21 85:21 86:1 89:23,24 90:7 91:1 94:14,20,22 95:1,4,6,12,15 ,18 96:5,6,14,23 97:1,12 98:4,9,20 99:2,17 100:4,10,12,18 101:23 102:16 103:9,12 104:18,20,23 105:4 106:1 114:9 118:4 129:25 134:4 141:18 142:12 147:22 148:5,9 155:7,12 157:14,16,21,2 4 163:25 166:22 170:7 171:25 172:1,4,5,6,11 ,15,16 173:3

**insured** 34:18 35:5 52:3

56:21 57:8,17 59:1 69:19 70:13 73:11 74:10 75:16 76:18 106:16 131:25 139:9,11,14 173:4

**insured's** 69:22 82:19 167:13 169:7 170:8

**insurer** 34:15 82:19 90:16

**integrated** 12:23

**intended** 32:3 60:24 145:12 154:18

**intending** 90:25

**intent** 22:1 154:21

**intention** 90:11 157:4

**intentionally** 134:10

**interest** 164:18 170:8

**interested** 178:15

**interests** 167:12 169:7 173:3

**interim** 19:9 22:10

**intern** 25:1 26:7



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

**international**
90:16 97:10

**internship**
21:17,18
24:5,24 25:14
26:12

**interpret** 96:8
103:19 104:1

**interpretation**
23:10 100:9

**interpretations**
17:10

**interpreting**
100:22 123:5

**interrupt**
130:11

**interview**
27:9,14

**introducing**
91:8

**investigate**
38:13
95:16,22,25
96:24 97:25
103:5 129:22
130:14,18
136:4

**investigated**
95:23 131:12

**investigating**
97:19 130:20

**investigation**
24:20 94:24
96:2 98:10
113:19 129:24
130:15 133:5

**investigations**

101:20

**investigative**
27:12 130:21

**investigator**
27:8,10

**involve** 30:3
130:21 131:25

**involved** 52:6
53:17 59:10
79:25 80:8
98:16 133:15
178:14

**involvement**
112:4

**involves** 52:2
81:6 90:15
112:2

**involving** 51:12

**Iowa** 42:4

**Iran** 80:12

**Iranian** 80:9

**Irma** 83:13 85:3
86:16 97:9

**isn't** 55:10
74:20 94:25
96:22 104:16
105:20 106:13
111:12,22
122:11 123:4
126:8 132:11
144:16
145:15,18
157:21 161:5
162:5 164:15

**ISO** 133:15
146:12 147:17

**issue** 12:12
55:19 76:9
80:19 82:6
104:11 113:18
154:13,17
161:19 162:13
164:11

**issues** 7:6
104:17 158:4

**it'd** 59:2 60:17

**items** 141:8

**I-U-R** 90:19

**IV** 2:3

**I've** 14:12,18
24:13 50:24
52:21 53:4
59:8,9 61:3,11
74:12 96:17
97:4 98:15
101:5 126:5,7
128:13 143:18
151:3 154:23
164:14 165:11

---

J

**Jackson** 2:4,10

**January** 39:3
62:10 74:15

**Jenkins** 79:14

**Jimenez** 62:22
63:12

**job** 25:2 26:23
27:11,21 40:13
45:8 49:1

**joined** 31:7

**jot** 14:10

**journals**

60:23,24

**Judge** 76:22,23
87:9 88:22

**Judges** 103:17

**judgment** 56:21
57:3,8 59:1
70:10 72:3
73:7 76:23
89:18 167:4
172:2

**July** 8:9 146:5
147:11 163:9
164:19
174:10,15
178:17

**June** 1:21 3:15
4:7 92:21
121:5 138:14
159:3 160:8
163:8

**juries** 102:17

**jury** 37:3 72:3
87:4,10,16
89:8,9 101:15
102:17
103:16,19
104:1

**justifiable**
172:25

---

K

**Kemper** 22:20
47:25
48:2,16,21

**K-E-S-L-E** 64:16

**Kesler**
64:13,16,19

 MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          **www.MILESTONEREPORTING.com**          **Toll Free 855-MYDEPOS**

65:1,15

**K-E-S-S-L-E-R** 64:13

**key** 109:18

**kicks** 112:13

**kids** 39:21

**killed** 81:5

**kinds** 102:13

**Kinsale** 76:14

**Kluin** 31:8,9

**knew** 45:3 51:8 146:11

**knowledge** 86:12 132:12

**known** 22:20 31:1 34:3 52:21 98:2

**Kutchera** 71:13

**K-U-T-C-H-E-R-A** 71:13

---

L

---

**labeled** 106:24

**lack** 113:18,19 135:11,15 142:19

**L-A-H-A-M** 75:18

**Lamborghini** 79:22

**language** 96:9 143:17 153:25 154:8,14 170:22

**large** 34:15 76:9,11 178:7

**last** 9:18 12:13 14:9,17,21 32:8 37:11 62:18 74:14,15 92:6 173:16

**late** 82:6,10 152:14

**later** 10:18 21:8 121:6 157:20 159:3,14,21 160:3

**latter** 56:24

**launched** 51:6

**law** 2:3 16:9,10 17:3,16 19:8,10,11,17,24 22:4 24:8 26:11,12,16,21,24 27:2,16 30:14,15,22,25 31:22 32:4,5,13 35:23 40:7 42:8 52:21 64:8 65:15 91:7 94:21 95:11 98:17 99:11,22,25 100:5,9,18,22 103:11 107:23 109:3 167:9 169:3,18,23

**laws** 23:10 24:18 94:20,21 95:6 97:23 103:8 104:5

**lawsuit** 36:5 112:22 125:18

**lawyer** 17:5 31:24 35:3,25 36:9,17 59:6,14 73:20,22 130:3 145:14

**lawyers** 27:3 37:21,25 38:5 51:8 56:19 61:21 103:25 151:4

**layer** 79:20,21

**layers** 86:7

**laying** 86:5

**lead** 143:5 144:4,15 171:12

**learn** 143:21

**least** 74:15 75:5 137:19

**leave** 32:11 50:18

**lectured** 59:21

**led** 42:25

**Lee** 2:3 5:7 15:8,10 64:8 65:13

**legal** 17:5,7,9,10,19 27:7 32:2 33:9,20 37:17,22 38:2 39:18,25 51:9 55:24 61:6 96:9 170:3,5

**less** 50:16 121:13

123:6,10 139:6

**let's** 30:13 92:14,18 110:4 127:9 144:10 173:8

**letter** 99:11 119:23 122:4 152:21 153:14 157:25 180:5

**level** 41:4 87:14 117:8

**lgunn@gunnlawgr oup.com** 2:6

**liability** 27:4 33:8,11,20 51:24 53:20 54:24,25 55:25 56:1 61:6 69:23 105:22

**liaison** 28:10 29:25

**Liberty** 86:1

**library** 25:6

**license** 62:3

**licensed** 19:24 20:22

**licenses** 21:9

**life** 23:14,15 47:8 75:14 160:19 162:11,13,17,22

**life-insurance** 75:13

**lifestyle** 39:22

**lift** 161:14



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     Toll Free 855-MYDEPOS

**lightning** 84:3,18

**likelihood** 135:17

**likely** 53:17 132:4 158:2

**likewise** 159:23

**limit** 164:20

**limited** 10:13 52:24 61:5 91:3 157:2 170:6

**limits** 105:5,8,11,18, 24 106:2,3,14 120:2 121:3,16 122:2,17 123:22 124:8,17 125:2,18 126:1,19 127:4 137:19,20,22,2 3 138:3,21 139:1 151:22,24 152:17 153:8 155:9 156:3,9,21 157:5 160:10 164:24 165:2,3 172:7,13

**line** 45:14 48:6 111:22 123:16 126:8,9 140:5 154:7,8 179:3

**lines** 45:15

**list** 10:24 11:3,5,8,12,17

18:16 62:16 64:7 65:6,18,21 69:11,12 74:7 75:1,4,10 98:20 108:2,4 109:1 128:6,15

**listed** 14:18,20 64:6 68:9,10 86:23 108:9 140:21

**lists** 62:12

**literally** 14:6

**literature** 129:23

**litigate** 38:14

**litigated** 55:3

**litigation** 27:22,24 28:6,7 29:21 30:7,9 52:1,6 54:22 56:4,10,11,16 60:14 119:13 122:20

**litigation-based** 55:14

**little** 17:4,13,14 43:6 70:6 104:15 105:20

**lives** 160:24

**located** 50:8

**location** 5:6

**log** 10:7,18 44:13

**logger** 84:2

**London** 38:2,3,8,9 39:19

**long** 15:14,15 51:13,17,18 67:10 96:8 99:21

**longer** 41:17 74:4 124:16

**long-haul** 42:10

**lose** 161:23

**loss** 52:3 55:8,12 76:9,11 78:6 81:4 82:5 83:13 84:18 86:4

**lot** 24:19 26:4 33:1,11 35:15,17 36:15,21 39:20 42:4,9 48:17 49:15 56:2 60:2 90:23 113:17 114:14 149:9 166:20 169:25

**loved** 31:21

**low** 137:23

**lower** 164:5,15

**lowest** 137:16 164:6

**Lucie** 76:15,17,22

**lying** 81:17

— M —

**ma'am** 176:6

**machinery** 84:4

**Madam** 167:22 171:4

**Madison** 26:18

**magic** 134:12 135:11 142:3,10 143:3 145:3 158:11

**mail** 173:13

**main** 40:23 80:19 129:4

**mainly** 79:24 80:25

**mainstream** 26:3

**maintain** 48:12

**maintained** 44:19

**maintaining** 121:9

**major** 31:13 32:12 33:17 35:19 47:7 55:7,12 82:8 95:21 101:4 165:25

**majority** 46:22 48:20

**makeup** 47:21 48:2

**mal** 61:6 79:15

**malpractice** 33:9,20 37:17,22 38:2



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    **Toll Free 855-MYDEPOS**

39:18 80:8

**man** 32:24

**manage** 48:18
134:20,21

**managed** 49:10
142:16

**Management**
97:10

**manager**
27:21,25
28:1,12,25
29:6,8,13,17
30:6,10 59:17

**managers** 45:14

**managing**
42:18,21

**manipulation**
112:2

**manner** 99:3

**Manning** 70:5

**manual**
99:6,20,21,24
136:3

**manuals** 41:3
97:7,14
98:1,13
99:2,19

**March** 16:3,7
53:23

**mark** 8:15 9:10
17:23 18:2,4

**marked** 8:19
9:15 18:9,10

**marketing** 45:2

**marketplace**

37:24

**married** 19:10

**massage** 117:6
144:12

**master** 98:20

**master's** 22:2
23:6

**material** 8:24
9:4,6 11:3
13:15 14:12
15:23 24:19
97:6 98:23
99:6 109:5,8
131:11

**materials** 3:11
9:24 10:13,25
11:3,13,18
16:2 24:12,15
91:17 99:2
104:21
108:2,5,7,8,12
,21 109:2
119:24 142:12
151:9 152:19

**math** 75:7

**matter** 15:20
17:25 65:15
79:14 97:18
98:25 126:19
128:21
129:5,12 171:2
179:17

**matters** 55:3
57:14 61:4

**may** 4:10 6:6
30:1 55:18
106:15 107:15
109:18 127:16

135:9 151:9
168:5 169:10
171:21

**maybe** 17:16
41:11 56:9
151:23 158:24

**MBA** 32:3

**McCusker** 26:16

**McNamara** 89:7

**McNulty** 31:8

**me.I** 179:18

**mean** 27:12,24
33:16 36:25
38:7 58:14
59:6 71:9
86:13 94:18
96:9 107:16
126:6 137:6
157:15 161:22

**meaning** 69:9
124:3 146:12

**means** 95:1
157:9 161:6

**meant** 28:2 33:1
44:16 87:22
126:18 165:7

**meantime** 7:4

**measures**
136:18,20
144:6 159:25

**medical** 79:15
80:8 114:18
115:4,10
131:13,20
133:12 135:20
136:14
141:13,15,19

142:2,23,25
143:4,7,8,11,1
8,20 144:23
145:8,9,19
146:1,15 147:8
148:11,14
149:7 158:23
160:20
161:18,19,21
162:1

**Med-Pay** 163:17

**meet** 49:17

**member** 16:10

**memory** 31:11

**mention** 99:13
110:20
111:15,17
112:18 145:21
158:16

**mentioned** 6:12
15:6 24:24
37:16 39:8
40:9 43:13
52:9,15 53:10
54:19 55:24
60:19 78:1
104:4,12 107:1
109:16
111:9,11,12
112:7 113:5
118:15 132:6
137:6 146:20
158:1,2,11
159:21 162:17

**mentioning**
112:11

**mere** 111:15,17

**Meridian** 79:18



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

**merits** 106:10

**Mesa** 83:18,19

**mess** 7:8

**message** 111:7 135:6

**messages** 135:1

**messy** 81:18

**methods** 135:1,6

**MGA** 42:18

**Michigan** 42:3,4

**mid** 35:15

**mid-'80s** 20:17 35:18

**MIDDLE** 1:2

**mid-trial** 88:1

**Midwest** 42:2

**miles** 79:22

**MILESTONE** 4:3

**million** 88:7,10

**millions** 73:7

**Milwaukee** 22:12 24:24 27:17 39:9 40:10 43:18 48:24 50:4

**mind** 14:11 32:4 111:17 112:14 133:13 135:16,23 149:4 150:13 155:17 157:1 169:6

**minds** 156:12

**mine** 12:22

**minimize** 60:4

**Minnesota** 42:4

**minutes** 15:15

**miraculously** 135:4

**misplaced** 52:15

**missed** 68:24 69:1 167:18

**missionary** 90:17

**missions** 33:21 54:24 55:21

**missions-based** 56:5

**mistaken** 54:21

**modalities** 111:2

**modified** 103:20

**moment** 6:12

**Mondamin** 1:6 2:2 8:4

**MONDAY** 4:6

**monies** 156:25

**monster** 77:20

**month** 86:19

**months** 51:16 121:6 134:17,18

**morning** 6:10,11

**morphed** 30:18

**Motion** 90:5

**motivation** 61:23

**motor** 8:9 17:20 147:2

**motorist** 8:8 35:9 59:10 105:10 131:15 140:24

**motors** 25:25 29:14 59:9 61:25

**Moultrop** 69:14 88:2,4

**M-O-U-L-T-R-O-P** 69:14

**move** 70:9 164:7,8,16

**moved** 7:20 90:24 119:23

**movement** 161:8

**MRI** 149:10

**MRIs** 132:1 143:24

**Muller** 67:3,19 86:8,9

**multi-day** 49:16

**multi-jurisdictional** 75:12

**multi-module** 23:4,9

**multiple** 86:5,7

**Murphy** 82:24 83:1

**mutual** 22:13 37:21 47:10,11 48:7,11,18

84:17 86:1

**myself** 17:5,6 30:14 31:21 38:11 40:21 41:9 45:23 53:20,21

---

### N

**name's** 6:12

**national** 23:17 60:21,24 73:14 98:1,2,7 102:24 103:1

**nationwide** 23:16 98:5

**nature** 31:6 39:15 44:6 57:6 91:18 98:12 136:24 158:2

**navigate** 55:13

**Nebraska** 42:4

**necessarily** 24:21 25:20 29:4,7 36:17 38:25 52:1 74:20 96:9 98:11 103:12 126:6,9 132:12

**necessary** 12:5 38:14 171:13

**neck** 111:23 143:16 149:15,18

**negative** 133:16 146:13 147:17 158:9

 MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY



CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     www.**MILESTONEREPORTING**.com     **Toll Free 855-MYDEPOS**

negotiate 24:20
  38:13 95:22
  123:17

negotiated 72:7

negotiating
  97:19 157:7

negotiation
  154:1,9

negotiations
  126:6

neither
  93:24,25 136:8

nice 166:14

night 9:18
  14:9,17

nobody 93:22
  114:3

Nodak 67:7

nominal 77:12

non-causal
  147:5

none 39:4
  107:25 145:2
  146:19

non-economic
  141:3 142:7

nonprofit 49:5

nonprofits 49:6

nor 17:5 178:14

normal 137:5
  161:7

north 46:24
  67:4,7 70:2,9

northern 42:1

46:24

Northfield
  83:11

Notary 4:9
  177:17
  178:6,24

notation 110:18

notch 112:13

note 56:24
  121:4,14
  122:10,21
  123:14 126:1,3
  136:16

noted 31:22

notes 9:18,22
  11:25 14:7
  120:7,14,18
  142:2
  145:10,12
  148:23,25
  149:1 159:14
  165:13

noteworthy
  35:17

nothing 6:4
  91:8 98:8 99:7
  102:12 103:2
  112:1 122:19
  124:2 125:6
  133:20
  134:2,6,22
  135:7,23 139:2
  142:14 165:25

notice 3:10
  8:12 82:6,10
  117:22 118:4

novel 96:22

November 117:25
  152:19 158:24

nowhere 159:14

—————————
O
—————————

OATH 177:1

object 154:7
  168:20
  169:4,19

objection
  167:19,25
  168:3

objective
  157:3,6

obligated 99:19
  144:21 155:8

obligation
  95:16,24,25
  97:24 131:19

obligations
  95:3 96:24
  166:21 167:9
  169:2,24

obtain 23:24
  37:23
  114:11,14
  139:11 156:21

obtained 19:4
  77:14 85:1
  131:11

obtaining 19:7
  131:18 167:14

obviously 35:2
  48:8 57:15
  129:16 142:16
  169:23

occasion 34:20

134:16

occupied 58:4

occur 15:11
  20:16

occurred 117:11
  120:9 169:11

October 110:23
  113:3,22
  117:11,18
  134:25
  158:22,24,25

offer 16:15,20
  119:11,13
  120:10 121:5
  124:24 126:19
  127:7
  137:18,21,25
  138:7 139:1
  151:2
  152:4,5,11,13,
  14 155:8,17,18
  156:15
  163:6,10
  164:3,14
  168:17

offered 89:17
  121:10 122:17
  124:1 161:18
  162:6
  163:20,22

offering 17:19
  89:19 105:17
  126:18 143:9
  160:17,20,21
  161:20,21
  165:2

offers 121:1
  124:20,21
  125:15,16,19



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE ORLANDO, FL 32801
JACKSONVILLE, FL 32256
TAMPA, FL 33602
407.423.9900    www.MILESTONEREPORTING.com    Toll Free 855-MYDEPOS

137:15,22
151:15 165:3,9
167:8 172:12

**offer's** 151:5

**offhand** 68:19

**office** 6:22
7:4,14,17,21
9:1,13 10:2
12:1 18:6
26:16 42:3,16
46:14 49:16
50:12,19,20
51:7 166:8

**officer** 43:18
44:15 45:6,9
46:2 81:16

**offices** 5:9,12
46:12 49:15,20

**officially** 5:3

**Oh** 36:15 72:10
83:2 89:8
111:14 176:3

**okay** 6:21
9:5,22 10:6,15
11:9 12:19
13:25 14:4,13
15:4,11,14,22
16:6 17:2,8,15
18:25 19:7
20:2,5,10,13,1
8 21:11 23:12
24:23 27:23
28:12,21
29:12,17
31:11,15 32:19
33:13 36:2
37:5,15 38:15
40:1 43:10,22
47:22 49:1,22

50:3 51:3
52:9,15,25
53:22 57:19
58:1 59:15,21
60:8 61:1
62:2,20,25
63:9,14 64:12
65:18
66:14,17,24
67:3,9
68:6,15,23
69:6
70:2,11,15
71:4,13
72:1,20,22
73:10,13,25
74:6
75:9,14,23
76:5,14,21,25
77:13
78:8,15,17,24
79:2,5,13,18
80:1,3
81:2,12,19,23
82:2,24
83:14,16
84:14,16,19,23
,25 85:4,11,21
87:4,12,23
88:2,5,24
89:11,22
91:2,21
92:14,21 93:7
95:9 96:4
99:1,7
100:8,21 102:9
104:25 106:8
107:5,10
108:12,20,24
116:8,17,24
117:20 118:13

119:5,16
120:14 121:8
122:3 127:8
128:5,19
129:10
130:16,25
133:8 136:1
137:12 138:2
142:4 143:9
151:7,17
163:8,14
166:2,12
168:23
172:4,11 173:5
174:8,16,17,19
175:3,12,13,18
,21,23 176:3

**ones** 82:3 110:9
130:19

**Oney** 84:19,20
89:11

**ongoing** 158:2

**open** 50:13 69:8
118:22 149:13
153:20
164:23,25

**opened** 50:6
51:3

**operated**
42:17,18,19
59:19

**operating** 44:15

**operation** 46:13

**operations**
13:15 38:10,12
42:15 45:24
47:14 48:12
50:15 97:8

101:18 102:21

**opined** 132:20

**opinion**
89:17,19 94:13
100:8 104:16
108:21 113:17
126:11
128:20,24
129:2,3,4,8
130:17
131:2,3,4
141:17,18
142:10,21
143:9,13,14
145:9,19 146:2
147:13
150:14,16
155:7,12
157:14,16
160:17,20,21
161:19,20,21
162:6
163:21,25
167:11 169:16
170:3,5

**opinions**
10:4,14 12:12
13:22 15:17
16:15,20
17:17,19
87:5,6 93:24
95:13 97:2
98:4,14
101:1,7 106:23
107:4,7,10,15,
24 109:20,22
127:21,23,24
128:2,6,7,10,1
2,15,17,18
138:17 139:23



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.**MILESTONEREPORTING**.com          Toll Free **855-MYDEPOS**

140:1 148:15 149:19 165:22,23,25 166:4,6,7,9 171:16

**opportunities** 34:5

**opportunity** 49:14 131:24

**opposed** 99:19

**ORANGE** 177:4 178:4

**order** 100:14 130:1 139:18,20 141:3,21,25 170:19

**ordering** 174:1

**orders** 174:3 175:19

**ordinary** 161:5

**organization** 94:1

**organizations** 97:12

**original** 108:11 179:21

**originally** 22:1 32:2 50:8 89:8

**ORLANDO** 4:5

**orthopedic** 112:4

**others** 129:2 161:9

**Otherwise** 68:13

**ourselves** 41:24

**outbound** 120:25

**outcome** 151:18

**outside** 28:8,9,10 30:1 38:21 59:25 72:4 99:7 107:10 118:17,19 150:24 152:2 170:11

**overall** 113:17 117:13 129:1

**overarching** 128:20,24

**overlap** 55:4,20

**overriding** 132:5

**oversee** 46:10

**overseeing** 41:2 43:23

**oversight** 44:19,20

**owed** 172:21

**owned** 22:16 47:12 55:23

**owners** 22:14 72:24 73:9 76:10 77:13 90:4

**Owner's** 76:6

**ownership** 47:15

---

P

**P.A** 2:3

**p.m** 165:18

176:7

**package** 114:19

**Page** 3:2,9 16:2 91:25 101:11 103:6 104:5,25 109:12 110:11 115:13 119:5 127:20 128:19 158:14 160:13 162:25 164:19 179:3

**pages** 8:24 11:6 53:18

**paid** 52:14 94:6 124:3,9 129:19

**pain** 115:16 134:21,22

**Palmer** 2:10

**pantoniou@flala wyer.net** 2:13

**paragraph** 110:12 115:14 119:5,8 158:15 160:14 163:1 164:21

**paralegal** 52:13,19,21 53:3,4,9 93:8,12

**paralyzed** 80:11 161:11

**paraphrasing** 153:14

**paraplegia** 137:1,11 159:7

**paraplegic**

132:7,9 161:1

**Pardon** 68:24

**parent** 22:14 47:10

**Parsons** 78:10

**participant** 80:24

**participants** 4:6

**particular** 7:16 14:13 102:1,9 106:10 125:9 151:7,12 153:16 155:15

**particularly** 35:18 36:15 39:16 47:4 134:20 147:16

**parties** 5:4,20 12:9 56:17 72:5,7 91:8 107:2 178:13

**partners** 32:25

**part-time** 52:23 58:2

**partway** 81:15

**party** 17:21 35:1 62:1 63:9,10 64:23,24 69:17,20 71:2,20,22 72:18 75:23,24 78:21 86:13 105:14 106:13,16 131:5



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**
**407.423.9900**    **www.MILESTONEREPORTING.com**    **Toll Free 855-MYDEPOS**

139:6,8,10,12,
19 141:24
154:4

**party's** 69:24

**pass** 12:7

**passed** 12:20

**passive** 95:17

**past** 64:9
124:13

**Pat** 52:11

**patient** 112:10
149:2

**patients** 80:11

**patient's**
145:15

**pay** 129:18
169:8
172:17,20

**paying** 169:12

**payment** 127:3
156:21 166:25
168:25 170:17
172:25

**payments** 139:20

**pedestrian**
73:20

**peer** 132:1

**peer-to** 131:25

**peer-to-peer**
132:15

**pendency** 129:19

**pending** 28:11
66:5

**people** 23:5

42:5

**people's** 160:24

**per** 91:13

**percent**
33:18,19,21,22
34:2 38:7
44:12 46:21
47:22 56:9,11
57:16,17,25
58:4,8,10,17
69:21,24
74:16,24 97:17
98:24

**percentage**
28:24 33:14,15
44:10 46:17
56:6 57:12,21

**Perfect** 5:14
173:19
175:12,25

**performed** 12:16
80:9

**perhaps** 68:12
112:2

**period** 22:25
24:9 25:22,23
28:13 30:7,11
40:18
41:7,19,23
43:24 50:1
112:19,21
113:2,6 116:14
117:15 118:9
123:2,8 132:19
138:24 141:11
146:1,6 148:19
150:2,7,24
152:2 155:24
157:17 161:17

162:19
163:9,10

**periodicals**
99:13

**periods** 39:17
158:20

**permanency**
114:6 131:8
132:21
134:9,12 136:7
140:10 141:7
142:6 143:13
145:19,22
146:1 147:23
148:2,7,10
149:7 158:1,9

**permanent**
134:11,14
135:9,12,17,22
136:24 140:17
141:14
143:6,10
144:4,17,21
145:1,3,6,7
159:16,20
160:4

**permanently**
7:20

**permit** 172:18

**person** 89:18
137:10 175:19

**personal** 43:8
84:22

**personally**
177:7

**personnel** 49:18

**pertains** 17:20

**pertinent**
109:19

**phase** 117:16

**philosophy** 43:3

**phonetic** 89:7

**phrase** 133:24
148:23 153:14

**phrased** 100:11

**physical** 112:3
115:23 117:6

**physician** 142:1

**physicians**
143:12 145:18
146:4 149:19

**pick** 27:14

**picked** 44:17,20
47:16 48:15
49:4

**pictures**
27:8,15

**piece** 54:23
60:6,17 84:2
151:10

**pilot** 33:12

**Pine** 81:3

**PIP** 114:19
130:6 131:13
133:17 163:6

**plaintiff** 1:7
2:2 3:12 5:8
8:3 34:1,5,9
56:24
57:7,14,17
66:3,18 67:12
70:12,23 71:18
74:10,17,24



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

75:6,16
78:7,13 80:17
81:13,20
82:13,16,25
84:20 85:7
88:3,5,7,10,14
89:12,14 94:4
108:22 141:24

**plaintiffs** 20:7
39:5 90:12

**plaintiff's**
27:5 74:13
78:23 86:25
87:3,17 130:3

**Plaintiffs**
151:4

**Plaintiff's**
18:3 73:22
84:24 87:17
124:1

**plan**
162:13,17,18,2
3

**plans** 162:11

**play** 142:20

**please**
5:4,15,25 6:14

**plus** 26:1

**pocket** 124:2

**point** 18:15
22:21 24:1
30:5 32:19
35:20 43:19
55:23 70:2,9
102:10
107:12,14
111:8,11
115:24,25

116:3 119:4
120:7,23
121:18,24
122:1,14,20
123:9,13,22
124:22
125:5,15
130:22,23
137:4,24
138:3,22 145:2
151:1,11
154:4,22 156:9
158:8 159:12
160:7 161:4
162:22 163:5
164:24 165:4
166:11 167:4
171:15

**points** 128:11

**pole** 32:25

**police** 27:14
81:14,16

**policies** 38:15
46:23 100:6

**policy** 23:9,10
34:4 47:12
48:11 52:4
55:9 63:3,11
90:16
105:5,7,24
106:2,3 120:2
121:3,16
123:22
124:8,17
125:2,18 126:1
127:4
137:18,22
138:3,21
140:21,24
141:9

151:22,24
152:17 153:8
155:5,9
156:3,9,23
157:2,5 160:10
164:20,24
167:8 169:1,14
172:7,12,21,25
173:2

**policyholder**
70:13 73:11
74:17,25
75:6,16

**Pollock** 70:3

**portions** 79:16

**position** 9:12
39:25 69:21,23
80:20 105:3
106:1 113:20
158:6

**possibility**
111:10 136:25

**possible** 96:24
110:20 126:7
170:20

**possibly** 144:15

**post** 43:3

**post-accident**
80:22

**potential**
112:10

**potentially**
155:20 156:24
167:14

**Powell** 97:23,24
104:12,13,14

**power** 105:17

**practical** 95:1
97:9

**practice** 16:22
17:12,18
19:21,24 31:23
32:22 33:15
35:18,20 46:11
52:21 55:24
57:21 94:14,17
95:7,12
96:10,15
99:23,25
100:19 102:6
103:8,23 104:6
128:23
129:6,13
141:19 147:23
148:6,9
155:8,13
157:15,16,22
164:1 169:1,17
172:1,5,15

**practiced** 19:22

**practices** 17:1
41:10 52:8
95:10

**practicing** 40:7

**precepts**
100:17,21

**precise** 94:23
96:9 141:16
147:1 149:3

**precisely** 70:17
113:15 123:5

**pre-existing**
132:8

**prejudice** 82:10

**prepare** 13:25



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    www.**MILESTONEREPORTING**.com    Toll Free 855-MYDEPOS

**prepared** 92:13 171:1

**preparing** 91:16,17

**presence** 47:17

**present** 136:9

**presentation** 60:7,18

**presentations** 61:3,16,19

**president** 39:25 40:10,14 41:6 43:11,21 44:9 45:22,23

**pressure** 157:8

**pre-suit** 112:21 113:2,6,7 117:15,16

**pretty** 7:2 33:3,16 44:22 45:10 49:10 51:12 60:21 80:24 102:4 103:4 104:17

**previously** 128:13

**PRG** 120:15

**price** 174:2

**Pride** 76:15,17,22

**primarily** 21:21 22:20 29:5 40:18 42:1,3 46:24 49:7 51:4,5 58:23 64:3 79:20,25

84:5 92:12 108:10

**primary** 15:9 20:8,11 22:14 33:6 51:22 54:19 70:7 79:20 95:24 163:6

**principle** 101:19 170:6

**principles** 98:17 103:4

**prior** 5:19 64:9 113:2 126:21 132:25 133:15,18,20 137:1 146:15,22 159:7 167:4

**privilege** 10:7,18

**pro** 19:22 20:2,18

**proactive** 96:2 113:19 129:24 130:7

**proactively** 127:5 130:6

**probability** 141:15 145:8 148:11

**probably** 23:4 24:15 31:5 33:19 41:11 46:21,24 49:24 58:8 143:16 144:17 165:7,13

174:7,11

**problem** 15:1 117:7 168:10

**procedure** 4:8 110:13 111:18 113:4

**procedures** 100:6 119:3

**proceed** 52:5 55:10 111:20 127:16 150:9 172:18,22

**proceeding** 178:9,10

**PROCEEDINGS** 3:3 5:1

**process** 21:20 25:15 40:19 41:3 43:2 88:22

**produce** 10:17

**produced** 8:25 9:8,13,23 11:7,8 18:20,22 68:17 94:4 108:22 109:3,5,8 120:19 177:10

**producer** 86:4

**product** 10:5 27:4

**production** 9:24

**professional** 6:17,19 33:7,11,19 51:24 53:20 54:24,25 55:25

59:7,16 61:6

**program** 25:7

**progress** 135:15

**progressed** 33:5

**progressing** 134:23

**Progressive** 1:11 2:8 5:11 6:13 16:14,21 62:22 77:1,8 78:17 80:16,24 83:1 84:19 85:15 86:8 96:1 103:17 109:6 112:22 113:9,12,18,24 114:3,17,22 115:10 117:10 118:8 119:11 120:23 121:10 122:7,17,23 124:3,6,7,9,16 ,19 125:15,23,25 126:12,16 127:2,7 128:21 129:4,11,17 130:17 131:5 135:2 138:25 139:13 141:13 143:2,10 144:20 145:25 146:11 147:14 148:22 151:24 152:10,16,20 153:6,24 154:4,10,15,19 155:8,21,24 156:2,8,18 157:8,10,17



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

158:23 160:11 161:18 162:7,19 163:11,21 166:25 167:3 168:18 170:12

**Progressive's** 8:8 105:2,17 126:12 167:7,8 168:23 169:2,23

**prohibited** 91:7

**prominent** 73:22 97:5

**prompted** 49:19

**promptly** 94:24

**proof** 142:16 144:22

**proper** 24:20 98:9 100:16 149:24

**properly** 95:20 100:14 130:1,13,17,20 131:11

**properties** 81:6

**property** 23:8 26:1 33:2 34:13 45:17 47:8 78:6,14 85:5,14 86:16

**proposed** 153:6,10,11 155:25 156:3,6

**protecting** 139:9

**protection**

139:11

**prove** 141:25 142:6

**provide** 8:7 11:2 15:16 16:10 62:9 73:25 99:22 104:5 108:2 109:21 141:20 143:12 154:8

**provided** 3:14 7:13 9:7 10:24 11:9,12,15,17, 20,23 17:24 18:4,5 63:14 94:4 107:23 145:25 146:1 162:18 166:7

**providers** 162:6

**provides** 99:8 104:6

**providing** 145:9

**provision** 169:14

**P-S-H-A-L-L** 75:21

**PT** 144:13

**PTI** 84:25 85:1,11,12 86:15

**public** 4:9 61:21 177:17 178:6,24

**publications** 60:13 61:16

**publicly** 22:15

**published** 60:23 61:10

**publishing** 61:11

**pull** 99:10,15

**pulling** 8:20 18:11

**punitives** 88:8,11

**pure** 134:7

**purposes** 149:3 168:1

**pursuant** 4:8 68:17 167:8

**pursue** 105:14 125:7

**pursued** 142:22

**pursues** 124:2

**pursuing** 56:22

**pursuit** 106:16

**puts** 113:19 169:7,12 173:3

**putting** 51:11 67:23 150:18 157:7 167:12

---

Q

---

**quad** 34:12

**qualifications** 91:10

**question** 35:3 37:1 68:1,3,4 74:22 76:12 83:23 90:22 91:7 98:12 103:18,22,23

105:18 106:4 110:6 115:22 116:12 121:23 122:6 132:23 133:21 137:21 149:13 159:19 162:5 166:5 168:4 169:5 172:11,19

**questions** 35:2 51:23 54:21 55:2,6 68:8 79:13 132:17 133:4,7 166:13,19 171:21

**quickly** 7:10 51:11,12

**quite** 21:8,13 24:16 47:19 53:7 95:14

**quota** 47:13

**quote** 96:18 174:2

**quotes** 101:17

---

R

---

**racing** 79:23,24

**radically** 24:21

**raise** 5:25

**raised** 133:21

**raising** 132:23

**ran** 25:7 44:23,24 49:12 73:19 133:15

**range** 33:3 46:21 137:17


MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     Toll Free 855-MYDEPOS

164:2,3,5,7,14,15,17

**ranges** 163:20,22

**rather** 23:11 135:24 167:20

**Raymond** 85:6,8

**reach** 93:24 102:5 103:20

**reached** 72:7 135:8 137:4

**reaching** 96:4

**reaction** 151:2

**reactive** 96:3

**readily** 130:10

**reading** 4:11 14:7 107:2 113:14 149:25 156:12 170:18 173:9,11

**ready** 94:3

**real** 12:10 150:7 164:11

**reality** 123:15 125:3,22

**realized** 149:25

**really** 35:16 95:21 117:6 130:22 132:24 161:16 173:8

**re-ask** 168:4

**re-asking** 168:1

**reason** 43:5 72:1 74:10 75:8 156:5

166:2,5 179:3

**reasonable** 141:15 145:8 148:11 155:2

**reasonably** 105:23 114:11,14

**reasons** 74:12 107:8 165:9 179:19

**rebuilding** 7:3

**recall** 14:22 28:20 30:5,12 35:24 36:6 37:11 39:5 54:17 65:5 68:22 70:5,6,7 76:22 77:2,3,11 80:18,20 120:12 153:2,19 163:23

**receive** 8:12 139:20

**received** 8:23 10:23 12:21 16:3 108:25 113:14 142:17 158:3

**receives** 114:10 126:13

**recent** 96:19

**recently** 71:8

**recess** 54:9 127:13 165:16

**recitation**

101:12 102:2

**recite** 106:25 109:23

**recognition** 137:7

**recognize** 137:9

**recommended** 111:16

**record** 5:3,16,20 6:15 54:12 110:23 113:3,15,23 114:1 115:15 127:15 130:6 131:25 132:15 135:7 136:17,21 145:15 151:7,8,10 158:23,25 165:19 168:2 173:8 176:4 178:9 179:19

**records** 11:20 111:9,12,18 112:18 113:8,9,21,25 114:4,5,8 117:20 118:8 119:1 130:8 131:18 132:2 134:23 135:12,14 136:15,16,19 142:11,15,23,25 143:1,4,12,20,21 144:5,20 145:5,19

147:13 148:19,21 149:20,25 157:18 161:18 162:7

**recover** 141:25

**redid** 24:6,7

**REDIRECT** 3:6 171:23

**reduce** 122:2

**refamiliarize** 41:9

**refer** 13:14 22:12 98:17 142:10

**reference** 162:25

**referenced** 23:7,12 108:14 125:20

**references** 113:13 159:1

**referencing** 158:20

**referred** 22:25 31:1 82:20

**referring** 58:15 123:3 140:11 163:4,8

**refers** 110:23

**reflect** 120:7

**reflected** 92:11

**reflective** 74:20

**reflects**



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    **Toll Free 855-MYDEPOS**

**refreshing** 14:11

**refused** 73:9 76:10

**regarding** 8:7 98:4

**regular** 25:16

**regularly** 36:19 39:19

**regulators** 48:9

**reinsurance** 38:3

**reinsured** 38:8

**rejection** 80:21 155:17

**relate** 128:8,13 130:19 146:5,19

**related** 17:13 59:23 138:19 178:13

**relates** 100:9

**relation** 171:2

**relations** 61:21

**relationship** 147:6

**release** 112:1,8 139:7,10,12,14,21 153:4,6,10,11,17,21,24 154:9,11,14,18,25 155:13,21,25

92:4,14 105:9 122:21

156:3,6,17 157:12 167:7,13 168:19,24 169:10,12 170:11,20,23

**released** 154:4,15

**releases** 139:15

**releasing** 139:13

**relevant** 171:17

**relied** 10:13 97:2,15 102:2 104:21 107:23 108:12

**rely** 10:3 13:16 98:12 101:1,12 114:5,7 126:12 130:2 144:19 157:22

**remained** 45:24 46:21 119:18 121:22 122:13 123:1

**remarkable** 133:13

**Remedy** 117:22 118:3

**remember** 37:14 68:3,4 70:16,17 152:24

**remotely** 4:6

**removed** 159:18

**render** 95:13 97:2

**rendered** 166:7

**renders** 132:9

**repeated** 133:23

**rephrase** 36:25 148:8

**reply** 44:17

**report** 3:12,14 11:10 13:16,17,22 14:7,16,17,19 17:24,25 18:2,5,11,15,21 19:1 43:5 44:17 53:24 62:5 81:17 91:9,17 97:15 101:11 104:5 106:18,20 107:5,6 108:1,5,6,9,11,13,14,15 109:11,25 110:7 127:19,25 128:1,8 134:4,13 138:10,11 142:3 145:11,16,22,24 146:10 148:24 153:3 158:13 162:25 171:14 178:8

**reported** 28:16 43:20 45:20

**Reporter** 1:22 4:10 5:2,14,18,24 6:6 54:8,10

127:12,14 165:15,17 167:22,24 168:8,11 171:4,7 173:7,12,15,18,23,25 174:4,8,12,16,19,23 175:2,8,10,12,14,18,23,25 176:3 177:17 178:6,24

**reporting** 4:4 28:3,18

**reports** 12:12 27:14 40:16 93:25 106:22 107:11 116:21 133:19 134:25 141:17 146:15 147:3 149:1 158:12 171:1,5,17

**represent** 6:13 34:18,20 56:19 74:9

**representation** 74:8

**representative** 26:10

**represented** 26:7 34:21 66:2 70:3

**representing** 58:25

**reprimanded** 20:24



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY
CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**
**407.423.9900**    www.**MILESTONEREPORTING**.com    Toll Free 855-MYDEPOS

**reproduce** 11:8

**request** 8:25 9:2 10:12 155:13 179:18

**requested** 168:14

**requesting** 139:20

**requests** 9:7 10:11

**require** 17:13

**required** 48:11 99:25 130:4 172:1,6,12,14, 16,20

**requirement** 140:14 142:1 170:19

**requirements** 17:10

**requirement's** 140:20

**requires** 95:17 148:14 170:17

**requiring** 167:13

**rescheduled** 88:23

**research** 27:7 101:3

**residence** 7:18 50:12

**residence/ office** 50:13

**residency** 50:21

**resident** 50:24 51:1

**resist** 134:4 158:7

**resistance** 134:6

**resolution** 72:2,7

**resolve** 69:25 70:15 105:17 106:14 134:16 135:4 144:24 155:9

**resolved** 66:6,7,22 69:5 71:7,9,25 72:2 74:4 77:11 78:9,16 81:25 85:20 106:5,7 134:18

**resolves** 72:9

**resolving** 72:4 135:7 137:25

**resort** 81:6

**resource** 97:11

**respect** 13:23 17:1

**respected** 98:2

**respond** 94:24

**responded** 9:2,3

**response** 10:22 18:19 106:2 152:25 162:1 167:23

**responsibility** 33:7 43:9

48:5,15,16

**responsible** 41:2

**responsive** 8:25 9:4,6,14 10:11 94:10

**rest** 25:8 41:12 42:19

**Restaurant** 85:22,23

**resting** 135:10

**restricted** 90:8

**rests** 113:18

**result** 86:25 87:20,24 89:4,7 133:24 155:17

**resulted** 80:11 87:2,3

**resume** 11:15 21:16

**retain** 56:19

**retained** 8:6 16:9 30:1 34:17 35:7 53:18,22 56:21 59:9 63:2,11,23 64:8,25 65:12,14 66:18 67:6,12 70:13,22 71:17 72:13,25 73:14 75:15,25 76:16 77:7 78:4,7,11,13,1 8 79:8,11

80:4,6,16 81:12,19 82:12,15,24 83:1,10,19 84:10,17,20 85:7,12,15,22 86:2,8,24 87:19 90:21

**retainer** 15:24

**retired** 12:3 44:23 49:12 50:3 52:22 53:6

**retry** 89:9

**return** 46:9 114:20

**returned** 27:17 39:9 114:22 131:14

**reversed** 36:3 76:19,24 88:14 89:21

**review** 11:24 12:8,11 13:21 14:5,10 16:15,18 49:17 95:10 101:10,13,25 102:3,11 104:19 108:20,21 109:2,8 123:18 131:24,25 132:1,13,15 135:14 142:13 144:24 157:18

**reviewed** 10:25 11:4,13,18 14:2,4,12,14,1



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

7,20,23 15:2
108:2,5,25
109:1,5 114:5
115:6 119:25
130:6 149:14
151:10

**reviewing** 14:14
91:17 130:7
149:18

**risk** 38:9,24
97:10 137:2

**risks** 42:22

**R-I-U-S** 90:15

**Rivas** 84:25

**ROBINSON** 4:4

**Rodriguez** 15:2

**Rohn** 65:24
67:20,21

**R-O-H-N** 65:24

**role** 12:5 20:10
25:1
27:6,12,19
28:13
29:5,6,8,9,18,
22 30:6,10
31:19 37:19
38:19 40:3,23
43:11 44:5,9
49:11 52:23
59:17 62:25
63:1,2 70:4
76:8

**roles** 45:8

**roofs** 82:7,8

**rough** 28:23
33:23 56:13

**round** 40:25
44:23 45:10
49:12

**ruled** 87:14
91:5

**Rules** 4:8

**run** 57:16
146:12

**running** 38:6
40:24,25

**runs** 84:3

**rupture** 144:3

---
S
---

**S&R** 86:1

**Sacred** 80:3,7

**safe** 152:10

**Safeco** 79:5,11
87:23

**Saldin** 116:7

**Salid** 116:6

**sand** 123:17
126:8

**Sanibel** 7:2

**Sartes** 125:4
131:21 152:21
154:6,10
156:11,16

**Sartez** 15:3

**sat** 21:21

**satisfied** 105:3

**Sauk** 76:5,6
77:23,24

**S-A-U-K** 76:6

**saw** 113:25
119:21 146:3
149:10 161:3,9

**scale** 111:25
112:5

**scarring**
140:10,18,19
141:8

**scenes** 27:8

**schedule** 8:1

**scheduled** 39:3
107:21 111:19
112:12,15
118:10,15,18,2
4 150:3

**school**
19:8,10,11,17
22:2,4
26:12,21 27:16
30:14,22
31:22,24 32:4

**scope** 16:17

**Scow** 73:13,14

**S-C-O-W** 73:13

**scrambling** 84:3

**screen** 10:20
18:15 62:6

**search** 68:18
133:16 147:17

**seasoned** 134:13

**second** 14:24
17:11,23
87:3,5 114:14
115:14 139:7
142:9 158:14
160:13 163:1

164:21 168:1

**Secondly** 96:18

**section**
63:17,21 68:10
69:9
101:10,21,22
102:1,11,22
104:14,19,20
105:1 109:12
110:11
115:3,13
121:20 123:2
124:12
127:19,20,23
128:5,9
130:12,13,23,2
5 131:1
133:8,10
140:23,24
141:1 158:13
159:9 162:13

**sections** 104:22

**seem** 74:13
135:10

**seems** 53:7

**seen** 93:6,14,16
116:6 126:7
131:23 143:16
145:20,21
151:3,19
154:23 162:10

**SELECT** 1:11 2:8

**self-resolve**
144:16

**selling** 38:4

**Semi** 58:3

**seminars** 61:13



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

**Seminole**
  77:13,14,24,25

**semi-related**
  77:19

**semi-retired**
  58:2,3

**semi-truck**
  73:19

**send** 173:13

**senior** 32:25

**sense** 51:7
  137:8,23
  144:16 161:24
  167:12

**sent** 87:15
  113:9,11
  114:1,17
  152:21 153:6
  155:24 156:3

**sentence** 119:6

**separate** 29:15
  45:16,17
  143:24

**separately**
  13:10 93:8
  98:15

**series** 80:10
  95:2

**serious** 112:10
  144:1,6 149:16

**service** 12:17
  47:14 48:13
  49:7 110:24
  113:3,23

**services** 53:8
  117:25

**serving** 15:19

**sets** 143:24

**settle** 42:22
  120:2 121:17
  124:17 127:3
  128:21
  129:5,12
  138:20,21
  150:15,21
  151:4 156:6,7
  157:9

**settled**
  66:9,12,23,24
  67:10 69:8
  70:1 71:25
  74:5 80:2
  81:18 82:23
  83:8 87:25
  122:18 129:15

**settlement**
  66:11 69:6
  71:10 72:4,5
  77:12 80:25
  152:22
  153:15,22

**settlements**
  156:24

**settles** 151:19

**settling** 121:15
  157:4

**several** 14:21
  32:15 133:23

**severe** 81:5

**severity** 111:25
  112:13

**sexual** 49:8

**share** 10:20

  18:15 42:12
  62:6

**shareholders**
  48:8,10

**shares** 47:13

**sheer** 147:20

**sheet**
  12:20,22,23
  13:4 91:23
  92:2,17 93:6
  179:20

**sheets** 11:21
  13:3

**shelf** 99:10

**she's**
  52:12,13,22
  53:6

**shooting** 76:18
  83:22

**shoots** 90:19

**short** 31:15
  68:8 95:5

**shot** 31:25 32:5

**shoulder** 161:2

**showed** 115:3
  119:25 149:6

**shown** 13:10

**shows** 105:23

**shut** 164:16

**sic** 116:6

**sign** 139:14,21
  154:25 180:5

**signal** 112:8

**signed** 16:1,3

  80:21 114:25
  131:14,17,22
  179:19

**significant**
  38:8 67:23
  73:6 137:6,9
  139:6 140:18
  160:23

**significantly**
  132:11

**signing** 4:11
  80:23

**silent** 80:24

**similar** 63:2
  141:20

**simplified**
  154:9

**simply** 11:8
  16:13 23:13,20
  25:8 105:4
  130:2 132:3
  133:2 136:8
  139:1 149:10
  151:25

**Simpson** 86:15

**single** 99:1
  106:25 109:17

**sir** 6:18 10:20
  18:8 58:3 65:8
  74:6 115:22
  119:9 120:15
  121:25 143:7
  166:12
  171:1,12

**Sirius** 90:14

**sit** 21:24
  120:12 130:2



MILESTONE | REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    **Toll Free 855-MYDEPOS**

**sitting** 22:4

**situation** 52:20 57:1 112:11 132:7 135:21 161:6,25

**situations** 95:1 143:22 151:19

**six** 117:13 134:18

**ski** 90:24 91:1

**skiing** 90:17,23

**skip** 127:20

**slightly** 165:7

**slip-and-fall** 82:18

**slipped** 65:6

**Slowly** 25:10

**small** 27:2 60:17 61:8

**Smart** 84:9

**Smith** 152:21

**smoothed** 7:9

**snowbird** 50:14

**SNR** 86:2

**social** 49:6

**sold** 50:22

**solemnly** 6:2

**solicit** 152:21

**solving** 117:7

**somebody** 126:8

**somehow** 70:1 135:4,8

**some-odd** 74:16

**someone** 55:6 149:14 151:20 161:5,11 162:3,24

**somewhat** 42:17 113:11 114:21

**somewhere** 14:19 15:23

**sorry** 7:6 12:14 30:13 64:15 83:2 87:22 108:18 112:9 115:5 135:1 167:18 168:8 173:25 174:19 175:15

**sort** 12:24 15:1 26:5 30:20 35:2 49:9 55:8 60:5 90:24 122:5 135:21 143:21 146:23 160:23 162:12

**sought** 8:18 23:4 98:15 131:17

**sound** 16:4

**Sounds** 54:8 127:12 165:15

**source** 100:21 102:10 147:18

**sources** 96:18 101:11 102:1 104:21

**south** 47:17,19 50:15,19

**Southeast** 6:25

**sparse** 137:7,8

**speak** 15:7 149:4 154:21

**speaking** 30:21 56:2 60:3

**specialists** 133:12

**specialized** 27:3

**specialty** 84:7

**specific** 23:16 55:1 80:7 91:9 97:14 98:6,12,23 99:8 100:15 101:2,3,6,8,11 102:9,25 103:2 110:6 118:9 141:20 142:24 143:1,3,13 148:20 149:20 151:10 153:25 154:13 165:6

**specifically** 13:23 14:5 16:25 60:11 93:20 101:19 123:3 141:14 146:9 147:9 151:13 154:7 158:11 162:20

**speculate** 135:22

**speculated** 136:8

**speculating** 134:2

**speculation** 134:7 147:20

**spell** 6:15

**spend** 12:19 25:5 50:17

**spent** 93:5

**spinal** 80:10

**spine** 113:23 132:10 147:10 159:17

**split** 7:16 35:4

**splitting** 45:15

**spoke** 15:6 121:2

**spontaneously** 134:18 160:3

**sports** 60:14 61:2,5

**spot** 154:24

**sprain** 143:23

**squad** 81:15

**St** 76:15,17,22

**staff** 7:21 51:8 52:9

**stage** 64:5 112:8 113:15 142:2

**stair** 125:16

**stamp** 120:15

**stand** 135:19 169:22

**standard** 57:1,7 99:20 100:15 101:10,12,25



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     www.**MILESTONEREPORTING**.com     Toll Free 855-MYDEPOS

102:2,10
104:13,19
148:6,9 157:24
169:1
175:1,2,3

**standards**
96:6,11
97:2,15
98:5,6,7,13,21
99:16
100:10,12
103:12

**Standby** 167:24

**start** 14:6
25:10 32:17
95:14 101:14
116:23 134:20
146:16 168:16
173:9

**started** 5:3
14:15 25:8
31:14,17 32:24
45:15 50:14
51:10,12
61:12,14 88:16
102:15 103:7

**starting** 54:16

**starts** 119:6
158:16

**state** 4:10
5:4,15 6:14
19:25
20:3,9,14,18,2
1 22:22
23:16,17 25:17
33:10 34:25
38:1,5,16
39:4,6 47:17
51:10 58:22

59:23,25 60:20
63:5 64:21
65:25 66:20
67:4,11 72:12
73:2,16 78:4
85:6 87:19
97:18,22 98:25
99:8 100:23
111:2 140:16
164:19 177:3
178:3,7

**stated** 121:2
141:14 147:9

**statement** 107:7
110:12 116:18
119:20 122:24
128:25
129:1,11 139:5
141:20 142:24
143:1 148:20
151:11 163:21

**statements**
123:16 126:13

**states** 1:1
19:21,23 42:1
80:9 82:9
97:24 110:18
127:20 136:21

**stating** 170:3

**status** 67:9
68:23 69:4
71:4,24 72:20
74:3 76:3
77:10
78:12,15,19,24
79:9 80:1,5
81:23 83:5
84:14,23
85:2,9,12,16,2

4 86:2,10,18
113:21

**statute** 140:12
141:9

**statutes** 17:17
94:21

**stay** 39:22

**step** 55:11
112:3

**stepped** 117:8
125:16

**steps** 27:9
95:18

**STIPULATION** 4:1

**stock**
47:7,10,11
48:7

**stood** 23:2

**stopped** 26:11
41:15

**storage** 86:5

**storm** 77:20
78:6

**straight** 131:1

**strain** 143:22

**strains** 144:2

**strange** 67:22

**street** 2:4,10
4:4 6:25
79:23,24

**strength** 161:2

**stricken** 89:25

**strictly** 38:17
56:4 91:5 94:1

96:3

**strike** 30:8
84:3 90:24

**struck** 89:22

**structure** 30:19
43:6

**stuff** 48:17
131:10 175:7

**subject** 60:9
154:1

**subjectively**
147:24 148:3

**submit** 145:11

**submitted** 92:25
94:7 117:21
118:8 132:1
141:12
142:12,24
143:2 144:20
147:14 148:21
157:23 161:18
162:7 178:17

**sub-opinions**
129:3

**subpoena** 94:11

**Subsection**
140:13

**subset** 23:19
61:9

**subsets** 129:3,7

**subsidiaries**
45:23

**substance** 15:17
16:11 145:2

**substantial**



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    **Toll Free 855-MYDEPOS**

36:18 47:16

**substantiate**
133:21

**substituting**
149:17

**sudden** 88:17

**sue** 154:18

**sued** 56:20
69:19 80:12

**suffered** 73:6
84:2

**suit** 119:14
123:22 124:15
125:2,13

**Suite** 2:4,11
4:4 6:20

**summaries** 94:2

**summarized**
93:15

**summarizing**
9:19 52:24

**summary** 11:24
12:9 72:3
76:23 89:18
101:16 106:24
109:14,19
110:22
175:6,16

**summer** 50:22

**Sun** 72:24,25
73:5,8,10 76:9
78:2,3 88:9

**supervised** 28:3
44:11

**supervising**
29:19 40:23,25

41:20 45:11

**supervision**
28:25 73:21

**supervisor**
27:22,24 28:6
29:7,21 30:7,9
59:17

**supervisors**
41:1 45:12

**supervisory**
41:13 44:6

**supplemental**
3:14 11:9
14:19,22 17:25
18:5,12 106:20
107:6
108:6,9,13,15
127:25 128:1,8
138:10,16
153:3 166:6

**Supplemented**
127:25

**support** 27:6
97:11 136:5
147:5 151:11

**supported**
136:6,7

**supposed** 129:25

**Supreme** 20:25
21:3

**sure** 8:23 10:8
22:24 23:3
24:9,15 31:16
34:9 36:20
45:5 46:19
48:2,9 58:10
59:12 67:21
68:20 72:10

81:9 87:8
91:25 92:18
95:12 96:10
98:11 99:24
103:16 107:17
112:16 118:24
120:14 121:11
122:6 126:20
138:7,8 140:12
142:23 151:3
155:23 166:3
167:25 168:6

**surgeries** 80:10

**surgery** 110:20
111:4,15
112:5,9 144:4
150:3,5,9

**surgical** 111:18
159:4 160:8

**suspended**
116:3,9

**suspension**
116:5

**swear** 4:10 6:2

**switch** 31:19
39:12

**switched** 22:3
45:13

**sworn** 6:1 177:8

**symptoms** 136:14
146:18

**syndicate** 38:6

**Syndicates** 38:4

**system** 12:23

**systems**
40:19,22 41:10

**S-Z-E-W-S-K-I**
53:6

---

T

**table** 40:25
45:11 49:12
125:23 151:3

**tables** 44:24

**tablet** 46:20

**tactics** 60:4

**taking** 30:25
39:16 101:18

**talk** 55:11 61:4
90:21 102:15
153:3

**talked** 55:5
88:24 89:1
97:6 102:20
123:24 151:15
152:12 163:19
166:10,20

**talking** 29:22
35:15 39:24
43:10 53:5
54:15 55:5
57:19 60:15
101:25 102:5
122:23,25
124:12 125:8
158:22 159:16
162:14

**tally** 46:20

**Tampa** 1:3
2:5,11 5:9,12

**taught** 143:17

**Teague** 67:11
68:6,20,23



MILESTONE │ REPORTING COMPANY
TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

69:4

**T-E-A-G-U-E** 67:11

**team** 42:25 52:21

**technical** 15:1

**technically** 27:20

**techniques** 60:4

**tecum** 3:10 8:13,17 10:21,22 18:19 68:17

**Telephone** 2:5,12

**temporary** 7:1

**ten** 75:5

**tend** 53:20,21 66:16

**tended** 151:24

**tender** 105:4 106:2,14 153:7 172:6

**tendered** 156:2

**tendering** 105:11 124:8 139:1

**term** 95:5

**terms** 29:6 30:19,21 137:7 140:10 150:22 157:9

**Terrace** 81:3

**terribly** 96:1

**testified** 29:24

63:23 88:2 89:15 103:7 138:2 151:22

**testifies** 93:25

**testify** 16:12 88:19 90:6,8,25 103:17 123:21 125:1,3

**testifying** 17:9,11 90:11 91:1 171:11

**testimony** 6:2 8:7 18:16 50:11 62:10,14 63:15,21 64:6 65:18 69:9 74:7,15 75:10 86:22 88:20 91:3,6,8,13,16 107:19 109:24 110:1 122:16 123:19 125:4 126:11,16 135:11 149:8 151:9 171:12

**Tetons** 90:18

**Texas** 47:17

**Thank** 5:14 6:7 54:12,25 65:10 127:16 165:19 166:15 171:21 173:6,7,22 175:13

**that'd** 16:8 56:11,13 57:10

**that'll** 12:11 18:3 79:3 90:3

**themselves** 11:3 41:1 139:13 149:4

**theory** 117:5

**therapy** 112:3 115:23 117:6

**there'd** 32:13 139:2

**there'll** 69:10

**there's** 7:25 8:17 11:5 12:1 15:7 24:18 32:10 53:3,8 62:17,18 63:17,22 64:16 69:10 78:1 80:25 92:6,24 93:7,17 95:14 98:19 99:14 100:17 102:13 103:1 105:21 106:5 107:18,20 109:11 113:13 120:19 122:19 124:2,5 125:6,11 126:22 127:20 128:1 135:6 136:17 138:16 139:17 142:14 144:3 149:9 154:24 158:15 159:19 164:10

**they'd** 123:10

**they'll** 94:23

**they're** 53:9 55:12 90:10 95:7 97:12

103:1,4 105:18 113:20 136:23 137:8 139:13,14 144:2 145:13,14 149:2 159:18 164:6 167:12 170:18

**they've** 113:14 117:8 122:1,16 144:12,13

**third** 63:9 64:23 69:17,19,24 71:2,22 72:18 75:23,24 78:21 86:13 105:14 106:13,16 119:5 139:8,9 158:14

**third-party** 68:21 71:3 72:19 86:11 105:11,15 138:23 139:5

**Thompson** 2:10

**thorough** 94:24

**thoroughly** 130:13,18 136:3

**thoughts** 9:20 14:10 16:15

**thousands** 11:6 149:15

**threshold** 140:8,16 141:3,5,21


MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**          www.**MILESTONEREPORTING**.com          Toll Free 855-MYDEPOS

**throughout** 42:2 119:16 121:21 126:17

**Thursday** 15:12 174:13

**timeframe** 22:7 24:11 28:19,22 31:4 37:12 46:1,16 96:17 115:18 122:25 124:10 143:2 147:9 150:25 155:23 162:8

**timeframes** 159:10

**timekeeper** 12:24

**timeline** 112:5

**timely** 122:18 152:13 155:18

**timesheet** 93:16 94:8

**title** 26:24 27:20 44:18 45:13

**titled** 62:10 101:23 109:14 127:21

**today** 6:14 8:2,13 91:13 139:24 140:2 165:24 166:10,14 171:12 173:10,21 174:24

**today's** 14:1

**tool** 131:19 158:5

**tools** 98:1 130:21 131:6,24 133:6 142:19,20,22 157:19

**top** 103:6 115:14 119:6 158:15

**topic** 59:21 60:13 61:2,9

**topics** 89:24

**tort** 140:8,16 141:2,5,21

**total** 41:11 62:12 63:17 74:21 92:4,15,22 155:4

**totem** 32:25

**touch** 60:16

**touched** 60:2

**towards** 134:24 156:22

**track** 12:25

**tracking** 44:13

**traded** 22:15

**Tragos** 109:3 115:3 119:17,25 121:8,12,14,21

**trail** 39:9

**training** 97:7 135:20

**trajectory** 25:13

**transaction** 46:7 47:9,23 48:4

**transcript** 4:12 66:15 67:1 173:13,20 174:24 177:7 178:9 179:16,21

**transcripts** 68:11,15 110:8

**transitory** 144:15

**transmitted** 113:24 115:11

**travel** 49:22 53:7

**traveled** 46:5

**Travelers** 75:21

**treat** 112:1,8

**treated** 148:18

**treating** 115:23 142:1 143:12 145:18 146:4 147:3 149:2,19 162:6

**treatment** 111:2 113:8,9 115:15,16,19,21 116:2,10,13,18,20,22 117:1,5 118:9,12,18,19 119:7 133:11 134:17 135:15

136:22 142:2 145:10,12 148:23 149:1,3 158:12

**treatments** 116:16 149:12

**trial** 31:23,24 32:8 33:18 36:16,23 62:13 63:21,24 64:7 68:13 69:9,11 72:21 74:13 75:1,2,4,9 76:4 78:22 79:11 86:19,22 87:2,3,20,21,22,24 88:16,18,20,21 89:16 166:4

**trials** 88:25 89:1

**tried** 36:10 84:15,24 87:25 148:25 149:12

**Trinity** 22:20 113:23

**trip** 49:16

**trouble** 34:14 130:5

**truckers** 42:10

**true** 30:20 99:21 100:7,25 134:8 138:2 147:25 178:9

**truly** 139:11

**trust** 157:25 176:2



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**    **www.MILESTONEREPORTING.com**    **Toll Free 855-MYDEPOS**

**truth** 6:3,4

**try** 32:17
36:13,22 37:2
94:19 95:18
117:4 123:16
152:22 161:4
162:15,20

**trying** 55:5,13
107:3 109:22
123:4,5 137:9
139:4 149:22
161:22 163:15
168:11

**turn** 147:23
148:2

**turned** 38:13
69:20 81:15
82:21 84:6

**tweaks** 97:22

**twice** 49:24
78:22 88:24
89:1 164:6

**type** 34:9 35:3
40:22 44:13
52:19 55:17
61:7 74:1
97:24 104:10
111:24 112:9
144:4 153:25
161:25

**typed** 106:21

**types** 24:21
27:9 117:14
143:20 149:16

**typical** 132:7
164:4

**typically** 17:16

28:8 39:2 52:2
56:16
57:2,4,7,9
97:22 100:7
112:3 124:2
139:9 148:24

---

U

**U.S** 38:10

**ultimate**
103:18,22
157:9

**ultimately**
112:5 124:20
154:3 156:5

**UM** 16:14 59:4
69:20,21 77:3
78:21 80:19,21
114:12 124:8
127:4 140:21
141:4,22
150:15 153:8
155:5,9
156:8,23 157:5
166:21 172:17

**UM/UIM** 167:4
168:25

**umbrella** 49:9

**uncomfortable**
43:7

**undergo** 116:19
118:10 119:2
132:18 150:5

**undergoing**
115:18 118:11

**underline** 95:19

**underlying** 77:4
110:4,10

112:23

**undermined**
67:24

**undersigned**
177:6

**understand**
94:25 103:15
121:11
151:1,12 165:9
168:18 172:19

**understanding**
8:6 9:8 19:3
30:17 39:7
57:12 72:6
91:12 94:13
103:8 116:25
117:3,12 118:3
140:15 141:2
153:19 154:2
157:15 169:17

**understood**
74:12

**undertaken**
157:18

**undervalued**
163:13

**underwent**
117:17 118:17

**Underwriter**
23:8

**underwriters**
39:20

**underwriting**
23:10 42:16
44:16,21 45:19

**undisclosed**
166:3

**undoubtedly**
143:15

**unfair** 55:19
133:11 135:23
136:10

**uninsured** 8:8
17:20 25:25
29:14 35:8
59:9,10 61:25
105:10 131:15
140:24

**unique** 34:24
81:14 104:13

**unit** 45:16,17
84:3

**United** 1:1
84:16

**Unitrin** 22:19
47:6,24,25
48:16

**universal** 170:6

**University**
19:12

**unknown** 150:11

**unless** 68:12
69:7 126:22
138:7 144:22

**unlikely** 134:19

**unsure** 78:20

**unusual** 42:17
43:5 44:25

**unwilling** 120:1

**unwillingness**
138:20 150:14

**updated** 13:12



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        www.**MILESTONEREPORTING**.com        Toll Free 855-MYDEPOS

152:22

**updates** 24:18

**upon** 10:13 96:22 97:13 101:12 102:2 128:25 134:6 153:16 168:19 169:12,16 173:2 179:18

**upper** 133:3 137:10 161:2

**up-to-date** 62:16

**USAA** 81:19

**usually** 49:18 134:16

**Utah** 79:15

**utilize** 131:5

**utilized** 158:5

---
V
---

**vacation** 166:14

**vaguely** 152:24

**Valencia** 66:17 67:19,21,22

**valid** 126:23

**Valley** 72:24,25 73:5,8,10 76:10 78:2,3 88:9

**valuable** 155:22

**value** 163:1

**valued** 105:7

**varies** 57:15 58:7

**various** 31:5,11 41:1 45:15 48:9 49:17,20 80:13 117:9 129:22 146:21

**vehicle** 8:9 147:2

**venue** 12:10 104:10

**verb** 95:17

**verbally** 127:2

**verbiage** 146:19

**verdict** 36:14 37:3 72:3,21 78:23 79:1 84:24 87:1,2,3,17,22 88:3,4,6,7,10, 13 89:6,12,14 142:17 167:5

**verify** 157:25

**version** 82:19 115:9

**versus** 18:21 28:25 57:14 91:16 102:25 111:8,18 112:15

**via** 2:7,13 4:5 5:12 69:6

**viable** 155:20

**vice** 19:22 20:3,18 39:25 40:10,13 41:6 43:11,21 44:8 45:22

**video** 5:8 88:19

**videoconference** 2:7,13 4:5

**view** 116:21 134:8 161:4

**Village** 77:13,14,24

**violate** 167:8 169:1,2

**violated** 103:13 164:1

**visit** 49:15 50:19

---
W
---

**W2** 52:14 54:2

**waist** 161:12

**waived** 4:12

**walk** 48:6 65:19 161:3

**walking** 86:20

**warranted** 106:10

**wasn't** 34:7 45:17 67:23 82:22 90:25 118:15 122:13 125:17,24 135:22 142:23,24,25 145:3,4 152:4,11 156:7,16 157:11 158:10 160:4 162:3 164:25

**watching**

25:9,11

**water** 67:24

**waving** 173:9

**ways** 41:25 72:3 104:5 129:22

**we'd** 34:3 38:13 49:16 50:17 166:6

**week** 58:5,6 174:7,8

**weekend** 92:13

**weeks** 58:6

**weigh** 107:20

**Weil** 81:9

**W-E-I-L** 81:10

**we'll** 7:11 8:15 9:10 10:16 17:23 96:4 122:4,5 154:8 166:19 174:8,9 175:22

**we're** 5:8 7:3 8:2 54:14 89:9 111:5 116:23 123:15 124:12 125:8 165:21

**west** 6:19 47:19

**wet** 41:12,15

**we've** 15:24 41:22 51:23 54:4 102:20 104:22 118:19 127:10 137:20 148:20 151:19 162:10 165:11

**whatever** 11:21



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**      **www.MILESTONEREPORTING.com**      **Toll Free 855-MYDEPOS**

27:13,15 32:25 50:20 91:20 175:17

**whatnot** 87:14

**wheelchair** 161:1,13 162:24

**wheelchair-bound** 162:4

**wherein** 141:13

**whether** 16:21 32:13 43:2 54:1 68:1 78:21 79:23 97:20 100:3,5 103:12,24 106:9 111:15 113:8 114:25 116:9 117:5 118:22 119:2 126:21 131:16 133:21 148:6,10 150:8,22 162:5 164:13 172:20

**whiplash** 111:24

**whole** 6:3 33:3 45:20 80:10 114:14 168:11,12

**who's** 56:20 161:11

**Wicker** 152:21

**wide** 164:14

**Wilkins** 8:4,7 13:7 14:24 17:20 65:16

93:21 110:12,19 111:4 112:18,21 113:9 114:12,17,20 115:6,11,18 116:19,25 117:17,21 118:10 119:1,14 120:1 121:17 123:18 124:15,21,23 125:1,13,17 126:14 127:1 132:6,18 133:17 138:2 139:18 141:12 142:5 143:11 145:7 146:4,17,21 147:24 148:19 149:19 150:2,8,14 151:16,21 152:11,16,25 154:18 155:9 156:7,12,16 157:4 159:4 160:7,18 162:6 167:1 172:17

**Wilkin's** 138:20 140:21

**WILKINS** 1:6 2:2

**Wilkins's** 162:1

**willing** 123:21 124:16,21 125:17,25 138:3 156:7 160:10

**willingness** 138:20 150:14,20 157:9

**Wilshire** 85:21

**window** 118:4,7

**winter** 42:5

**Wisconsin** 6:20 7:17,19,21,24 19:12,18 20:25 21:2 23:19 25:17,19,20 26:18 29:3,5 31:22 35:23,25 37:7,21,25 38:5,17,23,24, 25 42:3 50:9,16,22 51:4,6,9,11,14 58:22 63:6 66:20 71:15 73:2 76:7 77:14 82:9 90:15

**Wisconsin's** 34:24

**wise** 33:14

**withheld** 9:24

**withholding** 10:1

**witness** 3:12 4:11,12 5:4,17,20 6:5 8:3 9:17 18:3 54:7 57:13 58:18 65:9 66:3,9 69:1 87:8 103:15

110:16 126:3,5,16 127:11 146:8 149:22 150:11 153:19 154:21 156:11 159:12 166:15 167:11 168:21 169:6,20 170:5,14 171:19 172:9 173:11,14,16 177:6

**witnesses** 27:9,15 82:22

**Wonderful** 5:18,24

**Wood** 78:17 88:25

**Wopshall** 88:15

**W-O-P-S-H-A-L-L** 88:15

**wording** 153:20

**work** 7:23,24 10:5 13:23 21:18 24:23 26:20 28:4,24 31:20,25 32:14,19 33:11,21 34:15 39:15,16,18 47:3 51:12,13,24 52:22 53:2,20,21 54:16,24 55:1,9,21 56:7,15,16 57:13,20,22,25



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**     **www.MILESTONEREPORTING.com**     **Toll Free 855-MYDEPOS**

58:2,10 61:17 64:4 91:16 92:25 93:18 96:17 140:5 174:10,14,21

**worked** 12:3 22:11 26:15 27:11 28:4 30:22 31:4 32:6,15 47:12 93:20

**workers** 45:16

**working** 32:23 40:22 56:12 58:9 144:7 159:25 160:1

**works** 7:22 12:5 97:13

**world** 32:2

**worth** 165:2

**would've** 15:24 26:9,10 38:24 40:23 44:6 60:2,6 61:16,19 93:14 122:18 123:24 124:4,10 125:6,22 129:20 131:20,23 132:13,19,20 133:6 137:20 143:15 151:15,23 152:1 154:3 159:6 162:22

**wrapped** 138:25 165:13

**write** 109:21 145:18,22 154:7

**writes** 49:6 93:25

**writing** 22:21 106:19 127:2 145:10,13,15 166:7

**written** 10:12 38:15,24 46:23 61:1 97:3,4 98:13 104:14

**wrong** 85:18

**wrote** 26:3 30:19 42:1 49:6 56:2 90:16 109:25 110:7 122:4 138:5

---

Y

**y'all** 165:15

**year-and-a-half** 135:5

**yep** 102:19 171:25 173:18

**yesterday** 18:6,22 138:13

**yet** 13:4 93:13 108:10 110:20 115:14 132:6 133:20 135:8

**York** 47:7

**you'll** 14:8 98:22 99:5,12,13

151:3

**young** 2:10 32:24 39:21 90:17

**younger** 36:17

**yourself** 13:8 29:1 144:11 164:11,13

**you've** 8:2,6 50:25 62:12,13 63:14,22 64:25 65:3,12,14 74:23 91:23 92:2 95:23 111:23 125:20 127:24 132:10 135:19 137:24 139:23 140:2 144:10 145:1 155:21 159:20 171:11

---

Z

**Zakia** 85:6

**zero** 134:1 147:5

**zoo** 81:5

**Zoom** 5:8,12



MILESTONE | REPORTING COMPANY

TOMORROW'S TECHNOLOGY TODAY

CORPORATE **ORLANDO, FL 32801**
**JACKSONVILLE, FL 32256**
**TAMPA, FL 33602**

**407.423.9900**        **www.MILESTONEREPORTING.com**        **Toll Free 855-MYDEPOS**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MONDAMIN WILKINS,

    Plaintiff,

v.                                     Case No.: 8:24-CV-01793-TPB-AAS

PROGRESSIVE SELECT
INSURANCE                                   COMPANY,

    Defendant.
_____/

## **<u>NOTICE OF TAKING DEPOSITION DUCES TECUM</u>**

**PLEASE TAKE NOTICE** that the undersigned will take the deposition of the below-named person on the date and at the hour indicated, via video conference:

| **<u>NAME</u>** | **<u>DATE</u>** | **<u>TIME</u>** |
|---|---|---|
| **Daniel Doucette** | **June 30th, 2025** | **9:00 A.M.** |

upon oral examination before Milestone Reporting, Official Court Reporter, or some other officer duly authorized by law to take depositions. Deponent shall have with them, at the aforementioned time and place, the materials outlined in "ATTACHMENT A." The deposition is being taken for purposes of discovery, for use at trial, or both of the foregoing, or for other such purposes as are permitted under the applicable and governing rules.

EXHIBIT

1
_____

**VIDEO CONFERENCE LINK**

https://us06web.zoom.us/j/82145156046?pwd=UeUR3KBk8InjLj10bx32umfeveiEUQ.1

Meeting ID: 821 4515 6046

Passcode: 574446

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on this 19th day of June 2025, a true and correct copy of the foregoing document was filed and served on this day on all counsel of record identified on the Service List below.

/s/ *David Angley*

**MEGAN E. ALEXANDER, ESQ.**
Florida Bar No.: 58883
malexander@flalawyer.net
**DAVID M. ANGLEY, ESQ**.
Florida Bar No.: 0121464
dangley@flalawyer.net
Young, Bill, Boles, Palmer, Duke
& Thompson, P.A.
401 E. Jackson St., Suite 2950
Tampa, FL 33602
Telephone: (813) 603-3006
Facsimile: (813) 603-3011
*Counsel for Progressive Select*
*Insurance Company*

**SERVICE LIST**

**Lee D. Gunn IV, Esq**.

Florida Bar No.: 367192

lgunn@gunnlawgroup.com

labramson@gunnlawgroup.com

**L. Delton Gunn V, Esq.**

Florida Bar No.: 1038889

dgunn@gunnlawgroup.com

clopez@gunnlawgroup.com

efile@gunnlawgroup.com

Gunn Law Group, P.A.

401 E. Jackson St., Suite 3600

Tampa, Florida 33602

Telephone: (813) 228-7070

Facsimile: (813) 228-9400

Counsel for Plaintiff

*Via Email*

**ATTACHMENT "A"**
**Deposition Duces Tecum of Daniel Doucette**

1.  All documents of any type whatsoever, including photographs, correspondence, notes, pleadings, memoranda and any written, audio, visual and other type of information reviewed by you, relied upon by you, and/or referenced by you, or in any way considered by you in evaluating this matter and in formulating your opinions and conclusions in this matter.

2.  All reports, correspondence and other documents that reflect your opinions, conclusions, and analysis in this matter, excluding draft reports.

3.  All documents, material, and things provided to you by the Gunn Law Group, P.A., in connection with the case styled *Mondamin Wilkins v. Progressive Select Ins. Co.*, Case No.: 8:24-cv-01793-TPB-AAS, United States District Court, Middle District of Florida, Tampa Division.

4.  A copy of your current resume or *curriculum vitae*.

5.  All notes, records, photographs, and other documents provided to you or obtained by you in connection with the case styled *Mondamin Wilkins v. Progressive Select Ins. Co.*, Case No.: 8:24-cv-01793-TPB-AAS, United States District Court, Middle District of Florida, Tampa Division.

6.  Any billing records, time records, or activity which evidence actions taken by you in this case.

7.  All documents which contain information about the services you have been retained to provide in this case, the scope of your work, the basis for your billing, and the amount that has been charged and paid for your services.

8.  All documents or tangible items reviewed by you in connection with your opinions in this case.

9.  All documents, notes, memoranda, reports, and communications created, produced, generated, or authored by you in connection with this case, excluding draft reports.

10. All written communications, notes, emails, and written memoranda of verbal communications in your possession, to or from anyone to the extent that the communications:

    (i)     relate to compensation for the expert's study or testimony;

      (ii)     identify facts or data that the party's attorney provided, and the expert considered in forming the opinions to be expressed; or

      (iii)    identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed.

11. All treatises, and/or publications consulted or relied upon in forming opinions that you consider authoritative with respect to the subject matters involved in this case.

12. Copies or a list of all cases, statutes, or administrative regulations you have referred to or considered in connection with your investigation and work conducted in this case.

13. All documents that contain information about the expert work you generally perform and whether it is performed for plaintiffs, defendants, or some percentage of each.

14. All documents which contain information concerning the approximation of the portion of your professional time devoted to service as an expert. This may be stated in approximation in hours expended or percentage of income earned as an expert.

15. The identity (underline the party's name for which you were the expert) of each court case in which you have actually testified as an expert, (whether by deposition or at trial), during the last five (5) years.

16. A list of all of the cases over the past five (5) years in which Gunn Law Group, P.A., has retained your services as an expert witness.

17. All course and/or seminar material you have written, authored, co-authored, contributed to or presented concerning the law of insurance bad faith or insurance adjusting practices or techniques.

18. All course and/or seminar materials written, authored, co-authored, contributed to or presented by you including, but not limited to, audiotapes, handouts, manuals, course books and other materials of all types concerning the law of insurance bad faith or insurance adjusting practices or techniques.

19. All depositions or reports given by you in which you were hired and disclosed as an expert in insurance bad faith.

**NOTE: Any documents that you contend are privileged will not be disclosed at the deposition. However, please bring them and they will be marked sufficiently for identification to allow a subsequent judicial determination as to the claimed privilege.**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

MONDAMIN WILKINS,

      Plaintiffs,

vs.

PROGRESSIVE SELECT INSURANCE
COMPANY,

      Defendant.

Case No. 8:24-cv-01793-TPB-AAS

## <u>RESPONSES TO ATTACHMENT "A"</u>
## <u>Deposition Duces Tecum of Daniel Doucette</u>

1. All documents of any type whatsoever, including photographs, correspondence, notes, pleadings, memoranda and any written, audio, visual and other type of information reviewed by you, relied upon by you, and/or referenced by you, or in any way considered by you in evaluating this matter and in formulating your opinions and conclusions in this matter.

    **RESPONSE:** Please see list of materials reviewed.

2. All reports, correspondence and other documents that reflect your opinions, conclusions, and analysis in this matter, excluding draft reports.

    **RESPONSE:** Please see report and supplemental report provided in compliance with Fed. R. Civ. P. 26.

3. All documents, material, and things provided to you by the Gunn Law Group, P.A., in connection with the case styled Mondamin Wilkins v. Progressive Select Ins. Co., Case No.: 8:24-cv-01793-TPB-AAS, United States District Court, Middle District of Florida, Tampa Division.

    **RESPONSE:** Please see list of materials reviewed

EXHIBIT

2

4.    A copy of your current resume or curriculum vitae.

      **RESPONSE:** Please see attached CV.

5.    All notes, records, photographs, and other documents provided to you or obtained by you in connection with the case styled Mondamin Wilkins v. Progressive Select Ins. Co., Case No.: 8:24-cv-01793-TPB-AAS, United States District Court, Middle District of Florida, Tampa Division.

      **RESPONSE:** Please see list of materials reviewed.

6.    Any billing records, time records, or activity which evidence actions taken by you in this case.

      **RESPONSE:** Please see attached time sheet.

7.    All documents which contain information about the services you have been retained to provide in this case, the scope of your work, the basis for your billing, and the amount that has been charged and paid for your services.

      **RESPONSE:** Please see attached time sheet, fee schedule provided along with Mr. Doucette's disclosure, and retainer agreement with Gunn Law Group.

8.    All documents or tangible items reviewed by you in connection with your opinions in this case.

      **RESPONSE:** Please see list of materials reviewed.

9.    All documents, notes, memoranda, reports, and communications created, produced, generated, or authored by you in connection with this case, excluding draft reports.

      **RESPONSE:** Please see attached. Also see Claim Review and Document Summary and Abstract for additional notes. Additionally see deposition summaries attached.

10. All written communications, notes, emails, and written memoranda of verbal communications in your possession, to or from anyone to the extent that the communications:

> (i) relate to compensation for the expert's study or testimony;
>
> (ii) identify facts or data that the party's attorney provided, and the expert considered in forming the opinions to be expressed; or
>
> (iii) identify assumptions that the party's attorney provided and that the expert relied on in forming the opinions to be expressed.

**RESPONSE:** None other than above.

11. All treatises, and/or publications consulted or relied upon in forming opinions that you consider authoritative with respect to the subject matters involved in this case.

**RESPONSE:** See cites in report to the AIC course material and "Claims Operations", also cited in report.

12. Copies or a list of all cases, statutes, or administrative regulations you have referred to or considered in connection with your investigation and work conducted in this case.

**RESPONSE:** None specifically searched.

13. All documents that contain information about the expert work you generally perform and whether it is performed for plaintiffs, defendants, or some percentage of each.

**RESPONSE:** Please refer to Mr. Doucette's case list provided along with his disclosure. No specific document exists. However, my cases are typically about 60% for the policyholder and 40% for the insurance carrier.

14. All documents which contain information concerning the approximation of the portion of your professional time devoted to service as an expert. This

may be stated in approximation in hours expended or percentage of income earned as an expert.

**RESPONSE:** No specific document exists.  However, my cases are typically about 60% for the policyholder and 40% for the insurance carrier.

15.   The identity (underline the party's name for which you were the expert) of each court case in which you have actually testified as an expert, (whether by deposition or at trial), during the last five (5) years.

**RESPONSE:** Please refer to Mr. Doucette's case list provided along with his disclosure. Mr. Doucette's case list dates back to January 1, 2021, in compliance with Fed. R. Civ. P. 26(a)(2)(B)(v). Plaintiff objects to this request as not proportional to the needs of this case in seeking a broader time period of five (5) years.

16.   A list of all of the cases over the past five (5) years in which Gunn Law Group, P.A., has retained your services as an expert witness.

**RESPONSE:** Please refer to Mr. Doucette's case list provided along with his disclosure. Mr. Doucette's case list dates back to January 1, 2021, in compliance with Fed. R. Civ. P. 26(a)(2)(B)(v). Plaintiff objects to this request as not proportional to the needs of this case in seeking a broader time period of five (5) years.

17.   All course and/or seminar material you have written, authored, co-authored, contributed to or presented concerning the law of insurance bad faith or insurance adjusting practices or techniques.

**RESPONSE:** I have not written specifically on bad faith.  I have not published any articles since I left the practice of law in 1989.  Prior to that time, I published a number of articles in the DRI newsletter as well as the ABA Journal and "The Complete Lawyer".  Most of these pertained to professional liability, sports injuries, and other topics.  I do not know if these are available.

18. All course and/or seminar materials written, authored, co-authored, contributed to or presented by you including, but not limited to, audiotapes, handouts, manuals, course books and other materials of all types concerning the law of insurance bad faith or insurance adjusting practices or techniques.

    **RESPONSE:** See response to #17 above.

19. All depositions or reports given by you in which you were hired and disclosed as an expert in insurance bad faith.

    **RESPONSE:** Plaintiff objects to this request as it is overbroad, unduly burdensome, and not proportional to the needs of the case under Fed. R. Civ. P. 26(b)(1). The request provides no limitations on time frame, jurisdiction, or relevance to the issues in this case. I do not maintain copies of the depositions. The reports cannot be produced without violating various privileges including work product and attorney client. Additionally, many of the reports review information that had been provided under various confidentiality agreements or protective orders.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of June 2025, a true and correct copy of the foregoing has been served via e-mail transmission on all counsel of records identified on the attached Service List.

Respectfully submitted,

*/s/ L. Delton Gunn V*
Lee D. Gunn, IV, Esq.
Florid Bar Number: 367192
lgunn@gunnlawgroup.com
labramson@gunnlawgroup.com
L. Delton Gunn, Esq.
Florida Bar No.: 1038889
dgunn@gunnlawgroup.com
clopez@gunnlawgroup.com
GUNN LAW GROUP, P.A.
401 E Jackson Street, Suite 3600
Tampa, Florida 33602
Tel: (813) 228-7070

Fax: (813) 228-9400
*Counsel for Plaintiff*

**<u>SERVICE LIST</u>**

Megan E. Alexander, Esq.
David M. Angley, Esq.
Austin P. Booth, Esq,
YOUNG, BILL, BOLES, PALMER DUKE, & THOMPSON, P.A.
401 E Jackson Street, Suite 2950
Tampa, Florida 33602
(813) 603-3066
E-mail: [malexander@flalawyer.net](mailto:malexander@flalawyer.net)
[dangley@flalawyer.net](mailto:dangley@flalawyer.net)
[abooth@flalawyer.net](mailto:abooth@flalawyer.net)
*Counsel for Progressive American Insurance Co.*

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 2047 | 2050 | Response P's RFP | 7/18/11 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 109 | 109 | claim notes | 2/22/12 | suit filed 2/11/2020 Progressive not served yet | Miller | file |
| 36 | none | none | policy | 4/12/18 | UM Coverage Selection<br>*I want Non-stacked Uninsured Motorist coverage in the same limits as my Bodily Injury liability coverage* | Mondamin | Progressive |
| 17 | 290 | 299 | report | 7/26/19 | "CRASH REPORT"<br>Ireland FTYROW | FL HWY PATROL | file |
| 17 | 338 | 351 | report | 7/26/19 | re Lisa<br>"RUN REPORT"<br>"Patient Care Report" | Pasco County FD | file |
| 17 | 352 | 371 | med records | 7/26/19 | re Lisa<br>"MEDICAL RECORDS"<br>Emergency Department North Bay Hospital<br>Dr. Khalid M Saeed, DO<br>Diagnostic Imaging | BayCare Health | file |
| 15 | 1 | 1 | claim notes | 7/26/19 | *. . . INSURED PASSENGER WAS SENT TO ANOTHER HOSPITAL…*<br>*INJURIES: NECK, SCRATCHES-SHOULDERS, LOWER BACK* | Green | file |
| 15 | 1 | 1 | claim notes | 7/26/19 | vehicle is non-driveable | Green | file |
| 29 | none | none | report | 7/26/19 | <u>Crash Report</u> in Amica demand | FL HWY PATROL | Karaus |
| 15 | 2 | 2 | claim notes | 7/27/19 | assigned claim to A124612 | Diaz | file |
| 15 | 2 | 2 | claim notes | 7/27/19 | initial liability review | Pitt | file |
| 15 | 3 | 3 | claim notes | 7/27/19 | OBC to Monamin<br>injuries | Pitt | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 3 | 3 | claim notes | 7/27/19 | *INJURY UPDATED FOR MONDAMINS WILKINS LEVEL" MINOR/NOT VISIBLE* | Pitt | file |
| 15 | 3 | 3 | claim notes | 7/27/19 | *PIP EXPOSURE OPENED ON MONDAMIN…* | Pitt | file |
| 15 | 4 | 4 | claim notes | 7/27/19 | IV had ROW | Pitt | file |
| 15 | 6 | 6 | claim notes | 7/27/19 | *… INSURED RECORDED INTERVIEW . . .* Lisa - CV went through stop sign. | Pitt | file |
| 15 | 7 | 7 | claim notes | 7/29/19 | other insurance Amica : Gayle Ireland | Progressive | file |
| 15 | 7 | 7 | claim notes | 7/29/19 | total loss | Pitt | file |
| 15 | 7 | 7 | claim notes | 7/29/19 | "CV BREACHED ROW" | Pitt | file |
| 15 | 8 | 8 | claim notes | 7/29/19 | "OPEN MEDPAY FOR NOG UPDATE CLA" | Rosario | file |
| 15 | 8 | 8 | claim notes | 7/29/19 | "UPLOADED UM SELECT FORM INTO DOCS" | Rosario | file |
| 15 | 8 | 9 | claim notes | 7/29/19 | Injury "NG: BACK AND NECK-RETIRED ID: BACK AND NECK-WORKS AT STEINMART-CASHIER" no priors listed | Rosario | file |
| 15 | 9 | 9 | claim notes | 7/29/19 | other carrier accepted lability | Rosario | file |
| 162 | none | none | contract | 7/29/19 | "GENERAL CONTINGENT FEE CONTRACT" | Mondamin | Tragos |
| 163 | none | none | contract | 7/29/19 | "GENERAL CONTINGENT FEE CONTRACT" and related | Mondamin | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 10 | 10 | claim notes | 7/30/19 | "INITIAL INSD CTC"<br>spoke with Mondamin - interview<br>describes injuries<br>"MAY SEE AN ATTY"<br>.. *He states his wife is caretaker-he is paralyze from waist down due to a stroke previously. Wife can not take care of him now-may hire a care taker...*<br>His atty is Tragos | Rosario | file |
| 15 | 11 | 11 | claim notes | 7/30/19 | call from ID<br>neck and back pain, can't turn head | Rosario | file |
| 23 | none | none | letter | 7/31/19 | LOR - info request | Sartes | Amica |
| 24 | none | none | letter | 7/31/19 | LOR - info request | Sartes | Amica |
| 74 | none | none | fax | 7/31/19 | LOR Mondamin - request info | Sartes | Rosario |
| 80 | none | none | letter | 7/31/19 | LOR - Mondamin request insurance info | Sartes | Rosario |
| 81 | none | none | letter | 7/31/19 | LOR - Mondamin request insurance info | Sartes | Rosario |
| 17 | 512 | 519 | letter | 8/2/19 | acknowledge letter requesting info.<br>Enclosed Dec for Arthur Ireland | Amica | Tragos |
| 17 | 372 | 391 | med records | 8/5/19 | RE Lisa<br>"RADIOLOGY"<br>Cervical Spine, Thoracic Spine and Lumbar Spine<br>referred by Dr. Ronald Stacey, DC<br>Dr. Mark J. Timken, MD | Gulf Coast MRI | file |
| 15 | 12 | 13 | claim notes | 8/6/19 | LOR received<br>call from ID<br>neck and back pain, can't turn head<br>"UM UPLOADED FROM PCV TO EFF" | Brown | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 13 | 13 | claim notes | 8/7/19 | "REV'D LOR X2 … DATED: 07/31/19: Client: Mondamin and Lisa | Lacey | file |
| 15 | 14 | 14 | claim notes | 8/8/19 | atty office advised they have not started treatment as of yet | Rosario | file |
| 15 | 14 | 14 | claim notes | 8/12/19 | PIP info 1st date of treatment for NOG 8/1/2019 *FOR PARTIES* | Rosario | file |
| 27 | none | none | mail | 8/12/19 | Certified mail receipt | Tragos | Amica |
| 76 | none | none | claim file | 8/13/19 | re Mondamin - application for PIP benefits | Mondamin | Progressive |
| 79 | none | none | letter | 8/13/19 | re Mondamin - request info re PIP w/ notification of PUP benefits, authorizations and related forms | Rosario | Mondamin |
| 15 | 15 | 15 | claim notes | 8/19/19 | Need update Medicare for Mondamin | Lacey | file |
| 77 | none | none | claim file | 8/22/19 | re Mondamin - application for PIP benefits | Mondamin | Progressive |
| 15 | 16 | 16 | claim notes | 8/28/19 | mailed simplified disclosure for Mondamin and Lisa | Progressive | file |
| 15 | 16 | 16 | claim notes | 8/29/19 | called hosp - 2 to 3 treatments per week for both. Both referred for MRI | Rosario | file |
| 15 | 16 | 17 | claim notes | 8/29/19 | both injured and represented currently treating at chiro Injury analysis Mondamin - pain in thoracic, chiro treatment Lisa - lumbar thoracic, chiro treatment | Rosario | file |
| 15 | 17 | 18 | claim notes | 9/3/19 | Lisa - "BRUISING/CERVICAL PAIN/LUMBAR AND BURNS" | Rosario | file |
| 15 | 18 | 18 | claim notes | 9/3/19 | Mondamin - "WHIPLASH/GLASS IN FOREHEAD/BRUISING AND APRASIONS ON BILATERAL LEGS" | Rosario | file |

# Abstract of Correspondence and Claim File
# Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 17 | 510 | 511 | letter | 9/9/19 | LOR - Lisa<br>. . . *We are requesting that an UMI claim be opened on behalf of our client, Lisa Wilkins . . .* | Tragos | Progressive |
| 91 | none | none | fax | 9/9/19 | re Mondamin<br>LOR - injuries exceed at-fault. Request permission to settle with Amica.<br>enclosed Amica info. | Tragos | Progressive |
| 92 | none | none | fax | 9/9/19 | re Mondamin<br>LOR - injuries exceed at-fault. Request permission to settle with Amica. | Tragos | Progressive |
| 17 | 420 | 435 | med records | 9/11/19 | re Lisa<br>summary of findings and history<br>Victor M. Hayes, MD | Trinity Spine Center | file |
| 15 | 18 | 18 | claim notes | 9/13/19 | TLD from Tagos for Lisa | Melvan | file |
| 15 | 19 | 19 | claim notes | 9/13/19 | *UM/UIM EXPOSURE OPENED ON LISA WILKINS* | Thomas | file |
| 15 | 19 | 19 | claim notes | 9/13/19 | reviewed Time limited demand for Lisa<br>*OPENED FEATURE AND TRANS TO ORG 34099* | Thomas | file |
| 15 | 19 | 19 | claim notes | 9/13/19 | UM/UIM EXPOSURE OPENED ON MONDAMIN WILKINS | Thomas | file |
| 15 | 19 | 19 | claim notes | 9/13/19 | reviewed Time limited demand for Mondamin<br>OPENED FEATURE AND TRANS TO ORG 34099 | Thomas | file |
| 15 | 19 | 19 | claim notes | 9/16/19 | *UM/UIM, UM/UIM EXPOSURE(S) REJECTED BY ORG 34099 SENT TO 3401* | Nelson | file |
| 15 | 19 | 19 | claim notes | 9/16/19 | TLD - no due date noted<br>re Lisa | Melvan | file |
| 15 | 20 | 20 | claim notes | 9/16/19 | TLD - no due date noted<br>re Monamin | Melvan | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 20 | 20 | claim notes | 9/16/19 | no proof of tort tender for either | Starczewski | file |
| 95 | none | none | letter | 9/16/19 | mail delivery certification | Tragos | Progressive |
| 15 | 20 | 20 | claim notes | 9/18/19 | no payments for either insd yet | Espinal | file |
| 15 | 20 | 20 | claim notes | 9/19/19 | UM Limits 50/100 non-stacked | Espinal | file |
| 29 | none | none | letter | 9/23/19 | LOR Mondamin - Amica demand<br>Background - Facts - Damages<br>Demand for policy limits on or before 10/24/2019 | Tragos | Karaus |
| 15 | 22 | 23 | claim notes | 9/26/19 | both injured and represented<br>currently treating at chiro<br>Injury analysis<br>Mondamin - pain in thoracic, chiro treatment; MRI 4 herniations and disc bulge<br>Lisa - lumbar thoracic, chiro treatment; MRI 2 herniations<br>*Will refer to EH once threshold met* | Rosario | file |
| 15 | 24 | 24 | claim notes | 10/2/19 | sent Mondamin PIP log of payment $2,671.12 | Rosario | file |
| 15 | 24 | 24 | claim notes | 10/4/19 | *NO PROOF OF BI TENDER*<br>*-*<br>*PIP STILL OPEN* | Espinal | file |
| 15 | 26 | 26 | claim notes | 10/16/19 | *… LET'S COMPLETE UM INVESTIGATION . . .*<br>*F/U WITH ID ATTY - INTRO AS UM ADJUSTER …* | Ricketts | file |
| 37 | none | none | policy | 10/16/19 | Auto Insurance Coverage Summary | Progressive | file |
| 38 | none | none | policy | 10/16/19 | Florida Policy Endorsement | Progressive | file |
| 39 | none | none | policy | 10/16/19 | Florida Auto Policy | Progressive | file |
| 17 | 264 | 273 | fax | 10/21/19 | LOR - Lisa<br>enclosed demand summary. Demand packet will be mailed. | Gallagher | Progressive |

## Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 17 | 264 | 273 | fax | 10/21/19 | LOR - Lisa<br>to provide facts, special damages and a demand.<br>Demand for policy limits, | Tragos | Espinal |
| 17 | 274 | 289 | fax | 10/21/19 | "Received OCT 24 2019"<br>LOR - Lisa<br>to provide facts, special damages and a demand.<br>Demand for policy limits, | Tragos | Espinal |
| 259 | none | none | fax | 10/21/19 | LOR - Mondamin<br>*… enclosed demand summary …* | Gallagher | Progressive |
| 275 | none | none | fax | 10/21/19 | LOR - Mondamin<br>*… enclosed demand summary …* | Gallagher | Progressive |
| 261 | none | none | fax | 10/21/19 | LOR - Mondamin<br>to provide facts, special damages and a demand.<br>BACKGROUND, FACTS, DAMAGES, PROGNOSIS, SUMMARY, CONCLUSION<br>Permanent injuries, Demand for policy limits on or before 11/20/2019 | Tragos | Espinal |
| 262 | none | none | letter | 10/21/19 | LOR - Mondamin<br>to provide facts, special damages and a demand.<br>BACKGROUND, FACTS, DAMAGES, PROGNOSIS, SUMMARY, CONCLUSION<br>Permanent injuries, Demand for policy limits on or before 11/20/2019 | Tragos | Espinal |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 263 | none | none | letter | 10/21/19 | LOR - Mondamin<br>to provide facts, special damages and a demand.<br>BACKGROUND, FACTS, DAMAGES, PROGNOSIS, SUMMARY, CONCLUSION<br>Permanent injuries, Demand for policy limits on or before 11/20/2019<br>w/ "Demand Package" | Tragos | Espinal |
| 264 | none | none | fax | 10/21/19 | LOR - Mondamin<br>to provide facts, special damages and a demand.<br>BACKGROUND, FACTS, DAMAGES, PROGNOSIS, SUMMARY, CONCLUSION<br>Permanent injuries, Demand for policy limits on or before 11/20/2019 | Tragos | Espinal |
| 265 | none | none | fax | 10/21/19 | LOR - Mondamin<br>to provide facts, special damages and a demand.<br>BACKGROUND, FACTS, DAMAGES, PROGNOSIS, SUMMARY, CONCLUSION<br>Permanent injuries, Demand for policy limits on or before 11/20/2019 | Tragos | Espinal |
| 17 | 504 | 507 | letter | 10/23/19 | LOR - Lisa<br>. . . *We are requesting permission to settle with the at-fault driver's insurance company. A copy of Amica Mutual Insurance Company's letter extending the $10,000.00 bodily injury limit is enclosed...* | Tragos | Progressive |
| 15 | 27 | 27 | claim notes | 10/23/19 | *BI NEGOTIATION FOR" WILKINS, MONDAMIN*<br>*...*<br>*DEMAND AMOUNT: 50000 EXPIRES ON 11-20-2019* | Ricketts | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 93 | none | none | letter | 10/23/19 | re Mondamin<br>LOR - injuries exceed at-fault. Request permission to settle with Amica. | Tragos | Progressive |
| 88 | none | none | letter | 10/23/19 | re Mondamin<br>request permission to settle with Amica | Tragos | Progressive |
| 15 | 27 | 27 | claim notes | 10/24/19 | *BI NEGOTIATION FOR" WILKINS, LISA*<br>*…*<br>*DEMAND AMOUNT: 50000 EXPIRES ON 11-20-2019* | Ricketts | file |
| 15 | 27 | 28 | claim notes | 10/24/19 | both injured and represented<br>currently treating at chiro<br>Injury analysis<br>Mondamin - pain in thoracic, chiro treatment; MRI 4 herniations and disc bulge<br>Lisa - lumbar thoracic, chiro treatment; MRI 2 herniations<br>Will refer to EH once threshold met | Rosario | file |
| 15 | 28 | 28 | claim notes | 10/25/19 | BI NEGOTIATION FOR" WILKINS, LISA<br>…<br>DEMAND AMOUNT: 50000 EXPIRES ON 11-20-2019 | Espinal | file |
| 15 | 29 | 29 | claim notes | 10/25/19 | *50K LIMITS   NO HELP INJ*<br>*TOTAL BILLS 14K BEFORE REDUCTION*<br>*NO INVASIVE* | Espinal | file |
| 15 | 29 | 30 | claim notes | 10/29/19 | Lisa - total PIP paid $9,825.887 | Rosario | file |
| 15 | 30 | 30 | claim notes | 10/29/19 | PIP closing<br>benefits almost exhausted | Rosario | file |
| 15 | 30 | 30 | claim notes | 10/30/19 | *NO HELP LOSS INJ*<br>*9K IN BILLS*<br>*10K BI AHEAD OF UM* | Espinal | file |
| 15 | 30 | 30 | claim notes | 10/31/19 | WOS RCVD - Due in 30 days<br>Lisa and Mondamin | Ricketts | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 31 | 31 | claim notes | 11/7/19 | OBC to Trinity 1 to 2 times a week | Rosario | file |
| 15 | 31 | 33 | claim notes | 11/8/19 | re PIP<br>"PRE-SUIT NUMBER" …<br>RE Mondamin<br>Atty Calkin | Ramirez | file |
| 15 | 33 | 35 | claim notes | 11/8/19 | re PIP<br>"PRE-SUIT NUMBER" …<br>RE Mondamin<br>Atty Calkin | Ramirez | file |
| 266 | none | none | fax | 11/18/19 | re Mondamin<br>*… Attached please find updated medical records and bills*<br>re Mondamin<br>medical bills incurred $14,302.98<br>Mondamin continues to treat and injections are scheduled.<br>After injections we will forward additional records. | Tragos | Espinal |
| 267 | none | none | fax | 11/18/19 | re Mondamin<br>*… Attached please find updated medical records and bills*<br>re Mondamin<br>medical bills incurred $14,302.98<br>w/ enclosed records<br>Mondamin continues to treat and injections are scheduled.<br>After injections we will forward additional records. | Tragos | Espinal |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 35 | 35 | claim notes | 11/19/19 | "Injury Evaluation"<br>Lisa 1000 to 3000<br>*ALLEGED INJ: NECK AND BACK PAIN*<br>MRI 8/5/19  disc bulge and herniatioin w/ cord deformity and stenosis<br>MRI 9/13/19 disc bulge and herniation<br>*$7,374-$12,374 - 10k BI* | Espinal | file |
| 15 | 35 | 35 | claim notes | 11/19/19 | "Injury Evaluation"<br>re Mondamin<br>*- NO MEDS ATTACHED TO EVAL*<br>*-ATTY OUTLINED TX AND DEMANDED LIMITS BUT NO MEDS* | Espinal | file |
| 15 | 35 | 35 | claim notes | 11/19/19 | re Lisa - offer 1000 | Espinal | file |
| 15 | 35 | 35 | claim notes | 11/19/19 | spoke w/ paralegal for insds.<br>Advised I have not rec'd full demand for Mondamin,<br>Mailed response X@ | Espinal | file |
| 15 | 35 | 36 | claim notes | 11/19/19 | both injured and represented<br>currently treating at chiro<br>Injury analysis<br>Mondamin - pain in thoracic, chiro treatment; MRI 4 herniations and disc bulge<br>Will refer to EH once threshold met | Rosario | file |
| 15 | 36 | 37 | claim notes | 11/19/19 | OBC to atty request extension to TLD granted through 11/29. will send records | Ricketts | file |
| 96 | none | none | letter | 11/19/19 | re Mondamin - request med records | Espinal | Sartes |
| 97 | none | none | letter | 11/26/19 | re Mondamin<br>new claim rep | Imregi | Sartes |
| 7 | none | none | CRN | 11/27/19 | attached CRN filed on this date | Sartes | Espinal |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 16 | 4918 | 4918 | email | 11/27/19 | re "Conversation with Heimy Espinal"<br>Ricketts - "you call the aty to make offer?"<br>Espinal - "I will update the note"<br>Ricketts - "thank you :)" | Ricketts | Espinal |
| 17 | 300 | 313 | fax | 11/27/19 | LOR - Mondamin<br>attached CRN | Sartes | Progressive |
| 17 | 488 | 503 | fax | 11/27/19 | LOR - Lisa<br>attached CRN | Sartes | Espinal |
| 15 | 39 | 40 | claim notes | 11/27/19 | "Injury Evaluation"<br>Mondamin 1000 to 3000<br>ALLEGED INJ: NECK AND BACK PAIN<br>MRI 8/5/19  disc herniation<br>$6,644-$10,644 - 10k BI<br>"EGGSHELL" | Espinal | file |
| 15 | 41 | 41 | claim notes | 11/27/19 | re Mondamin<br>offer 1000` | Espinal | file |
| 41 | none | none | fax | 11/27/19 | attached CRN filed on this date | Sartes | Espinal |
| 44 | none | none | CRN | 11/27/19 | re Mondamin<br>"Unsatisfactory Settlement Offer" [see CRDS] | Tragos | FL DFS |
| 45 | none | none | CRN | 11/27/19 | re Lisa<br>"Unsatisfactory Settlement Offer" [see CRDS] | Tragos | FL DFS |
| 107 | none | none | letter | 11/27/19 | re Mondamin - offer $1,000 | Espinal | Sartes |
| 15 | 41 | 41 | claim notes | 11/29/19 | rec'd CRN | Slowey | file |
| 17 | 524 | 527 | med records | 12/2/19 | "ADDITIONAL TREATMENT<br>CLAIMANT: MONDAMIN WILKINS"<br>. . .<br>CLAIMANT: LISA WILKINS" | Trinity Spine Center | file |
| 15 | 41 | 41 | claim notes | 12/2/19 | CRN RECEIVED | Espinal | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 41 | 42 | claim notes | 12/3/19 | exposures: 2<br>CRN response needed | Espinal | file |
| 15 | 42 | 42 | claim notes | 12/4/19 | *… REVIEWED AND AGREE W/ LIAB DET. …* | Crawford | file |
| 15 | 42 | 42 | claim notes | 12/4/19 | call to atty.  Stated add'l docs sent on 11/18. clts receiving injections and will send add'l records | Crawford | file |
| 94 | none | none | letter | 12/4/19 | re Mondamin<br>new claim rep | Crawford | Sartes |
| 17 | 520 | 523 | fax | 12/5/19 | re Lisa and Mondamin<br>attached updated medical records re Lisa<br>*… This updated bill brings Mrs. Wilkins' medicals incurred to $30,211.27 …* | Tragos | Progressive |
| 42 | none | none | fax | 12/5/19 | re Mondamin claim no. 19-2350589<br>attached updated medical records from Trinity Spine<br>including branch block of 12/2/2019 | Tragos | Crawford |
| 42 | none | none | fax | 12/5/19 | re Mondamin<br>med records of 12/2/2019 in fax | Trinity Spine Center | Crawford |
| 268 | none | none | fax | 12/5/19 | re Mondamin<br>… Attached please find updated medical records and bills re Mondamin<br>medical bills incurred $31,462.98 | Tragos | Crawford |
| 269 | none | none | fax | 12/5/19 | re Mondamin<br>… Attached please find updated medical records and bills re Mondamin<br>medical bills incurred $31,462.98<br>w/ attached med records | Tragos | Crawford |
| 15 | 44 | 44 | claim notes | 12/9/19 | confirmed BI paid $10k | Crawford | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 46 | 47 | claim notes | 12/16/19 | "Injury Evaluation" re Mondamin<br>8144 to 13144<br>Disc herniation and stenosis; injections;<br>eggshell claimant; 2 prior laminectomies | Crawford | file |
| 15 | 47 | 47 | claim notes | 12/16/19 | requested authorization for 13144 | Crawford | file |
| 15 | 47 | 47 | claim notes | 12/16/19 | authorized 13144 for Mondamin<br>agree w/ evaluation outlined<br>*MULTIPLE INJECTIOINS/EGGSHELL CLAIMANT ARE DRIVING VALUE.* | Gorman | file |
| 15 | 47 | 47 | claim notes | 12/16/19 | CRN re Lisa | Gorman | file |
| 15 | 47 | 48 | claim notes | 12/17/19 | "injury evaluation"<br>Mondamin offer 8200<br>atty says clts will not accept less than limits | Crawford | file |
| 15 | 48 | 48 | claim notes | 12/17/19 | advised atty have not rcvd add'l docs for ID | Crawford | file |
| 75 | none | none | fax | 12/17/19 | re Mondamin - confirm offer of $8200 | Crawford | Sartes |
| 108 | none | none | letter | 12/17/19 | re Mondamin - offer $8,200 | Crawford | Sartes |
| 17 | 436 | 444 | med records | 12/19/19 | re Lisa<br>summary of findings and history<br>Victor M. Hayes, MD<br>Kamaldeen R. Saldin | Trinity Spine Center | file |
| 15 | 49 | 49 | claim notes | 12/24/19 | atty stated add'l docs were sent. | Crawford | file |
| 43 | none | none | fax | 12/31/19 | re Mondamin claim no. 19-2350589<br>attached updated medical records from Trinity Spine<br>including services of 12/18/2019 | Tragos | Crawford |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 270 | none | none | fax | 12/31/19 | re Mondamin<br>… Attached please find updated medical records and bills re Mondamin<br>medical bills incurred $31,998.98 | Tragos | Crawford |
| 271 | none | none | fax | 12/31/19 | re Mondamin<br>… Attached please find updated medical records and bills re Mondamin<br>medical bills incurred $31,998.98<br>w/ attached med records | Tragos | Crawford |
| 15 | 50 | 50 | claim notes | 1/6/20 | review add'l treatment<br>update eval; submit offer | Crawford | file |
| 15 | 50 | 51 | claim notes | 1/13/20 | "Injury Evaluation" re Lisa<br>9982 to 13982 | Crawford | file |
| 15 | 51 | 51 | claim notes | 1/13/20 | "Injury Evaluation" re Mondamin<br>7278 to 12278 | Crawford | file |
| 15 | 51 | 51 | claim notes | 1/13/20 | re Lisa<br>request authority to 13982; updated eval | Crawford | file |
| 15 | 51 | 51 | claim notes | 1/13/20 | reviewed and agree w/ eval | Rodriguez | file |
| 15 | 51 | 52 | claim notes | 1/13/20 | re Mondamin<br>authorized 13144 | Rodriguez | file |
| 15 | 52 | 52 | claim notes | 1/13/20 | "injury Evaluation" re Lisa<br>authorized 13982 | Rodriguez | file |
| 15 | 52 | 52 | claim notes | 1/13/20 | call to atty  - not coming off policy limits | Crawford | file |
| 15 | 52 | 52 | claim notes | 1/13/20 | "Injury Evaluation" re Lisa<br>offer 10000 | Crawford | file |
| 83 | none | none | letter | 1/13/20 | re Mondamin - confirm offer of $8200 | Crawford | Sartes |
| 102 | none | none | fax | 1/13/20 | re Mondamin - offer $8200 | Crawford | Sartes |

# Abstract of Correspondence and Claim File
# Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 53 | 54 | claim notes | 1/20/20 | "Injury Evaluation" re Mondamin<br>tort tendered $10k<br>acknowledge CRN<br>Deny all allegations | Crawford | file |
| 15 | 54 | 54 | claim notes | 1/20/20 | agree w/ CRN response<br>ID range $9,982 - $13,982<br>NI range $7,278 - $12,278 | Rodriguez | file |
| 8 | none | none | CRN | 1/21/20 | acknowledge receipt of CRN.<br>. . . *WE DENY ALL ALLEGATIONS SET FORTH IN THIS COMPLAINT . THERE IS A DISPUTE REGARDING THE VALUE OF THE CLAIM. ...* | Crawford | file |
| 15 | 54 | 54 | claim notes | 1/21/20 | authorized CRN response | O'Brien | file |
| 15 | 55 | 55 | claim notes | 1/21/20 | responded to CRN | Crawford | file |
| 87 | none | none | fax | 1/21/20 | re Mondamin and Lisa<br>Progressive is waiving UM subro | Espinal | Sartes |
| 25 | none | none | release | 1/22/20 | release for $10k | Mondamin | Ireland |
| 15 | 55 | 55 | claim notes | 1/27/20 | OBC to Atty to follow up on offer. Atty stated clts are not willing to neg. claim. Will file suit | Crawford | file |
| 15 | 57 | 57 | claim notes | 2/11/20 | OBC to Atty to follow up on offer. Atty stated clts are not willing to neg. claim. Filed suit | Crawford | file |
| 15 | 59 | 59 | claim notes | 2/21/20 | suit filed 2/11/2020 Progressive not served yet | Crawford | file |
| 15 | 59 | 59 | claim notes | 2/21/20 | OBC to atty. They are not accepting limits | Crawford | file |
| 85 | none | none | letter | 2/21/20 | re Mondamin<br>We have reached PIP limit | Progressive | Tragos |
| 15 | 59 | 59 | claim notes | 3/2/20 | OBC to atty to follow up on offer<br>Atty has nothing to add | Crawford | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 60 | 60 | claim notes | 3/30/20 | *OBC TO ATTY OFFICE TOFOLLOW UP ON OFFER, ATTY STILL SEEKING POL LIMITS.* | Crawford | file |
| 15 | 60 | 60 | claim notes | 3/31/20 | C/ rec'd | Perez | file |
| 15 | 60 | 61 | claim notes | 3/31/20 | file transferred. Suit filed | Crawford | file |
| 15 | 61 | 65 | claim notes | 3/31/20 | "File Review" coverage and injury summary Mondamin - last offer $8200, demand $50k Lisa - last offer $10k, demand $50k Liability 100% PDMG summary Amica tendered $10k Referred to HC Tampa for assignment | Hailman | file |
| 90 | none | none | fax | 3/31/20 | extension of time to answer | Hailman | Sartes |
| 98 | none | none | letter | 3/31/20 | re Mondamin and Lisa extension of time to answer | Hailman | Sartes |
| 16 | 4899 | 4899 | email | 4/3/20 | we previously sent a referral. We will send outside. WE are withdrawing the referral. | Miller | "HC Referral Tampa" |
| 15 | 65 | 65 | claim notes | 4/3/20 | request claim file | Hailman | file |
| 15 | 65 | 65 | claim notes | 4/3/20 | cancelled referral to Tampa HC Forward to Wicker Smith | Hailman | file |
| 64 | none | none | email | 4/6/20 | B/F be released? | Diaz | Sartes |
| 15 | 66 | 66 | claim notes | 4/10/20 | "File Review" 2 Ps multiple injections setting reserves at 50X2 based on same | Miller | file |
| 15 | 67 | 67 | claim notes | 4/14/20 | *BRINGING HCF HOME TO EVALUATE* | Hailman | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 67 | 67 | claim notes | 4/14/20 | OBC to atty.<br>Lisa - $34k in bills. I show $25k<br>Mondamin - $40k bills<br>tort tendered<br>...*IF WE WERE TO EVEN OFFER THE LIMITS, THEY ARE NOT SURE IF THEY WOULD ACCEPT...* | Hailman | file |
| 15 | 67 | 69 | claim notes | 4/14/20 | "Injury Evaluation"<br>Lisa - [extensive analysis] *SHE WAS THEN INVOLVED IN A SUBSEQUENT LOSS ON 12/26/19 WITH THE SAME COMPLAINTS, NEW AFTER SUBSEQUENT LOSS ARE COMPARIBLE.* | Hailman | file |
| 15 | 69 | 71 | claim notes | 4/14/20 | "Injury Evaluation"<br>Mondamin - [extensive analysis] | Hailman | file |
| 15 | 71 | 71 | claim notes | 4/14/20 | OBC to atty request add'l records<br>confirmed faxed a few weeks go not for our department | Hailman | file |
| 49 | none | none | med records | 4/23/20 | re Mondamin<br>bill 8/1/2019 - 4/23/2020 | Trinity HealthCare Center | file |
| 110 | none | none | med records | 4/23/20 | med statement 8/1/2019 - 4/23/2020<br>$9,292.02 | Trinity HealthCare Center | Sartes |
| 15 | 71 | 71 | claim notes | 5/6/20 | "Litigation"<br>Initial DPC w/ D/C | Hailman | file |
| 15 | 72 | 73 | claim notes | 5/15/20 | "Injury Evaluation"<br>Lisa - records review | Hailman | file |
| 18 | 2461 | 2467 | Response P's RFP | 6/9/20 | REDACTED<br>Atty-clt | D Privilege Log | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 73 | 76 | claim notes | 6/13/20 | "Injury Evaluation" [extensive analysis] Lisa - low 10764 high 34764 subsequent loss 12/26/19 | Hailman | file |
| 15 | 76 | 77 | claim notes | 6/13/20 | "Injury Evaluation" [extensive analysis] Mondamin - low 16678 high 37678 | Hailman | file |
| 15 | 78 | 78 | claim notes | 6/13/20 | "litigation" summary from D/C "BUDGE: $25-30 | Hailman | file |
| 15 | 78 | 78 | claim notes | 6/13/20 | Mondamin - offer 17000 | Hailman | file |
| 15 | 78 | 78 | claim notes | 6/13/20 | Lisa - offer 15000 | Hailman | file |
| 103 | none | none | letter | 6/13/20 | re Mondamin - offer $17,000 | Hailman | Sartes |
| 104 | none | none | fax | 6/13/20 | re Mondamin - offer $17,000 | Hailman | Sartes |
| 166 | none | none | court doc | 6/16/20 | Notice of production from Non-party w/ medical records | Ghezelbash | Sartes |
| 227 | none | none | court doc | 6/16/20 | Notice of production from Non-party re Mondamin medical records w/ various discovery responses | Ghezelbash | Sartes |
| 57 | none | none | fax | 6/22/20 | request compliance w/ discovery | Sartes | Ghezelbash |
| 58 | none | none | fax | 6/22/20 | request compliance w/ discovery | Sartes | Ghezelbash |
| 59 | none | none | fax | 6/22/20 | request compliance w/ discovery | Sartes | Ghezelbash |
| 18 | 1601 | 1601 | Response P's RFP | 6/23/20 | REDACTED atty-clt | D Privilege Log | file |
| 113 | none | none | court doc | 6/23/20 | notice of depo of Mondamin and Lisa for 11/2/2020 | Diaz | file |
| 167 | none | none | court doc | 6/24/20 | "No Objection and Request for Copies" re Mondamin Med records | Sartes | Ghezelbash |
| 228 | none | none | court doc | 6/24/20 | "No Objection and Request for Copies" re Mondamin Med records | Sartes | Wicker Smith |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 114 | none | none | court doc | 6/25/20 | amended notice of depo of Mondamin and Lisa for 11/2/2020 | Diaz | file |
| 15 | 79 | 79 | claim notes | 7/9/20 | "Injury Evaluation" [extensive analysis] Mondamin - agree to range up to limits | Hailman | file |
| 15 | 79 | 79 | claim notes | 7/9/20 | re Mondamin - requested authorization for 50000 | Hailman | file |
| 15 | 80 | 80 | claim notes | 7/9/20 | authorized 50000 | Miller | file |
| 15 | 80 | 80 | claim notes | 7/10/20 | re Mondamin *MADE NEW OFFER $25K IN ATTEMPT TO RESOLVE.* Declined | Hailman | file |
| 106 | none | none | letter | 7/10/20 | re Mondamin - offer $25,000 | Hailman | Sartes |
| 18 | 4183 | 4205 | Response P's RFP | 7/27/20 | REDACTED Non-responsive; Irrelevant; Atty-clt | D Privilege Log | file |
| 15 | 80 | 80 | claim notes | 7/30/20 | *ACK OFFER OUT IN RESPONSE TO ADDITIONAL MEDS* | Miller | file |
| 15 | 81 | 81 | claim notes | 8/3/20 | UPDATED OFF OUTX2 | Miller | file |
| 189 | none | none | claim file | 8/28/20 | certified Amica claim file including medical records, photos, correspondence, payment records, etc. | Amica | file |
| 240 | none | none | claim file | 8/28/20 | certified Amica claim file including medical records, photos, correspondence, payment records, etc. | Amica | file |
| 197 | none | none | med records | 9/11/20 | medical records and related discovery docs Humana | medical provider | Wicker Smith |
| 247 | none | none | med records | 9/11/20 | medical records and related discovery docs Humana | medical provider | Wicker Smith |
| 62 | none | none | email | 9/28/20 | request authorizations | Diaz | Sartes |

# Abstract of Correspondence and Claim File
# Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 168 | none | none | court doc | 9/28/20 | Notice of production from Non-party w/ medical records | Ghezelbash | Sartes |
| 169 | none | none | court doc | 9/28/20 | Notice of production from Non-party w/ medical records | Ghezelbash | Sartes |
| 230 | none | none | court doc | 9/28/20 | Notice of production from Non-party re Lisa medical records w/ various discovery responses | Ghezelbash | Sartes |
| 231 | none | none | court doc | 9/28/20 | Notice of production from Non-party re Mondamin medical records w/ various discovery responses | Ghezelbash | Sartes |
| 232 | none | none | court doc | 9/29/20 | P's "No Objections and Request for Copies" re Notice of 9/28/2020 | Sartes | Ghezelbash |
| 233 | none | none | court doc | 9/29/20 | Request for copies from Tower Radiology re Mondamin | Sartes | Ghezelbash |
| 205 | none | none | med records | 10/13/20 | NO medical records and related discovery docs Walmart Pharmacy | medical provider | Wicker Smith |
| 254 | none | none | med records | 10/13/20 | NO medical records and related discovery docs Walmart Pharmacy | medical provider | Wicker Smith |
| 202 | none | none | med records | 10/22/20 | medical records and related discovery docs Torbert Emergency Phys | medical provider | Wicker Smith |
| 252 | none | none | med records | 10/22/20 | medical records and related discovery docs Torbert Emergency Phys | medical provider | Wicker Smith |
| 203 | none | none | med records | 10/22/20 | medical records and related discovery docs Torbert Emergency Phys | medical provider | Wicker Smith |
| 193 | none | none | med records | 10/28/20 | NO medical records and related discovery docs Fast MD | medical provider | Wicker Smith |
| 244 | none | none | med records | 10/28/20 | NO medical records and related discovery docs Fast MD | medical provider | Wicker Smith |
| 115 | none | none | court doc | 10/30/20 | amended notice of depo of Mondamin and Lisa for 11/2/2020 | Ghezelbash | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 82 | 85 | claim notes | 11/3/20 | "Injury Evaluation" [extensive analysis]<br>Lisa -<br>range low 11264 high 35264 | Hailman | file |
| 15 | 85 | 85 | claim notes | 11/3/20 | re Lisa -<br>requested authorization for 35264 | Hailman | file |
| 15 | 85 | 85 | claim notes | 11/3/20 | re Lisa -<br>agreed auth | Miller | file |
| 15 | 85 | 87 | claim notes | 11/3/20 | "Injury Evaluation" {extensive analysis]<br>Mondamin -<br>…*PREV RANGED UP TO LIMITS* | Hailman | file |
| 15 | 87 | 87 | claim notes | 11/4/20 | re Mondamin<br>add'l records rec'd | Hailman | file |
| 187 | none | none | court doc | 11/4/20 | subpoena to Records Custodian AdventHealth<br>re Mondamin<br>w/ med records attached | Ghezelbash | Advent Health |
| 201 | none | none | med records | 11/5/20 | medical records and related discovery docs<br>Tampa Bay Surgical Group | medical provider | Wicker Smith |
| 251 | none | none | med records | 11/5/20 | medical records and related discovery docs<br>Tampa Bay Surgical Group | medical provider | Wicker Smith |
| 15 | 88 | 88 | claim notes | 11/6/20 | depos completed<br>REDACT4ED | Hailman | file |
| 18 | 88 | 88 | Response P's RFP | 11/6/20 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 190 | none | none | med records | 11/6/20 | medical records and related discovery docs<br>Apollo Medical Group | medical provider | Wicker Smith |
| 241 | none | none | med records | 11/6/20 | medical records and related discovery docs<br>Apollo Medical Group | medical provider | Wicker Smith |
| 239 | none | none | court doc | 11/10/20 | subpoena - AdventHealth<br>w/ Mondamin med records | Ghezelbash | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 192 | none | none | med records | 11/13/20 | medical records and related discovery Doctors Urgent Care | medical provider | Wicker Smith |
| 243 | none | none | med records | 11/13/20 | medical records and related discovery Doctors Urgent Care | medical provider | Wicker Smith |
| 196 | none | none | med records | 11/13/20 | medical records and related discovery docs Gulf Coast MRI - including disc | medical provider | Wicker Smith |
| 200 | none | none | med records | 11/16/20 | medical records and related discovery docs Publix | medical provider | Wicker Smith |
| 250 | none | none | med records | 11/16/20 | medical records and related discovery docs Publix | medical provider | Wicker Smith |
| 195 | none | none | med records | 11/17/20 | medical records and related discovery docs Florida Medical Clinic | medical provider | Wicker Smith |
| 246 | none | none | med records | 11/17/20 | medical records and related discovery docs Florida Medical Clinic | medical provider | Wicker Smith |
| 18 | 1858 | 1863 | Response P's RFP | 11/18/20 | REDACTED Atty-clt | D Privilege Log | file |
| 18 | 1934 | 1935 | Response P's RFP | 11/18/20 | REDACTED Atty-clt | D Privilege Log | file |
| 18 | 3930 | 3934 | Response P's RFP | 11/18/20 | REDACTED Atty-clt | D Privilege Log | file |
| 194 | none | none | med records | 11/19/20 | NO medical records and related discovery docs Florida Cardiology Group | medical provider | Wicker Smith |
| 245 | none | none | med records | 11/19/20 | NO medical records and related discovery docs Florida Cardiology Group | medical provider | Wicker Smith |
| 15 | 88 | 88 | claim notes | 11/23/20 | OBC to atty Looking for $200k Lisa and $150k Mondamin | Hailman | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 16 | 4893 | 4894 | chain email | 12/9/20 | PC reported that he previously demanded $50k and it should have been tendered. Ps current demand is $200k as to Mondamin and $150k as to Lisa. *He stated that his clients will now not take policy limits.* REDACTED | Diaz | Hailman |
| 16 | 4895 | 4895 | email | 12/9/20 | PC reported that he previously demanded $50k and it should have been tendered. Ps current demand is $200k as to Mondamin and $150k as to Lisa. *He stated that his clients will now not take policy limits.* REDACTED | Diaz | Hailman |
| 16 | 4900 | 4901 | chain email | 12/9/20 | PC reported that he previously demanded $50k and it should have been tendered. Ps current demand is $200k as to Mondamin and $150k as to Lisa. *He stated that his clients will now not take policy limits.* REDACTED | Diaz | Hailman |
| 16 | 4893 | 4894 | chain email | 12/9/20 | *Would you take this as a demand and log it?* | Hailman | Miller |
| 16 | 4900 | 49001 | chain email | 12/9/20 | *Would you take this as a demand and log it?* | Hailman | Miller |
| 16 | 4893 | 4894 | chain email | 12/9/20 | yes, log 200k and 150k | Miller | Hailman |
| 15 | 89 | 89 | claim notes | 12/9/20 | Discussed w/ D/C. Current demands $200k Mondamin, $150k Lisa REDACTED | Hailman | file |
| 18 | 89 | 89 | Response P's RFP | 12/9/20 | REDACTED Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 4893 | 4893 | Response P's RFP | 12/9/20 | REDACTED Atty-clt | D Privilege Log | file |
| 18 | 4895 | 4895 | Response P's RFP | 12/9/20 | REDACTED Atty-clt | D Privilege Log | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 4900 | 4900 | Response P's RFP | 12/9/20 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 209 | none | none | court doc | 12/9/20 | Notice of production from Non-party<br>re medical records for Mondamin | Ghezelbash | Sartes |
| 210 | none | none | letter | 12/9/20 | request authorizations for Amita and Testa | Vlk | Sartes |
| 15 | 90 | 93 | claim notes | 12/22/20 | "Injury Evaluation" [extensive duplicated analysis]<br>Lisa | Hailman | file |
| 191 | none | none | med records | 12/22/20 | medical records and related discovery docs<br>CIOX Health / BayCare HomeCare | medical provider | Wicker Smith |
| 242 | none | none | med records | 12/22/20 | medical records and related discovery docs<br>CIOX Health / BayCare HomeCare | medical provider | Wicker Smith |
| 208 | none | none | court doc | 12/23/20 | "Certificate of Non-Objection"<br>re Mondamin and Lisa med records | Ghezelbash | Sartes |
| 15 | 93 | 96 | claim notes | 12/24/20 | "Injury Evaluation" [extensive duplicated analysis]<br>Lisa<br>Range high low 50000 | Hailman | file |
| 15 | 96 | 96 | claim notes | 12/24/20 | requested authorization for 50000 | Hailman | file |
| 15 | 96 | 96 | claim notes | 12/24/20 | *… GIVEN THE ADD'L TX THAT'S NOTED WE WILL TENDER THE UM* | DiPasquale | file |
| 15 | 96 | 96 | claim notes | 12/24/20 | re Lisa<br>authorized 50000 | DiPasquale | file |
| 15 | 96 | 96 | claim notes | 12/24/20 | re Lisa<br>*… ANOTHER LOSS EXISTS FOR THIS POLICY* | Hailman | file |
| 15 | 96 | 96 | claim notes | 12/24/20 | tender package X2 | Hailman | file |
| 15 | 97 | 97 | claim notes | 12/24/20 | re Mondamin<br>settlement amount 50000 | Hailman | file |
| 15 | 97 | 97 | claim notes | 12/24/20 | re Lisa<br>settlement amount 50000 | Hailman | file |

## Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 188 | none | none | CD | 12/29/20 | med records disc AdventHealth | medical provider | file |
| 240 | none | none | court doc | 12/29/20 | med records disc AdventHealth | Advent Health | file |
| 257 | none | none | email | 12/29/20 | FW: Wilkins (CORRECTION) REDACTED see PRIVILEGE LOG | Sartes | REDACTED |
| 257 | none | none | email | 12/29/20 | FW: Wilkins (CORRECTION) REDACTED see PRIVILEGE LOG | Sartes | REDACTED |
| 257 | none | none | email | 12/29/20 | FW: Wilkins (CORRECTION) REDACTED see PRIVILEGE LOG | Sartes | REDACTED |
| 257 | none | none | email | 12/29/20 | FW: Wilkins (CORRECTION) REDACTED see PRIVILEGE LOG | Sartes | REDACTED |
| 16 | 4915 | 4916 | chain email | 12/30/20 | attached correspondence | Brown | Diaz |
| 16 | 4896 | 4896 | email | 12/31/20 | acknowledge tenders of $50k each on 12/29/2020 w/ releases.  We have alleged B/F are payments w/o prejudice? | Sartes | Diaz |
| 16 | 4907 | 4907 | email | 12/31/20 | acknowledge tenders of $50k each on 12/29/2020 w/ releases.  We have alleged B/F are payments w/o prejudice? | Sartes | Diaz |
| 66 | none | none | email | 12/31/20 | acknowledge $50k tender for Mondamin and Lisa.  Is it Progressive's intent that | Sartes | Diaz |
| 67 | none | none | email | 12/31/20 | acknowledge $50k tender for Mondamin and Lisa.  Is it Progressive's intent that | Sartes | Diaz |
| 257 | none | none | email | 12/31/20 | RE: memo to PLT on Wilkins REDACTED see PRIVILEGE LOG | Sartes | REDACTED |
| 257 | none | none | email | 12/31/20 | RE: memo to PLT on Wilkins REDACTED see PRIVILEGE LOG | Sartes | REDACTED |
| 257 | none | none | email | 12/31/20 | memo to PLT on Wilkins REDACTED see PRIVILEGE LOG | Sartes | REDACTED |
| 257 | none | none | email | 12/31/20 | Mondamin Wilkins REDACTED see PRIVILEGE LOG | Sartes | REDACTED |

# Abstract of Correspondence and Claim File
# Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 16 | 4891 | 4892 | chain email | 1/4/21 | *... Please see attached response to the tender from PC.* REDACTED | Diaz | Hailman |
| 16 | 4911 | 4911 | chain email | 1/4/21 | see attached response to tender REDACTED | Diaz | Hailman |
| 18 | 4891 | 4891 | Response P's RFP | 1/4/21 | REDACTED Atty-clt | D Privilege Log | file |
| 18 | 4911 | 4911 | Response P's RFP | 1/4/21 | REDACTED Atty-clt | D Privilege Log | file |
| 53 | none | none | email | 1/14/21 | request signed authorizations | Vlk | Sartes |
| 16 | 4891 | 4892 | chain email | 1/15/21 | *I would get Erin's thoughts on this then we can review with legal.* | Miller | Hailman |
| 16 | 4891 | 4892 | chain email | 1/15/21 | please review | Hailman | Miller |
| 16 | 4911 | 4911 | chain email | 1/15/21 | please review | Hailman | Miller |
| 16 | 4915 | 4916 | chain email | 1/15/21 | Progressive's tender was in response to new info. If there are issues with the releases please advise. *Progressive is not* | Diaz | Brown |
| 16 | 4915 | 4916 | chain email | 1/15/21 | FYI | Diaz | Hailman |
| 15 | 100 | 100 | claim notes | 1/15/21 | PA requests clarification of tender. Request he outline B/F as not in C/ | Miller | file |
| 15 | 100 | 100 | claim notes | 1/15/21 | appears will continue to pursue claim | DiPasquale | file |
| 15 | 101 | 101 | claim notes | 1/15/21 | spoke w/ D/C REDACTED | Hailman | file |
| 16 | 4913 | 4914 | letter | 1/19/21 | request med records w/ authorization | Vlk | Advent Health |
| 257 | none | none | email | 1/25/21 | Wilkins REDACTED see PRIVILEGE LOG | Tragos | REDACTED |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 257 | none | none | email | 1/25/21 | Wilkins<br>REDACTED see PRIVILEGE LOG | Tragos | REDACTED |
| 257 | none | none | email | 1/27/21 | re Wilkins, Lisa first mva<br>REDACTED see PRIVILEGE LOG | Gallagher | REDACTED |
| 257 | none | none | email | 1/27/21 | re Wilkins, Lisa first mva<br>REDACTED see PRIVILEGE LOG | Tragos | REDACTED |
| 257 | none | none | email | 1/27/21 | Wilkins, Lisa first mva<br>REDACTED see PRIVILEGE LOG | Gallagher | REDACTED |
| 16 | 4912 | 4912 | invoice | 1/29/21 | $5,660 | CiOX Health | Wicker Smith |
| 16 | 4902 | 4902 | chain email | 2/2/21 | re video on USB for hard file. | Miller | Zellisha |
| 16 | 4910 | 4910 | email | 2/2/21 | re USB video, we have tendered, waiting to see if accepted. Want to make sure it gets to hard file | Miller | DiPasquale |
| 16 | 4902 | 4902 | chain email | 2/3/21 | let me know if you need anything from me or Janice | Miller | Zellisha |
| 16 | 4902 | 4902 | chain email | 2/3/21 | Will get this to Riverview | Zellisha | Miller |
| 15 | 101 | 101 | claim notes | 2/3/21 | D/C email<br>Progressive's tender was in response to new info. If there are | Hailman | file |
| 15 | 101 | 102 | claim notes | 2/4/21 | PA appears to reject tender for Mondamin only. Draft for Lisa has cleared. | Miller | file |
| 15 | 102 | 103 | claim notes | 2/5/21 | Lisa draft cleared bank 1/27/2021. No release or dismissal. Mondamin rejects tender and returns draft. | Roehrs | file |
| 15 | 103 | 103 | claim notes | 2/5/21 | UM coverage outline | Roehrs | file |
| 15 | 103 | 103 | claim notes | 2/5/21 | "Coverage"<br>100% labile | Roehrs | file |
| 15 | 103 | 105 | claim notes | 2/5/21 | "Damages" [extensive analysis]<br>re Mondamin | Roehrs | file |

# Abstract of Correspondence and Claim File
# Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 105 | 106 | claim notes | 2/5/21 | Legal RT<br>REDACTED | Roehrs | file |
| 18 | 105 | 105 | Response P's RFP | 2/5/21 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 15 | 106 | 106 | claim notes | 2/9/21 | email to Diaz<br>REDACTED | Roehrs | file |
| 18 | 106 | 106 | Response P's RFP | 2/9/21 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 15 | 106 | 107 | claim notes | 2/10/21 | OK to waive MP Subro | Lacey | file |
| 84 | none | none | letter | 2/10/21 | re Mondamin<br>we are moving forward to waive med pay lien | Lacey | Sartes |
| 15 | 108 | 108 | claim notes | 2/12/21 | conf w/ DC<br>REDACTED | Roehrs | file |
| 15 | 108 | 108 | claim notes | 2/12/21 | "Litigation"<br>re trial prep and experts | Roehrs | file |
| 15 | 108 | 108 | claim notes | 2/12/21 | email to DC<br>REDACTED | Roehrs | file |
| 15 | 109 | 109 | claim notes | 2/12/21 | "Litigation"<br>re trial prep and experts | Roehrs | file |
| 18 | 108 | 108 | Response P's RFP | 2/12/21 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 2055 | 2055 | Response P's RFP | 2/12/21 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 109 | 109 | claim notes | 2/15/21 | "Litigation"<br>re trial prep and experts | Roehrs | file |
| 16 | 4908 | 4909 | chain email | 2/19/21 | re invoice | Wicker Smith | Hailman |
| 204 | none | none | med records | 3/9/21 | medical records and related discovery docs<br>UF Health Shands Hospital | medical provider | Wicker Smith |

## Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 253 | none | none | med records | 3/9/21 | medical records and related discovery docs UF Health Shands Hospital | medical provider | Wicker Smith |
| 15 | 111 | 111 | d | 3/22/21 | "Litigation" summary of status | Roehrs | file |
| 15 | 111 | 111 | claim notes | 3/24/21 | need to complete initial discovery before mediation | Roehrs | file |
| 15 | 112 | 112 | claim notes | 3/24/21 | email to Diaz - cancel mediation | Roehrs | file |
| 18 | 2042 | 2042 | Response P's RFP | 3/24/21 | REDACTED Atty-clt | D Privilege Log | file |
| 56 | none | none | authorization | 3/31/21 | Mondamin authorize release to Amita | Mondamin | med provider |
| 18 | 1653 | 1653 | Response P's RFP | 4/5/21 | REDACTED Post J/; work product | D Privilege Log | file |
| 15 | 112 | 112 | claim notes | 4/26/21 | "Litigation" summary of status | Roehrs | file |
| 165 | none | none | court doc | 4/28/21 | D Notice of Compliance to request for copies of med records | Ghezelbash | Sartes |
| 185 | none | none | court doc | 4/28/21 | "Notice of Partial Compliance" re Mondamin med records | Ghezelbash | Sartes |
| 198 | none | none | letter | 4/28/21 | invoice for records | Wicker Smith | Sartes |
| 248 | none | none | letter | 4/28/21 | invoice for records | Wicker Smith | Sartes |
| 199 | none | none | court doc | 4/28/21 | "Notice of Partial Compliance" re Mondamin med records | Ghezelbash | Sartes |
| 249 | none | none | court doc | 4/28/21 | "Notice of Partial Compliance" re Mondamin med records | Ghezelbash | Sartes |
| 235 | none | none | court doc | 4/28/21 | "Notice of Partial Compliance" re Mondamin med records | Ghezelbash | Sartes |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 236 | none | none | court doc | 4/28/21 | "Notice of Partial Compliance" re Mondamin med records | Ghezelbash | Sartes |
| 15 | 114 | 114 | claim notes | 5/12/21 | new trial date 5/23/2022 | Roehrs | file |
| 18 | 1510 | 1510 | Response P's RFP | 5/13/21 | REDACTED Post J/; work product | D Privilege Log | file |
| 65 | none | none | email | 5/26/21 | re withheld discovery responses. G/F attempt to obtain compliance | Sartes | Diaz |
| 15 | 114 | 114 | claim notes | 6/17/21 | request DC update | Roehrs | file |
| 15 | 115 | 115 | claim notes | 6/25/21 | email to DC REDACTED | Roehrs | file |
| 18 | 115 | 115 | Response P's RFP | 6/25/21 | REDACTED Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 1812 | 1813 | Response P's RFP | 6/25/21 | REDACTED Atty-clt | D Privilege Log | file |
| 18 | 2312 | 2313 | Response P's RFP | 6/29/21 | REDACTED Atty-clt | D Privilege Log | file |
| 18 | 2358 | 2361 | Response P's RFP | 6/29/21 | REDACTED Atty-clt | D Privilege Log | file |
| 15 | 115 | 117 | claim notes | 7/5/21 | "Litigation" re trial prep and experts | Roehrs | file |
| 18 | 1988 | 1988 | Response P's RFP | 7/14/21 | REDACTED non-responsive | D Privilege Log | file |
| 218 | none | none | court doc | 7/14/21 | Notice of production from Non-party Elite Spine re medical records for Mondamin | Hanes | Sartes |
| 219 | none | none | court doc | 7/14/21 | request for copies from Elite Spine re Mondamin | Neiser | file |
| 15 | 118 | 118 | claim notes | 7/15/21 | "Litigation" re trial prep and experts | Roehrs | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 2316 | 2318 | Response P's RFP | 7/15/21 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 18 | 2496 | 2496 | Response P's RFP | 7/15/21 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 224 | none | none | court doc | 7/21/21 | Notice of production from Non-party Tower Radiology re medical records | Hanes | Sartes |
| 170 | none | none | court doc | 8/2/21 | "Certificate of Non-Objection"<br>re Mondamin med records | Hanes | Sartes |
| 223 | none | none | court doc | 8/2/21 | "Certificate of Non-Objection"<br>re Mondamin and Lisa med records | Hanes | Sartes |
| 15 | 119 | 119 | claim notes | 10/18/21 | UM reserve adequate. Favorable radiology review | Roehrs | file |
| 15 | 120 | 121 | claim notes | 11/22/21 | P has no objective evidence of injury | Roehrs | file |
| 216 | none | none | court doc | 12/14/21 | request for copies from Elite Spine<br>re Mondamin | Neiser | file |
| 217 | none | none | court doc | 12/14/21 | request for copies from Elite Spine<br>re Mondamin | Neiser | file |
| 221 | none | none | court doc | 12/14/21 | request for copies from Tower Radiology<br>re Mondamin | Neiser | file |
| 222 | none | none | court doc | 12/14/21 | request for copies from Tower Radiology<br>re Mondamin | Neiser | file |
| 225 | none | none | court doc | 12/14/21 | Request for copies from Tower Radiology<br>re Mondamin | Neiser | file |
| 15 | 121 | 121 | claim notes | 1/19/22 | favorable CME | DiPasquale | file |
| 18 | 1989 | 2022 | Response P's RFP | 1/24/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 18 | 2206 | 2212 | Response P's RFP | 1/24/22 | REDACTED<br>Atty-clt | D Privilege Log | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 121 | 123 | claim notes | 1/26/22 | mediation summary<br>rejected $50k tender | Roehrs | file |
| 15 | 123 | 123 | claim notes | 1/26/22 | demand 250000 | Roehrs | file |
| 15 | 123 | 124 | claim notes | 1/26/22 | mediation REDACTED c/w DC | Roehrs | file |
| 18 | 123 | 123 | Response P's RFP | 1/26/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 123 | 123 | Response P's RFP | 2/3/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 2027 | 2029 | Response P's RFP | 2/3/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 124 | 124 | claim notes | 2/4/22 | updated from DC<br>REDACTED | Roehrs | file |
| 18 | 124 | 124 | Response P's RFP | 2/4/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 1801 | 1805 | Response P's RFP | 2/4/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 125 | 125 | claim notes | 2/15/22 | re trial prep and experts | Roehrs | file |
| 172 | none | none | court doc | 2/16/22 | Notice of production from Non-party<br>w/ medical records | Hanes | Sartes |
| 122 | none | none | court doc | 2/17/22 | Notice of depo of Dr. Saldin for 3/22/2022 | Hanes | file |
| 124 | none | none | court doc | 2/17/22 | Subpoena for depo of Dr. Saldin for 3/22/2022 | Hanes | Dr. Saldin |
| 128 | none | none | court doc | 2/17/22 | Notice of depo of Dr. Hayes for 3/14/2022 | Hanes | file |
| 129 | none | none | court doc | 2/17/22 | Subpoena for depo of Dr. Hayes for 3/14/2022 | Hanes | Dr. Hayes |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 139 | none | none | court doc | 2/17/22 | Notice of depo of Billing Rep for 3/24/2022 | Hanes | file |
| 144 | none | none | court doc | 2/17/22 | Notice of Depo of Montano, Billing Rep | Hanes | file |
| 145 | none | none | court doc | 2/17/22 | Notice of Depo of Montano, Billing Rep | Hanes | file |
| 147 | none | none | court doc | 2/17/22 | Subpoena to Montano, Billing Rep | Hanes | Montano |
| 148 | none | none | court doc | 2/17/22 | Subpoena to Montano, Billing Rep | Hanes | Montano |
| 151 | none | none | court doc | 2/17/22 | Notice of Depo of Oster, Billing Rep | Hanes | file |
| 153 | none | none | court doc | 2/17/22 | Subpoena to Oster, Billing Rep | Hanes | Oster |
| 160 | none | none | court doc | 2/17/22 | Notice of Depo of Trinity Healthcare, Billing Rep | Hanes | file |
| 150 | none | none | court doc | 2/18/22 | Notice of Cancellation of Motano Depo | Hanes | file |
| 152 | none | none | report | 2/18/22 | "Account Financial History by Service Date" re Montamin | Spine&Orth Specialists | file |
| 155 | none | none | report | 2/18/22 | "Account Financial History by Service Date" re Montamin | Spine&Orth Specialists | file |
| 15 | 125 | 125 | claim notes | 2/21/22 | Legal RT REDACTED | Roehrs | file |
| 18 | 125 | 125 | Response P's RFP | 2/21/22 | REDACTED Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 159 | none | none | court doc | 2/21/22 | Notice of Cancellation of Billing Rep Depo | Hanes | file |
| 15 | 126 | 126 | claim notes | 2/22/22 | "Injury Evaluation" [summary] | Roehrs | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 126 | 127 | claim notes | 2/22/22 | email to DC<br>REDACTED | Roehrs | file |
| 18 | 126 | 126 | Response P's RFP | 2/22/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 2030 | 2030 | Response P's RFP | 2/22/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 89 | none | none | fax | 2/22/22 | re Mondamin<br>response to $250k demand. Limits of $50k were tendered | Roehrs | Neiser |
| 181 | none | none | court doc | 2/22/22 | Notice of production from Non-party<br>w/ medical records | Hanes | Sartes |
| 15 | 127 | 127 | claim notes | 2/23/22 | email to DC request update | Roehrs | file |
| 18 | 1607 | 1607 | Response P's RFP | 2/23/22 | REDACTED<br>atty-clt | D Privilege Log | file |
| 176 | none | none | court doc | 2/25/22 | "Request for Copies" re med records | Neiser | file |
| 15 | 127 | 127 | claim notes | 2/28/22 | we have motion to continue trial as experts not avail | Roehrs | file |
| 69 | none | none | release | 2/28/22 | Consent to Release Info - CMS | Mondamin | Wicker Smith |
| 141 | none | none | report | 3/2/22 | "Account Financial History by Service Date"<br>re Montamin | Spine & Orth Specialists | file |
| 173 | none | none | court doc | 3/4/22 | "Request for Copies" re med records | Sartes | Progressive |
| 174 | none | none | court doc | 3/4/22 | "Request for Copies" re med records | Sartes | Progressive |
| 178 | none | none | court doc | 3/4/22 | "Request for Copies" re med records | Neiser | file |
| 179 | none | none | court doc | 3/4/22 | "Request for Copies" re med records | Neiser | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 182 | none | none | court doc | 3/4/22 | "Request for Copies" re med records | Neiser | file |
| 134 | none | none | court doc | 3/7/22 | Notice of depo of Kristi Kirby | Hanes | file |
| 136 | none | none | court doc | 3/7/22 | Notice of depo of Dr. Liles | Hanes | file |
| 175 | none | none | court doc | 3/8/22 | "Certificate of Non-Objection" re Mondamin med records | Hanes | Sartes |
| 180 | none | none | court doc | 3/8/22 | "Certificate of Non-Objection" re Mondamin med records | Hanes | Sartes |
| 15 | 128 | 129 | claim notes | 3/9/22 | trial continued to 8/26 | Roehrs | file |
| 142 | none | none | court doc | 3/9/22 | Subpoena for depo of Montano, Billing Rep | Hanes | Montano |
| 143 | none | none | letter | 3/9/22 | re Mondamin Objection and Motion for Protective Order | Atty Rothwell | Hanes |
| 146 | none | none | court doc | 3/9/22 | Objection and Motion for Protective Order as to Trinity Spine Center | Atty Rothwell | file |
| 18 | 2422 | 2424 | Response P's RFP | 3/11/22 | REDACTED Atty-clt | D Privilege Log | file |
| 126 | none | none | court doc | 3/11/22 | amended notice of depo of Dr. Hayes for 4/14/2022 | Hanes | file |
| 15 | 129 | 129 | claim notes | 3/14/22 | "Litigation" re trial prep and experts | Roehrs | file |
| 15 | 131 | 131 | claim notes | 3/28/22 | "Litigation" … REJECTED 50K UM TENDER… | Roehrs | file |
| 18 | 1627 | 1629 | Response P's RFP | 4/12/22 | REDACTED Post J/; work product | D Privilege Log | file |
| 18 | 1794 | 1797 | Response P's RFP | 4/14/22 | REDACTED Atty-clt | D Privilege Log | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 2409 | 2412 | Response P's RFP | 4/14/22 | REDACTED<br>non-responsive | D Privilege Log | file |
| 18 | 1821 | 1821 | Response P's RFP | 4/21/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 18 | 1626 | 1626 | Response P's RFP | 4/26/22 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 2478 | 2479 | Response P's RFP | 5/2/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 135 | 135 | claim notes | 5/3/22 | "Litigation"<br>re trial prep and experts | Roehrs | file |
| 18 | 135 | 135 | Response P's RFP | 5/3/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 2340 | 2342 | Response P's RFP | 5/5/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 135 | 135 | claim notes | 5/9/22 | thank you for summary<br>REDACTED | Roehrs | file |
| 18 | 135 | 135 | Response P's RFP | 5/9/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 1654 | 1654 | Response P's RFP | 5/9/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 18 | 2344 | 2346 | Response P's RFP | 5/25/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 139 | 139 | claim notes | 6/2/22 | approve motion to continue trial | Roehrs | file |
| 18 | 1716 | 1718 | Response P's RFP | 6/2/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 18 | 1543 | 1547 | Response P's RFP | 6/3/22 | REDACTED<br>atty-clt | D Privilege Log | file |
| 18 | 2061 | 2065 | Response P's RFP | 6/3/22 | REDACTED<br>Atty-clt | D Privilege Log | file |

# Abstract of Correspondence and Claim File
# Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 140 | 140 | claim notes | 6/11/22 | "Litigation"<br>re trial prep and experts | Roehrs | file |
| 18 | 140 | 140 | Response P's RFP | 6/11/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 1605 | 1606 | Response P's RFP | 6/11/22 | REDACTED<br>atty-clt | D Privilege Log | file |
| 15 | 140 | 141 | claim notes | 6/16/22 | "Litigation"<br>re trial prep - analysis/impression | Roehrs | file |
| 18 | 140 | 140 | Response P's RFP | 6/16/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 1745 | 1747 | Response P's RFP | 6/16/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 141 | 142 | claim notes | 6/21/22 | "Litigation"<br>re trial prep and experts | Roehrs | file |
| 18 | 141 | 141 | Response P's RFP | 6/21/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 1942 | 1942 | Response P's RFP | 6/21/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 142 | 142 | claim notes | 6/27/22 | RECD REPORT<br>REDACTED | Roehrs | file |
| 18 | 142 | 142 | Response P's RFP | 6/27/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 15 | 143 | 144 | claim notes | 6/28/22 | "File Summary"<br>re trial prep and expert testimony | Roehrs | file |
| 15 | 145 | 145 | claim notes | 6/29/22 | "Litigation"<br>email to DC REDACTED | Roehrs | file |
| 18 | 145 | 145 | Response P's RFP | 6/29/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 1726 | 1725 | Response P's RFP | 6/29/22 | REDACTED<br>Atty-clt | D Privilege Log | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 1819 | 1820 | Response P's RFP | 7/6/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 147 | 148 | claim notes | 7/7/22 | "Litigation"<br>CW DC REDACTED | Roehrs | file |
| 18 | 147 | 147 | Response P's RFP | 7/7/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 1630 | 1631 | Response P's RFP | 7/7/22 | REDACTED<br>atty-clt | D Privilege Log | file |
| 18 | 1688 | 1690 | Response P's RFP | 7/8/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 148 | 148 | claim notes | 7/11/22 | "Litigation"<br>re trial prep and experts | Roehrs | file |
| 18 | 148 | 148 | Response P's RFP | 7/11/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 1068 | 1070 | Response P's RFP | 7/16/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 148 | 149 | claim notes | 7/18/22 | "Litigation"<br>re trial prep and experts<br>REDACTED | Roehrs | file |
| 18 | 148 | 148 | Response P's RFP | 7/18/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 2040 | 2041 | Response P's RFP | 7/18/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 149 | 149 | claim notes | 7/19/22 | "Litigation"<br>re trial prep and experts<br>REDACTED | Roehrs | file |
| 15 | 149 | 149 | claim notes | 7/19/22 | "Litigation"<br>re tort feasor 100%<br>REDACTED | Roehrs | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 149 | 149 | Response P's RFP | 7/19/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 149 | 149 | Response P's RFP | 7/20/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 15 | 153 | 153 | claim notes | 8/2/22 | "Litigation"<br>re trial prep and experts | Roehrs | file |
| 18 | 1836 | 1837 | Response P's RFP | 8/8/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 155 | 156 | claim notes | 8/12/22 | "Litigation"<br>re trial prep and experts | Roehrs | file |
| 15 | 157 | 157 | claim notes | 8/12/22 | "Litigation"<br>re trial prep and experts | Roehrs | file |
| 18 | 2051 | 2053 | Response P's RFP | 8/12/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 157 | 158 | claim notes | 8/13/22 | "Litigation"<br>re trial prep and reporter issue | Roehrs | file |
| 15 | 159 | 161 | claim notes | 8/15/22 | "Litigation"<br>re Trial Day 1 | Roehrs | file |
| 15 | 161 | 167 | claim notes | 8/16/22 | "Litigation"<br>re Trial Day 2 | Roehrs | file |
| 15 | 169 | 173 | claim notes | 8/18/22 | "Litigation"<br>re Trial Day 3 | Roehrs | file |
| 15 | 175 | 178 | claim notes | 8/18/22 | "Litigation"<br>re Trial Day 4 | Roehrs | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 15 | 178 | 179 | claim notes | 8/22/22 | "Litigation"<br>re Trial Day 5<br>Verdict<br>Ireland negligence was cause<br>Total damages for future meds $511,386.35<br>Permanent injury<br>Past pain $150,000<br>Future pain $275,000<br>Total Verdict $936,386.85 | Roehrs | file |
| 15 | 179 | 179 | claim notes | 8/22/22 | call from DC<br>REDACTED | Roehrs | file |
| 15 | 179 | 180 | claim notes | 8/22/22 | verdict noted | DiPasquale | file |
| 18 | 179 | 179 | Response P's RFP | 8/22/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 15 | 181 | 182 | claim notes | 8/23/22 | closing arguments summarized | Roehrs | file |
| 15 | 184 | 184 | claim notes | 8/25/22 | post trial call with defense and legal | DiPasquale | file |
| 15 | 184 | 184 | claim notes | 8/25/22 | post trial call with defense and legal<br>REDACTED | Roehrs | file |
| 18 | 184 | 184 | Response P's RFP | 8/25/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 184 | 184 | Response P's RFP | 8/26/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 15 | 185 | 186 | claim notes | 8/30/22 | call to DC<br>REDACTED | Roehrs | file |
| 18 | 185 | 185 | Response P's RFP | 8/30/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 2025 | 2025 | Response P's RFP | 8/30/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 187 | 187 | claim notes | 9/1/22 | REDACTED | McAuley | file |
| 18 | 187 | 187 | Response P's RFP | 9/1/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | 0 | file |
| 15 | 187 | 188 | claim notes | 9/6/22 | call from DC<br>REDACTED | Roehrs | file |
| 18 | 187 | 187 | Response P's RFP | 9/6/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 15 | 188 | 188 | claim notes | 9/7/22 | call from DC<br>REDACTED | Roehrs | file |
| 18 | 188 | 188 | Response P's RFP | 9/7/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 15 | 191 | 191 | claim notes | 9/21/22 | motions filed | Roehrs | file |
| 15 | 191 | 191 | claim notes | 9/21/22 | email to DC<br>REDACTED | Roehrs | file |
| 18 | 191 | 191 | Response P's RFP | 9/21/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 1940 | 1940 | Response P's RFP | 9/21/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 18 | 2474 | 2477 | Response P's RFP | 9/21/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 18 | 2054 | 2057 | Response P's RFP | 9/22/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 192 | 192 | claim notes | 9/25/22 | re costs | DiPasquale | file |
| 15 | 192 | 193 | claim notes | 10/5/22 | re motions<br>REDACTED | Roehrs | file |

## Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 193 | 193 | Response P's RFP | 10/5/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 1986 | 1986 | Response P's RFP | 10/5/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 18 | 2032 | 2032 | Response P's RFP | 10/20/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 195 | 195 | claim notes | 10/26/22 | "Litigation"<br>REDACTED | Roehrs | file |
| 15 | 195 | 196 | claim notes | 10/26/22 | "Litigation"<br>Summary of Motion hearing<br>REDACTED | Roehrs | file |
| 18 | 195 | 195 | Response P's RFP | 10/26/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 195 | 195 | Response P's RFP | 10/26/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 196 | 196 | Response P's RFP | 10/26/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 1616 | 1618 | Response P's RFP | 10/26/22 | REDACTED<br>atty-clt | D Privilege Log | file |
| 15 | 196 | 196 | claim notes | 11/8/22 | "Litigation"<br>CW DC<br>REDACTED | Roehrs | file |
| 18 | 196 | 196 | Response P's RFP | 11/8/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 15 | 196 | 199 | claim notes | 11/10/22 | "Litigation"<br>email to DC and DC update<br>REDACTED | Roehrs | file |
| 18 | 196 | 196 | Response P's RFP | 11/10/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 198 | 198 | Response P's RFP | 11/10/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 2486 | 2487 | Response P's RFP | 11/10/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 199 | 201 | claim notes | 11/11/22 | "Litigation"<br>re motion for costs<br>REDACTED | Roehrs | file |
| 18 | 199 | 199 | Response P's RFP | 11/11/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 15 | 201 | 201 | claim notes | 11/14/22 | "Litigation"<br>re costs authority<br>REDACTED | Roehrs | file |
| 18 | 201 | 201 | Response P's RFP | 11/14/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 2036 | 2036 | Response P's RFP | 11/14/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 201 | 202 | claim notes | 11/21/22 | "Litigation"<br>email to DC<br>REDACTED | Roehrs | file |
| 18 | 201 | 201 | Response P's RFP | 11/21/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 2356 | 2356 | Response P's RFP | 11/21/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 18 | 202 | 202 | Response P's RFP | 11/22/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 15 | 202 | 202 | claim notes | 12/6/22 | "Litigation"<br>update from DC<br>REDACTED | Roehrs | file |
| 18 | 202 | 202 | Response P's RFP | 12/6/22 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 1814 | 1817 | Response P's RFP | 12/6/22 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 16 | 4897 | 4898 | chain email | 1/9/23 | request hard file | Tinsley | Roehrs |
| 16 | 4903 | 4906 | chain email | 1/9/23 | please have hard file uploaded | Tinsley | Roehrs |
| 16 | 4897 | 4898 | chain email | 1/10/23 | I did not receive the hard file. Request prior "um reps locate the hard file and upload" | Roehrs | Tinsley |
| 16 | 4903 | 4906 | chain email | 1/10/23 | I will request hard file | Roehrs | Tinsley |
| 15 | 204 | 205 | claim notes | 1/10/23 | call from legal re hard file upload | Roehrs | file |
| 18 | 101 | 101 | Response P's RFP | 1/15/23 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 16 | 4897 | 4898 | chain email | 1/18/23 | Yes. File at Riverview office | Hailman | Tinsley |
| 16 | 4897 | 4898 | chain email | 1/18/23 | Have you located the hard file? | Tinsley | Hailman |
| 16 | 4903 | 4906 | chain email | 1/18/23 | Have you located the hard file? | Tinsley | Hailman |
| 16 | 4903 | 4906 | chain email | 1/18/23 | Yes. File at Riverview office | Hailman | Tinsley |
| 16 | 4903 | 4906 | chain email | 1/18/23 | Is there someone there that con look for it? We need for suit | Tinsley | Hailman |
| 16 | 4903 | 4906 | chain email | 1/18/23 | tracking it down | Tinsley | Hailman |
| 15 | 208 | 208 | claim notes | 1/24/23 | "Litigation"<br>email to DC<br>REDACTED | Roehrs | file |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 208 | 208 | Response P's RFP | 1/24/23 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 1651 | 1651 | Response P's RFP | 1/24/23 | REDACTED<br>atty-clt | D Privilege Log | file |
| 18 | 652 | 655 | Response P's RFP | 1/29/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 15 | 208 | 209 | claim notes | 2/15/23 | "Litigation"<br>P claimed costs of $79,274.18<br>DC authority to $45k<br>Legal to handle appeal | Roehrs | file |
| 15 | 209 | 209 | claim notes | 2/27/23 | REDACTED | Tinsley | file |
| 18 | 209 | 209 | Response P's RFP | 2/27/23 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 15 | 212 | 212 | claim notes | 3/7/23 | "Litigation"<br>P claimed costs of $79,274.18<br>DC authority to $45k<br>Legal to handle appeal | Roehrs | file |
| 18 | 716 | 724 | Response P's RFP | 3/14/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 15 | 219 | 219 | claim notes | 3/27/23 | proceed w/ cost hearing | Roehrs | file |
| 15 | 219 | 219 | claim notes | 3/28/23 | DC provided proposed Final J/ | Roehrs | file |
| 15 | 220 | 220 | claim notes | 3/28/23 | "Litigation"<br>post verdict conf and email to DC<br>REDACTED | Roehrs | file |
| 18 | 220 | 220 | Response P's RFP | 3/28/23 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 1938 | 1938 | Response P's RFP | 3/28/23 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 220 | 221 | claim notes | 3/29/23 | "Litigation"<br>judge ruled costs $56,221.13<br>P requesting interest on entire amount not just $50k<br>REDACTED | Roehrs | file |
| 15 | 221 | 221 | claim notes | 3/30/23 | "Litigation"<br>re claim file<br>REDACTED | Roehrs | file |
| 18 | 221 | 221 | Response P's RFP | 3/30/23 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 893 | 895 | Response P's RFP | 3/30/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 1674 | 1677 | Response P's RFP | 3/30/23 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 222 | 224 | claim notes | 4/10/23 | "Litigation"<br>re costs<br>REDACTED | Roehrs | file |
| 15 | 225 | 225 | claim notes | 4/10/23 | "Litigation"<br>re email to DC and Kansa Gooden<br>REDACTED | Roehrs | file |
| 18 | 222 | 222 | Response P's RFP | 4/10/23 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 224 | 224 | Response P's RFP | 4/10/23 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 225 | 225 | Response P's RFP | 4/10/23 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 2480 | 2483 | Response P's RFP | 4/10/23 | REDACTED<br>Atty-clt | D Privilege Log | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 225 | 225 | Response P's RFP | 4/11/23 | REDACTED<br>Irrelevant; Atty-clt privilege; beyond scope | D Privilege Log | file |
| 18 | 816 | 817 | Response P's RFP | 4/11/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 1532 | 1535 | Response P's RFP | 4/11/23 | REDACTED<br>Post J/; work product | D Privilege Log | file |
| 18 | 1733 | 1733 | Response P's RFP | 4/11/23 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 15 | 226 | 255 | claim notes | 4/12/23 | REDACTED | Claims Processor | file |
| 18 | 2241 | 2303 | Response P's RFP | 4/13/23 | REDACTED<br>Post J/; work product | D Privilege Log | file |
| 18 | 692 | 692 | Response P's RFP | 4/14/23 | REDACTED<br>Post J/; work product | D Privilege Log | file |
| 18 | 2498 | 2514 | Response P's RFP | 4/14/23 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 18 | 227 | 227 | Response P's RFP | 4/17/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 691 | 691 | Response P's RFP | 4/17/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 2417 | 2420 | Response P's RFP | 5/8/23 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 18 | 1536 | 1538 | Response P's RFP | 5/10/23 | REDACTED<br>Post J/; work product | D Privilege Log | file |
| 18 | 1064 | 1064 | Response P's RFP | 5/19/23 | REDACTED<br>Post J/; work product | D Privilege Log | file |
| 18 | 2538 | 2538 | Response P's RFP | 5/19/23 | REDACTED<br>Post J/; Work product | D Privilege Log | file |
| 18 | 4836 | 4836 | Response P's RFP | 5/22/23 | REDACTED<br>Post J/; work product | D Privilege Log | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 3518 | 3518 | Response P's RFP | 6/8/23 | REDACTED<br>Post J/; Work product | D Privilege Log | file |
| 18 | 3538 | 3538 | Response P's RFP | 6/9/23 | REDACTED<br>Post J/; Work product | D Privilege Log | file |
| 18 | 2517 | 2517 | Response P's RFP | 6/27/23 | REDACTED<br>Post J/; Work product | D Privilege Log | file |
| 18 | 4851 | 4851 | Response P's RFP | 6/29/23 | REDACTED<br>Post J/; work product | D Privilege Log | file |
| 18 | 668 | 669 | Response P's RFP | 7/14/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 3500 | 3500 | Response P's RFP | 7/14/23 | REDACTED<br>Post J/; Work product | D Privilege Log | file |
| 18 | 3553 | 3553 | Response P's RFP | 7/14/23 | REDACTED<br>Post J/; Work product | D Privilege Log | file |
| 18 | 666 | 667 | Response P's RFP | 7/16/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 664 | 665 | Response P's RFP | 8/14/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 818 | 819 | Response P's RFP | 9/15/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 820 | 820 | Response P's RFP | 9/27/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 823 | 824 | Response P's RFP | 9/29/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 812 | 815 | Response P's RFP | 10/2/23 | REDACTED<br>Atty-clt | D Privilege Log | file |
| 18 | 3588 | 3588 | Response P's RFP | 10/2/23 | REDACTED<br>Post J/; Work product | D Privilege Log | file |
| 18 | 3516 | 3516 | Response P's RFP | 10/5/23 | REDACTED<br>Post J/; Work product | D Privilege Log | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 661 | 663 | Response P's RFP | 10/20/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 736 | 810 | Response P's RFP | 10/20/23 | REDACTED<br>Post J/; work product | D Privilege Log | file |
| 18 | 821 | 822 | Response P's RFP | 10/23/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 902 | 971 | Response P's RFP | 11/6/23 | REDACTED<br>Post J/; work product; | D Privilege Log | file |
| 18 | 1656 | 1656 | Response P's RFP | 11/16/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 686 | 689 | Response P's RFP | 11/17/23 | REDACTED<br>Post J/; work product | D Privilege Log | file |
| 18 | 1061 | 1061 | Response P's RFP | 12/6/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 670 | 678 | Response P's RFP | 12/7/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 690 | 690 | Response P's RFP | 12/19/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 679 | 679 | Response P's RFP | 12/21/23 | REDACTED<br>Post J/; work product; | D Privilege Log | file |
| 18 | 896 | 900 | Response P's RFP | 12/31/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 901 | 901 | Response P's RFP | 12/31/23 | REDACTED<br>Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 4789 | 4793 | Response P's RFP | 1/24/24 | REDACTED<br>Post J/; work product | D Privilege Log | file |
| 18 | 726 | 726 | Response P's RFP | 1/25/24 | REDACTED<br>Post J/; work product | D Privilege Log | file |
| 18 | 2362 | 2366 | Response P's RFP | 1/25/24 | REDACTED<br>Atty-clt | D Privilege Log | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 3414 | 3422 | Response P's RFP | 1/25/24 | REDACTED Post J/; Work product; non-responsive | D Privilege Log | file |
| 18 | 651 | 651 | Response P's RFP | 1/31/24 | REDACTED Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 2357 | 2357 | Response P's RFP | 4/5/24 | REDACTED Post J/; work product | D Privilege Log | file |
| 18 | 728 | 735 | Response P's RFP | 4/8/24 | REDACTED Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 811 | 811 | Response P's RFP | 4/11/24 | REDACTED Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 1513 | 1513 | Response P's RFP | 4/12/24 | REDACTED Post J/; work product | D Privilege Log | file |
| 18 | 1524 | 1530 | Response P's RFP | 4/12/24 | REDACTED Post J/; work product | D Privilege Log | file |
| 18 | 3514 | 3514 | Response P's RFP | 4/12/24 | REDACTED Post J/; Work product | D Privilege Log | file |
| 18 | 1389 | 1394 | Response P's RFP | 4/26/24 | REDACTED Post J/; work product | D Privilege Log | file |
| 82 | none | none | letter | 4/26/24 | re Mondamin we can not accept check of 4/12/2024 as it states full and final settlement. We ask for reissue stating right to pursue | Sartes | Roehrs |
| 18 | 1600 | 1600 | Response P's RFP | 5/3/24 | REDACTED Post J/; work product; Atty-clt | D Privilege Log | file |
| 18 | 1508 | 1508 | Response P's RFP | 5/7/24 | REDACTED Post J/; work product | D Privilege Log | file |
| 18 | 1515 | 1518 | Response P's RFP | 5/7/24 | REDACTED Post J/; work product | D Privilege Log | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRG**xxxx** | Bates No end PRG**xxxx** | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 18 | 3579 | 3579 | Response P's RFP | 5/7/24 | REDACTED<br>Post J/; Work product | D Privilege Log | file |
| 18 | 1411 | 1412 | Response P's RFP | 5/9/24 | REDACTED<br>Post J/; work product | D Privilege Log | file |
| 14 | none | none | court doc | 5/10/24 | Partial Satisfaction of J/ D tendered $50k 5/8/2024 | P | D |
| 18 | 1519 | 1523 | Response P's RFP | 5/13/24 | REDACTED<br>Post J/; work product | D Privilege Log | file |
| 18 | 3508 | 3508 | Response P's RFP | 5/13/24 | REDACTED<br>Post J/; Work product | D Privilege Log | file |
| 18 | 1379 | 1382 | Response P's RFP | 5/19/24 | REDACTED<br>Post J/; work product | D Privilege Log | file |
| 13 | none | none | court doc | 8/6/24 | Answer | D | P |
| 11 | none | none | court doc | 7/8/2024 | Complaint | Hedstrom | D |
| 15 | 227 | 255 | claim notes | REDACTED | REDACTED | REDACTED | file |
| 17 | 256 | 259 | court doc | undated | D answers to Ints [incomplete and appears to be DRAFT] | Hailman | file |
| 17 | 260 | 263 | claim file | undated | calendar<br>"Chiro MD MRI MD (Dr. Ungen)"<br>[appears to be med services analysis | unidentified | file |
| 17 | 314 | 337 | photo | undated | vehicle photos | unidentified | file |
| 17 | 445 | 452 | photo | undated | photos unidentifiable | unidentified | file |
| 17 | 508 | 509 | claim file | undated | "TLD"<br>Claim #19-2350589<br>"NO DUE DATE NOTED" | Progressive | file |
| 29 | none | none | photo | undated | Photographs in Amica demand | unidentified | Karaus |
| 54 | none | none | authorization | undated | Mondamin authorize release to various providers | unidentified | med provider |
| 55 | none | none | authorization | undated | Mondamin authorize release to Amita | unidentified | med provider |
| 70 | none | none | release | undated | Consent to Release Info - CMS | unsigned | Wicker Smith |
| 78 | none | none | claim file | undated | re Mondamin - info for PIP benefits | Progressive | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 117 | none | none | CV | undated | Victor Morales Hayes, MD | Dr. Hayes | file |
| 119 | none | none | CV | undated | K. Ria Saldin, M.D., M.P.H. | Dr. Saldin | file |
| 123 | none | none | CV | undated | K. Ria Saldin, M.D., M.P.H. | Dr. Saldin | file |
| 121 | none | none | report | undated | Dr. deposition index | Dr. Saldin | file |
| 127 | none | none | CV | undated | Victor Morales Hayes, MD | Dr. Hayes | file |
| 130 | none | none | report | undated | Dr. deposition index | Dr. Hayes | file |
| 140 | none | none | CV | undated | Jennifer Montano, CPC | Montano | file |
| 207 | none | none | authorization | undated | med record auth for Testa | unsigned | Wicker Smith |
| 17 | 392 | 419 | med records | various | re Lisa<br>Exam notes<br>Ronald Stacey, DC<br>James Majorana, DC | Trinity HealthCare Center | file |
| 17 | 453 | 457 | claim file | various | re Mondamin<br>"PIP LOG"<br>Medical Payments Details - paid $2,671.12 | Progressive | file |
| 17 | 457 | 460 | claim file | various | re Lisa<br>"PIP LOG"<br>Medical Payments Details - paid $6,021.04 | Progressive | file |
| 17 | 461 | 487 | med records | various | re Lisa<br>"MEDICAL BILLS"<br>Pasco County FD<br>Morton Plant North Bay Hospital<br>Pasco County Emergency Physicians<br>Radiology Center of Clearwater<br>Trinity Health Care Center<br>Spine and Orthopaedic Specialists | various | file |
| 29 | none | none | med records | various | Medical Records in Amica demand | various | Karaus |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| Locator | Bates No start PRGxxxx | Bates No end PRGxxxx | Document Type | Date | Content | Author | To |
|---|---|---|---|---|---|---|---|
| 48 | none | none | med records | various | re Mondamin<br>11/7/2019 to 4/20/2020 | Trinity HealthCare Center | file |
| 50 | none | none | med records | various | re Mondamin<br>summary of findings, bills and related | Trinity Spine Center | file |
| 118 | none | none | med records | various | treatment notes and related | Dr. Hayes | file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
|---|
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| To |
| --- |
| - |
| - |
| - |
| - |
| - |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
|---|
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
|----|
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| Hailman |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| file |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| file |
| file |
| - |
| - |
| - |
| - |
| - |
| file |
| file |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| To |
| --- |
| file |
| file |
| file |
| file |
| file |
| file |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
|  |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| Key Ghezelbash |
| Key Ghezelbash |
| Key Ghezelbash |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| file |
| - |
| - |
| - |
| - |
| file |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| Ghezelbash Sartes |
| Ghezelbash |
| Ghezelbash |
| Ghezelbash |
| Ghezelbash |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| Ghezelbash Lawrence |
| Ghezelbash Lawrence |
| - |
| - |
| - |
| - |
| - |
| - |
| Ghezelbash Sartes |
| Ghezelbash Lawrence |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| Hailman |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
|---|
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| file |
| file |
| - |
| - |
| file |
| file |
| file |

## Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| file |
| - |
| - |
| Ghezelbash |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| file |
| - |
| - |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| To |
| --- |
| - |
| - |
| file |
| file |
| file |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
|---|
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| file |
| - |
| file |
| - |
| file |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| file |
| file |
| - |
| file |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| file |
| - |
| - |
| - |
| - |
| - |
| - |
| file |
| file |
| - |
| - |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| To |
| --- |
| - |
| - |
| - |
| file |
| file |
| - |
| file |
| Sartes |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
|----|
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
|----|
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
|---|
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| Gunn<br>Reed<br>Hanes<br>Gooden<br>Consalvo |
| - |
| - |
| - |

# Abstract of Correspondence and Claim File
## Wilkins v Progressive

| To |
|---|
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| To |
| --- |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |
| - |

**Abstract of Correspondence and Claim File**
**Wilkins v Progressive**

| To |
|:--:|
| - |
| - |
| - |



**C O N F I D E N T I A L**

## CASE REVIEW and DOCUMENT SUMMARY

## Prepared for Doucette & Associates, Inc.

Date: April 22, 2025

| Case Name | MONDAMIN WILKINS, Plaintiff, Vs. PROGRESSIVE SELECT INSURANCE COMPANY, Defendant. | |
|---|---|---|
| Case No. | 8:24-cv*01793-TPB-AAS | |
| Venue | Circuit Court Pasco County, FL removed to US District Court Middle District | |
| Judge | Hon. Thomas P. Barber USDC Judge | |
| Date Filed | 7/8/2024 | |
| Expert Disclosure | P – 4/29/2025 | D – 5/27/2025 |
| Mediation | On or before 7/15/2025 (see #19) | |
| Pre-trial Conference | 10/20/2025 (see #20) | |
| Trial Date | November 2025 (see #20) | |
| Plaintiff Attorney | Gunn Law Group, P.A. of Tampa, FL<br>  Ryan L. Hedstrom, Esq.<br>  Lee D. Gunn, Esq.<br>  L. Delton Gunn, V, Esq~ | |
| Defendant Attorney | Young, Bill, Boles, Palmer, Duke & Thompson, P.A. of Tampa, FL<br>  Megan E. Alexander, Esq.<br>  David M. Angley, Esq.<br>  Austin P. Booth, Esq.<br>  Michael Crampton, Esq. | |

Underlying Action ("U/A")

| | |
|---|---|
| Case Name | LISA WILKINS and MONDAMIN WILKINS, Plaintiffs, Vs. PROGRESSIVE SELECT INSURANCE COMPANY, Defendant. |
| Case No. | 20-CA-382 |
| Venue | Circuit Court Pasco County, FL |
| Judge | Hon. Kimberly Sharpe Byrd |
| Date Filed | 2/11/2020 |
| Trial Date | 8/15/2022 - |
| Plaintiff Attorney | Tragos, Sartes & Tragos, LLC of Clearwater, FL<br>    Peter L. Tragos, Esq.<br>    Linda Gallagher, paralegal<br>    David A. Neiser, Esq.<br>    Peter A. Sartes, Esq. |
| Defendant Attorney | La Cava, Jacobson and Goodis, P.A. of Tampa, FL<br>    Erin M. Diaz, Esq. |
| | Wicker Smith of Tampa, FL<br>    Erin M. Diaz, Esq.<br>    Victoria M. Vlk, Paralegal<br>    Donna Hanes, Esq.<br>    Stephanie Mendez, Esq.<br>    Michael Reed, Esq.<br>    Afsheim Ghezelbash, Esq.<br>    Jessica Key, Legal Assistants<br>    Maria Espinosa, Esq. |
| | Denbo LLC<br>    Emily Silver, Esq. |
| Defendant Appellate Counsel | Boyd & Jenerette, P.A.<br>    Kansas Gooden, Esq. |
| Status | Lisa accepted $50k tender and release effective 2/22/2021.<br>8/19/2022 Jury awarded $936,386.85.<br>4/14/2023 Final J/ Mondamin v D $56,221.13 |

## I.     EXECUTIVE SUMMARY

Underlying Facts from CRN accepted 11/27/2019:

Mondamin Wilkins is a pleasant 55 year-old married man who is wheelchair bound as the result of a prior spinal cord injury. Mr. Wilkins resides in New Port Richey, Florida with his wife. Lisa Wilkins. Prior to this collision, Mr. Wilkins had no issues with her cervical or thoracic spine, and was able to move his upper body without pain. Since the collision, Mr. Wilkins cannot perform at the same level as before.

**FACTS**

On July 26, 2019, Mondamin Wilkins was a passenger in a vehicle operated by his wife, Lisa Wilkins, which was traveling eastbound on Trouble Creek Road in New Port Richey, Florida. At the same date and time, Gayle Ireland was operating her vehicle southbound on May Ann Drive in New Port Richey approaching the intersection of Trouble Creek Road. Ms. Ireland failed to stop at the stop sign governing her lane of travel and attempted to make a left-hand turn onto Trouble Creek Road from Mary Ann Drive. As a result of her failure to stop for the stop sign, Ms. Ireland's vehicle forcefully struck the front driver's side of the Wilkins vehicle. The force of the collision pushed the Wilkins vehicle off the roadway and into a utility pole on the side of the road.

The force of the collision caused the airbags to deploy and Mr. Wilkins' head to be snapped back and forth violently causing him immediate pain. He also struck his legs on the dashboard.

Law enforcement was contacted and Trooper Sequeira of the Florida Highway Patrol responded to the scene. Ultimately, Gayle Ireland was found at fault and received a citation for failing to stop at the stop sign governing her lane of travel, Citation #ABDV2KE. Please see enclosed long form crash report.

Mrs. Lisa Wilkins accepted the $50k tender from Progressive on 2/22/2021. However, Mr. Mondamin Wilkins pursued litigation. The Jury awarded $936,386.85 against the tort-feasor and $56,221.13 against Progressive.  This B/F suit against Progressive continues.

## II. PARTICIPANTS and WITNESSES

| | | | DEPOSED |
|---|---|---|---|
| Amica | Insurer | Amica Mutual Insurance Company | n/a corp. |
| Arthur | Vehicle owner | Arthur Allen Ireland, Owner of tortfeasor vehicle | |
| Brown | Claim Rep | Shonda Brown (A116908) Progressive | |
| Crawford* | Claim Rep | Camille Crawford (A124714) Progressive | |
| D | Defendant | PROGRESSIVE SELECT INSURANCE COMPANY | |
| DiPasquale | Claim Rep | Nicholas DiPasquale, Progressive | |
| Dreschel | Claim Rep | Jennifer Dreschel, Progressive | |
| Espinal* | Claim Rep | Heimy Espinal (A108608) Progressive | |
| Gorman* | Claim Rep | Lexi Gorman, (A097685) Progressive | |
| Green | Claim Rep | Horgline Green (A134395) Progressive | |
| Hailman | Claim Rep | Janice Hailman, Progressive | |
| Imregi | Claim Rep | Anthony Imregi, Progressive | |
| Ireland | Tortfeasor | Gayle Nicole Ireland, MV operator | |
| Karaus | Amica Claim Rep | Allison Karaus, Amica | |
| Lacey | Claim Rep | W. Douglas Lacey (WDL0001) Progressive | |
| Lisa | P in U/A | Lisa Wilkins | 11/2/2020 |
| McAuley | Claim Rep | Kelly J. McAuley, Esq. (A136267) Progressive Corporate Counsel | |
| Melvan | Claim Rep | Marginia F. Melvan (MXM0219) Progressive | |
| Miller* | Claim Rep | Jacob Miller (A092398) Progressive | |
| Mondamin a/k/a Tony | P | MONDAMIN WILKINS, | 11/2/2020 |
| Montano | Witness | Jennifer Montano, Billing Corporate Representative for Trinity Spine Center, f/k/a Elite Spine and Orthopedics | |
| Nelson | Claim Rep | Jessica L. Nelson (JLN0004) Progressive | |
| O'Brien | Claim Rep | Mark Edward O'Brien (MXO0024) Progressive | |
| Oster | Witness | Andrew Oster, Jr., Billing Corporate Representative for Trinity Spine Center, f/k/a Elite Spine and Orthopedics | |
| P | Plaintiff | MONDAMIN WILKINS, | |
| Perez | Claim Rep | Nicole D. Perez (A113967) Progressive | |
| Pitt | Claim Rep | Jeremy Pitt (A124612) Progressive | |
| Ramirez | Claim Rep | Megan Ramirez (A080103) Progressive | |
| Ricketts* | Claim Rep | Jasminn Ricketts, Progressive | |
| Rodriguez | Claim Rep | Krissi Rodriguez (A085069) Progressive | |
| Roehrs | Claim Rep | John M. Roehrs, Progressive, | |
| Rosario | Claim Rep | Arlene Rosario (A095229) Progressive | |
| Slowey | Claim Rep | Thomas B. Slowey (A089596) Progressive | |
| Starczewski | Claim Rep | Genny Starczewski (A111249) Progressive | |

| | | | |
|---|---|---|---|
| Thomas | Claim Rep | Digna M. Thomas (DXT0162) Progressive | |
| Tinsley | Claim Rep | Tina B. Tinsley, Progressive, Corporate Claims Legal Department, Legal Assistant I | |
| Zellisha | Claim Rep | David L. Zellisha, Progressive, | |
| Zimmer | Claim Rep | Cheryl Zimmer, Esq., Progressive Corporate Counsel | |

*Identified by D in Rule 26 Disclosures #12

## III.   POLICIES

| File: #11 Ex. A; #34; see also #36, #37, #38 and #39 | |
|---|---|
| Insurer | Progressive Select Insurance Co. |
| Policy Number and Type | 920978943; Florida Auto Policy |
| Named Insured | Mondamin Wilkins JR |
| Policy Period | 4/16/2019 to 10/16/2019 |
| Limits | **2018 HYUNDAI SANTA FE 4 DOOR WAGON** VIN: **KM8SM4HF8JU260388** Garaging ZIP Code: 34655 Primary use of the vehicle:  Commute Length of vehicle ownership when policy started or vehicle added: Less than 1 month This vehicle is currently enrolled in the Snapshot $^{SM}$ Program.<br><br>| | Limits | Deductible | Premium |<br>|---|---|---|---|<br>| Liability To Others | | | |<br>|   Bodily Injury Liability | $50,000 each person/$100,000 each accident | | $120 |<br>|   Property Damage Liability | $50,000 each accident | | 152 |<br>| Personal Injury Protection/Deductible applies to Named Insured/Spouse/Dependent Resident Relatives | $10,000 Work Loss Excluded | $1,000/person | 93 |<br>| Uninsured Motorist - Nonstacked | $50,000 each person/$100,000 each accident | | 98 |<br>| Medical Payments | $500 each person | | 11 |<br>| Comprehensive | Actual Cash Value | $500 | 27 |<br>| Collision | Actual Cash Value | $500 | 85 |<br>| Rental Reimbursement | up to $40 each day/maximum 30 days | | 14 |<br>| **Total 6 month policy premium** | | | **$600.00** |<br>| Discount if paid in full | | | -124.00 |<br>| **Total 6 month policy premium if paid in full** | | | **$476.00** | |
| Endorsements *(pertinent to litigation)* | **Selection/Rejection of coverage**<br>If you do not want "Stacked Uninsured Motorist" coverage equal to your Bodily Injury liability limits, you must select one of the options below. You may select Uninsured Motorist coverage limits up to the Bodily Injury liability limits in your policy or you may reject Uninsured Motorist coverage entirely. If you do not reject Uninsured Motorist coverage entirely you may select "Stacked Uninsured Motorist" or "Non-stacked Uninsured Motorist."<br><br>Please select **one** coverage option below and a limit if listed under that option:<br><br>[ ]   **I want Stacked Uninsured Motorist coverage in the same limits as my Bodily Injury liability coverage. (Note: If you select this option the first paragraph of this form shall not apply.)**<br><br>[X]   **I want Non-stacked Uninsured Motorist coverage in the same limits as my Bodily Injury liability coverage.** |
| Claim # | 19-2350589 insured: Wilkins, Mondamin, Jr. |

| File: #32; #189; | |
|---|---|
| Insurer | Amica Mutual Insurance Company |
| Policy Number and Type | 99080927XV; Personal Auto Policy |
| Named Insured | Arthur A. Ireland, Jr., Gayle N. Ireland, Arthur Ireland Sr. |
| Policy Period | 8/23/2018 to 8/23/2019 |
| Limits | (see coverage table below) |
| Claim # | 60003599837 |

|  |  | AUTO 1 2000 LINC | AUTO 2 2019 TOYO | AUTO 3 2017 FORD |
|---|---|---|---|---|
| A. LIABILITY | each person | $ 10,000 | $ 10,000 | $ 10,000 |
| Bodily Injury | each accident | $ 20,000 | $ 20,000 | $ 20,000 |
| Property Damage | each accident | $ 50,000 | $ 50,000 | $ 50,000 |
| B. MEDICAL PAYMENTS | each person | | | |
| C. UNINSURED MOTORISTS # | each person | # $ 10,000 | # $ 10,000 | # $ 10,000 |
| Bodily Injury | each accident | $ 20,000 | $ 20,000 | $ 20,000 |
| D. DAMAGE TO YOUR AUTO (ACV means Actual Cash Value) | | | | |
| 1. Collision Loss | ACV minus deductible of | $ 500 | $ 500 | $ 500 |
| 2. Other Than Collision Loss | ACV minus deductible of | $ 500 | $ 500 | $ 500 |
| TOWING AND LABOR COSTS | each disablement | | | |
| OPTIONAL TRANSPORTATION EXPENSES AUTO 1 AUTO 2 AUTO 3 | | | | |

```
#LIMITS STACKED
FL PERSONAL INJURY PROTECTION        COVERED       COVERED       COVERED
AUTO LOAN/LEASE COVERAGE            NOT COVERED   NOT COVERED     COVERED
```

## IV.    CHRONOLOGY (see also Abstract)

| Date | Event | Description | Source |
|---|---|---|---|
| 072619 | MVA | Ireland negligently operated vehicle owned by Arthur Ireland causing MVA w/ vehicle.  P was a passenger | #11para6; |
| 072619 | FNOL | "07:07 PM ET IMMEDIATE CONCERNS" | #15 PRG1; |
| 102119 | Claim | Lisa – Limits demand | #17 PRG265; |
| | | Mondamin – Limits demand w/ "demand package" | #251; #259; #261; #262; #264; #275; |
| 111819 | Claim | Mondamin – updated medical records, bills incurred $14,302.98 | #266; #267; |
| 112719 | CRN | Mondamin and Lisa - Filing accepted | #11ExB; #7; |
| | D Offer | Mondamin - Progressive offer $1,000 | #107; |
| 120519 | Claim | Mondamin – updated medical records, Bills incurred $31,462.98 | #268, #269; |
| 121719 | D Offer | Mondamin - Progressive offer $8,200 | #75; #108; |
| 122619 | Loss | Lisa in subsequent loss – injury | #15 PRG74; |
| 123119 | Claim | Mondamin – updated medical records Bills incurred $31,998.98 | #270; #271; |
| 011320 | D Offer | Mondamin - Progressive offer $8,200 | #83; #102 |
| 012220 | Claim | Mondamin - release of Ireland (Amica) for $10k | #25; |
| 021120 | U/A | Mondamin and Lisa - Suit filed | #15 PRG59; |
| 061320 | D Offer | Mondamin - Progressive offer $17,000 | #103; |
| 071020 | D Offer | Mondamin - Progressive offer $25,000 | #106; |
| 122920 | D Offer | Mondamin and Lisa - Tender of $50k UIM to each | #16 PRG4896; #89; |
| 022221 | U/A | Lisa accepted tender and released | #15 PRG110; |
| 022222 | D Offer | Mondamin - Tender of $50k UM | #89; |
| 081922 | U/A | Mondamin - Jury awarded $936,386.85 | #11para15; |
| 041423 | U/A | Final J/ in U/A | #11para15; |
| 051024 | U/A | Partial Satisfaction of J. | #14; |
| 070824 | Suit | C/ filed in Pasco County | #11; |
| 080624 | Suit | Ans/ filed in USDC | #13; |

## V.     PLEADINGS, MOTIONS and AFFIDAVITS

| Para | COMPLAINT<br>Locator:  #11<br>Date: 7/8/2024 | ANSWER and AFFIRMATIVE DEFENSES<br>Locator: #13<br>Date: 8/6/2024 |
|---|---|---|
| 1 | ID P | Admit |
| 2 | ID D | Admit |
| 3 | Personal jurisdiction | Admit per Notice of Removal |
| 4 | Subject jurisdiction | Deny P is entitled to > $50k |
| 5 | Venue proper | Admit |
| 6 | 7/26/2019 MVA. Ireland negligent | Admit MVA |
| 7 | P suffered permanent injuries | Deny |
| 8 | Ireland and Arthur carried insufficient BI coverage | Deny info |
| 9 | D provided UM/UIM w/ $50k limit<br>Ex. A - policy | Admit policy<br>Terms speak for themselves |
| 10 | P timely reported claim and made demand | Admit report, records speak for themselves |
| 11 | D refused to pay UM | Deny opportunity to settle UM claim |
| 12 | 11/27/2019 P filed CRN<br>Ex, B - CRN | Admit<br>Ex. B speaks for itself. |
| 13 | 1/21/2020 D continued to deny UM<br>D did not cure | Admit.<br>Response speaks for itself. |
| 14 | P sued D for UM in U/A | Admit U/A speaks for itself. |
| 15 | 8/19/2022 U/A jury award $936,386.85<br>4/14/2023 U/A Final J/ affirmed through appeals | Admit award and J/ speak for itself. |
| 16 | Conditions precedent performed | Deny - lack info. |
| 17 | P retained Gunn Law | Deny – lack info. |
|  | Count I<br>Statutory Bad Faith Pursuant to Fla. Stat. §624.155 | |
| 18 | Reallege | Incorporate |

| | | |
|---|---|---|
| 19 | D refused to pay UM | Deny opportunity to settle UM claim |
| 20 | D accepted coverage for UM | Admit |
| 21 | D failed to investigate and pay | Deny opportunity to settle UM claim |
| 22 | D had duty of G/F | Admit duties Denies all other |
| 23 | D breached duties at 624.155(1)(b)(1) | Deny opportunity to settle UM claim |
| 24 | P has been damaged as a result | Deny |
| 25 | D violation of statute has caused damages | Deny |
| 26 | P was required to retain atty | Deny |
| 27 | P seeks all damages authorized by statute | Deny |
| 28 | | Deny WHEREFORE clause |
| 29 | | Deny all not specifically admitted |
| 30 | | Deny UM claim could have been settled in limits |
| 31 | | Deny P was presented w/ opportunity to settle |
| 32 | | Deny P or attys were willing to settle |
| 33 | | Deny P is entitled to J/ |
| 34 | | Deny liability, negligence, cause and damages |
| 35 | | Deny it did to cause J/ in U/A |
| 36 | | Deny B/F |
| 37 | | Jury demand |
| | | Affirmative Defenses |
| 38 | | Governed by policy |
| 39 | | setoff |
| 40 | | Barred by §624.155(4)(a) as D tendered $50k w/in 90 days of notice of UM claim |
| 41 | | Barred by §624.155(4)(a) as acts are insufficient to state C/A |
| 42 | | P breached duty of G/F |

## VI.    CLAIM FILE

| Page or Bates No. | Doc. Page No. | Content File: |
|---|---|---|
| | See Locator: #9 and #10 | |
| | | |

## VII.    WRITTEN DISCOVERY

### PLAINTIFF'S RESPONSES

| Int. No. | Content: P's Answers to 1st Interrogatories<br>Locator: #<br>Date: |
|---|---|
| | |

### DEFENDANT'S RESPONSES

| Int. No. | Content: D's Answers to 1st Interrogatories<br>Locator: #<br>Date: |
|---|---|
| | |

## VIII.    OTHER DOCUMENTS

| Page No. | Content: CRN re Mondamin<br>Locator: #11 Ex. B; #44; |
|---|---|
| C/ExB | **Reason for Notice**<br><br>Reasons for Notice:<br><br>**Unsatisfactory Settlement Offer**<br><br>**PURSUANT TO SECTION 624.155, F.S.** please indicate all statutory provisions alleged to have been violated.<br><br>**624.155(1)(b)(1)**     **Not attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests.**<br><br>Reference to specific policy language that is relevant to the violation, if any. If the person bringing the civil action is a third party claimant, she or he shall not be required to reference the specific policy language if the authorized insurer has not provided a copy of the policy to the third party claimant pursuant to written request.<br><br>**Uninsured Motorist Coverage (UM)**<br>**If a driver or owner of a vehicle does not have insurance and is legally liable for an accident, you can use UM coverage for injuries, including death, that you, your resident relatives, and occupants of your insured vehicle sustain, up to the limits you select.** |

| Page No. | Content: CRN re Lisa<br>Locator: #45 |
|---|---|
| #45 | **Reason for Notice**<br><br>Reasons for Notice:<br><br>**Unsatisfactory Settlement Offer**<br><br>**PURSUANT TO SECTION 624.155, F.S.** please indicate all statutory provisions alleged to have been violated.<br><br>624.155(1)(b)(1)    Not attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests.<br><br>Reference to specific policy language that is relevant to the violation, if any. If the person bringing the civil action is a third party claimant, she or he shall not be required to reference the specific policy language if the authorized insurer has not provided a copy of the policy to the third party claimant pursuant to written request.<br><br>**Uninsured Motorist Coverage (UM)**<br>If a driver or owner of a vehicle does not have insurance and is legally liable for an accident, you can use UM coverage for injuries, including death, that you, your resident relatives, and occupants of your insured vehicle sustain, up to the limits you select. |

## IX. DEPOSITIONS

| Locator: | Deponent: Lisa Wilkins<br>Date: 11/2/2020<br>Locator: #292 |
|---|---|
| | See Transcript Summary |

| Locator: | Deponent: Mondamin Wilkins<br>Date: 11/2/2020<br>File: #300 |
|---|---|
| | See Transcript Summary |

| Locator: | Deponent:<br>Date:<br>File: |
|---|---|
| | See Transcript Summary |

## X.      EXHIBITS

| Ex. No. | Date of Exhibit | Dropbox Page No. | File: |
|---|---|---|---|
| See Abstract of Correspondence and Claim File | | | |

# DEPO SUMMARY OF CAMILE CRAWFORD, 5.28.25

## Re: Wilkins v Progressive

# EXAM BY DF, Atty Angley

| Pg | Summary |
|----|---------|
| | Pfs: lee Gunn<br>Df: David Angley and Paul Blaise Antoniou<br>DOL/type/location: 7/26/19 Ireland driving with no/low BI insurance.  Progressive provided UM/UIM of $50K/pp.  CRN 11/27/19.  Jury $936K. |
| | **Progressive adjuster**<br><span style="color:red">NOTE: Progressive is deposing it's own witness</span> |
| | **Ex 1:** Claims Notes<br>**Ex 2:** Notice of Change in Claims Rep<br>**Ex 3:** CRN<br>**Ex 4:** Fax to Progressive from Tragos<br>**Ex 5:** Claim info letter, 12.17.19<br>**Ex 7:** Claim info letter, 1.13.20<br>**Ex 8:** Photo of windshield<br>**Ex 9:** Photos of front of car |
| 8 | Never deposed.<br>DOB 11/15/87.<br><br>BS in BA; management at Central State U in Ohio, 2010, and MBA in finance from Wright St U, 2013.<br><br>Adjuster license, 2018; FL All Adjuster.  Only FL. |
| 9 | I'm supervisor at Progressive.<br>July 2018 started at Progressive.  I worked in customer service at another insurer before. |
| 10 | PD adjuster in July 2018 after training x 1 year.  Took leave.<br>Nov 2019 BI w/ atty-rep for BI and UM x 1 year<br>Nov 2020 Supervisor of BI with atty-rep<br>Nov 2024 supervisor of atty-rep and non-rep |
| 13 | Trained for each position.  I still get training.<br><br>Prior to Progressive, I was at ADP as client tax specialist to eval taxes at a state level.<br><br>When I graduated and moved to FL, I worked at Dept of Economic Opportunity in unemployment. |

| Pg | Summary |
|---|---|
| 14 | Then, Aon Hewitt as benefit specialist.<br>Then, Capital Markets as human capital analyst<br>then Sedgwick as customer service rep<br>Then contract HR job.<br><br>ADP to Progressive.<br><br>In Dec 2019, I was an injury adjuster at Progressive for atty-rep for BI or UM: reviewed demands, paid claims.  I was adequately trained. |
| 15 | I handled the Wilkins 7/26/19 MVA UM claim.  I put notes in Claims Notes. |
| 16 | **Ex 1:** Claims Notes, 1-255. |
| 17 | I have a vague recall of this claim.  Only that it was a UM.<br><br>12/4/19 is my 1st note: "Bulk file review".  A file review if we get a claim assigned that somebody already worked.  It was transferred to me.  I reviewed coverage, claimant's date, UM coverage review, our disclosure, reserves, sent change of adjuster letter to introduce myself to Pf's atty, look for demands/offers and did a TTD note.<br><br>I reviewed the Claims Notes to see what was done. |
| 19 | We determined the other driver was at fault, not our insured.<br><br>We had gotten a demand and the prior adjuster extended an offer and I did a TTD on the last offer. |
| 20 | Reserves were $10K; it's set higher than the value. |
| 21 | Wilkins had UM with us, but I don't recall limits.<br><br>I was in the Maitland, FL office.<br><br>**Ex 2:** Notice of Change in Claims Rep to Pf's atty, Peter Sartes at Tragos. |
| 22 | 12/4/19: I noted my liability determination.<br><br>I also made a call to atty's office and spoke with Linda and she said she faxed over additonal documents 11/18/19 and her client was getting additionbal injections and would send additional records once she gets them. |

| Pg | Summary |
|---|---|
| 23 | I don't recall Linda's role.  I didn't get the additional documents from 11/18/19 call.  I don't recall if was ever sent.<br><br>My next TTD was to follow up with the atty for additional records.<br><br>12/9/19 by Cindy Rodriguez, claims processor on admin team that uploads mail.  I don't know her. |
| 24 | She indicates diary to my employee ID that CRN received.<br><br>12/9/19 I noted a call to claimant [sic] carrier that they paid the $10K BI limits.  I don't recall the insurer. |
| 25 | I wanted to confirm their limits and make sure I didn't pay in front of them for the UM.<br><br>Because we got the CRN, I wanted to make sure the claim wasn't valued within their limits and to confirm they paid out so I didn't tender in front of them.<br><br>12/9/19 by Chrissy Rodriguez, my supervisor, ACK/acknowledging the CRN was logged and on diary to review. |
| 26 | NI = named insured, Mr. Wilkins.<br>ID - insured driver<br><br>**Ex 3:** CRN, which I reviewed that day. |
| 27 | CRN is for first party coverage and the last attempt to settle before lawsuit.  That we are not in good faith.<br><br>At this point, none of Wilkins' doctors opined permanency. |
| 28 | We have 60 days to respond to CRN.  The 11/27/19 date puts deadline in Jan 2020. |
| 29 | 12/10/19 Rodriguez mail review.  We got additional records.<br><br>Lisa Wilkins also made a UM claim.  She is "ID".<br><br>I also adjusted Ms. Wilkins' claim. |
| 30 | Rodriguez directed me to review and respond to the additional records.  I detailed it 12/16/19 with my eval.<br><br>Trinity Spine Ctr: 10/24/19-12/2/19. |
| 31 | **Ex 4:** Fax to Progressive from Tragos; the records I reviewed.  There's no demand for limits.  Shows Wilkins had injections 10/28/19 and 12/2/19. |

| Pg | Summary |
|---|---|
| 32 | I didn't get the 10/28/19 record.  Dr. Saldeen didn't opine on permanency.  No future procedures were scheduled.  No reference to surgery or ACDF, except: "Follow up, consider left cervical RFA." |
| 33 | Just for him to consider and decide later.  It wasn't clear if Wilkins would undergo that procedure. |
| 34 | 12/16/19, Wilkins still had PIP remaining. $10K. <br><br> Wilkins had MedPay of $500. |
| 35 | Wilkins had a prior medical history.  He was paralyzed waist down due to a stroke and had 2 prior lumbar surgeries. |
|  | This is my eval of treatment at Trinity Spine and the diagnostic studies of his neck showing degeneration. <br><br> "Accepting injury; aggravation of cervical sprain/strain, with aggravation to DDD." |
| 36 | $3K-5K was my value for that injury.  Based on my training. <br><br> I valued the cervical injections $8-10K. |
| 37 | "Lumbar sprain/strain with 2 prior laminectomies, $3-5K" <br><br> I looked at the facts and based on my knowledge and training gave it a value. <br><br> "Although no lumbar" Lumbar MRI was not completed but I was still considering it. |
| 38 | "Eggshell claimant".  He was wheelchair-bound and had prior lumbar injury he needed invasive treatment.  I still considered it even without diagnostic testing.  It doesn't look like they were focused on that area, but I still gave value for aggravation to prior injury. <br><br> "There is additional $6,948 specials form injections 12/2/19" not yet processed by PIP.  PIP benefits still remained, so I'm only considering the copay, MedPay and PIP deductible. <br><br> Noted it and the out of pockets could go up. <br><br> My range was $8,144-13,144. Including out of pocket |
| 40 | I didn't consider pain and suffering; it hadn't reached the tort threshold. |
| 41 | I didn't consider future care as we didn't have permanency.  I didn't have info on future treatment either. <br><br> PRG 47 asking for authority of $13K and "see eval" |

| Pg | Summary |
|---|---|
| 42 | Supervisor reviews the eval and authorize if they agree.<br><br>12/16/19 Lexi Gorman: supervisor at Maitlan because Rodriguez was out of office.<br><br>I met Gorman in person. We sat and reviewed the claim together. She agreed with my eval. |
| 43 | She increased reserves to $15K. That's not the value of the claim.<br><br>12/17/19: called Pf's atty and offered $8,200. Atty said would not accept less than limits. I faxed and mailed my response. I don't recall the name of the atty. |
| 44 | We did not value the claim at limits. $8,200 was fair. It considered out of pocket medicals. **Ex 5:** Claim info letter, 12.17.19 to Pf's atty and offer. |
| 45 | 12/19/19 by Courtney Sutton, new supervisor that she reviewed response to TLD out.<br><br>12/24/19 I called and spoke with Pf's atty to follow up on my offer. |
| 46 | I don't recall who I spoke with. I discussed there were additional documents that showed 3 injections and scheduled for a surgery consult. But, I had not gotten additional records.<br><br>1/6/20 to review additional treatment and update my eval and submit offer. |
| 47 | As I got additional info, I'd evaluate my offer.<br><br>Note 1/16/20 by Rodriguez received letter 12/31/19 and 12/5/19 for the insured driver, faxed 12/19 with additional medical records she wants me to review and respond. |
| 48 | I reviewed the records which included DOS from Trinity Spine, 12/12/19, but no others.<br><br>"Current Plans" shows Wilkins had no additional injections or procedures since 12/2/19 and none were scheduled. |
| 50 | "Follow Up" Wilkins would consider a procedure, but none was scheduled. Wilkins said he'd think about it. It was not clear if he would undergo additional treatment. No doctor opined permanency. There was a recommendation of RFA, but no surgery. |
| 51 | 1/13/20 my review and eval of the Trinity Spine DOS 12/18/19; I considered the records and bills to date. It's the same as my 12/16/19 eval. |
| 52 | The tort fees had $10K BI, which had been tendered. WE offset it from whatever was paid out in BI. If claim is $20K and tort has $10K, we subtract and offer within the $10K left.<br><br>OOP as of 1/13/20 was $2,278. |

| Pg | Summary |
|---|---|
| 53 | PIP formula:<br>The total amount PIP pay times the .25, which would give you the copay, which is $1,716.13. Then subtract MedPay because we don't subrogate ourselves. I added the deductible for $2,216.13.<br><br>.25 is the percentage that PIP doesn't pay for the copay; it's like their copay.<br><br>"Bills not processed through PIP" is $6,948, but I wanted to consider it, so I multiplied it by 40% for reasonable and customary and x 20% to get the copay of $555.84. |
| 54 | .4 is the FL fee schedule, based on my training.<br><br>.2 is the amount we use to get the copay when PIP hadn't processed payment of a bill. |
| 55 | I took the 2 numbers and added them for $2,278.<br><br>No pain and suffering because there was no permanency.<br><br>My eval range: $7,278-12,278. |
| 56 | 1/13/20 by Rodriguez agreed<br><br>I then called Pf's atty that I had the additional records. I asked where they are with the last offer. He said they're not coming off limits. Also said if Progressive offered limits, they'd have to speak with their client to see if they were even willing to accept limits.<br><br>I asked him to send that they are not willing to negotiate in writing. He said they already did, but I had not received it. I only got additional records.<br><br>I asked again if they are not willing to come off limits, fi they could put in writing for both clients and he agreed.<br><br>They didn't send it. |
| 57 | NOG = named insured owner guest; a passenger. Mr. Wilkins.<br><br>I don't recall which atty I talked to.<br><br>It didn't appear they were willing to negotiate for even the limits at this time.<br><br>I was trying to have a fair resolution and attempted negotiations. |

| Pg | Summary |
|---|---|
| 58 | I sent a letter to the atty of our offer.<br><br>**Ex 7:** Claim info letter, 1.13.20 with $8200 offer.  I didn't get a counter.<br><br>1/20/20 noting my thoughts of CRN. |
| 59 | Considered tort tender.  My listed Rum coverage was $50K non-stacked.  Multilevel findings in c spine with aggravation to DDD.  Multiple injections.<br><br>PIP paid $7900 and OOP $2278.  My eval was accurate.  I made multiple attempts to negotiate, but they refuse to come off limits.<br><br>I said it's moderate impact where the tortfeasor vehicle Tboned claimant vehicle. |
| 60 | I requested to respond to the CRN that the claim is still negotiable; just a value dispute.<br><br>Wilkins still had remaining PIP.<br><br>Since 1/13/20, I got no additional medical records.<br><br>I can't force anyone to negotiate. |
| 61 | The atty didn't agree with my evaluation, but the claim was not valued at $50K.  Still no permanency. |
| 62 | No schedule medial procedures at this time.<br><br>The $8,200 offer included $2,278 OOP.  He's not entitled to pain and suffering if he didn't breach the tort threshold. |
| 63 | 1/20/20 Rodriguez agreed with my eval and to allow CRN to expire.  She directed me to continue to attempt resolution.<br><br>1/21/20 Mark O'Brien, our manager, agreed with CRN response.<br><br>I sent response to CRN database and Pf's atty. |
| 64 | I continued to seek resolution.<br><br>1/27/209 I called Pf's atty, but I don't recall the name.  To follow up on my last offer.  He said clients are not willing to negotiate and filing suit next week. |
| 65 | 2/11/20 called pf's atty, but I don't recall name, following up on my offer.  They wre not willing to negotiate and filed Complaint that day.  I searched Pasco Co website and unable to find it.<br><br>Wilkins was not willing to settle for $50K limits. |

| Pg | Summary |
|---|---|
| 66 | 2/18/20 Rodriguez found the Complaint.<br><br>2/21/20 we had not been served yet. I also called Pf's atty and spoke with assitant, who spoke with the atty. I was told they are not willing to accept limits now. |
| 67 | I continued to follow up with the atty even after this point. Attempt to settle.<br><br>3/2/20 called agains. Spoke with case manager who spoke with the atty. They had nothing else to add.<br><br>I had not received additional treatment records or bills. If I had, I would have evaluated. Still not served with the suit. |
| 68 | 3/11/20, 3/20/20 and 3/30/20: 3 times trying to follow up with Pf's atty. I left messages. 3/30/20 spoke with atty that we were [?not?] served 2/27/20 and asked for the notice.<br><br>3/31/20 Nicole Perez notes Complaint received. |
| 69 | File transfered because suit was filed. I had no further involvement. |
| 70 | Wilkins never breached the tort threshold during my handling. I always tried to evaluate and act in good faith. |
| | # EXAM BY PF, Atty Gunn |
| 71 | I was primary adjuster as of 12/4/19. Suit filed March 2020 and transferre dto a different adjuster. I'm not a litigation adjuster. |
| 72 | Progressive evaluated UM from DOL until CRN filed. I just became an injury adjuster in Nov 2019. I handled BI auto and UM/UIM. It was not my 1st UM. |
| 73 | I started ijury adjusting in Nov 2019 and I got this file Dec 2019.<br><br>Q: What training for cervical epidural steroid injections?<br>A: Training on evaluating. Each claim has different value. |
| 75 | Q: You said your values were based on training. What training?<br>A: Review each claim. |
| 76 | Progressive training. Nothing specific.<br>Q: What training to value 3 ESIs $3-5K? Based on juries?<br>A: No.<br>Q: Database, calcs, guidelines?<br>A: My experience and training. |

| Pg | Summary |
|---|---|
| 78 | I've no medical training. |
| | I have reviewed venues and risks in venues. |
| 79 | I considered it's in Pasco Co, but didn't run a verdict research report. |
| | No guidelines of amounts for certain injuries. |
| | No data or methodology for Wilkins' injuries. |
| 80 | Q: What did they train you for about Wilkins' injuries? |
| | A: What the injuries mean. Each claim gets a range based on the totality. |
| | I considered his preexisting wheelchair injuries. |
| 81 | I consider if the mechanism of injury is consistent with complaints. |
| | **Ex 8:** Photo of windshield of Mr. Wilkins. |
| 82 | I don't recall the vehicle. |
| | Q: It was totaled by Progressive at $22K. |
| | A: I don't recall. |
| | **Ex 9:** Photos of front of car |
| 83 | Q; Assume this is the spiderweb windshield and airbag residue. Would you consider that? |
| | A: Yes. |
| 84 | BI is a bit different than UM. Coverage is the difference. UM is 1st party and BI is 3rd and it depends who is responsible if we pay out. |
| | UM pays the legal liability of the UM/UIM motorist at fault. It was 100% on the UM driver. |
| 85 | q: You evaluate the whole picture of liability; what likely is going to incur in the future. |
| | A: No. |
| 86 | I handled PD. There were times the auto body shop estimated and we'd issue payment. Then they'd start repairs and find more problems and we'd write a supp payment. |
| | PD is 1st party. UM is 1st party. |
| 87 | And, they don't have to go through their own coverage; they could go through tort. |
| 88 | I never handled flooded cars from CAT claims. |
| 89 | Q: Does the UM policy require a release or there's no UM payment? |
| | A: I don't know. |

| Pg | Summary |
|---|---|
| 92 | Full and final release means the end of the claim. I don't understand what you're asking about the release. |
| 93 | q: Does the UM policy condition UM payment on a release?<br>A: Can I take a break?<br>Answer the question.<br>A: I don't recall. |
| 95 | Q: What happens if claimant accepted your $8200 offer and signed a release?<br>A: Settle and protects Progressive from further claim of UM benefits. |
| 96 | I didn't consider a partial payment of UM without a release. I don't recall if I was ever trained to do that. I was trained on UM. |
| 97 | We can request an EUO. If claimant refuses, we have the option to refuse coverage. |
| 98 | I don't recall if it's the same for IME.<br><br>I don't recall if I noticed claimant had not returned a signed medical authorization. I never asked for one.<br><br>I know the difference between reactive and proactive claim adjustment. We proactively seek records and reactive is waiting for them to be received. |
| 99 | We were trained to be proactive. I didn't request info from his HCPs.<br><br>I don't recall if I was trained to write a HCP to ask questions.<br><br>I had access to the PIP adjuster's notes. I saw Trinity's bills there. |
| 100 | I don't expect all those bills are related to the MVA. |
| 101 | Some are not related to the MVA and some bills aren't' reasonable.<br>Q: That would be fraud.<br>A: I don't know how to answer. |
| 102 | Q: Progressive can, like it did here, dispute reasonableness. But they won't provide bills unrelated to MVA without committing fraud.<br>A: Yes. I'll agree it would be fraud. |
| 103 | Q: Agree Wilkins had multiple cervical herniations; his central cord was displaced and radiating pain down his arms.<br>A: He had multi-finding levels in his cervical spine. |

| Pg | Summary |
|---|---|
| 104 | Q: The cervical spine has some hard bone and some soft discs.<br>A: Yes.<br>Q: The disc is the shock absorber that lets bones move without grinding on one another.<br>A: Yes.<br><br>I don't recall if we called it a jelly-filled donut.  I don't recall if we were trained a disc has a hard fibrous shell and a more gelatinous material inside. |
| 105 | I don't recall if we learned that due to trauma, that fibrous shell can be broken and cause herniation or that the gelatinous material gets outside the hard shell.<br><br>I don't recall if we were trained if disruption occurs, it's not going to get reabsorbed and are likely permanent.<br><br>I don't recall if we were trained that gelatinous materials start touching on nerve roots and put pressure on the cord that has radiating pain down the arms. |
| 106 | I don't recall if we were trained when a nerve root is impinged it sends signals to the arms and causes pain and numbness.<br><br>I don't recall if we were trained when a disc protrudes into the cord that can cause significant pain and loss of bodily function.<br><br>I was trained the purpose of conservative treatment like injections is to reduce the inflammation to the soft tissue surrounding a herniated discs for relief. |
| 107 | I don't recall if Wilkins had temporary relief to his ESI. |
| 108 | Q; Did you get trained that oftentimes surgeons want ESI before surgery because that's more likely to fix the problem?<br>A: I don't know how to answer.<br><br>We were trained people usually go through conservative care and increase to invasive. |
| 109 | I agree the fact he's getting conservative treatment doesn't preclude he'll later get surgery. RFA is more invasive, but I need to look it up for specifics. |
| 110 | I would have looked it up for Wilkins, but not noted because it's for my knowledge.  I was trained on RFA. |

| Pg | Summary |
|---|---|
| 111 | Q: Injection is with a sizable needle to reduce inflammation.<br>A: Yes.<br><br>I don't know fluoroscopy.<br><br>RFA uses radio waves to create a current that heats a small area of nerve tissue.<br><br>I would consider that in my evaluation. |
| 112 | Wilkins had some treatment while I worked the claim.<br><br>We have resources explaining injuries. I don't recall if it's on a computer or if it's proprietary. |
| 113 | At my level, we don't send records for medical review. |
| 114 | If I have questions, I ask my supervisor.<br><br>q: Does a herniated disc caused by MVA with radicular complaints meet the tort threshold?<br>A: Depends if we're able to determine if it was caused by the MVA. |
| 115 | q: Is a herniated discs caused by MVA likely permanent?<br>A: Possible. |
| 116 | His records don't say he had permanency. |
| 117 | We look at records objectively and not for ways to not pay.<br><br>Q: You shouldn't read records to be the absence of evidence. You should read records and say they don't say one way or other?<br>A: No.<br><br>Q: Did you think to ask his doctor if there was permanency?<br>A: No. I was provided with records that didn't say permanency. |
| 118 | Q: But you needed that answer of tort threshold to adjust the loss.<br>A: No. I didn't think it necessary considering I received the records. |
| 119 | I disagree with a herniation it's likely permanent.<br><br>I was trained to review the facts and evaluate.<br>Q: How would you determine what a jury would award?<br>A: For our numbers to be fair, we don't' have a tool because every claim is evaluated on its facts. |
| 120 | I don't know what a jury would find for this case. I don't know what the verdict was. |

| Pg | Summary |
|---|---|
| 121 | I don't recall Wilkins' life expectancy. I sometimes use that in evals while looking at age or medical history and how much longer they have. |
| 122 | May put more value with those facts.<br><br>Q: The gross bills were $30K for this claim and was 6 months after DOL when you evaluated and he'll live into the future. He wasn't' at MMI.<br>A: I don't recall if he was MMI.<br><br>I agree my evaluation had a record showing he was to follow up in 1 month. |
| 124 | The adjuster before me offered $1K. I didn't send a partial payment to cover his OOP. I don't recall if I was trained to do that. |
| 125 | The only offer I made before suit was $8200.<br><br>I needed approval to respond to the CRN. She looked and agreed my value was in line and negotiable. |
| 126 | Q: How did your eval look at his paralyzed stroke in a wheelchair with neck injury?<br>A: a lot of value for the aggravation to the prior injury.<br><br>Q: But to adapt because he's already in a wheelchair and now all these neck complaints making daily living more difficult.<br><br>A: I considered his injuries and treatment. |
| 127 | I live in Orlando, 2 hours from Tampa. |
| 128 | I described Wilkins as an eggshell Pf. I considered he was wheelchair-bound with prior injuries.<br><br>12/16/19 eval.<br>Q: Under INJURIES, do you have any record Wilkins had prior herniations?<br>A: I don't believe so. |
| 129 | I agree it's important to know if his complaints are new. I didn't just accept them as new complaints. I didn't know. |
| 130 | Q: Did you consider his injuries as related or exacerbated to the MVA?<br>A: There were a lot from the diagnostic testing or complaints in the records for me to consider. |
| 131 | I didn't know if the injuries were caused by the MVA or if from prior to the MVA. |
| 132 | [Gunn goes over the adjuster code etc] |

| Pg | Summary |
|---|---|
| 133 | I review records and consider the injuries.<br>Q: You considered these injuries related to the MVA because you had no other facts supporting anything than these are new complaints.<br>A: No. Disagree.<br><br>I don't know if these injuries were new or not. They could have been prior, or not. |
| 134 | I don't recall if the doctors had prior history of neck complaints. |
| 135 | Q: What does FL law make someone liable for activation of an underlying disease or injury preexisting condition like the jury is instructed?<br>A: I agree tort fees are liable for aggravation of preexissting. |
| 136 | Q: If a jury can't apportion the amount of injury from the preexisting, a jury is instructed to award damages for the entire condition.<br>A: I don't know.<br><br>Q; If imaging are preexisting, but not causing Wilkins problems until the MVA, you have to consider the activation of complaints from the MVA when evaluating.<br>A: Like aggravation, yes. |
| 137 | *Dexamethasone* is the part of the injection. I looked it up because I didn't know.<br><br>I captured the CPT codes. |
| 138 | The image guidance was used to know what level to put it in.<br><br>I don't recall if I read the consent to an ESI.<br>Q: Wilkins was willing to undergo these injections because pain was enough to take the risk of putting a needle in his cord.<br>A: Yes.<br><br>Ex 1 P 47 Lexi Gorman, supervisor: "CRN alleges Lisa Wilkins..." I agree it's for Ms. Wilkins. |
| 140 | No one has ever talked to me about the average paid claim on my files. I don't know if they track my payment history. |
| 141 | My raises/bonuses are based on performance. I was never told if I'm paying out more or less than the average adjuster. |
| 142 | # EXAM BY DF, Atty Angley |
| | I worked with my supers on my evaluations of Wilkins. They authorized them. |
| 143 | **Ex 5:** Claim info letter, 12.17.19 $8200 offer. It didn't condition a release; just an offer to engage in negotiations. I would have worked out language for a release. |

| Pg | Summary |
|---|---|
| 144 | When I 1st got the file 12/4/19, I called Pf's atty. Made numerous calls there. |
| 145 | I timely reviewed records and followed up on offers. I was proactive.<br><br>12/16/19 diagnostic notes per Trinity Spine. Again, no permanency was ever alleged. |
| 146 | I cut and pasted the medical records from 12/2/19 DOS. Dr. Saldeen didn't say the herniations were caused by the MVA. None of his doctors said they were caused by MVA. Wilkins didn't breach the tort threshold  Therefore, he's not entitled to non-economic damages.<br><br>RFA was never scheduled. No records showed he agreed to RFA.<br><br>He only had 2 injections during my time on the file. No other procedures. |
| 148 | If a doctor opined permanency, I'd expect it to be in the records.<br><br>I fairly considered the medical records provided. |
| 149 | # EXAM BY PF, Atty Gunn |
|  | Q: Tell me 1 proactive step you took to get facts. Not sitting at your desk waiting for Atty Sartes to send you records.<br>A: Reviewed PIP to make sure I wasn't missing anything. Maybe in PIP the Pf's atty didn't send me. |

**Documents Reviewed by Daniel R. Doucette**
**Regarding Wilkins v. Progressive**

| |
|---|
| |
| |
| 1-11.27.19 CRN Faxed - 52535 |
| 2_CRN Response by Progressive |
| Claim File (Part 1 of 2) |
| Claim File (Part 2 of 2) |
| Complaint and Demand for Jury Trial |
| Def Progressive's Rule 26 Initial Disclosures |
| Dkt 4 Def's Answer and Affirmative Defenses |
| Plt Partial Satisfaction of judgment |
| PRG's RRTP - Claim Notes |
| PRG's RRTP - Combined Emails |
| PRG's RRTP - Hard File |
| Progressive's Privilege Log |
| Dkt 24 - Endorsed Order |
| Dkt. 22 - Case Management & Scheduling Order |

| |
|---|
| |
| **Amica BI Correspondence** |

| |
|---|
| Amica - 627 LOR.docx |
| Amica - 627 LOR.pdf |

EXECUTED RELEASE

| |
|---|
| Message Sent 32387125 - FAX CONF RELEASE SENT msg |
| Wilkins L- Cert Rec 627 |

| |
|---|
| **Amica Demand** |

| |
|---|
| 9.23.19 COMPLETE DEMAND PACKAGE |

| |
|---|
| **Auto Policies** |
| **AMICA BI** |

| |
|---|
| Wilkins- Amica- Ireland Full Policy |

| |
|---|
| **PROGRESSIVE** |

Wilkins- Progressive- Full Policy- in booklet form

| |
|---|
| **claim19-2189421date20201124** |

| |
|---|
| WILKINS JR, MONDAMIN_Coverage_PolicyDocuments_1_12-28-2019 |
| WILKINS JR, MONDAMIN_Coverage_PolicyDocuments_1_12-28-2019 |
| WILKINS JR, MONDAMIN_Coverage_PolicyDocuments_3_11-21-2020 |
| WILKINS JR, MONDAMIN_Coverage_PolicyDocuments_3_11-21-2020 |
| **Civil Remedy** |
| 11.27.19 ltr to UMI re CRN |
| 12.5.19 faxed 2nd suppl demand |
| 12.31.2019 3rd suppl ltr to UMI - trinity spine |
| Filing- Mondamin |
| Filing-lisa |
| **UPDATED RECORDS TO ADJUSTER** |
| Fax Message Transmission Result to +1 (877) 2137258 - Sent |
| Mondamin - Trinity Health Care updated records |
| Mondamin - Trinity Heath Care updated bill |
| Mondaminn Trinity Spine updated records and bills |
| **Correspondence** |
| **OC CORRESPONDENCE** |
| 1.14.21 Ltr from OC re HIPAA for Client to sign |
| 1.15.21 PDF authorization_for_records_hipaa-signed |
| 3.30.21 Authorization to be signed |
| 3.31.21 Signed AMITA Authorization |
| 6.22.2020 Wilkins 10-DAY LTR.doc |
| 6.22.2020 Wilkins 10-DAY LTR.pdf |
| 8.26.21 Cover Letter for Gulf Coast MRI |
| Mondamin and Lisa Wilkins v Progressive |
| Mondamin and Lisa Wilkins v Progressive |
| PDF copy Letter to Opposing Attorney re Auth_10566441 |
| RE EXTERNAL |
| Wicker Smith - Correspondence re Proof of service |
| Wilkins 10-day Draft |
| Wilkins letter re 50k.pdf |
| Wilkins letter to OC re 50k.doc |
| **2.25.2022 ltr with medicare authorizations** |
| 13568759 MEDICARE-Signed |
| 13568759 MEDICARE |
| **Settlement Conf correspondence** |
| This folder is empty |

| PROGRESSIVE CORRESPONDENCE |
|---|
| 7.31.19 Progressive PIP - Faxed LOR |
| 12.17.19 Progressive UM Office 8200.00 |
| personal injury protection page 1 Tony |
| personal injury protection page 2 Tony |
| Progressive - PIP APP (tony) |
| Progressive - PIP DOCS |
| Progressive PIP - LOR doc |
| Progressive PIP - LOR pdf |
| Wilkins check return ltr 4.26.24 |
| Wilkins M- Progressive- confirm offer |
| Wilkins M- Progressive- waive medpay |
| Wilkins- Progressive- PIP exhausted |
| **PROGRESSIVE UMI** |
| 1.21.2020 ltr from progressive waiving Subro |
| 10.23.19 ltr to UM ASKING FOR PERMISSION TO SETTLE |
| 2.22.2022 response to demand of 250K - offer of 50K |
| 3.31.2020 ltr from insurer confirming ext to answer complaint |
| 9.9.19 UM LOR AND REQUEST FOR UM PERMISSION TO SETTLE - FAX CONF |
| 9.9.19 UM LOR AND REQUEST FOR UM PERMISSION TO SETTLE |
| 10.23.19 ltr to UM ASKING FOR PERMISSION TO SETTLE |
| Wilkins M- Progressive new rep |
| Wilkins M- Progressive- Cert Rec |
| Wilkins M- Progressive- insufficient info |
| Wilkins M- Progressive- new rep |
| Wilkins- Progressive- ext answer |
| **CORRESPONDENCE RETURNING SETTLEMENT CHECK** |
| This folder is empty |
| **OFFERS** |
| 1.13.202 progressive offer of 8200.00 |
| 6.13.2020 OFFER OF 17K |
| 6.15.2020 offer of 17K |
| RE CLAIM NO 19-2350589 WILKINS |
| Wilkins M- Progressive- offer UM |
| Wilkins M- Progressive- offer unchanged |
| Wilkins M- Progressive- UM offer |
| **UPDATED RECORDS TO ADJUSTER** |

Mondamin - Trinity Heath Care updated bill

| DEPOSITION |
|---|
| 2-2-22 Email to Dave--- Depo for Trinity Center billing manager--Phone Call Wilkins case |
| 6.23.2020 Notice Of Taking Deposition of Plaintiffs on 11.2.2020 |
| 6.25.20 Amended Notice Of Taking Deposition |
| Amended Notice Of Taking Deposition |
| Deposition Location |
| HAYES CV FROM DEPO FILE |
| Recs Depo Hayes and Saldin (1) |
| SALDIN CV FROM DEPO RECORDS |
| **DR. SALDIN - ELITE SPINE** |
| KS CASES (2) |
| NOTD FOR 3.22.2022 |
| SALDIN CV |
| subpoena |
| **DR. VICTOR HAYES - ELITE SPINE** |
| amended NOTD for 4.14.2022 |
| HAYES CV FROM DEPO FILE |
| NOTD FOR 3.14.2022 |
| subpoena |
| VHCASES (1) |
| **Feb 1-22 Emails regarding Depos from OC** |
| This folder is empty |
| **KIRBY DEPO** |
| Notice Of Taking Deposition |
| **LILES DEPO NOTICE** |
| Notice Of Taking Deposition |
| RE Wilkins |
| **MONTANO, JENNIFER -ELITE SPINE** |
| Exhibit 1 NODDT |
| Exhibit 3 CV for Julie Montano |
| Exhibit 4 Account Financial History by Service Date |
| Exhibit |
| Ltr to Hanes re Obj and MPO - Montano |
| NOTD FOR 3.24.2022 |
| NOTD FOR 3.24.2022(1) |
| Objection |
| SUBPOENA FOR TRIAL |
| SUBPOENA FOR TRIAL(1) |

| |
|---|
| **OSTER, ANDREW - ELITE SPINE** |
| N-CANCELLATION FOR 2.21.2022 DEPO |
| NOTD OSTER 2.21.22 |
| Recs Depo Oster |
| SUBPOENA FOR DEPO |
| **Trinity Wilkins Recs Depo Oster** |
| Recs Depo Oster |
| **SCHEDULING EMAILS** |
| Wilkins Mondamin and Lisa vs Progressive Select Insurance Company |
| **TRINITY HEALTH CARE BILLING AGENT** |
| 2.21.2022 notice of cancelation |
| NOTD FOR 2.22.22 |
| **Fee Agreements** |
| EXECUTED TST FEE AGREEMENT |
| WILKINS__MONDAMIN_-_TST_FEE_AGREEMENT_DOCS |
| **NPNP** |
| 4.28.21 Notice Of Completion Or Compliance |
| 6.16.20 Notice Of Production From Non Party (003) |
| 6.24.20 Response NO Obj |
| 9.28.20 Notice of Production From Non Party (1) |
| 9.28.20 Notice Of Production From Non Party (2) |

Certificate Of Non-Objectionpd

| |
|---|
| **2.16.2022** |
| 2.16.2022 notice of non party |
| 2.25.2022 REQUEST FOR COPIES.DOCX |
| 2.25.2022 REQUEST FOR COPIES |
| Certificate Of Non-Objection |
| Request For Copies |
| **2.22.2022 Nonparty** |
| 3.4.2022 REQUEST FOR COPIESdocx |
| 3.4.2022 REQUEST FOR COPIES |
| Certificate Of Non-Objection |
| Notice Of Production From Non Party |
| Request For Copies |
| **April 28 2021** |
| FW Wilkins Mondamin and Lisa vs Progressive Select Insurance Company |
| Notice of Partial Compliance |
| **DOCS** |
| AdventHealth North Pinellas - Medical Records |

| |
|---|
| AdventHealth Tampa - Radiology Studies Disc |
| Amica Mutual Insurance Company - Insurance Records |
| Apollo Medical Group - Medical Reports and Radiology Reports |
| BayCare HomeCare - Medical Records and Billing Records |
| Doctors Urgent Care - Medical Records and Billing Records |
| FastMD - No Records Response |
| Florida Cardiology Group - Billing Records |
| Florida Medical Clinic, LLC - No Records Response |
| Gulf Coast MRI - Medical Records, Billing Records, and Radiology Reports |
| Humana - Insurance Records and Billing Records |
| Invoice for Copies |
| Notice of Partial Compliance |
| Publix Pharmacy - Pharmacy Records |
| Tampa Bay Surgical Group - No Records Response |
| Torbert Emergency Physicians, LLC - Billing Records |
| Torbert Emergency Physicians, LLC - Medical Records and Radiology Reports |
| UF Health Shands Hospital - Medical Records and Billing Records |
| Wal-Mart Pharmacy - No Records Response |
| **Def NPNP United Health** |
| 10970840 |
| Certificate Of Non-Objection |
| Notice Of Production From Non Party |
| PDF copy LR to Opposing Attorney enclosing authorizatios to be |
| **Draft** |
| 6.24.20 P LW No objection draft |
| 6.24.20 P MW No objection draft |
| WILKINS M No objection draft |
| **July 14, 2021** |
| 12.14.21 Request for Copiesdocx |
| 12.14.21 Request for Copies |
| Notice of Production from Non-Party |
| Request For Copies |
| **July 21, 2021** |
| 12.14.21 Request for Copies.docx |
| 12.14.21 Request for Copies |
| Certificate Of Non-Objection |

| |
|---|
| Notice of Production from Non-Party |
| Request For Copies |
| **June 16, 2020** |
| 6.16.20 Notice Of Production From Non Party (003) |

6.24.20 Response NO Obj

| |
|---|
| **September 28, 2020** |
| 9.28.20 Notice of Production From Non Party (1) |
| 9.28.20 Notice Of Production From Non Party (2) |
| Request for Copies-Lisa |
| Request for Copies-Mondamin |
| **RESPONSE** |
| 4.28.21 Notice Of Completion Or Compliance |
| Notice of Partial Compliance |
| **DOCS** |
| AdventHealth North Pinellas - Medical Records |
| AdventHealth Tampa - Radiology Studies Disc |
| Amica Mutual Insurance Company - Insurance Records |
| Apollo Medical Group - Medical Reports and Radiology Reports |
| BayCare HomeCare - Medical Records and Billing Records |
| Doctors Urgent Care - Medical Records and Billing Records |
| FastMD - No Records Response |
| Florida Cardiology Group - Billing Records |

Florida Medical Clinic, LLC - No Records Response

| |
|---|
| Humana - Insurance Records and Billing Records |
| Invoice for Copies |
| Notice of Partial Compliance |
| Publix Pharmacy - Pharmacy Records |
| Tampa Bay Surgical Group - No Records Response |
| Torbert Emergency Physicians, LLC - Billing Records |
| UF Health Shands Hospital - Medical Records and Billing Records |
| Wal-Mart Pharmacy - No Records Response |
| **Outlook Emails and Calendar Entries** |
| Export-11-12-24 |

privilege log

| |
|---|
| **UMI Demand** |
| 10.21.19 Fax Insurance Adjuster DEMAND |
| 10.21.19 POSTAGE RECEIPT |
| 10.21.19 UMI DEMAND.docx |

10.21.19 UMI DEMAND

| |
|---|
| 10.21.2019 COMPLETE DEMAND PACKAGE |
| 10.21.2019 FINAL DEMAND SUMMARY FAX CONF |
| 10.21.2019 FINAL DEMAND SUMMARY |
| 11.18.19 SUPPL TO UMI DEMAND |
| 11.18.19 SUPPLEMENT TO UMI DEMAND |

12.5.19 2nd suppl ltr to UMI - trinity spine

12.5.19 faxed 2nd suppl demand

| |
|---|
| 12.31.2019 3rd suppl ltr to UMI - trinity spine.docx |
| 12.31.2019 3rd suppl ltr to UMI - trinity spine |
| Message Sent 31939729 - fax conf 3rd supp sent |
| Wilkins M- UM Claim Ntc Cert Rec |
| **Demand.zip** |
| 10.21.19 Fax Insurance Adjuster DEMAND.docx |
| 10.21.19 POSTAGE RECEIPT |
| 10.21.19 UMI DEMAND,docx |
| 10.21.19 UMI DEMAND |

10.21.2019 COMPLETE DEMAND PACKAGE

| |
|---|
| 10.21.2019 FINAL DEMAND SUMMARY FAX CONF |
| 10.21.2019 FINAL DEMAND SUMMARY |
| 11.18.19 SUPPL TO UMI DEMAND |
| 11.18.19 SUPPLEMENT TO UMI DEMAND |
| 12.31.2019 3rd suppl ltr to UMI - trinity spine |
| 12.5.19 2nd suppl ltr to UMI - trinity spine |
| 12.5.19 faxed 2nd suppl demand |
| Message Sent 31939729 - fax conf 3rd supp sent |
| Wilkins M- UM Claim Ntc Cert Rec |
| **Depostitions** |
| **TRANSCRIPTS - LISA** |
| 5774544 Wilkins.Lisa 110220_AMICUS.txt |
| 5774544 Wilkins.Lisa 110220.fullprint |

5774544 Wilkins.Lisa 110220.fullprint

| |
|---|
| 5774544 Wilkins.Lisa 110220.index |
| 5774544 Wilkins.Lisa 110220.miniprint |
| 5774544 Wilkins.Lisa 110220 |
| 5774544 Wilkins.Lisa 110220,txt |
| **TRANSCRIPTS - M** |
| 5774544 Wilkins.Mondamin 110220_AMICUS,txt |
| 5774544 Wilkins.Mondamin 110220.full |
| 5774544 Wilkins.Mondamin 110220.fullprint |
| 5774544 Wilkins.Mondamin 110220.miniprint |
| 5774544 Wilkins.Mondamin 110220,ptx |

| 5774544 Wilkins.Mondamin 110220.txt |
|---|

Mondamin Wilkins 5/7/25
Mondamin Wilkins 5/21/25
Lexi Gorman 5/5/25
Camille Crawford 5/28/25

|  |
|---|
| Notice of Deposition - Doucette |

**1**
**Daniel R. Doucette**
*Doucette & Associates*
*16800 W. Greenfield Avenue, Suite 124*
*Brookfield, WI  53005*
*O:  (239) 244-9388*
*C:  (262) 391-3246*
[Dan@doucetteassociates.com](mailto:Dan@doucetteassociates.com)

*Former insurance executive and trial lawyer, Mr. Doucette brings to the forensic consulting practice an extensive knowledge of insurance coupled with an intimate knowledge of the court system and trial tactics.*

## Career History

### Doucette & Associates, Waukesha, WI                                    2012 – Present
*Mr. Doucette is the principal in Doucette & Associates, a forensic consulting firm, focused on insurance coverage questions and bad faith litigation.*

### Milwaukee Insurance Group, Milwaukee WI                          1988-2012
### 1974-1976
*This multi-line group of insurance companies consisted of multiple property and casualty companies, a life insurance subsidiary and affiliated businesses.  It was a combination of a publicly traded holding company and a mutual insurance company parent.  Through acquisitions and mergers, the group went through a number of corporate changes and affiliations.  The public holding company and its downstream affiliates were acquired by a NYSE listed company.  The mutual insurance company then converted to a holding company and acquired/merged with the First Nonprofit Insurance Group based in Chicago, IL.*

### Chairman                                                                                    2005-2011
*Mr. Doucette had corporate responsibility for all activity of the group including Milwaukee Insurance Company and First Nonprofit Insurance Company as well as the subsidiaries and affiliates.  He was a member of the Claim Review Committee actively involved in reviewing and managing significant claims.*

### Chief Executive Officer                                                              1991-2005
*In 1991, Mr. Doucette assumed the CEO role including all P&L responsibility for the principal operations as well as all subsidiaries including the life insurance subsidiary and leasing affiliates.*

### Chief Operating Officer                                                            1990-1991
*In 1990, Mr. Doucette assumed full P&L responsibility for the group with the exception, at that time, of the life insurance subsidiary.  Responsibilities included all operational reports, all financial reports, as well as the agency operations.  During this period, all claim managers reported directly to Mr. Doucette and he remained actively involved in the management of all significant claims.*

## Exhibit 1

**Vice President of Legal – Vice President of Claims**                               *1988-1990*
*In this position, Mr. Doucette had complete responsibility for all litigation and claim activity on behalf of the group throughout its multiple state operations.*

**Associate Counsel – Litigation Supervisor & Claim Manager**                   *1974-1976*
*During this period, Mr. Doucette operated as in-house counsel, litigation supervisor and claim manager.*

**McCusker Law Office – Law Clerk/Investigator**                               *1971-1974*
*While in law school, Mr. Doucette worked for McCusker Law Office, a small, Madison based firm specializing in complex plaintiff cases.*

**College Intern – Claims Adjuster**                                           *1967-1971*

**Kluwin, Dunphy, Hankin & McNulty (Hinshaw & Culbertson), Milwaukee, WI**

**Managing Partner – Litigator**                                              *1976-1988*
*Mr. Doucette was an active trial litigator and a managing partner of the firm. He specialized in insurance related matters. In addition to his litigation and management activities, Mr. Doucette was an active lecturer, author and active in both state and national bar organizations.*

*In addition, Mr. Doucette acted as the defacto claim manager for a professional liability program underwritten in London.*

## *Education*

**University of Wisconsin, Madison, WI, Juris Doctor**                         *1971-1974*

**Boston College, Boston, MA**                                                *1967-1971*
*Bachelor of Science in Business Administration with a Major in Accounting-Magna cum Laude*

## *Organizational Involvement*

- *Young President's Organization/World President's Organization – Member 1991 to Present*
- *State Bar of Wisconsin – Member*
- *Defense Research & Trial Lawyers Association – Past Member & Officer*
- *The International Society of Air Safety Investigators – Past Member*
- *International Association of Defense Counsel – Past Member*
- *Lawyer-Pilot Bar Association – Past Member*
- *Marquette University Law School – Past Instructor-Trial Practice*



**Doucette & Associates**

*Forensic Consulting*
*Bad Faith & Insurance Coverage*
*Offices in Wisconsin & Florida*

16800 W. Greenfield Avenue
Suite 124
Brookfield, WI 53005
Office: 239/244-9388
Cell: 262/391-3246
dan@doucetteassociates.com
www.doucetteassociates.com

*Daniel R. Doucette*
*President*

## RETAINER AGREEMENT

### General Information

This agreement covers the terms and conditions of the retention of Doucette & Associates by your firm, Gunn Law Group, P.A., to participate in a matter entitled Wilkins v. Progressive.

In order for the retention agreement to become effective, a non-refundable retainer of $5,000.00 and a signed copy of this Agreement must be received.

Daniel Doucette agrees that he will author all reports and will be responsible for all testimony unless otherwise agreed or requested by the client. Other general review of materials may be performed by associate counsel or paralegal.

### Fee Schedule

The fee schedule is:
Daniel Doucette is billed at $475 per hour.
Associate Counsel is billed at $250 per hour.
Paralegal assistance is billed at $150 per hour.

All reasonable expenses will be reimbursed by the client. All out-of-pocket expenses, if any, (ground transportation, lodging, parking, mileage, etc.) are billed at cost. Travel time, outside of the area, will be charged at $250 per hour.

The client will be billed at regular intervals dependent upon the nature and volume of work involved.

All checks should be made payable to Doucette & Associates. The federal tax identification number is 39-1868920.

### Daubert

Client agrees that in the event a Daubert motion or similar state court motion is filed challenging the testimony of Mr. Doucette, copies of the moving papers and briefs will be forwarded to Mr. Doucette and counsel will work with him in preparation of a response.

Doucette & Associates agree they will not incur any extraordinary expenses, or in other ways change the terms of this Retainer Agreement, without the expressed consent of the retaining attorney.

Please sign below indicating your acceptance of the terms of this Agreement and return an executed copy to our office via email or U.S. mail.

Doucette & Associates, Inc.                    Gunn Law Group, P.A.

By:_____          By:_____
    Daniel R. Doucette                          L. Delton Gunn, V

Date:  3/18/25                          Date:_____

# DEPO SUMMARY OF LEXI GORMAN, 5.5.25

## Re: Wilkins v Progressive

# EXAM BY DF, Atty Angley

| Pg | Summary |
|---|---|
| | Pfs: Peter Sartes<br>Df: David Angley and Blaise Antoniou<br><br>DOL/type/location: 7/26/19 Ireland driving with no/low BI insurance.  Progressive provided UM/UIM of $50K/pp.  CRN 11/27/19.  Jury $936K. |
| | <mark>**Claims Manager w/ 2 entries on 12/16/19 ONLY**</mark><br><span style="color:red">NOTE: Progressive is deposing it's own witness</span> |
| | **Ex 1:** Claims Notes<br>**Ex 2:** Demand letter 10.10.19<br>**Ex 3:** Letter Tragos to Progressive, 12.5.19 |
| 7 | Never deposed. |
| 8 | BS, U of Central FL, 2014, psychology and interpersonal and organizational communication.  I have an all-adjuster's license in FL.<br><br>I'm claims manager at Progressive. |
| 9 | At Progressive 11 years.<br>Training 4 months while getting licensed.<br>Claims generalist x 1 year, auto PD<br>BI in auto claims with soft tissue, 2years - BI claims and UM<br>Pre-lit injury in casualty x 1.5 years and leadership<br>Supervisor 1.5 years<br>Supervisor in casualty 3 years<br>supervisor in medical claims of 1st party.<br>Dec 2022 promoted to a claims manager and current. |
| 10 | No prior insurance work prior to 2014.<br><br>I got trained for each job position.  Online, job-specific, job shadowing, hands-on. |

| Pg | Summary |
|---|---|
| 11 | I felt adequately trained for each role.  I still get training.<br><br>I was 22 when I started at Progressive.  Before that was hospitality and management at restaurants and a bankruptcy atty in my jr and sr years of college for AB Crouch.<br><br>I was an unpaid intern for research assistant. |
| 12 | At Crouch's, I met clients for details and assisted the lawyer.<br><br>Got my adjuster license July 2014.  Only FL.  No other certifications.<br><br>Dec 2019 I was supervisor in the casualty department for soft tissue, atty-rep in pre-litigaiton.<br><br>I had 6-7 reports for BI and UM. |
| 13 | By Dec 2019, I had adjusted/supervised BI 4-5 years.<br><br>Our Claims Notes are called *face sheet notes*, electronic. |
| 15 | **Ex 1:** Claims Notes , 255 pages. |
| 16 | Wilkins had a UM claim under his auto with Progressive. $50K/100K, non-stacked. |
| 17 | 12/16/19 are the only entries in this file.  I authorized the evaluation upon new info receiuved by the adjuster Camille Crawford.  I was not her supervisor.  Her supervisor was out of the office, Kristen Rodriguez. |
| 18 | I assisted with time limit demands or uregent requests when she was on paid time off.<br><br>I was in Matitland, FL with Crawford and Rodriguez at the time. |
| 19 | 12/16/19 at 1:44 after meeting with Crawford on the floor.  We had cubicles.  She was ~200' away.  It was my practice to discuss timed demands with adjusters. |
| 20 | We reviewed the records and evaluation.  She received additional records and we reviewed them together that hwat she was documenting had occured per the records.<br><br>We discussed her evaluation.<br><br>12/16/19 at 126pm: adjuster received additional documents.  Her entry detailed his treatment. |
| 21 | Wilkins had injections in Oct and Dec.<br><br>There was a CRN, not a timed demand. |

| Pg | Summary |
|---|---|
| 22 | What triggered her evaluation was the authority amount.  Hers was $10K.<br><br>"Received treatment documents; Trinity Spine Ctr 10/24/19-12/2/19."  I also reviewed the records. |
| 23 | **Ex 2:** Demand letter 10.10.19<br>12/5/19 fax from Tragos to Progressive with the records.  Crawford only entered info re these records that day. |
| 24 | DOS 12/2/19 Dr. Victor Hayes for injection: medial branch blocks.  Prior epidural steroid injection.<br><br>Progressive didn't get the 10/28/19 DOS injection.  It was not with the Ex 2. |
| 25 | There was no note re surgery with the Dec records, but showed: "follow up: left cervical RFA/radiofreequency ablation, was an option."  It wasn't scheduled.  It wasn't clear on this record if Wilkins would undergo RFA.<br><br>The 12/12/19 records doesn't have any plans for a ACDF/interior cervical discectomy fusion. |
| 26 | Dr. Kamaldeen Saldin signed the 12/12/19 record.  No permancy shown.<br><br>Based on this billing record it shows DOS 11/11/19, but the office visit wasn't enclosed. |
| 27 | Wilkins had PIP, which wsere not exhausted at this point.  He had MedPay with his policy too.<br><br>PIP reflects a change to out of pockets.<br><br>Wilkins had a prior medical history: he was paralyzed, which we considered. |
| 28 | 12/16/19 Crawford had noted prior demands.<br><br>At one point, there was a dmeand for limits.  There was an original evaluation and after additional treatment, Crawford updated it. |
| 29 | 12/16/19 Crawford note requests authorization for $13K for evaluation range of $8100-13,144. |
| 30 | In addition to the Dec records, I would have also looked at all records available.<br><br>**Ex 3:** Letter Tragos to Progressive, 12.5.19 with records and this is what I discussed with crawford. |

| Pg | Summary |
|---|---|
| 31 | Wilkins had conservative chiropractic and PT.<br><br>Wilkins was taken to the ER. I don't recall if he was admitted or released. Looking at the record now, it shows entred ER 1:39 and discharged 3:26, so he was not admitted. |
| 32 | The chiro treatment was at Trinity Health. 7 sessions.<br><br>He also presented to Trinity Spine 9/11/19 to Victor Hayes. I see no permanency. |
| 33 | The plan 9/11/19 was dosepak, continued therapy, potentially injection if pain didn't resolve and ACDF "wasn't" [?sic?] optional if they did not work.<br><br>No injections or surgery was scheduled in Sept. Injections may or may not occur.<br><br>Wilkins returned to Trinity Spine 10/9/19 with Dr. Saldin. |
| 34 | Dr. Saldin listed very similar plans: injections. No permanency given.<br><br>7/16/19 Crawford note: details the treatment. "Based off prior evaluation, CTL/cervical thoracic lumbar; SS/sprain/strain; cervical AGG/aggravation; DDD/degnerative disc disease." |
| 35 | Crawford accepted a sprain/strain with aggravation to the cervical spine and DDD. |
| 36 | Crawford valued $3-5K and for 5 cervical injections at $8K-10K.<br><br>She also apportioned for the low back $3K-5K.<br><br>These are values to resolve the claim. |
| 37 | Crawford noted injections were not billed or processed by PIP. She considered out of pockets for copya, MedPay liena nd $1K PIP deductible. The bills taht are submitted potentially reduce collateral payments.<br><br>Her evaluation range was $8,144-13,144. |
| 38 | The tort threshold in FL is that there can be no claim for damages for pain or suffering unless the threshold has been breahced: death, disfigurement, loss of bodily function and a permanent injury.<br><br>Wilkins had not breached a tort threshold. He's not entitled to non-econominc dmaages like pain and suffering. |

| Pg | Summary |
|---|---|
| 39 | Crawford's authority was $10K.  She requests through the Claims Notes and it generates a diary.<br><br>After meeting with her, I autghorized the $13K.  I agreed with her evbaluation.  It's based on experience and training. |
| 40 | I noted: "multiple injections, eggshell claimant are driving value."  Eggshell is predisposed to injuries based on preexisting.<br><br>I increased the reserves when I authorized her $13K, to $15K.  Reserves holds funds for worst case evaluation.<br><br>Doesn't mean the value was at $15K. |
| 41 | 12/16/19 relates to Ms. Wilkins.<br><br>I had no further involvement in the claim.<br><br>I always attempt a fair and reasonable evaluation, and in good faith. |
| 42 | # EXAM BY PF, Atty Gunn |
|  | Q: How did Progressive adjust UM differently from BI.<br>A; Taking any potential tort liability available as an offset on the evaluation.  Nothing else. |
| 44 | Insured reports BI to receive all benefits.  Investigate.  For hit and runs, you need an accident report. |
| 45 | If claiming a phantom vehicle, policy requires an accident report.  We don't' know there was a another car involved.  But here, we knew who the other driver was and tenant coverage. |
| 46 | Progressive investigates, looks at coverage and liability. |
| 47 | WE investigate UM like any other.  Statements, police report.<br><br>I don't know how long it took us to investigate liability here.  We accepted 100% on the UM driver. |
| 48 | UM stands in that person's shoes to determine liability.  Customer buys UM for coverage for our insured.  It's important coverage. |
| 49 | FL requires a rejection form to modify stacked UM.  It protects families from UM/UIM drivers. |
| 50 | We evaluate with medical treatment, injuries and out of pockets; usually provided by Pf's counsel. |

| Pg | Summary |
|---|---|
| 51 | UM is kept in the same file as the PIP MedPay file.  I can look at diagnostic codes and charges.<br><br>The UM adjuster did not ask for a medical authorization. |
| 52 | Q: What about the PIP adjuster?<br>A: It's included in the no-fault application; an assignment of benefits and medical authorization.<br>Q: Can the UM adjuster use that PIP authorization?<br>A: For a 1st party claim, yes, if completed.  It was not completed in this file. |
| 53 | Q: Did UM adjuster ask the PIP adjuster to get a signed authorization?<br>A: I don't recall.  She could have. |
| 54 | The cervical MRI showed herniations and osteophytes at multi-levels. |
| 55 | **Ex 3:** Letter Tragos to Progressive, 12.5.19 [?or 10/21/19 records?].  CT of C spine has C4-5 positive dermatomes. |
| 56 | The letter summarizes the treatment by the Pf's atty.  I can't say accurately or not. |
| 58 | It's acceptable for Pf's counsel to just send records without a summary.  Atty Sartes did it in hopes it will assist us resolve/pay. |
| 59 | We don't require a demand to pay a UM claim.    We investigate and make prompt, fair payments.<br><br>I'm not a lawyer. |
| 60 | The $50K was an offer to settle the UM claim; not policy limits.<br><br>Q: The offer was based on a full and final, which means, if you take the $8K+, the $41K+ is gone and you can't have that.<br>A; Correct. |
| 61 | Q: If Progressive thought there'd be future and pay $25K today, but leave the UM claim open for additional info, and maybe we'll pay up to $50K?<br>A; It could have happened.  That is not standard for evaluating claims. |
| 62 | WE evaluate info available and determine a reasonable value.<br><br>I'm not a radiologist. |
| 63 | If we want a 2nd opinion, we have tools.  That was not done prior to my involvement in this claim.<br><br>We accepted an aggravation to cervical. |

| Pg | Summary |
|---|---|
| 64 | We didn't have pre-existing records.<br>Q: No good faith basis to dispute the treatment for neck.<br>A: I agree I had no medical evaluation indicating the discs were not from the MVA. |
| 65 | I have significant experience with soft tissue claims.<br><br>The doctor didn't give permanency. We did not ask the doctor. We didn't do a record review before my time. |
| 66 | IME was an option. We choose not to at that time. |
| 67 | The doctor didn't feel the patient was a good candidate for neck surgery based on prior injuries due to risks. |
| 68 | Q: Because he was paralyzed waist down.<br>A; Show me the record.<br><br>It was based on risk. Also outline to that hopefully that level of treatment would not be needed and alternative treatments could be explored. |
| 69 | I don't know how big the needle is for injections. I've seen it.<br><br>I consider if somebody has injections is likely experiencing significant pain.<br><br>I wont' say ESI is temporary; it's case-by-case.<br><br>We didn't ask a doctor for future care needs. I can't say what his future care would be with certainty. |
| 70 | Q: Is the standard to evaluate that the claimant must demonstrate future care to a certainty?<br>A: Case-by-case. Merits. I can't say with certainty he'd have ongoing pain and care as of Dec 2019. That was not considered in our evaluation. |
| 71 | There was no permanent injury opined by a doctor. Need it for futures to be recoverable. |
| 72 | Q: If you were to evaluate future pain for Wilkins in Dec 2019, that would be $50K limits?<br>A: I would not have agreed to that at that point. |
| 73 | We made a decision based on info at that time. We don't have a formula to evaluate past and future pain. No computer model. |

| Pg | Summary |
|---|---|
| 74 | based on training and experience.<br><br>I've never been in a trial with these types of injuries.  Never ran a jury verdict search.<br><br>Q; What is your training and experience for Wilkins' loss?<br>A: on-the-job, course material, job shadows; being in the industry as long as I have, which was 5 years back then. |
| 75 | Q: How many other insurers did you watch for a fair claim?<br>A: None.<br><br>We did not consider pain and suffering on this claim. |
| 76 | Q: Atty Angley asked about lack of inclusion of pending medical bills.  You said there might be write-downs with PIP.<br>A: I can't speak to coding, but there are reductions to bills based on fee schedules and PIP statutes. |
| 77 | I agree those coding write-downs rarely result in $0 pay.<br><br>Q: Do you pay at 30, 50 or 90%?<br>A: Depends on the treatment.<br><br>Q: P 46 of Ex 1 is the evaluation.  100% UM driver fault. |
| 78 | MedPay was $500.  So I had $20,500 underneath UM; collateral offsets.  Anything over $20,500 is UM. |
| 79 | If there was health insurance, that would be applicable too and a right to subrogate.<br><br>Q: In UM, and a right of subrogation against the UM driver, Progressive gets the benefit of health insurance.<br>A: If we're on notice for a lien.  We have a right to protect the lien. |
| 80 | Typically, attys handle the liens.  We consider it, but I don't recall anything about health insurance in this case.<br><br>The claimant's atty handles the insurance lien.  It doesn't change the analysis [?sic?].  A health insurance lien is considered in UM analysis. |
| 81 | When paying full policy of UM, Progressive requests a release, but does not have specific hold harmless language. |
| 82 | Wilkins got injections; cervical ESI.  10/28 and 12/2 injections after Crawford's last evaluation, so those were "additional treatment".<br><br>I'm familiar with these procedures.  Medial branch block injection on the left C4-6. |

| Pg | Summary |
|---|---|
| 83 | The dexamethasone sodium phosphate is the material of the injection that provides pain relief to the nerves. |
| 84 | I don't know the science how the drugs affect the transmission by the nervous system to the brain.<br><br>The facet joints with image guidance is to identify the space the needle goes through. I don't know why fluoroscopy is used. I know if the needle is misplaced, a risk is spinal cord damage. |
| 85 | I agree for that procedure, a patient hurts pretty bad.<br><br>Q; What's the difference between the block of cervical medial nerve branch and facet joint injection process?<br>A: The placement. |
| 87 | Claims Notes: "Based off prior evaluation, CTL sprain/strain and aggravation to cervical DDD accepted." That is what she's considering. The $3-5K is based on experience of reasonable settlement. We look at medical bills and specifically, out of pockets. |
| 88 | She considered the history and impact. It was a heavy impact. The vehicle was a total loss. I don't know if Jaws of Life was used.<br><br>I can't say this impact is not inconsistent with permanency. I'm not a doctor. |
| 89 | WE make decisions based on medical records.<br><br>I don't know what MIST means.<br>Q: minor impact soft tissue. |
| 90 | I consider impact for injuries for causation. He got hit hard and makes sense he probably got hurt.<br><br>5 cervical injections, $8-10K. |
| 91 | Q: Where did the adjuster get that number?<br>A: Same consideration as discussed.<br>Q: Subjective experience?<br>A: Yes.<br><br>The 3 level injections are part of the $8-10K.<br><br>She assigned $3-5K for the low back. No specific treatment. |
| 92 | Q: P 47 "BI negotiation." Not negotiating BI, are we?<br>A: That is a specific system. It's UM. The "BI negotiation" is a system default. The only thing she added was 'see eval'; otherwise it's all system generated. |

| Pg | Summary |
|---|---|
| 93 | The system pulls the $13,144 from her prior note of ranges. |
|  | I don't know how many hours I spent reading the demand package.  I read it all. |
| 94 | I do it for all cases, but I can't say I recall specifically.  I go page by page. |
|  | I reviewed the CRN on 12/16/19, but was not involved. |
| 95 | Probably just Ms. Wilkins and not Mr. |
| 96 | I didn't instruct the adjuster on future work after we did the eval.  I would have it needed. |
| 97 | # EXAM BY DF, Atty Angley |
|  | I was trained how to review medical records and evaluate and was adequately trained as of Dec 2019. |
| 98 | Wilkins policy has language from the tort threshold and it's in the statute.  He has to establish a breach for non-economic damages.  There was no breach in Dec 2019. |
| 99 | No doctor gave permanency.  No loss of bodily function or disfigurement. |
| 100 | CT cervical by Dr. Chang: "No acute bony injury in cervical spine, multi-level degenerative changes."WE considered that. |
| 101 | that means some preexisting. |
|  | MRI 8/5/19 of cervical by Dr. Timken didn't say caused by the MVA. |
| 102 | MRI showed degenerative changes in cervical.  Loss of disc hydration is a finding of preexisting. |
|  | We fairly evaluated in dec 2019. |
| 103 | # EXAM BY PF, Atty Gunn |
|  | MRI is more sensitive for soft tissue than CT.  The MRI found disc changes. |
| 104 | I agree radiologists are not clinicians.  If someone sustained an injury, it's up to the treating doctor who takes in the entire picture. |
| 105 | We didn't consider an IME in dec 2019.  It wasn't a necessary step to move the claim forward; the value was within limits. |
| 107 | I don't recall my exact thought process, but it was not necessary. |
| 108 | No need for IME. |

| Pg | Summary |
|---|---|
| 109 | No indication of a permanent injury. |
| 113 | Future treatment is a potential liability of an UN driver. |
| 114 | In Dec 2019, we didn't seek IME for future bills. |
| 115 | # EXAM BY DF, Atty Angley |
|  | I evaluated all known info for the eval. |
| 116 | It was uncertain Wilkins needed more treatment.  Didn't know if it was related by the MVA.  There was no permanency. |
| 117 | If we got additional info, of course we'd consider it.

There was no opinion it was related or a permanent injury.  We didn't consider non-economics. |
| 118 | It was unknown what extent Wilkins' injuries were related to the MVA.

We considered collateral sources such as PIP and BI coverage the tortfeasor maintained. |
| 119 | # EXAM BY PF, Atty Gunn |
|  | Q: when a HCP submits bills to PIP for MVA, is it fraud if not related to the MVA?
A: I don't know.

PIP covers medical bills related to a covered loss. |
| 120 | PIP covers related treatment.

I don't approve PIP charges. |

**Notes-DRD-Wilkins v. Progressive**

**DOL 7/26/19**

USDC Middle District, Judge Barber

Gunn for Plt

Megan Alkexander and group for D

Wicker Smith defending underlying action

Mondamin Wilkins 55, married wheelchair bound from prior injury.

Wife is Lisa Wilkins.

MW upper body was ok until accident.

Vehicle operated by Lisa, other driver, Gayle Ireland failed to stop at stop sign and made left turn in front of Wilkins.

Wilkins car forced off roadway, struck utility pool, airbags deployed,

Citation issued for Ireland

Lisa wilkins accepted 50K tender on 2/22/21.

Jury award $936,386.  B/F case followed

Wilkins had 50/100 UM non-stacked

Limits demand for both made on 10/21/19

MW sent med records on 11/18/19 , bills $14,302

     Offer of $1000

Updated on 12/5/19 to $31,462

     Offer of $8200

MW settled with Ireland (Amica) for $10K

6/13/20 P offered $17,000

7/10/20 P offered $25000

12/2920 P tendered $50 to each

8/19/22 Jury awarded $936,386

**PLEADINGS**

P denieds it had opportunity to settle UM claim

Claims no opportunity to settle

Barred by 624.155(4)(a) tendered w/I 90 days of notice of UM claim

P responds to CRN by saying dispute re value of claim

**Documents-see abstract and timeline summary**

Depositions

**Lisa Wilkins 11/2/20 (underlying case)**

| | |
|---|---|
| 10 | DOB 3/23/68, born Chicago. FL driver license, since March 2020 and prior was IL. |
| 11 | Moved to FL 7 years ago. I didn't update the license sooner as we still had IL property, which we're renting it out.<br><br>My job got eliminated after I transferred here and we never changed it. |
| 13 | License never suspended. Never got a traffic citation.<br><br>Married 17 years to Mondamin Wilkins; 1st marriage. No kids. |
| 21 | My husband had a spinal cord stroke. I helped clean his wounds on the days the nurse didn't visit. I took care of him and the house while looking for a job. |
| 24 | **7/26/19 MVA:** Woke ~6am. Took my shower. Helped Tony out of bed (he's got a hospital bed in the living room) to the shower. Changed his sheets. Dressed him. Set up the ramp outside to get him to the car. Went to the dealer for our 2nd oil change and tire rotation.<br><br>We planned on stopping at Sam's on the way home, but it was drizzling and decided against it.<br><br>We were south on US 19 at the red light at 19 and Trouble Creek. We were the 1st one in the turn lane. There's only 1 turn lane. When the light turned green, I turned left. I always go slow there because of people in/out of Sam's. Out of nowhere, we get hit. The car filled up with smoke and it got real dark inside. |
| 25 | Driving a 2018 blue Hyundai Sante Fe. We're both owners. |
| 30 | INJURIES: severe neck pain, low back pain, bad headaches for 4 months+, burns on my arms from the airbags. |
| 32 | I was very unsteady on my feet when I stood for the xrays.<br><br>I was discharged in the afternoon; I don't know what time.<br><br>My car was totaled. It was towed.<br><br>Today, we have a hyndai Palisade. |
| 35 | From the July MVA, I also saw Dr. Saldin at Trinity Spine. No surgery recommended. I had 2 cortisone/steroid shots in my neck. I don't know dates, but before the Dec 2019 MVA.<br><br>I had ablation Jan 2020. |
| 39 | That driver paid me $10K for my injuries. |

|  | I'm still treating with Drs Stacy and Saldin.  Next appointment with Dr. Saldin is 3/10/21.  Florida Blue was our health insurance on DOL.  Not through employer as I was only part time.  Gave insurance card to the providers. |
|--|--|
|  |  |
|  |  |

**Lisa Wilkins 11/2/20**

| | |
|--|--|
| License never suspended.  Never got a traffic citation.<br><br>Married 17 years to Mondamin Wilkins; 1st marriage.  No kids. |
| My husband had a spinal cord stroke.  I helped clean his wounds on the days the nurse didn't visit.  I took care of him and the house while looking for a job. |
| Never hospitalized prior to this MVA of 7/26/19.  I wasn't seeing a PMD; except I saw Dr. Gadea once. |
| Impact was driver's side, between driver and passenger doors; middle.  It got real dark and smoky.  I was like in shock.<br><br>My hands were real tingly.  I must have gripped the steering wheel.  I have to keep moving them or they'd be stuck because of the nerves. |
| I opened my door a little bit to get air and somebody came to the door: "I called the paramedics and police and said they are on their way."<br><br>My car was pushed up against a power pole.<br><br>I did not contact law enforcement.  I didn't lose consciousness.<br><br>**INJURIES:** severe neck pain, low back pain, bad headaches for 4 months+, burns on my arms from the airbags. |
| I called friends to get ahold of Bill Schaefer, who has a hitch on his truck.  He picked me up, we went to empty out my car and get Tony's motorized wheelchair off the back. We were afraid it would get stolen.<br><br>He drove to our house and we unloaded everything and got Tony's wheelchair.  We went to Trinity to get Tony.<br><br>My next treatment was Trinity Spine 8/1/19 and they tested my balance, which they said was all off. |
| That driver paid me $10K for my injuries.<br><br>I'm still treating with Drs Stacy and Saldin.  Next appointment with Dr. Saldin is 3/10/21.<br>Florida Blue was our health insurance on DOL.  Not through employer as I was only part time.  Gave insurance card to the providers. |
| I thought the other driver's insurance would pay for my medical bills. |

| | If I'm on my feet too long or walk too much, it increases pain.  We don't really go out.  If I sit too long it gets stiff sometimes. |
|---|---|
| | |
| | |
| | |

**Mondamin Wilkins 11/2/20 (underlying case)**

| | |
|---|---|
| 7 | I go by Tony Wilkins. |
| 12 | Weber HS Chicago.  No church or extracurricular.<br><br>I'm retired and disabled.  Retired 2012 for a company I was at 30 years, Testa Produce in warehouse, loading trucks. |
| 13 | After I retired in 2014  to FL, I had a stroke in May 2014.<br><br>I was deposed for my suit against FL Hospital of Tampa for a bedsore wound; med-mal.  I was in hospital 3 months and they didn't turn me. |
| 18 | 1993 back surgery for herniated disc; it was shaved.  Off work 3 months. |
| 19 | Laminectomy L4-5 at Hinsdale in IL.  Hospitalized 3 days and home 2 months.  Returned to work after 3 months.  I did therapy.  I was back to status quo. |
| 25 | 5/13/14 was the stroke and discharge was 7/26/14.<br><br>From the stroke, I still have paralysis; in a wheelchair; pain by buttocks where you defecate from the wound scar. |
| 30 | Between July 2015 and the 7/26/19 MVA, I had no treatment. |
| 31 | **7/26/19 MVA:**<br>Friday.  Woke at 7am.  No breakfast as we were having lunch after the car service.<br><br>Wife and I had an appointment at Hyundai dealer on 19 in Port Richey for 7,000 mile check up. |
| 34 | Trouble Creek runs right to our complex.  She turned left, passed the Sam's Club entrance and within 3 minutes, somebody came from her side and hit us.  Airbags deployed and we were pushed into the power pole on Wiggins Street.<br><br>My side of the car started to fill with black smoke from the airbag.  I tried to open my window because it was hard to breathe.<br><br>I hit my head on the windshield because my side didn't have a power seat.  It went back and forth with a little clicker.  My feet went up into the dashboard. |
| 38 | The other lady was speeding or driving erratically because she got a couple of tickets.<br><br>Her car was red.<br><br>They extracted us because the power pole was going to fall down on our vehicle because we hit it so hard and the fire department was trying to hold it up. |

| | |
|---|---|
| | I was on a stretcher board, but saw her car was red. There were 3 ambulances and she was by 1 ambulance. Vaguely saw her out of the corner of my eye for 10 seconds as my head was strapped down. |
| 43 | They got a jaw to open my door; like a crowbar.<br><br>Hematoma laceration across my stomach from the seat belt. Bunch of cuts and bruises on my legs hitting the dashboard and under the console.<br><br>My feet bled because my feet swelled from the impact. All the blood rushing and I had a hard time getting shoes on/off when I got to the hospital.<br><br>Left neck and shoulder pain and a headache. |
| 44 | A bit of right side pain from my body twisting. My whole left side shifted. Right side back area and lower neck hurt.<br><br>Most pain was neck and was immediately a 10.<br><br>I was transported to Trinity Hospital. They took my wife somewhere else. |
| 48 | Next treatment was ~3 days later for MRI at Gulf Coast in Tarpon. I had 2 herniated discs and bulging disc in my neck and bruised shoulder. |
| 49 | Then I went to the Trinity Health Center with Dr. Ronald Stacy. He said I had a couple herniated dics in my neck and to go to Trinity Spine Center because I had very severe pain and daily headaches. I woke with a headache and went to sleep with a headache. Dr. Stacy didn't know what to do. |
| 50 | I went to Trinity Spine Center 1-2 weeks later and saw Dr. Saldin. He said we'd start with a cortisone shot to relieve the pain and maybe get the discs dissolved and inflammation away. He told me to go back to Dr. Stacy to massage the neck and relieve some pain. |
| 51 | I had an ablation in July 2020 and 3 cortisone shots. After the 3 shots, they said I should have ablation to relieve more pain because I still had a lot of headaches. |
| | |
| | |

Mondamin Wilkins 5/7/25

| | |
|---|---|
| 15 | I stopped for a better job. Graduated HS 1982.<br><br>Retired Oct 2012 from a produce company in Chicago, warehouse manager 28 year years at Testa Produce. |
| 18 | The only other MVA was in 1993 and I wasn't injured and had no treatment. No claim or suit.<br><br>5/13/14 I had a spinal cord stroke when both legs went out and I was paralyzed and in a wheelchair since. |
| 19 | Paralysis is waist down. No other conditions for neck/back.<br><br>No neck treatment prior to MVA. |

| | |
|---|---|
| | The spinal cord in 2014 didn't treat for my neck; focused on low back. |
| 20 | I had the coarctation of the aorta in 2000 for blockage in my heart and had a stint put in when I was 10.<br><br>I had back surgeries May 1993 and Feb 2007 for bulging disc; they shaved it; L4-5.  I don't know if it's from the 1993 MVA. |
| 21 | The MVA was Feb 1993 and I treated for bulging disc in May.  I didn't make a claim for the MVA.  Surgery was successful.<br><br>In 2007, I was walking to my car and slipped on ice and injured my back L5-S1 and had a successful lapendectomy. |
| 22 | Moved to FL March 2013 after retirement and my wife's job changed.<br><br>I filed suit over a bedsore wound from May 2014 hospitalization and it resolved out of court.   Peter Sartes and Tragos represented me. That's how I 1st came to know Sartes.<br><br>No other legal proceedings or claims. |
| 25 | **Ex 1:** General Contingency Fee Contract, 7/29/19. |
| 26 | I signed it at home after getting it via email.  I didn't meet with anyone at Tragos prior to this contract.  I contact Tragos Monday after the MVA.<br><br>I think Peter Tragos signed Ex 1.  My wife and I were injured.  Wife missed work.  To make a claim against Ireland. |
| 33 | I didn't keep calendars.<br><br>I relied on Tragos to communicate with Progressive and Ireland and to make decisions. |
| 34 | I followed my atty's recommendations in this claim.<br><br>**Ex 2:** Letter, 7.31.19 |
| 36 | The only communication we had with Progressive was my wife reported the MVA the day it happened.   I sent them photos and spoke to a rep at 7pm that night after I got home from the hospital. |
| 37 | Discussed the MVA and a rental car.  No other communications with Progressive.<br><br>My UM coverage with Progressive was $50/100K. |
| | |
| | Part II, 5/21/25 |
| 16 | I talked to Progressive 7/26/19 to get a rental car.<br>Q: Discuss coverage?<br>A: They didn't go over everything.  I don't know if I had more conversations with Progressive about coverage.<br><br>**Ex 3:** Request for Info, 8.13.19 from Progressive to me to complete PIP and medical auth and asked for treatment and insurance info and wage auth and affidavit of no other insurance. |
| 17 | **Ex 5:** Application for Benefits under PIP, 8/22/19 and filled it all out. |

| 18 | I thought I completed the medical auth, but not sure. |
|---|---|
| 19 | I provided my atty with a medical auth.  I don't recall why I didn't give Progressive one.<br><br>OBJECTION |
| 21 | I was retired and not making a lost wage claim.<br><br>**Ex 6:** Letter, 8.2.19.<br><br>Gail Ireland drove the other car and we claimed against her insurer, Amica and she had $10K limits. |
| 31 | Attys decided to settle with her and pursue my UM.<br><br>**Ex 11:** Demand from Tragos, 10.21.19, which I've seen. |
| 32 | I don't know if I got the attachments.  They demanded $50K from Progressive.  I authorized it. |
| 33 | Q: Did you know this letter did not include any attachments?<br>A: I didn't know that. |
| 36 | I didn't know the xrays showed degenerative in my neck.<br><br>I also treated at Trinity Health for chiropractic and massage therapy.<br><br>My atty referred me to him.<br><br>I 1st presented to Trinity Health 8/1/19 and had conservative chiro and therapy starting 8/9/19. |

| | |
|---|---|
| 37 | There was an 8 day gap so I could get MRIs.  My wife too. |
| | I also treated at Trinity Spine with Dr. Hayes and Saldin.  I was referred there by my chiropractor, Dr. Stacy. |
| 39 | I've seen some medical records form Hayes and Saldin. |
| | I don't know if the records sent to Progressive had permanency opinion. |
| | Dr. Hayes recommended continued conservative therapy, and if pain persisted to consider injections. |
| 40 | I had 2 procedures; radio frequency ablation? |
| | I don't know if Dr. Saldin opined permanency.  He recommended chiro care per our Oct 2019 demand; no surgery. |
| 41 | I had cortisone injections too. |
| | I only got Medicare; no other benefits. |
| 42 | Medical bills $9,718.81 per Ex 11. |
| | **Ex 12:** Letter from Heimy Espinal, Progressive, 11.27.19 offering $1K for UM, which I've seen. |
| 50 | Q: Do you have knowledge of these allegations? |
| | OBJECTION |
| | I don't know if we sent Progressive any permanency opinion from a doctor by then.  I defer to the documents. |

| | |
|---|---|
| 52 | Tragos approved the cervical injection.  He took the opinion of the doctor as I was in so much pain.<br><br>Q; In the end, who's decision?  You or your atty?<br>A: My doctor and me, but he had to consult with my atty.  Doctor wanted to make sure it was approved. |
| 58 | Probably mailed.<br><br>My chiro treatment at Trinity Health stopped during the pandemic 3.5 months, starting March. |
| 59 | **Ex 16**: Tragos correspondence 12.5.19, which I don't recall if I saw.<br><br>I had cortisone shots 12/2/19 and 10/28/19 in my neck with Dr. Saldin.<br><br>I don't know if my doctor opined about permanency by 12/5/19. |
| 61 | **Ex 17:** Letter from Progressive, 12.17.19, Camille Crawford, to Tragos, which I don't recall if I saw. $8,200 offer, which I didn't accept.  My decision.  OBJECTION |
| 62 | Q: As of 12/17/19, were you willing to settle for $50K?<br>A: No.<br><br>**Ex 18:** Email from tragos, 12.17.19: Peter Sartes, Crystal Linda and Peter Tragos.<br><br>I don't recall if I discussed the $8200 with attys.  I didn't keep notes. |
| 65 | $8200 offer, which I did not accept.  I was not willing to settle for $50K; I wasn't going to settle [??].  I discussed the offer with my attys; I was still treating.  It was via phone.  No notes. |

| | |
|---|---|
| 66 | I don't recall if I saw Progressive's response to CRN.<br><br>Any documents atty sent, I have in e or hard file. |
| 67 | **Ex 21:** Lawsuit, 2/11/20. I was not willing to settle for $50K limits on that day. I don't know if my attys told Progressive that. |
| 68 | Q: After suit, you never demanded the $50K limits.<br>A: There was mediation. I don't recall when. |
| 70 | I had more injections in my neck and 2 RFAs. The doctor said I'm not a candidate for neck surgery because of my stroke.<br><br>Q: Agree during suit, Progressive continued to try to settle.<br>A: I didn't know at the time. |
| 71 | I knew they offered $17K, but it wasn't sufficient. Discussed with my atty by phone. No notes. |
| 72 | **Ex 23:** Letter from Progressive, 7.10.20, $25K offer. I don't know if I saw the letter. Discussed it with my atty by phone. No notes. |
| 75 | At that time, I would only settle for above limits of $50K.<br><br>**Ex 26:** Letter from Progressive, 12.24.20, which I don't recall. Progressive tendered $50K. |
| 76 | I don't recall if my atty told me. I didn't accept. I was still treating. I wasn't willing to settle for limits. |
| 79 | **Ex 27:** Correspondence, 1.8.21.<br><br>Q: On 12/29/20, Peter Sartes emailed Lee Gunn that Progressive tendered UM limits and what to do with the checks. Did you know they were communicating?<br>A: No. I didn't know we were bringing in Gunn. I found out after I won my court in 2023. |

| | |
|---|---|
| 80 | Sartes to Gunn: "I believe Gunn is coming on board to handle the bad faith..." I wasn't aware at the time. I didn't intend to bring bad faith at the time; until it was settled, after court. |
| 85 | I'm suing because I haven't received money from the case I won. If we wanted to settle, I would've gotten my money back from 2023, but I haven't received bupkis. I'm speaking from my heart. |
| 86 | I won my case fairly. Went to appeal with 3 judges and I won. Progressive should have paid. |
| | |
| | |

**Camile Crawford 5/28/25**

| | |
|---|---|
| 9 | I'm supervisor at Progressive. July 2018 started at Progressive. I worked in customer service at another insurer before. |
| 10 | PD adjuster in July 2018 after training x 1 year. Took leave. Nov 2019 BI w/ atty-rep for BI and UM x 1 year Nov 2020 Supervisor of BI with atty-rep Nov 2024 supervisor of atty-rep and non-rep |
| 15 | I handled the Wilkins 7/26/19 MVA UM claim. I put notes in Claims Notes. |
| 16 | **Ex 1:** Claims Notes, 1-255. |
| 19 | We determined the other driver was at fault, not our insured. We had gotten a demand and the prior adjuster extended an offer and I did a TTD on the last offer. |
| 22 | 12/4/19: I noted my liability determination. I also made a call to atty's office and spoke with Linda and she said she faxed over additonal documents 11/18/19 and her client was getting additionbal injections and would send additional records once she gets them. |
| 23 | I don't recall Linda's role. I didn't get the additional documents from 11/18/19 call. I don't recall if was ever sent. My next TTD was to follow up with the atty for additional records. 12/9/19 by Cindy Rodriguez, claims processor on admin team that uploads mail. I don't know her. |
| 27 | CRN is for first party coverage and the last attempt to settle before lawsuit. That we are not in good faith. At this point, none of Wilkins' doctors opined permanency. |

| | |
|---|---|
| 28 | We have 60 days to respond to CRN. The 11/27/19 date puts deadline in Jan 2020. |
| 29 | 12/10/19 Rodriguez mail review. We got additional records.<br><br>Lisa Wilkins also made a UM claim. She is "ID".<br><br>I also adjusted Ms. Wilkins' claim. |
| 30 | Rodriguez directed me to review and respond to the additional records. I detailed it 12/16/19 with my eval.<br><br>Trinity Spine Ctr: 10/24/19-12/2/19. |
| 31 | **Ex 4:** Fax to Progressive from Tragos; the records I reviewed. There's no demand for limits. Shows Wilkins had injections 10/28/19 and 12/2/19. |
| 32 | I didn't get the 10/28/19 record. Dr. Saldeen didn't opine on permanency. No future procedures were scheduled. No reference to surgery or ACDF, except: "Follow up, consider left cervical RFA." |
| 33 | Just for him to consider and decide later. It wasn't clear if Wilkins would undergo that procedure. |
| 35 | Wilkins had a prior medical history. He was paralyzed waist down due to a stroke and had 2 prior lumbar surgeries. |
| 37 | "Lumbar sprain/strain with 2 prior laminectomies, $3-5K"<br><br>I looked at the facts and based on my knowledge and training gave it a value.<br><br>"Although no lumbar" Lumbar MRI was not completed but I was still considering it. |
| 38 | "Eggshell claimant". He was wheelchair-bound and had prior lumbar injury he needed invasive treatment. I still considered it even without diagnostic testing. It doesn't look like they were focused on that area, but I still gave value for aggravation to prior injury.<br><br>"There is additional $6,948 specials form injections 12/2/19" not yet processed by PIP. PIP benefits still remained, so I'm only considering the copay, MedPay and PIP deductible.<br><br>Noted it and the out of pockets could go up.<br><br>My range was $8,144-13,144. Including out of pocket |
| 40 | I didn't consider pain and suffering; it hadn't reached the tort threshold. |
| 41 | I didn't consider future care as we didn't have permanency. I didn't have info on future treatment either.<br><br>PRG 47 asking for authority of $13K and "see eval" |
| 43 | She increased reserves to $15K. That's not the value of the claim.<br><br>12/17/19: called Pf's atty and offered $8,200. Atty said would not accept less than limits. I faxed and mailed my response. I don't recall the name of the atty. |
| 44 | We did not value the claim at limits. $8,200 was fair. It considered out of pocket medicals.<br>**Ex 5:** Claim info letter, 12.17.19 to Pf's atty and offer. |

| | |
|---|---|
| 46 | I don't recall who I spoke with. I discussed there were additional documents that showed 3 injections and scheduled for a surgery consult. But, I had not gotten additional records.<br><br>1/6/20 to review additional treatment and update my eval and submit offer. |
| 47 | As I got additional info, I'd evaluate my offer.<br><br>Note 1/16/20 by Rodriguez received letter 12/31/19 and 12/5/19 for the insured driver, faxed 12/19 with additional medical records she wants me to review and respond. |
| 50 | "Follow Up" Wilkins would consider a procedure, but none was scheduled. Wilkins said he'd think about it. It was not clear if he would undergo additional treatment. No doctor opined permanency. There was a recommendation of RFA, but no surgery. |
| 56 | 1/13/20 by Rodriguez agreed<br><br>I then called Pf's atty that I had the additional records. I asked where they are with the last offer. He said they're not coming off limits. Also said if Progressive offered limits, they'd have to speak with their client to see if they were even willing to accept limits.<br><br>I asked him to send that they are not willing to negotiate in writing. He said they already did, but I had not received it. I only got additional records.<br><br>I asked again if they are not willing to come off limits, fi they could put in writing for both clients and he agreed.<br><br>They didn't send it. |
| 60 | I requested to respond to the CRN that the claim is still negotiable; just a value dispute.<br><br>Wilkins still had remaining PIP.<br><br>Since 1/13/20, I got no additional medical records.<br><br>I can't force anyone to negotiate. |
| 61 | The atty didn't agree with my evaluation, but the claim was not valued at $50K. Still no permanency. |
| 62 | No schedule medial procedures at this time.<br><br>The $8,200 offer included $2,278 OOP. He's not entitled to pain and suffering if he didn't breach the tort threshold. |
| 65 | 2/11/20 called pf's atty, but I don't recall name, following up on my offer. They wre not willing to negotiate and filed Complaint that day. I searched Pasco Co website and unable to find it.<br><br>Wilkins was not willing to settle for $50K limits. |
| 66 | 2/18/20 Rodriguez found the Complaint.<br><br>2/21/20 we had not been served yet. I also called Pf's atty and spoke with assitant, who spoke with the atty. I was told they are not willing to accept limits now. |
| 67 | I continued to follow up with the atty even after this point. Attempt to settle. |

| | |
|---|---|
| | 3/2/20 called agains.  Spoke with case manager who spoke with the atty.  They had nothing else to add.<br><br>I had not received additional treatment records or bills.  If I had, I would have evaluated.  Still not served with the suit. |
| 68 | 3/11/20, 3/20/20 and 3/30/20:  3 times trying to follow up with Pf's atty.  I left messages.<br>3/30/20 spoke with atty that we were [?not?] served 2/27/20 and asked for the notice.<br><br>3/31/20 Nicole Perez notes Complaint received. |
| 70 | Wilkins never breached the tort threshold during my handling.  I always tried to evaluate and act in good faith. |
| 72 | Progressive evaluated UM from DOL until CRN filed.  I just became an injury adjuster in Nov 2019.  I handled BI auto and UM/UIM.  It was not my 1st UM. |
| 73 | I started ijury adjusting in Nov 2019 and I got this file Dec 2019.<br><br>Q: What training for cervical epidural steroid injections?<br>A: Training on evaluating.  Each claim has different value. |
| 78 | I've no medical training.<br><br>I have reviewed venues and risks in venues. |
| 81 | I consider if the mechanism of injury is consistent with complaints.<br><br>**Ex 8:** Photo of windshield of Mr. Wilkins. |
| 93 | q: Does the UM policy condition UM payment on a release?<br>A: Can I take a break?<br>Answer the question.<br>A: I don't recall. |
| 96 | I didn't consider a partial payment of UM without a release.  I don't recall if I was ever trained to do that.  I was trained on UM. |
| 97 | We can request an EUO.  If claimant refuses, we have the option to refuse coverage. |
| 98 | I don't recall if it's the same for IME.<br><br>I don't recall if I noticed claimant had not returned a signed medical authorization.  I never asked for one.<br><br>I know the difference between reactive and proactive claim adjustment.  We proactively seek records and reactive is waiting for them to be received. |
| 99 | We were trained to be proactive.  I didn't request info from his HCPs.<br><br>I don't recall if I was trained to write a HCP to ask questions.<br><br>I had access to the PIP adjuster's notes.  I saw Trinity's bills there. |
| 100 | I don't expect all those bills are related to the MVA. |
| 101 | Some are not related to the MVA and some bills aren't' reasonable.<br>Q: That would be fraud.<br>A: I don't know how to answer. |

| | |
|---|---|
| 102 | Q: Progressive can, like it did here, dispute reasonableness. But they won't provide bills unrelated to MVA without committing fraud.<br>A: Yes. I'll agree it would be fraud. |
| 103 | Q: Agree Wilkins had multiple cervical herniations; his central cord was displaced and radiating pain down his arms.<br>A: He had multi-finding levels in his cervical spine. |
| 104 | Q: The cervical spine has some hard bone and some soft discs.<br>A: Yes.<br>Q: The disc is the shock absorber that lets bones move without grinding on one another.<br>A: Yes.<br><br>I don't recall if we called it a jelly-filled donut. I don't recall if we were trained a disc has a hard fibrous shell and a more gelatinous material inside. |
| 105 | I don't recall if we learned that due to trauma, that fibrous shell can be broken and cause herniation or that the gelatinous material gets outside the hard shell.<br><br>I don't recall if we were trained if disruption occurs, it's not going to get reabsorbed and are likely permanent.<br><br>I don't recall if we were trained that gelatinous materials start touching on nerve roots and put pressure on the cord that has radiating pain down the arms. |
| 106 | I don't recall if we were trained when a nerve root is impinged it sends signals to the arms and causes pain and numbness.<br><br>I don't recall if we were trained when a disc protrudes into the cord that can cause significant pain and loss of bodily function.<br><br>I was trained the purpose of conservative treatment like injections is to reduce the inflammation to the soft tissue surrounding a herniated discs for relief. |
| 109 | I agree the fact he's getting conservative treatment doesn't preclude he'll later get surgery.<br>RFA is more invasive, but I need to look it up for specifics. |
| 110 | I would have looked it up for Wilkins, but not noted because it's for my knowledge. I was trained on RFA. |
| 111 | Q: Injection is with a sizable needle to reduce inflammation.<br>A: Yes.<br><br>I don't know fluoroscopy.<br><br>RFA uses radio waves to create a current that heats a small area of nerve tissue.<br><br>I would consider that in my evaluation. |
| 113 | At my level, we don't send records for medical review. |
| 114 | If I have questions, I ask my supervisor.<br><br>q: Does a herniated disc caused by MVA with radicular complaints meet the tort threshold?<br>A: Depends if we're able to determine if it was caused by the MVA. |
| 115 | q: Is a herniated discs caused by MVA likely permanent? |

| | |
|---|---|
| | A: Possible. |
| 116 | His records don't say he had permanency. |
| 117 | We look at records objectively and not for ways to not pay.<br><br>Q: You shouldn't read records to be the absence of evidence. You should read records and say they don't say one way or other?<br>A: No.<br><br>Q: Did you think to ask his doctor if there was permanency?<br>A: No. I was provided with records that didn't say permanency. |
| 118 | Q: But you needed that answer of tort threshold to adjust the loss.<br>A: No. I didn't think it necessary considering I received the records. |
| 119 | I disagree with a herniation it's likely permanent.<br><br>I was trained to review the facts and evaluate.<br>Q: How would you determine what a jury would award?<br>A: For our numbers to be fair, we don't' have a tool because every claim is evaluated on its facts. |
| 122 | May put more value with those facts.<br><br>Q: The gross bills were $30K for this claim and was 6 months after DOL when you evaluated and he'll live into the future. He wasn't' at MMI.<br>A: I don't recall if he was MMI.<br><br>I agree my evaluation had a record showing he was to follow up in 1 month. |
| 126 | Q: How did your eval look at his paralyzed stroke in a wheelchair with neck injury?<br>A: a lot of value for the aggravation to the prior injury.<br><br>Q: But to adapt because he's already in a wheelchair and now all these neck complaints making daily living more difficult.<br><br>A: I considered his injuries and treatment. |
| 128 | I described Wilkins as an eggshell Pf. I considered he was wheelchair-bound with prior injuries.<br><br>12/16/19 eval.<br>Q: Under INJURIES, do you have any record Wilkins had prior herniations?<br>A: I don't believe so. |
| 131 | I didn't know if the injuries were caused by the MVA or if from prior to the MVA. |
| 133 | I don't know if these injuries were new or not. They could have been prior, or not. |
| 135 | Q: What does FL law make someone liable for activation of an underlying disease or injury preexisting condition like the jury is instructed?<br>A: I agree tort fees are liable for aggravation of preexissting. |
| 138 | The image guidance was used to know what level to put it in.<br><br>I don't recall if I read the consent to an ESI.<br>Q: Wilkins was willing to undergo these injections because pain was enough to take the risk of putting a needle in his cord.<br>A: Yes. |

| | |
|---|---|
| | Ex 1 P 47 Lexi Gorman, supervisor: "CRN alleges Lisa Wilkins…"  I agree it's for Ms. Wilkins. |
| 143 | **Ex 5:** Claim info letter, 12.17.19 $8200 offer.  It didn't condition a release; just an offer to engage in negotiations.  I would have worked out language for a release. |
| 146 | I cut and pasted the medical records from 12/2/19 DOS.  Dr. Saldeen didn't say the herniations were caused by the MVA.  None of his doctors said they were caused by MVA.  Wilkins didn't breach the tort threshold  Therefore, he's not entitled to non-economic damages.

RFA was never scheduled.  No records showed he agreed to RFA.

He only had 2 injections during my time on the file.  No other procedures. |
| 148 | If a doctor opined permanency, I'd expect it to be in the records.

I fairly considered the medical records provided. |
| | Q: Tell me 1 proactive step you took to get facts.  Not sitting at your desk waiting for Atty Sartes to send you records.
A: Reviewed PIP to make sure I wasn't missing anything.  Maybe in PIP the Pf's atty didn't send me. |
| | |

**Lexi Gorman 5/5/25**

| | |
|---|---|
| | **Claims Manager w/ 2 entries on 12/16/19 ONLY**
NOTE: Progressive is deposing it's own witness |
| 13 | By Dec 2019, I had adjusted/supervised BI 4-5 years.

Our Claims Notes are called *face sheet notes*, electronic. |
| 17 | 12/16/19 are the only entries in this file.  I authorized the evaluation upon new info receiuved by the adjuster Camille Crawford.  I was not her supervisor.  Her supervisor was out of the office, Kristen Rodriguez. |
| 18 | I assisted with time limit demands or uregent requests when she was on paid time off.

I was in Matitland, FL with Crawford and Rodriguez at the time. |
| 20 | We reviewed the records and evaluation.  She received additional records and we reviewed them together that hwat she was documenting had occured per the records.

We discussed her evaluation.

12/16/19 at 126pm: adjuster received additional documents.  Her entry detailed his treatment. |
| 21 | Wilkins had injections in Oct and Dec.

There was a CRN, not a timed demand. |
| 22 | What triggered her evaluation was the authority amount.  Hers was $10K. |

| | |
|---|---|
| | "Received treatment documents; Trinity Spine Ctr 10/24/19-12/2/19." I also reviewed the records. |
| 23 | **Ex 2:** Demand letter 10.10.19<br>12/5/19 fax from Tragos to Progressive with the records. Crawford only entered info re these records that day. |
| 24 | DOS 12/2/19 Dr. Victor Hayes for injection: medial branch blocks. Prior epidural steroid injection.<br><br>Progressive didn't get the 10/28/19 DOS injection. It was not with the Ex 2. |
| 25 | There was no note re surgery with the Dec records, but showed: "follow up: left cervical RFA/radiofreequency ablation, was an option." It wasn't scheduled. It wasn't clear on this record if Wilkins would undergo RFA.<br><br>The 12/12/19 records doesn't have any plans for a ACDF/interior cervical discectomy fusion. |
| 27 | Wilkins had PIP, which wsere not exhausted at this point. He had MedPay with his policy too.<br><br>PIP reflects a change to out of pockets.<br><br>Wilkins had a prior medical history: he was paralyzed, which we considered. |
| 28 | 12/16/19 Crawford had noted prior demands.<br><br>At one point, there was a dmeand for limits. There was an original evaluation and after additional treatment, Crawford updated it. |
| 29 | 12/16/19 Crawford note requests authorization for $13K for evaluation range of $8100-13,144. |
| 30 | In addition to the Dec records, I would have also looked at all records available.<br><br>**Ex 3:** Letter Tragos to Progressive, 12.5.19 with records and this is what I discussed with crawford. |
| 32 | The chiro treatment was at Trinity Health. 7 sessions.<br><br>He also presented to Trinity Spine 9/11/19 to Victor Hayes. I see no permanency. |
| 33 | The plan 9/11/19 was dosepak, continued therapy, potentially injection if pain didn't resolve and ACDF "wasn't" [?sic?] optional if they did not work.<br><br>No injections or surgery was scheduled in Sept. Injections may or may not occur.<br><br>Wilkins returned to Trinity Spine 10/9/19 with Dr. Saldin. |
| 34 | Dr. Saldin listed very similar plans: injections. No permanency given.<br><br>7/16/19 Crawford note: details the treatment. "Based off prior evaluation, CTL/cervical thoracic lumbar; SS/sprain/strain; cervical AGG/aggravation; DDD/degenerative disc disease." |
| 35 | Crawford accepted a sprain/strain with aggravation to the cervical spine and DDD. |
| 36 | Crawford valued $3-5K and for 5 cervical injections at $8K-10K.<br><br>She also apportioned for the low back $3K-5K. |

| | |
|---|---|
| | These are values to resolve the claim. |
| 38 | The tort threshold in FL is that there can be no claim for damages for pain or suffering unless the threshold has been breahced: death, disfigurement, loss of bodily function and a permanent injury.<br><br>Wilkins had not breached a tort threshold. He's not entitled to non-econominc dmaages like pain and suffering. |
| 40 | I noted: "multiple injections, eggshell claimant are driving value." Eggshell is predisposed to injuries based on preexisting.<br><br>I increased the reserves when I authorized her $13K, to $15K. Reserves holds funds for worst case evaluation.<br><br>Doesn't mean the value was at $15K. |
| 51 | UM is kept in the same file as the PIP MedPay file. I can look at diagnostic codes and charges.<br><br>The UM adjuster did not ask for a medical authorization. |
| 52 | Q: What about the PIP adjuster?<br>A: It's included in the no-fault application; an assignment of benefits and medical authorization.<br>Q: Can the UM adjuster use that PIP authorization?<br>A: For a 1st party claim, yes, if completed. It was not completed in this file. |
| 53 | Q: Did UM adjuster ask the PIP adjuster to get a signed authorization?<br>A: I don't recall. She could have. |
| 54 | The cervical MRI showed herniations and osteophytes at multi-levels. |
| 58 | It's acceptable for Pf's counsel to just send records without a summary. Atty Sartes did it in hopes it will assist us resolve/pay. |
| 59 | We don't require a demand to pay a UM claim. We investigate and make prompt, fair payments.<br><br>I'm not a lawyer. |
| 61 | Q: If Progressive thought there'd be future and pay $25K today, but leave the UM claim open for additional info, and maybe we'll pay up to $50K?<br>A; It could have happened. That is not standard for evaluating claims. |
| 63 | If we want a 2nd opinion, we have tools. That was not done prior to my involvement in this claim.<br><br>We accepted an aggravation to cervical. |
| 64 | We didn't have pre-existing records.<br>Q: No good faith basis to dispute the treatment for neck.<br>A: I agree I had no medical evaluation indicating the discs were not from the MVA. |
| 65 | I have significant experience with soft tissue claims.<br><br>The doctor didn't give permanency. We did not ask the doctor. We didn't do a record review before my time. |
| 66 | IME was an option. We choose not to at that time. |

| | |
|---|---|
| 67 | The doctor didn't feel the patient was a good candidate for neck surgery based on prior injuries due to risks. |
| 69 | I don't know how big the needle is for injections. I've seen it.<br><br>I consider if somebody has injections is likely experiencing significant pain.<br><br>I wont' say ESI is temporary; it's case-by-case.<br><br>We didn't ask a doctor for future care needs. I can't say what his future care would be with certainty. |
| 71 | There was no permanent injury opined by a doctor. Need it for futures to be recoverable. |
| 72 | Q: If you were to evaluate future pain for Wilkins in Dec 2019, that would be $50K limits?<br>A: I would not have agreed to that at that point. |
| 73 | We made a decision based on info at that time. We don't have a formula to evaluate past and future pain. No computer model. |
| 75 | We did not consider pain and suffering on this claim. |
| 78 | MedPay was $500. So I had $20,500 underneath UM; collateral offsets. Anything over $20,500 is UM. |
| 80 | Typically, attys handle the liens. We consider it, but I don't recall anything about health insurance in this case.<br><br>The claimant's atty handles the insurance lien. It doesn't change the analysis [?sic?]. A health insurance lien is considered in UM analysis. |
| 81 | When paying full policy of UM, Progressive requests a release, but does not have specific hold harmless language. |
| 82 | Wilkins got injections; cervical ESI. 10/28 and 12/2 injections after Crawford's last evaluation, so those were "additional treatment".<br><br>I'm familiar with these procedures. Medial branch block injection on the left C4-6. |
| 85 | I agree for that procedure, a patient hurts pretty bad.<br><br>Q; What's the difference between the block of cervical medial nerve branch and facet joint injection process?<br>A: The placement. |
| 88 | She considered the history and impact. It was a heavy impact. The vehicle was a total loss. I don't know if Jaws of Life was used.<br><br>I can't say this impact is not inconsistent with permanency. I'm not a doctor. |
| 90 | I consider impact for injuries for causation. He got hit hard and makes sense he probably got hurt.<br><br>5 cervical injections, $8-10K. |
| 91 | Q: Where did the adjuster get that number?<br>A: Same consideration as discussed.<br>Q: Subjective experience?<br>A: Yes. |

|  | |
|---|---|
|  | The 3 level injections are part of the $8-10K.<br><br>She assigned $3-5K for the low back. No specific treatment. |
|  | I was trained how to review medical records and evaluate and was adequately trained as of Dec 2019. |
| 98 | Wilkins policy has language from the tort threshold and it's in the statute. He has to establish a breach for non-economic damages. There was no breach in Dec 2019. |
| 99 | No doctor gave permanency. No loss of bodily function or disfigurement. |
| 100 | CT cervical by Dr. Chang: "No acute bony injury in cervical spine, multi-level degenerative changes."WE considered that. |
| 101 | that means some preexisting.<br><br>MRI 8/5/19 of cervical by Dr. Timken didn't say caused by the MVA. |
| 104 | I agree radiologists are not clinicians. If someone sustained an injury, it's up to the treating doctor who takes in the entire picture. |
| 105 | We didn't consider an IME in dec 2019. It wasn't a necessary step to move the claim forward; the value was within limits. |
| 109 | No indication of a permanent injury. |
| 114 | In Dec 2019, we didn't seek IME for future bills. |
| 116 | It was uncertain Wilkins needed more treatment. Didn't know if it was related by the MVA. There was no permanency. |
| 117 | If we got additional info, of course we'd consider it.<br><br>There was no opinion it was related or a permanent injury. We didn't consider non-economics. |
| 118 | It was unknown what extent Wilkins' injuries were related to the MVA.<br><br>We considered collateral sources such as PIP and BI coverage the tortfeasor maintained. |
|  | Q: when a HCP submits bills to PIP for MVA, is it fraud if not related to the MVA?<br>A: I don't know.<br><br>PIP covers medical bills related to a covered loss. |
|  | |

1. Note on pg 40 of claim notes, Prog 40, Espinal is doing eval, notes the 4 herniations, notes the paraplegic condition, allows less than half of the PIP paid specials, and notes severe impact and likely ESI
    a. Then notes that no invasive, chiro only, Pip available---on weakness notes impact and eggshell, where is mention of herniations, or impact of paraplegia
    b. Notes surgery consult on page 49

# DEPO SUMMARY OF LISA WILKINS, 11.2.20

## Re: Wilkins v Progressive

# EXAM BY DF, Atty Ghezelbash

| Pg | Summary |
|---|---|
| | Pfs: Peter Sartes<br>Df: Afshein Ghezelbash<br><br>DOL/type/location: 7/26/19 Ireland driving with no/low BI insurance.  Progressive provided UM/UIM of $50K/pp.  CRN 11/27/19.  Jury $936K. |
| | **No Exhibits** |
| 8 | Maiden name Spetka. |
| 9 | New Port Richey, FL on DOL and today.  Lived there 5 years and we rent. |
| 10 | DOB 3/23/68, born Chicago.  FL driver license, since March 2020 and prior was IL. |
| 11 | Moved to FL 7 years ago.  I didn't update the license sooner as we still had IL property, which we're renting it out.<br><br>My job got eliminated after I transferred here and we never changed it. |
| 13 | License never suspended.  Never got a traffic citation.<br><br>Married 17 years to Mondamin Wilkins; 1st marriage.  No kids. |
| 14 | Associate's in applied science from Wilbur Wright in Chicago, 1992.<br>Luther HS, Chicago, 1986.  No certificates or licenses.<br><br>No extracurricular orgs. |
| 15 | I have a lawsuit from Dec 2019 when I was hit by a car by work.  I was at Nebraska and 19 and southbound.  I was at the light in the turn lane. My job at Steinmart is there.  When the arrow changed, I took my foot off to turn left onto Nebraska and the man next to me going straight decided to turn also and into the front end of my vehicle. |
| 16 | I got additional neck and back pain and tingling down my legs.  Cops came right away.  I don't know if the other driver was cited.  My vehicle was driveable after.<br><br>Peter Sartes and Peter Tragos are my attys for that MVA. |

| Pg | Summary |
|---|---|
| 17 | I'm treating for that 12/26/19 MVA with Dr. Stacy at Trinity Health Center and Dr. Saldin at Trinity Spine Ctr. |
| | Never arrested. Never disciplined on the job. |
| | Oct 2018: cashier at Steinmart, but they filed chapter 11 last week and closed it. No severance package. |
| 18 | Nov 2012-July 2014: I worked at Florida Medical Training Institute as a regional business office coordinator. |
| | July 2014-Oct 2018, I didn't work as I was taking care of my husband. |
| | July 1997 - Nov 2012: Lincoln College of Tech and FL Medical Training Institute (owned by Lincoln Educational Srvs) in Melrose Park, IL |
| 19 | When I relocated to FL, I still did office work, but was business office audit manager. |
| | I left FL Medical Training as I heard they acquired FL schools and we wanted to get away from the cold. Then they closed the 5 FL locations July 2014. |
| 21 | My husband had a spinal cord stroke. I helped clean his wounds on the days the nurse didn't visit. I took care of him and the house while looking for a job. |
| 22 | Never hospitalized prior to this MVA of 7/26/19. I wasn't seeing a PMD; except I saw Dr. Gadea once. |
| 23 | I did have blood pressure issues after my husband's stroke and saw Dr. Young until he didn't take my insurance. |
| | Never a work comp claim. |
| 24 | **7/26/19 MVA:** Woke ~6am. Took my shower. Helped Tony out of bed (he's got a hospital bed in the living room) to the shower. Changed his sheets. Dressed him. Set up the ramp outside to get him to the car. Went to the dealer for our 2nd oil change and tire rotation. |
| | We planned on stopping at Sam's on the way home, but it was drizzling and decided against it. |
| | We were south on US 19 at the red light at 19 and Trouble Creek. We were the 1st one in the turn lane. There's only 1 turn lane. When the light turned green, I turned left. I always go slow there because of people in/out of Sam's. Out of nowhere, we get hit. The car filled up with smoke and it got real dark inside. |
| 25 | Driving a 2018 blue Hyundai Sante Fe. We're both owners. |

| Pg | Summary |
|---|---|
| 26 | Tony was in front passenger seat.<br><br>We drove to Hyundai of New Port Richey.  Got the car serviced. |
| 27 | Southbound on 19.  Weather a bit drizzly.  Turned left, east, on Trouble Creek.  Posted limit is 30-35mph.<br><br>After I turned, I'm going slow past Sam's because of people in/out.  I passed the entrance/exit and saw out of the corner of my eye this blur of red.  O heard a big band and got jolted.  Everything was black in the car with the smoke from the airbags. |
| 28 | I saw the driver of the other car after the paramedics got me out of the car on the board.  I didn't see that car prior to impact.<br><br>Right before impact, we decided not to go to Sam's and just pick up lunch and go home and eat.  Then impact. |
| 29 | Impact was driver's side, between driver and passenger doors; middle.  It got real dark and smoky.  I was like in shock.<br><br>My hands were real tingly.  I must have gripped the steering wheel.  I have to keep moving them or they'd be stuck because of the nerves. |
| 30 | I opened my door a little bit to get air and somebody came to the door: "I called the paramedics and police and said they are on their way."<br><br>My car was pushed up against a power pole.<br><br>I did not contact law enforcement.  I didn't lose consciousness.<br><br>**INJURIES:** severe neck pain, low back pain, bad headaches for 4 months+, burns on my arms from the airbags. |
| 31 | Paramedics came really quick. Within minutes. They got me out 1st. I told them Tony was paralyzed.  They tried to get us out as quickly as possible because they said the pole was weaving and didn't want it to fall on us.<br><br>I didn't know they would take us to different hospitals.  I went to Morton Plant North bay ER.  I got xrays and didn't see anything broken. |
| 32 | I was very unsteady on my feet when I stood for the xrays.<br><br>I was discharged in the afternoon; I don't know what time.<br><br>My car was totaled.  It was towed.<br><br>Today, we have a hyndai Palisade. |

| Pg | Summary |
|---|---|
| 33 | I called friends to get ahold of Bill Schaefer, who has a hitch on his truck.  He picked me up, we went to empty out my car and get Tony's motorized wheelchair off the back.  We were afraid it would get stolen.

He drove to our house and we unloaded everything and got Tony's wheelchair.  We went to Trinity to get Tony.

My next treatment was Trinity Spine 8/1/19 and they tested my balance, which they said was all off. |
| 34 | Sent me for xrays and MRI 8/5/19.

Saw a chiropractor 8/9/19 and doing that since.  They did it really slow because they didn't want to make everything worse.  Dr. Stacy.

I last saw him a couple weeks ago because of my work schedule.

the Dec 2019 MVA also led me to seek treatment. |
| 35 | From the July MVA, I also saw Dr. Saldin at Trinity Spine.  No surgery recommended.  I had 2 cortisone/steroid shots in my neck.  I don't know dates, but before the Dec 2019 MVA.

I had ablation Jan 2020. |
| 36 | Today, the most painful injury is my lower back and a bit with my neck.  Neck is better after the ablation.  My pain today is 4 in neck and 6 in low back.

I was wearing glasses on DOL for distance. |
| 37 | Prior to MVA, I was able to do everything without pain, but now I have to watch.  I wear a waist belt to help Tony in the morning because I'm stiff and sore and it takes me longer to do things.

When at Steinmart, I wore the waist belt too.

I don't do sports.  But all activities is just slower now.  I watch how I move so I don't turn the wrong way and then I'm in traction.

I was waring a seat belt.

Last vacation was before we moved down here. |

| Pg | Summary |
|---|---|
| 38 | MVA interferes with sex.  Due to his condition, it's more foreplay and it bothers my neck a lot more. <br><br> I'm claiming 2 days of missed work. $9.16/hr. <br><br> Never communicated with the driver. |
| 39 | That driver paid me $10K for my injuries. <br><br> I'm still treating with Drs Stacy and Saldin.  Next appointment with Dr. Saldin is 3/10/21.  Florida Blue was our health insurance on DOL.  Not through employer as I was only part time.  Gave insurance card to the providers. |
| 40 | I thought the other driver's insurance would pay for my medical bills. <br><br> If I'm on my feet too long or walk too much, it increases pain.  We don't really go out.  If I sit too long it gets stiff sometimes. |
| 41 | After the July MVA, when on my feet, I had to get a note from Dr. Stacy for work to sit on a stool. |

# DEPO SUMMARY OF MONDAMIN WILKINS, 5.7.25

## Re: Wilkins v Progressive

## EXAM BY DF, Atty Angely

| Pg | Summary |
|---|---|
| | Pfs: Peter Sartes<br>Df: David Angely and Blaise Antoniou<br><br>DOL/type/location: 7/26/19 Ireland driving with no/low BI insurance.  Progressive provided UM/UIM of $50K/pp.  CRN 11/27/19.  Jury $936K. |
| | **Ex 1:** General Contingency Fee Contract<br>**Ex 2:** Letter, 7.31.19<br>**Ex 3:** Request for Info, 8.13.19 |
| 8 | Mondamin Nocomas Wilkins, Jr. |
| 10 | I was deposed 2x in the underlying case.  No other depos.<br><br>For today, I talked to Atty Delton Gunn via phone 2x.  Didn't review documents outside his presence. |
| 11 | GUNN: We didn't go over any specific documents.<br>A: Maybe 2 documents. |
| 13 | We discussed 2 points.  Didn't look at documents.<br><br>Calls were 15 minutes each. |
| 14 | No convictions.  I live in New Port Richey.<br><br>Went through 2 years collage, but no degree in engineering for my masters in computers and electronics, 1982-1984. |
| 15 | I stopped for a better job.  Graduated HS 1982.<br><br>Retired Oct 2012 from a produce company in Chicago, warehouse manager 28 year years at Testa Produce. |
| 16 | Manager 1986-2012. |
| 17 | Burger King manager 1980-1982.<br>Continental White Cap 1982-1984.  Cap manufacturing on production line.<br>Supervisor Plus Warehouse Foods 1983-1984. |

| Pg | Summary |
|---|---|
| 18 | The only other MVA was in 1993 and I wasn't injured and had no treatment. No claim or suit. |
|  | 5/13/14 I had a spinal cord stroke when both legs went out and I was paralyzed and in a wheelchair since. |
| 19 | Paralysis is waist down. No other conditions for neck/back. |
|  | No neck treatment prior to MVA. |
|  | The spinal cord in 2014 didn't treat for my neck; focused on low back. |
| 20 | I had the coarctation of the aorta in 2000 for blockage in my heart and had a stint put in when I was 10. |
|  | I had back surgeries May 1993 and Feb 2007 for bulging disc; they shaved it; L4-5. I don't know if it's from the 1993 MVA. |
| 21 | The MVA was Feb 1993 and I treated for bulging disc in May. I didn't make a claim for the MVA. Surgery was successful. |
|  | In 2007, I was walking to my car and slipped on ice and injured my back L5-S1 and had a successful lapendectomy. |
| 22 | Moved to FL March 2013 after retirement and my wife's job changed. |
|  | I filed suit over a bedsore wound from May 2014 hospitalization and it resolved out of court. Peter Sartes and Tragos represented me. That's how I 1st came to know Sartes. |
|  | No other legal proceedings or claims. |
| 23 | Progressive is my current insurer. |
|  | Today we're here for bad faith from my lawsuit against Progressive for UM form 7/26/19 MVA. Driver was Gail Ireland. |
| 24 | Friday 7/26/19, we had an appointment at the auto dealer for oil and wheel rotation and got there 10am and left 12:00. We went down to Trouble Creek Dr and Tboned by Ireland. I hired Tragos, Sartes. |
| 25 | **Ex 1:** General Contingency Fee Contract, 7/29/19. |
| 26 | I signed it at home after getting it via email. I didn't meet with anyone at Tragos prior to this contract. I contact Tragos Monday after the MVA. |
|  | I think Peter Tragos signed Ex 1. My wife and I were injured. Wife missed work. To make a claim against Ireland. |

| Pg | Summary |
|---|---|
| 27 | Q: Was it also to bring any claim against Progressive?<br>A: I wanted therapy as I was in serious pain. So was my wife. I wanted cushion.<br><br>I didn't know how much insurance Ireland had. I had retained Tragos before. |
| 28 | A friend of mine referred me to Tragos then.<br><br>I talked to Peter Tragos, because the other Peter was on vacation. Peter Sartes represented me in the prior suit. For this MVA, they both represented me. 1 did paperwork and the other went to court. Tragos in court and Sartes did the leg work. |
| 29 | We were in court 5 days.<br><br>Linda Gallagher sent forms to my house. My contact was Peter Sartes. |
| 30 | I'd only pay the firm if they won at 1/3 up to $1M |
| 31 | I didn't pay them anything. |
| 32 | I have notes in a notebook from communication with Tragos at my house, along with emails and documents. |
| 33 | I didn't keep calendars.<br><br>I relied on Tragos to communicate with Progressive and Ireland and to make decisions. |
| 34 | I followed my atty's recommendations in this claim.<br><br>**Ex 2:** Letter, 7.31.19 |
| 35 | I'm on a phone because computer didn't work.<br><br>I might have gotten correspondence between Tragos and Progressive. They would go to my wife's emial and she kept some. |
| 36 | The only communication we had with Progressive was my wife reported the MVA the day it happened. I sent them photos and spoke to a rep at 7pm that night after I got home from the hospital. |
| 37 | Discussed the MVA and a rental car. No other communications with Progressive.<br><br>My UM coverage with Progressive was $50/100K. |
| 38 | It means whatever bills aren't paid by the person who hit me, Progressive would pay.<br><br>I didn't know my limits in July 2019. I didn't know the most they pay is the limits, but later learned. |

| Pg | Summary |
|---|---|
| 40 | I didn't understand at the time as I was looking for therapy. Later understood limits, while doing therapy. |
| 41 | I didn't understand my limits were $50K/pp at the time because I talked to Progressive. It was before that. Even though I had a limit, they would take it into consideration and pay what was not paid. That was discussed on the DOL. I believe they were talking about PIP. |
| 42 | I don't recall if they asked me to complete a PIP application<br><br>**Ex 3:** Request for Info, 8.13.19 to Tragos |
|  | Because he can't get computer to work, depo was suspended. |

# DEPO SUMMARY OF MONDAMIN WILKINS, 5.21.25

## Re: Wilkins v Progressive

## EXAM BY DF, Atty Angley

| Pg | Summary |
|---|---|
| | Pfs: Peter Sartes<br>Df: David Angley<br><br>DOL/type/location: 7/26/19 Ireland driving with no/low BI insurance.  Progressive provided UM/UIM of $50K/pp.  CRN 11/27/19.  Jury $936K. |
| | **WILKINS, Mondamin, 5.21.25**<br>**Ex 4:** Claim Info<br>**Ex 5:** Application for Benefits<br>**Ex 6:** Letter, 8.2.19<br>**Ex 7:** correspondence Amica to Tragos, 8.2.19<br>**Ex 8:** Correspondence Tragos and Progressive 9.9.19<br>**Ex 9:** Correspondence Amica to Tragos, 10.22.19<br>**Ex 10:** Release, 1.22.20<br>**Ex 11:** Demand from Tragos, 10.21.19<br>**Ex 12:** Letter from Heimy Espinal, Progressive, 11.27.19<br>**Ex 13**: Letter from Sartes, 11.27.19<br>**Ex 14**: Tragos 11/14 email chain<br>**Ex 15**: Tragos correspondence 11.81.19<br>**Ex 16**: Tragos correspondence 12.5.19<br>**Ex 17:** Letter from Progressive, 12.17.19<br>**Ex 18:** Email from tragos, 12.17.19<br>**Ex 19:** Letter from Tragos, 12.31.19<br>**Ex 20:** Letter from Progressive, 1.13.20<br>**Ex 21:** Lawsuit<br>**Ex 22:** Letter from Progressive, 6.13.20<br>**Ex 23:** Letter from Progressive, 7.10.20<br>**Ex 24:** Email correspondence, 11.17.20<br>**Ex 25:** Email from Tragos, 11.18.20<br>**Ex 26:** Letter from Progressive, 12.24.20<br>**Ex 27:** Correspondence, 1.8.21<br>**Ex 28:** Letter from Tragos, 1.29.21<br>**Ex 29:** Final Judgment<br>**Ex 30:** Bad Faith Claim |
| | Continued from 5/7/21 |

| Pg | Summary |
|---|---|
| 9 | I didn't prepare for today. No documents. Met atty 10 minutes before I came in here today. |
| 11 | **Ex 2:** Letter, 7.31.19, which I think I've seen. My atty to Progressive re representation. They request the dec and policy. |
| 12 | **Ex 4:** Claim Info, which I've seen (8/27/19) |
| 13 | I understood non-stack $50/100 as the other driver kicks in to pay for medical bills or my car. I didn't know the max was $50K UM at the time. Maybe $100K. I later learned it was 50 after I called Progressive. |
| 14 | I don't recall the conversation. |
| 15 | MVA was Friday and I talked to my atty Monday because the firm was closed. |
| 16 | I talked to Progressive 7/26/19 to get a rental car.<br>Q: Discuss coverage?<br>A: They didn't go over everything. I don't know if I had more conversations with Progressive about coverage.<br><br>**Ex 3:** Request for Info, 8.13.19 from Progressive to me to complete PIP and medical auth and asked for treatment and insurance info and wage auth and affidavit of no other insurance. |
| 17 | **Ex 5:** Application for Benefits under PIP, 8/22/19 and filled it all out. |
| 18 | I thought I completed the medical auth, but not sure. |
| 19 | I provided my atty with a medical auth. I don't recall why I didn't give Progressive one. OBJECTION |
| 20 | I probably kept copies of the forms.<br><br>My wife gave the HCPs the insurance card. I had Medicare Humana. |
| 21 | I was retired and not making a lost wage claim.<br><br>**Ex 6:** Letter, 8.2.19.<br><br>Gail Ireland drove the other car and we claimed against her insurer, Amica and she had $10K limits. |
| 22 | **Ex 7:** correspondence Amica to Tragos, 8.2.19, which I've seen. I kept a copy.<br><br>The $10K was her brother's, not hers. She was driving his car. |

| Pg | Summary |
|---|---|
| 23 | **Ex 8:** Correspondence Tragos and Progressive 9.9.19, which I've seen from my attys and I kept a copy. |
| 24 | I put documents in a file and gave it to Gunn.<br><br>I kept everything from my attys in a file. |
| 25 | I didn't destroy anything. |
| 26 | I gave my atty the notebook with my notes. |
| 27 | Ex 8 Tragos asks Progressive to open an UM claim. I authorized it. |
| 28 | That meant whatever wasn't' paid by Ireland would be paid by my UM.<br><br>Ex 8 requests permission to settle with Ireland for $10K limits. |
| 29 | **Ex 9:** Correspondence Amica to Tragos, 10.22.19 with a check.<br><br>**Ex 10:** Release, 1.22.20 for that $10K settlement. |
| 30 | Q: Why not pursue a suit against Ireland when she caused the MVA?<br>OBJECTION |
| 31 | Attys decided to settle with her and pursue my UM.<br><br>**Ex 11:** Demand from Tragos, 10.21.19, which I've seen. |
| 32 | I don't know if I got the attachments. They demanded $50K from Progressive. I authorized it. |
| 33 | Q: Did you know this letter did not include any attachments?<br>A: I didn't know that. |
| 34 | Did you help prepare Ex 11?<br>OBJECTION |
| 35 | I believed all medical records were sent to Progressive. Q: Were you willing to settle for $50K then?<br>A: I was still treating. NO.<br><br>I was taken by ambulance to the ER.<br><br>I don't have preexisting neck.<br><br>I had just x-rays at the hospital. |

| Pg | Summary |
|---|---|
| 36 | I didn't know the xrays showed degenerative in my neck.<br><br>I also treated at Trinity Health for chiropractic and massage therapy.<br><br>My atty referred me to him.<br><br>I 1st presented to Trinity Health 8/1/19 and had conservative chiro and therapy starting 8/9/19. |
| 37 | There was an 8 day gap so I could get MRIs. My wife too.<br><br>I also treated at Trinity Spine with Dr. Hayes and Saldin. I was referred there by my chiropractor, Dr. Stacy. |
| 38 | I met Dr. Hayes 9/11/19.<br><br>Q; He didn't diagnose permanency.<br>A: I had neck pain and he told me frm a bulging disc. |
| 39 | I've seen some medical records form Hayes and Saldin.<br><br>I don't know if the records sent to Progressive had permanency opinion.<br><br>Dr. Hayes recommended continued conservative therapy, and if pain persisted to consider injections. |
| 40 | I had 2 procedures; radio frequency ablation?<br><br>I don't know if Dr. Saldin opined permanency. He recommended chiro care per our Oct 2019 demand; no surgery. |
| 41 | I had cortisone injections too.<br><br>I only got Medicare; no other benefits. |
| 42 | Medical bills $9,718.81 per Ex 11.<br><br>**Ex 12:** Letter from Heimy Espinal, Progressive, 11.27.19 offering $1K for UM, which I've seen. |
| 43 | Discussed the offer with my atty, but I don't recall when. |
| 44 | I don't recall if by phone. We didn't accept the offer and I can't tell you due to OBJECTION. |
| 46 | **Ex 13**: Letter from Sartes, 11.27.19 to Progressive, which I've seen. Encloses CRN for Mr. Wilkins. |
| 47 | Same date Progressive made the $1K offer. |

| Pg | Summary |
|---|---|
| 48 | I don't recall if I discussed it with my attys. Didn't keep notes. If by email, I kept it in my wife's account. |
| 49 | Q: Did you intend to bring a bad faith against Progressive on 11/27/19?<br>OBJECTION |
| 50 | Q: Do you have knowledge of these allegations?<br>OBJECTION<br><br>I don't know if we sent Progressive any permanency opinion from a doctor by then. I defer to the documents. |
| 51 | **Ex 14**: Tragos 11/14 email chain  My atty was not involved in my decisions about treatment. He was involved in improving the treatment.<br><br>Q: Were you aware your doctor reached out to your atty to approve treatment you were contemplating.<br>A: I relied on the Spine Center to contact my atty on treatment; approval. |
| 52 | Tragos approved the cervical injection. He took the opinion of the doctor as I was in so much pain.<br><br>Q; In the end, who's decision? You or your atty?<br>A: My doctor and me, but he had to consult with my atty. Doctor wanted to make sure it was approved. |
| 54 | I treated at Trinity Spine and they gave me their opinion about treatment and they called my atty for permission for the treatment. |
| 55 | I was in severe pain and wanted treatment and that's all I know. |
| 56 | I relied on my attys to handle communications with my doctors. My atty gave authorization to proceed with treatment. |
| 57 | I don't know if we sent a demand after 10/21/19. I relied on my attys.<br><br>**Ex 15**: Tragos correspondence 11.18.19. I don't know if I've seen it. |
| 58 | Probably mailed.<br><br>My chiro treatment at Trinity Health stopped during the pandemic 3.5 months, starting March. |
| 59 | **Ex 16**: Tragos correspondence 12.5.19, which I don't recall if I saw.<br><br>I had cortisone shots 12/2/19 and 10/28/19 in my neck with Dr. Saldin.<br><br>I don't know if my doctor opined about permanency by 12/5/19. |

| Pg | Summary |
|---|---|
| 60 | RFA was suggested but not scheduled at that time. I hadn't agreed as I was still doing the shots. I didn't agree to surgery because it wasn't suggested at that time. |
| 61 | **Ex 17:** Letter from Progressive, 12.17.19, Camille Crawford, to Tragos, which I don't recall if I saw. $8,200 offer, which I didn't accept. My decision. OBJECTION |
| 62 | Q: As of 12/17/19, were you willing to settle for $50K?<br>A: No.<br><br>**Ex 18:** Email from tragos, 12.17.19: Peter Sartes, Crystal Linda and Peter Tragos.<br><br>I don't recall if I discussed the $8200 with attys. I didn't keep notes. |
| 63 | The 12/2/19 injection provided a little relief. |
| 64 | **Ex 19:** Letter from Tragos, 12.31.19. |
| 64 | I met Dr. Saldin 12/18/19. Additional procedures were not discussed then. I don't recall if I was scheduled for more.<br><br>**Ex 20:** Letter from Progressive, 1.13.20; Crawford to Tragos, which I don't know if I saw. |
| 65 | $8200 offer, which I did not accept. I was not willing to settle for $50K; I wasn't going to settle [??]. I discussed the offer with my attys; I was still treating. It was via phone. No notes. |
| 66 | I don't recall if I saw Progressive's response to CRN.<br><br>Any documents atty sent, I have in e or hard file. |
| 67 | **Ex 21:** Lawsuit, 2/11/20. I was not willing to settle for $50K limits on that day. I don't know if my attys told Progressive that. |
| 68 | Q: After suit, you never demanded the $50K limits.<br>A: There was mediation. I don't recall when. |
| 69 | We never demanded $50K after suit. I continued treating; chiro. |
| 70 | I had more injections in my neck and 2 RFAs. The doctor said I'm not a candidate for neck surgery because of my stroke.<br><br>Q: Agree during suit, Progressive continued to try to settle.<br>A: I didn't know at the time. |
| 71 | **Ex 22:** Letter from Progressive, 6.13.20 (Janice Hailman) to Tragos. I don't recall if I've seen it. |

| Pg | Summary |
|---|---|
| 71 | I knew they offered $17K, but it wasn't sufficient.  Discussed with my atty by phone.  No notes. |
| 72 | **Ex 23:** Letter from Progressive, 7.10.20, $25K offer.  I don't know if I saw the letter. Discussed it with my atty by phone.  No notes. |
| 73 | **Ex 24:** Email correspondence, 11.17.20 to Tragos, which I don't think I saw. |
| 74 | I don't recall if Progressive reached out to my atty to discuss settlement.<br><br>**Ex 25:** Email from Tragos, 11.18.20, which I discussed with the atty.  Sartes emailed Peter Tragos that he spoke with me and it says I was ok with $100K but hoped negotiations start at $150K. |
| 75 | At that time, I would only settle for above limits of $50K.<br><br>**Ex 26:** Letter from Progressive, 12.24.20, which I don't recall.  Progressive tendered $50K. |
| 76 | I don't recall if my atty told me.  I didn't accept.  I was still treating.  I wasn't willing to settle for limits. |
| 77 | I am now represented by Gunn Law Group.  My atty referred me.  OBJECTION |
| 78 | I 1st heard about Gunn after I won trial. |
| 79 | **Ex 27:** Correspondence, 1.8.21.<br><br>Q: On 12/29/20, Peter Sartes emailed Lee Gunn that Progressive tendered UM limits and what to do with the checks.  Did you know they were communicating?<br>A: No.  I didn't know we were bringing in Gunn.  I found out after I won my court in 2023. |
| 80 | Sartes to Gunn: "I believe Gunn is coming on board to handle the bad faith..."  I wasn't aware at the time.  I didn't intend to bring bad faith at the time; until it was settled, after court. |
| 81 | I knew nothing of the conversations between the attys in dec 2020 and Jan 2021.<br><br>Q: When did you sign with Gunn?<br>OBJECTION<br><br>**Ex 28:** Letter from Tragos, 1.29.21; Sartes to Hailman at Progressive that the $50K was being returned because limits were rejected.  I had not yet retained Gunn.  I don't know if the attys had an agreement. |
| 82 | **Ex 29:** Final Judgment, 4/14/23 $936K and Tragos is entitled to a 40% fee if bad faith prevails: $374K. |
| 83 | I've received no money.  I don't believe my attys have.  I paid them no money. |

| Pg | Summary |
|---|---|
| 84 | **Ex 30:** Bad Faith Complaint 7/30/24. Never sw it. No involvement with drafting ti.<br>Q: What factual basis that Progressive acted in bad faith?<br>OBJECTION |
| 85 | I'm suing because I haven't received money from the case I won. If we wanted to settle, I would've gotten my money back from 2023, but I haven't received bupkis. I'm speaking from my heart. |
| 86 | I won my case fairly. Went to appeal with 3 judges and I won. Progressive should have paid. |
| 87 | # EXAM BY PF, Atty Gunn |
| | I gave you 850 pages for production for you to redact. I don't recall all of them; 6 years ago. |
| 90 | If a document not in my file, assume I didn't get it.<br><br>I had many conversations with my attys during the underlying case. Calls would not be in my file. |
| 91 | I'm not a doctor or lawyer. I do understand *permanency*; forever. |
| 92 | But I have no opinions about that. |
| | # EXAM BY DF, Atty Angley |
| | I sent all documents to Gunn. |

# DEPO SUMMARY OF MONDAMIN WILKINS, 11.2.20

## Re: Wilkins v Progressive

# EXAM BY DF, Atty Ghezelbash

| Pg | Summary |
|---|---|
| | Pfs: Peter Sartes<br>Df: Afshein Ghezelbash<br><br>DOL/type/location: 7/26/19 Ireland driving with no/low BI insurance.  Progressive provided UM/UIM of $50K/pp.  CRN 11/27/19.  Jury $936K. |
| | **No Exhibits** |
| 6 | Deposed 3 years ago. |
| 7 | I go by Tony Wilkins. |
| 8 | I live in New Port Richey, FL x 5 years; rent.<br>DOB 1/25/64 Chicago. |
| 9 | Moved to FL 8 years ago for wife's job, formerly Lincoln Tech School.<br><br>My driver's license expired this year.  My wife does the driving. |
| 10 | Wife is Lisa Wilkins, married 17 years ago.  Prior marriage was 1990-1996 to Linda Wilkins.  No children. |
| 11 | DeVry U 2 years; didn't finish.  Electronics. |
| 12 | Weber HS Chicago.  No church or extracurricular.<br><br>I'm retired and disabled.  Retired 2012 for a company I was at 30 years, Testa Produce in warehouse, loading trucks. |
| 13 | After I retired in 2014  to FL, I had a stroke in May 2014.<br><br>I was deposed for my suit against FL Hospital of Tampa for a bedsore wound; med-mal.  I was in hospital 3 months and they didn't turn me. |
| 14 | Atty Sartes did the suit in Dec 2014.  Settled Oct 2018 in Hillsborough. |
| 15 | I had a spinal cord stroke and lack of turning, I had a stage 4 wound 6-8" to the bone and I still have pain. |

| Pg | Summary |
|---|---|
| 16 | No other claims.  No convictions.<br><br>After HS, Burger King in Chicago, 1980-1982. |
| 17 | 1982-1984 White Cap manufacturing in Chicago.<br>1984-2012 Testa as warehouse manager at 4545 S. Racine Ave in Chicago.  Pension from Teamster's union. |
| 18 | 1993 back surgery for herniated disc; it was shaved.  Off work 3 months. |
| 19 | Laminectomy L4-5 at Hinsdale in IL.  Hospitalized 3 days and home 2 months.  Returned to work after 3 months.  I did therapy.  I was back to status quo. |
| 20 | I slipped on ice that caused back problems, like a slipped disc.  I went to a chiropractor and didn't do surgery right away.  I had United Health insurance. |
| 21 | The next hospitalization was my stroke in 2014.  I had just skimmed the pool ~noon and getting ready to shower and my legs went out.  I crawled to my phone and ambulance took me to Trinity Hospital for spinal cord stroke. |
| 22 | They sent me to Gainesville Hospital to find what caused the stroke.  8 days there and then FL Hospital of Tampa for therapy 3 months due to bedsore and antibiotics.  I was in a wound vac because the wound was so deep. |
| 23 | I was standing ready to jump in the shower when my legs buckled.  They wanted to know what caused it because I was just 50 and they never saw this before. |
| 24 | No one connected it to my 1993 surgery.  I saw 35-40 doctors and they still don't know what caused it.  1 said it was the 1993 back injury.<br><br>After a couple weeks, the bedsores started.  2 wounds connected under each other and then one big wound. |
| 25 | 5/13/14 was the stroke and discharge was 7/26/14.<br><br>From the stroke, I still have paralysis; in a wheelchair; pain by buttocks where you defecate from the wound scar. |
| 26 | No hospitalized between the stork and MVA.  I did have some therapy, but maxed it out July 2015. |
| 27 | I watch a lot of TV because I'm homebound.  My wife works.<br><br>After the stroke, I took prescription pain meds for the wound once in a while.  Getting in/out of the car hurts where the wound was. |
| 28 | Dr. Rafael Benezra Rohman/Roman was my PMD.  Didn't see him before my stroke.  I had other doctors. |

| Pg | Summary |
|---|---|
| 29 | I saw Dr. Jordan Young from Trinity Hospital.<br><br>Last saw Dr. Roman 2 months ago.  Last saw Dr. Young 3 years ago because he didn't take Medicare.  I had Cigna. |
| 30 | Between July 2015 and the 7/26/19 MVA, I had no treatment. |
| 31 | **7/26/19 MVA:**<br>Friday.  Woke at 7am.  No breakfast as we were having lunch after the car service.<br><br>Wife and I had an appointment at Hyundai dealer on 19 in Port Richey for 7,000 mile check up. |
| 32 | We left the house at 9:00.  Wife driving and I in passenger seat |
| 33 | 2018 blue Sante Fe.  Service was done about noon.  We got in the vehicle and it was a light drizzle when we left about 12:15.  We were going to stop at Sam's at Trouble Creek, but since it was raining, we were going to go home and have lunch and sit by our pool.<br><br>Wife was south on 19 and turned left from 19 onto Trouble Creek, eastbound. |
| 34 | Trouble Creek runs right to our complex.  She turned left, passed the Sam's Club entrance and within 3 minutes, somebody came from her side and hit us.  Airbags deployed and we were pushed into the power pole on Wiggins Street.<br><br>My side of the car started to fill with black smoke from the airbag.  I tried to open my window because it was hard to breathe.<br><br>I hit my head on the windshield because my side didn't have a power seat.  It went back and forth with a little clicker.  My feet went up into the dashboard. |
| 35 | It's a 2 lane highway; 1 lane each way.<br><br>After turning onto Trouble Creek, we were about .25 mile before impact; ~50-75'.  We just passed the Sam's entrance/exit and the street comes next. |
| 36 | My wife just asked if we were going for lunch and I said I don't know.  Then impact.<br><br>I saw red right out of the corner of my vision on my left side and it struck her side between the driver and passenger door.<br><br>So fast we didn't have time to react. |

| Pg | Summary |
|---|---|
| 37 | We didn't realize there was another vehicle.  When we turned onto Trouble Creek, we were the 1st car from the turning lane; nobody in front of us.<br><br>She crossed the median going the other way.  She was going 35-40mph.  My wife was 25mph. |
| 38 | The other lady was speeding or driving erratically because she got a couple of tickets.<br><br>Her car was red.<br><br>They extracted us because the power pole was going to fall down on our vehicle because we hit it so hard and the fire department was trying to hold it up.<br><br>I was on a stretcher board, but saw her car was red.  There were 3 ambulances and she was by 1 ambulance.  Vaguely saw her out of the corner of my eye for 10 seconds as my head was strapped down. |
| 39 | I didn't lose consciousness..  I had pain from left shoulder and neck.  I had fragments of glass in my forehead when I het the windshield.  The ambulance lady was picking fragments out of my forehead.<br><br>Never communicated with the other driver.<br><br>Ambulance arrived 5-10 minutes after impact.  A girl in vehicle behind us was in a white Chevy.  We tried to get her name but she contacted the police and fire department saying she was on lunch and saw the whole accident.  We only saw her ~2minutes. |
| 40 | I didn't communicate with law enforcement.  My wife did; they got her license.<br><br>I was wearing a seat belt.  We were listening to music.  Posted speed is 25-30mph; it's posted as you enter off the street by Sam's.<br><br>At impact, I braced myself.  Airbags deployed.  Car filled with smoke and it was hard to breathe.  I tried to get my window down because I was suffocating. |
| 41 | Our car was totaled and it was towed.  The other car was off the side by the curb, but I don't know what happened to it.<br><br>After impact, we hit the power pole, which was 15-30' away. |

| Pg | Summary |
|---|---|
| 42 | We drive by this intersection frequently to go to Sam's.<br><br>My passenger front end went right into the pole on a diagonal. I couldn't get my door open. The pole shook.<br><br>they had to re-brace it because it was going to fall. They had to put a new one in because it was vibrating profusely; back and forth. |
| 43 | They got a jaw to open my door; like a crowbar.<br><br>Hematoma laceration across my stomach from the seat belt. Bunch of cuts and bruises on my legs hitting the dashboard and under the console.<br><br>My feet bled because my feet swelled from the impact. All the blood rushing and I had a hard time getting shoes on/off when I got to the hospital.<br><br>Left neck and shoulder pain and a headache. |
| 44 | A bit of right side pain from my body twisting. My whole left side shifted. Right side back area and lower neck hurt.<br><br>Most pain was neck and was immediately a 10.<br><br>I was transported to Trinity Hospital. They took my wife somewhere else. |
| 45 | I was in the ER, had xrays and CAT. Doctor said I suffered pressure from my neck and it would be sore a couple days and put compress on.<br><br>Got pain meds and cold packs for my neck. |
| 46 | I was trying to locate my wife. She had my wallet.<br><br>They put a collar on me in the ambulance. They tried to give me oxygen because it was hard to breathe after the airbags deployed.<br><br>My power scooter was on the back of our vehicle. I didn't have anyway to get around. |
| 47 | I left the hospital ~6pm. My wheelchair was at home. Power scooter was in the boneyard. My wife called friends (Bill Schaefer) to pick her up and get my wheelchair, then pick me up at Trinity. |
| 48 | Next treatment was ~3 days later for MRI at Gulf Coast in Tarpon. I had 2 herniated discs and bulging disc in my neck and bruised shoulder. |

| Pg | Summary |
|---|---|
| 49 | Then I went to the Trinity Health Center with Dr. Ronald Stacy.  He said I had a couple herniated dics in my neck and to go to Trinity Spine Center because I had very severe pain and daily headaches.  I woke with a headache and went to sleep with a headache.  Dr. Stacy didn't know what to do. |
| 50 | I went to Trinity Spine Center 1-2 weeks later and saw Dr. Saldin.  He said we'd start with a cortisone shot to relieve the pain and maybe get the discs dissolved and inflammation away.   He told me to go back to Dr. Stacy to massage the neck and relieve some pain. |
| 51 | I had an ablation in July 2020 and 3 cortisone shots.  After the 3 shots, they said I should have ablation to relieve more pain because I still had a lot of headaches. |
| 52 | The shot relieved pain 5-7 days.  Then back to constant pain; throbbing every day.

Right now the pain is 5.  It's been a little better since the ablation.  I still wake with little neck pain.  I still go to the doctor for an update.

I last say Dr. Saldin 2 months ago.  I have an appointment this week to see if they can do anything about the right side, since the left side got a little better.  I'll see Dr. Lee. |
| 53 | I saw Dr. Stacy 3 weeks ago.  I try to see him, but with my wife's work schedule, it's hard. |
| 54 | My left side is better than before.  We'll see if I can get relief on my right side.

I still have a little bit of pain in my left shoulder. |
| 55 | Before the MVA, I was feeling a lot better because I just got my motorized scooter.  I used it to get in the pool.  Now, I hardly get into the pool as it's too hard with my neck and shoulder.  More effort than before.

With my wife being injured, I don't want to put more stress on her.

To pay for treatment, I assumed the insurance would cover it.  The other lady didn't have much coverage.  I have UIM and they should cover it. |
| 56 | I had Medicare and Humana and gave it to my treaters. |
| 57 | I had to pay for my car's hitch for my scooter as it's not considered part of the car. $800.

I don't know about medical bills as my atty gets them.

My wife took photos of our vehicle when she went to get my scooter. |
| 58 | Today, I still have neck pain, daily headaches.  I was fine before the MVA.

It's a sharp pain.  When I go out or to bed, I wear a neck brace. |

| Pg | Summary |
|---|---|
| 59 | I've been wheelchair-bound since my stroke. It doesn't affect my sense of feeling in limbs. It's the same feeling I had before the stroke.<br><br>The other insurance paid $10K for my injuries.<br><br>In addition to the treatment for the MVA, I see my general doctor, Dr. Roman. |

| Timesheet-DRD-Wilkins v Progressive | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| 4/18/25 | begin document review | | 2.75 | | |
| 4/20/21 | Review of claim file | | 4.5 | | |
| 4/23/25 | Review of depositions and complet | | 2.25 | | |
| 4/24/25 | Begin report | | 4.75 | | |
| 4/25/25 | Work on report | | 3.25 | | |
| 4/28/25 | complt report | | 1.25 | | |
| 6/13/25 | Dep prep | | 1 | | |
| 6/18/25 | Review addtl depositions and prep | | 4.25 | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | 24 | | $11,400.00 |
| | | | | | |

**Notes-DRD-Wilkins v. Progressive**

**DOL 7/26/19**

USDC Middle District, Judge Barber

Gunn for Plt

Megan Alkexander and group for D

Wicker Smith defending underlying action

Mondamin Wilkins 55, married wheelchair bound from prior injury.

Wife is Lisa Wilkins.

MW upper body was ok until accident.

Vehicle operated by Lisa, other driver, Gayle Ireland failed to stop at stop sign and made left turn in front of Wilkins.

Wilkins car forced off roadway, struck utility pool, airbags deployed,

Citation issued for Ireland

Lisa wilkins accepted 50K tender on 2/22/21.

Jury award $936,386.  B/F case followed

Wilkins had 50/100 UM non-stacked

Limits demand for both made on 10/21/19

MW sent med records on 11/18/19 , bills $14,302

     Offer of $1000

Updated on 12/5/19 to $31,462

     Offer of $8200

MW settled with Ireland (Amica) for $10K

6/13/20 P offered $17,000

7/10/20 P offered $25000

12/2920 P tendered $50 to each

8/19/22 Jury awarded $936,386

**PLEADINGS**

P denieds it had opportunity to settle UM claim

Claims no opportunity to settle

Barred by 624.155(4)(a) tendered w/I 90 days of notice of UM claim

P responds to CRN by saying dispute re value of claim


**Documents-see abstract and timeline summary**

Depositions

**Lisa Wilkins 11/2/20 (underlying case)**

| | |
|---|---|
| 10 | DOB 3/23/68, born Chicago. FL driver license, since March 2020 and prior was IL. |
| 11 | Moved to FL 7 years ago. I didn't update the license sooner as we still had IL property, which we're renting it out.<br><br>My job got eliminated after I transferred here and we never changed it. |
| 13 | License never suspended. Never got a traffic citation.<br><br>Married 17 years to Mondamin Wilkins; 1st marriage. No kids. |
| 21 | My husband had a spinal cord stroke. I helped clean his wounds on the days the nurse didn't visit. I took care of him and the house while looking for a job. |
| 24 | **7/26/19 MVA:** Woke ~6am. Took my shower. Helped Tony out of bed (he's got a hospital bed in the living room) to the shower. Changed his sheets. Dressed him. Set up the ramp outside to get him to the car. Went to the dealer for our 2nd oil change and tire rotation.<br><br>We planned on stopping at Sam's on the way home, but it was drizzling and decided against it.<br><br>We were south on US 19 at the red light at 19 and Trouble Creek. We were the 1st one in the turn lane. There's only 1 turn lane. When the light turned green, I turned left. I always go slow there because of people in/out of Sam's. Out of nowhere, we get hit. The car filled up with smoke and it got real dark inside. |
| 25 | Driving a 2018 blue Hyundai Sante Fe. We're both owners. |
| 30 | INJURIES: severe neck pain, low back pain, bad headaches for 4 months+, burns on my arms from the airbags. |
| 32 | I was very unsteady on my feet when I stood for the xrays.<br><br>I was discharged in the afternoon; I don't know what time.<br><br>My car was totaled. It was towed.<br><br>Today, we have a hyndai Palisade. |
| 35 | From the July MVA, I also saw Dr. Saldin at Trinity Spine. No surgery recommended. I had 2 cortisone/steroid shots in my neck. I don't know dates, but before the Dec 2019 MVA.<br><br>I had ablation Jan 2020. |
| 39 | That driver paid me $10K for my injuries. |

|  | I'm still treating with Drs Stacy and Saldin. Next appointment with Dr. Saldin is 3/10/21. Florida Blue was our health insurance on DOL. Not through employer as I was only part time. Gave insurance card to the providers. |
|---|---|
|  |  |
|  |  |

**Lisa Wilkins 11/2/20**

| 13 | License never suspended. Never got a traffic citation.<br><br>Married 17 years to Mondamin Wilkins; 1st marriage. No kids. |
|---|---|
| 21 | My husband had a spinal cord stroke. I helped clean his wounds on the days the nurse didn't visit. I took care of him and the house while looking for a job. |
| 22 | Never hospitalized prior to this MVA of 7/26/19. I wasn't seeing a PMD; except I saw Dr. Gadea once. |
| 29 | Impact was driver's side, between driver and passenger doors; middle. It got real dark and smoky. I was like in shock.<br><br>My hands were real tingly. I must have gripped the steering wheel. I have to keep moving them or they'd be stuck because of the nerves. |
| 30 | I opened my door a little bit to get air and somebody came to the door: "I called the paramedics and police and said they are on their way."<br><br>My car was pushed up against a power pole.<br><br>I did not contact law enforcement. I didn't lose consciousness.<br><br>**INJURIES:** severe neck pain, low back pain, bad headaches for 4 months+, burns on my arms from the airbags. |
| 33 | I called friends to get ahold of Bill Schaefer, who has a hitch on his truck. He picked me up, we went to empty out my car and get Tony's motorized wheelchair off the back. We were afraid it would get stolen.<br><br>He drove to our house and we unloaded everything and got Tony's wheelchair. We went to Trinity to get Tony.<br><br>My next treatment was Trinity Spine 8/1/19 and they tested my balance, which they said was all off. |
| 39 | That driver paid me $10K for my injuries.<br><br>I'm still treating with Drs Stacy and Saldin. Next appointment with Dr. Saldin is 3/10/21.<br>Florida Blue was our health insurance on DOL. Not through employer as I was only part time. Gave insurance card to the providers. |
| 40 | I thought the other driver's insurance would pay for my medical bills. |

| | If I'm on my feet too long or walk too much, it increases pain.  We don't really go out.  If I sit too long it gets stiff sometimes. |
|---|---|
| | |
| | |
| | |

**Mondamin Wilkins 11/2/20 (underlying case)**

| | |
|---|---|
| 7 | I go by Tony Wilkins. |
| 12 | Weber HS Chicago.  No church or extracurricular.<br><br>I'm retired and disabled.  Retired 2012 for a company I was at 30 years, Testa Produce in warehouse, loading trucks. |
| 13 | After I retired in 2014  to FL, I had a stroke in May 2014.<br><br>I was deposed for my suit against FL Hospital of Tampa for a bedsore wound; med-mal.  I was in hospital 3 months and they didn't turn me. |
| 18 | 1993 back surgery for herniated disc; it was shaved.  Off work 3 months. |
| 19 | Laminectomy L4-5 at Hinsdale in IL.  Hospitalized 3 days and home 2 months.  Returned to work after 3 months.  I did therapy.  I was back to status quo. |
| 25 | 5/13/14 was the stroke and discharge was 7/26/14.<br><br>From the stroke, I still have paralysis; in a wheelchair; pain by buttocks where you defecate from the wound scar. |
| 30 | Between July 2015 and the 7/26/19 MVA, I had no treatment. |
| 31 | **7/26/19 MVA:**<br>Friday.  Woke at 7am.  No breakfast as we were having lunch after the car service.<br><br>Wife and I had an appointment at Hyundai dealer on 19 in Port Richey for 7,000 mile check up. |
| 34 | Trouble Creek runs right to our complex.  She turned left, passed the Sam's Club entrance and within 3 minutes, somebody came from her side and hit us.  Airbags deployed and we were pushed into the power pole on Wiggins Street.<br><br>My side of the car started to fill with black smoke from the airbag.  I tried to open my window because it was hard to breathe.<br><br>I hit my head on the windshield because my side didn't have a power seat.  It went back and forth with a little clicker.  My feet went up into the dashboard. |
| 38 | The other lady was speeding or driving erratically because she got a couple of tickets.<br><br>Her car was red.<br><br>They extracted us because the power pole was going to fall down on our vehicle because we hit it so hard and the fire department was trying to hold it up. |

| | |
|---|---|
| | I was on a stretcher board, but saw her car was red.  There were 3 ambulances and she was by 1 ambulance.  Vaguely saw her out of the corner of my eye for 10 seconds as my head was strapped down. |
| 43 | They got a jaw to open my door; like a crowbar.<br><br>Hematoma laceration across my stomach from the seat belt.  Bunch of cuts and bruises on my legs hitting the dashboard and under the console.<br><br>My feet bled because my feet swelled from the impact.  All the blood rushing and I had a hard time getting shoes on/off when I got to the hospital.<br><br>Left neck and shoulder pain and a headache. |
| 44 | A bit of right side pain from my body twisting.  My whole left side shifted.  Right side back area and lower neck hurt.<br><br>Most pain was neck and was immediately a 10.<br><br>I was transported to Trinity Hospital.  They took my wife somewhere else. |
| 48 | Next treatment was ~3 days later for MRI at Gulf Coast in Tarpon.  I had 2 herniated discs and bulging disc  in my neck and bruised shoulder. |
| 49 | Then I went to the Trinity Health Center with Dr. Ronald Stacy.  He said I had a couple herniated dics in my neck and to go to Trinity Spine Center because I had very severe pain and daily headaches.  I woke with a headache and went to sleep with a headache. Dr. Stacy didn't know what to do. |
| 50 | I went to Trinity Spine Center 1-2 weeks later and saw Dr. Saldin.  He said we'd start with a cortisone shot to relieve the pain and maybe get the discs dissolved and inflammation away.   He told me to go back to Dr. Stacy to massage the neck and relieve some pain. |
| 51 | I had an ablation in July 2020 and 3 cortisone shots.  After the 3 shots, they said I should have ablation to relieve more pain because I still had a lot of headaches. |
| | |
| | |

Mondamin Wilkins 5/7/25

| | |
|---|---|
| 15 | I stopped for a better job.  Graduated HS 1982.<br><br>Retired Oct 2012 from a produce company in Chicago, warehouse manager 28 year years at Testa Produce. |
| 18 | The only other MVA was in 1993 and I wasn't injured and had no treatment.  No claim or suit.<br><br>5/13/14 I had a spinal cord stroke when both legs went out and I was paralyzed and in a wheelchair since. |
| 19 | Paralysis is waist down.  No other conditions for neck/back.<br><br>No neck treatment prior to MVA. |

| | |
|---|---|
| | The spinal cord in 2014 didn't treat for my neck; focused on low back. |
| 20 | I had the coarctation of the aorta in 2000 for blockage in my heart and had a stint put in when I was 10. |
| | I had back surgeries May 1993 and Feb 2007 for bulging disc; they shaved it; L4-5.  I don't know if it's from the 1993 MVA. |
| 21 | The MVA was Feb 1993 and I treated for bulging disc in May.  I didn't make a claim for the MVA.  Surgery was successful. |
| | In 2007, I was walking to my car and slipped on ice and injured my back L5-S1 and had a successful lapendectomy. |
| 22 | Moved to FL March 2013 after retirement and my wife's job changed. |
| | I filed suit over a bedsore wound from May 2014 hospitalization and it resolved out of court.   Peter Sartes and Tragos represented me. That's how I 1st came to know Sartes. |
| | No other legal proceedings or claims. |
| 25 | **Ex 1:** General Contingency Fee Contract, 7/29/19. |
| 26 | I signed it at home after getting it via email.  I didn't meet with anyone at Tragos prior to this contract.  I contact Tragos Monday after the MVA. |
| | I think Peter Tragos signed Ex 1.  My wife and I were injured.  Wife missed work.  To make a claim against Ireland. |
| 33 | I didn't keep calendars. |
| | I relied on Tragos to communicate with Progressive and Ireland and to make decisions. |
| 34 | I followed my atty's recommendations in this claim. |
| | **Ex 2:** Letter, 7.31.19 |
| 36 | The only communication we had with Progressive was my wife reported the MVA the day it happened.   I sent them photos and spoke to a rep at 7pm that night after I got home from the hospital. |
| 37 | Discussed the MVA and a rental car.  No other communications with Progressive. |
| | My UM coverage with Progressive was $50/100K. |
| | |
| | Part II, 5/21/25 |
| 16 | I talked to Progressive 7/26/19 to get a rental car.<br>Q: Discuss coverage?<br>A: They didn't go over everything.  I don't know if I had more conversations with Progressive about coverage. |
| | **Ex 3:** Request for Info, 8.13.19 from Progressive to me to complete PIP and medical auth and asked for treatment and insurance info and wage auth and affidavit of no other insurance. |
| 17 | **Ex 5:** Application for Benefits under PIP, 8/22/19 and filled it all out. |

| | |
|---|---|
| I thought I completed the medical auth, but not sure. |
| I provided my atty with a medical auth. I don't recall why I didn't give Progressive one.<br><br>OBJECTION |
| I was retired and not making a lost wage claim.<br><br>**Ex 6:** Letter, 8.2.19.<br><br>Gail Ireland drove the other car and we claimed against her insurer, Amica and she had $10K limits. |
| Attys decided to settle with her and pursue my UM.<br><br>**Ex 11:** Demand from Tragos, 10.21.19, which I've seen. |
| I don't know if I got the attachments. They demanded $50K from Progressive. I authorized it. |
| Q: Did you know this letter did not include any attachments?<br>A: I didn't know that. |
| I didn't know the xrays showed degenerative in my neck.<br><br>I also treated at Trinity Health for chiropractic and massage therapy.<br><br>My atty referred me to him.<br><br>I 1st presented to Trinity Health 8/1/19 and had conservative chiro and therapy starting 8/9/19. |

| | |
|---|---|
| 37 | There was an 8 day gap so I could get MRIs.  My wife too.<br><br>I also treated at Trinity Spine with Dr. Hayes and Saldin.  I was referred there by my chiropractor, Dr. Stacy. |
| 39 | I've seen some medical records form Hayes and Saldin.<br><br>I don't know if the records sent to Progressive had permanency opinion.<br><br>Dr. Hayes recommended continued conservative therapy, and if pain persisted to consider injections. |
| 40 | I had 2 procedures; radio frequency ablation?<br><br>I don't know if Dr. Saldin opined permanency.  He recommended chiro care per our Oct 2019 demand; no surgery. |
| 41 | I had cortisone injections too.<br><br>I only got Medicare; no other benefits. |
| 42 | Medical bills $9,718.81 per Ex 11.<br><br>**Ex 12:** Letter from Heimy Espinal, Progressive, 11.27.19 offering $1K for UM, which I've seen. |
| 50 | Q: Do you have knowledge of these allegations?<br>OBJECTION<br><br>I don't know if we sent Progressive any permanency opinion from a doctor by then.  I defer to the documents. |

| | |
|---|---|
| 52 | Tragos approved the cervical injection. He took the opinion of the doctor as I was in so much pain.<br><br>Q; In the end, who's decision? You or your atty?<br><br>A: My doctor and me, but he had to consult with my atty. Doctor wanted to make sure it was approved. |
| 58 | Probably mailed.<br><br>My chiro treatment at Trinity Health stopped during the pandemic 3.5 months, starting March. |
| 59 | **Ex 16**: Tragos correspondence 12.5.19, which I don't recall if I saw.<br><br>I had cortisone shots 12/2/19 and 10/28/19 in my neck with Dr. Saldin.<br><br>I don't know if my doctor opined about permanency by 12/5/19. |
| 61 | **Ex 17:** Letter from Progressive, 12.17.19, Camille Crawford, to Tragos, which I don't recall if I saw. $8,200 offer, which I didn't accept. My decision. OBJECTION |
| 62 | Q: As of 12/17/19, were you willing to settle for $50K?<br>A: No.<br><br>**Ex 18:** Email from tragos, 12.17.19: Peter Sartes, Crystal Linda and Peter Tragos.<br><br>I don't recall if I discussed the $8200 with attys. I didn't keep notes. |
| 65 | $8200 offer, which I did not accept. I was not willing to settle for $50K; I wasn't going to settle [??]. I discussed the offer with my attys; I was still treating. It was via phone. No notes. |

| | |
|---|---|
| 66 | I don't recall if I saw Progressive's response to CRN.<br><br>Any documents atty sent, I have in e or hard file. |
| 67 | **Ex 21:** Lawsuit, 2/11/20.  I was not willing to settle for $50K limits on that day.  I don't know if my attys told Progressive that. |
| 68 | Q: After suit, you never demanded the $50K limits.<br>A: There was mediation.  I don't recall when. |
| 70 | I had more injections in my neck and 2 RFAs.  The doctor said I'm not a candidate for neck surgery because of my stroke.<br><br>Q: Agree during suit, Progressive continued to try to settle.<br>A: I didn't know at the time. |
| 71 | I knew they offered $17K, but it wasn't sufficient.  Discussed with my atty by phone.  No notes. |
| 72 | **Ex 23:** Letter from Progressive, 7.10.20, $25K offer.  I don't know if I saw the letter.  Discussed it with my atty by phone.  No notes. |
| 75 | At that time, I would only settle for above limits of $50K.<br><br>**Ex 26:** Letter from Progressive, 12.24.20, which I don't recall.  Progressive tendered $50K. |
| 76 | I don't recall if my atty told me.  I didn't accept.  I was still treating.  I wasn't willing to settle for limits. |
| 79 | **Ex 27:** Correspondence, 1.8.21.<br><br>Q: On 12/29/20, Peter Sartes emailed Lee Gunn that Progressive tendered UM limits and what to do with the checks.  Did you know they were communicating?<br>A: No.  I didn't know we were bringing in Gunn.  I found out after I won my court in 2023. |

| | |
|---|---|
| 80 | Sartes to Gunn: "I believe Gunn is coming on board to handle the bad faith…" I wasn't aware at the time. I didn't intend to bring bad faith at the time; until it was settled, after court. |
| 85 | I'm suing because I haven't received money from the case I won. If we wanted to settle, I would've gotten my money back from 2023, but I haven't received bupkis. I'm speaking from my heart. |
| 86 | I won my case fairly. Went to appeal with 3 judges and I won. Progressive should have paid. |
| | |
| | |

**Camile Crawford 5/28/25**

| | |
|---|---|
| 9 | I'm supervisor at Progressive. July 2018 started at Progressive. I worked in customer service at another insurer before. |
| 10 | PD adjuster in July 2018 after training x 1 year. Took leave. Nov 2019 BI w/ atty-rep for BI and UM x 1 year Nov 2020 Supervisor of BI with atty-rep Nov 2024 supervisor of atty-rep and non-rep |
| 15 | I handled the Wilkins 7/26/19 MVA UM claim. I put notes in Claims Notes. |
| 16 | **Ex 1:** Claims Notes, 1-255. |
| 19 | We determined the other driver was at fault, not our insured.<br><br>We had gotten a demand and the prior adjuster extended an offer and I did a TTD on the last offer. |
| 22 | 12/4/19: I noted my liability determination.<br><br>I also made a call to atty's office and spoke with Linda and she said she faxed over additonal documents 11/18/19 and her client was getting additionbal injections and would send additional records once she gets them. |
| 23 | I don't recall Linda's role. I didn't get the additional documents from 11/18/19 call. I don't recall if was ever sent.<br><br>My next TTD was to follow up with the atty for additional records.<br><br>12/9/19 by Cindy Rodriguez, claims processor on admin team that uploads mail. I don't know her. |
| 27 | CRN is for first party coverage and the last attempt to settle before lawsuit. That we are not in good faith.<br><br>At this point, none of Wilkins' doctors opined permanency. |

| | |
|---|---|
| 28 | We have 60 days to respond to CRN. The 11/27/19 date puts deadline in Jan 2020. |
| 29 | 12/10/19 Rodriguez mail review. We got additional records.<br><br>Lisa Wilkins also made a UM claim. She is "ID".<br><br>I also adjusted Ms. Wilkins' claim. |
| 30 | Rodriguez directed me to review and respond to the additional records. I detailed it 12/16/19 with my eval.<br><br>Trinity Spine Ctr: 10/24/19-12/2/19. |
| 31 | **Ex 4:** Fax to Progressive from Tragos; the records I reviewed. There's no demand for limits. Shows Wilkins had injections 10/28/19 and 12/2/19. |
| 32 | I didn't get the 10/28/19 record. Dr. Saldeen didn't opine on permanency. No future procedures were scheduled. No reference to surgery or ACDF, except: "Follow up, consider left cervical RFA." |
| 33 | Just for him to consider and decide later. It wasn't clear if Wilkins would undergo that procedure. |
| 35 | Wilkins had a prior medical history. He was paralyzed waist down due to a stroke and had 2 prior lumbar surgeries. |
| 37 | "Lumbar sprain/strain with 2 prior laminectomies, $3-5K"<br><br>I looked at the facts and based on my knowledge and training gave it a value.<br><br>"Although no lumbar" Lumbar MRI was not completed but I was still considering it. |
| 38 | "Eggshell claimant". He was wheelchair-bound and had prior lumbar injury he needed invasive treatment. I still considered it even without diagnostic testing. It doesn't look like they were focused on that area, but I still gave value for aggravation to prior injury.<br><br>"There is additional $6,948 specials form injections 12/2/19" not yet processed by PIP. PIP benefits still remained, so I'm only considering the copay, MedPay and PIP deductible.<br><br>Noted it and the out of pockets could go up.<br><br>My range was $8,144-13,144. Including out of pocket |
| 40 | I didn't consider pain and suffering; it hadn't reached the tort threshold. |
| 41 | I didn't consider future care as we didn't have permanency. I didn't have info on future treatment either.<br><br>PRG 47 asking for authority of $13K and "see eval" |
| 43 | She increased reserves to $15K. That's not the value of the claim.<br><br>12/17/19: called Pf's atty and offered $8,200. Atty said would not accept less than limits. I faxed and mailed my response. I don't recall the name of the atty. |
| 44 | We did not value the claim at limits. $8,200 was fair. It considered out of pocket medicals.<br>**Ex 5:** Claim info letter, 12.17.19 to Pf's atty and offer. |

| | |
|---|---|
| 46 | I don't recall who I spoke with. I discussed there were additional documents that showed 3 injections and scheduled for a surgery consult. But, I had not gotten additional records.<br><br>1/6/20 to review additional treatment and update my eval and submit offer. |
| 47 | As I got additional info, I'd evaluate my offer.<br><br>Note 1/16/20 by Rodriguez received letter 12/31/19 and 12/5/19 for the insured driver, faxed 12/19 with additional medical records she wants me to review and respond. |
| 50 | "Follow Up" Wilkins would consider a procedure, but none was scheduled. Wilkins said he'd think about it. It was not clear if he would undergo additional treatment. No doctor opined permanency. There was a recommendation of RFA, but no surgery. |
| 56 | 1/13/20 by Rodriguez agreed<br><br>I then called Pf's atty that I had the additional records. I asked where they are with the last offer. He said they're not coming off limits. Also said if Progressive offered limits, they'd have to speak with their client to see if they were even willing to accept limits.<br><br>I asked him to send that they are not willing to negotiate in writing. He said they already did, but I had not received it. I only got additional records.<br><br>I asked again if they are not willing to come off limits, fi they could put in writing for both clients and he agreed.<br><br>They didn't send it. |
| 60 | I requested to respond to the CRN that the claim is still negotiable; just a value dispute.<br><br>Wilkins still had remaining PIP.<br><br>Since 1/13/20, I got no additional medical records.<br><br>I can't force anyone to negotiate. |
| 61 | The atty didn't agree with my evaluation, but the claim was not valued at $50K. Still no permanency. |
| 62 | No schedule medial procedures at this time.<br><br>The $8,200 offer included $2,278 OOP. He's not entitled to pain and suffering if he didn't breach the tort threshold. |
| 65 | 2/11/20 called pf's atty, but I don't recall name, following up on my offer. They wre not willing to negotiate and filed Complaint that day. I searched Pasco Co website and unable to find it.<br><br>Wilkins was not willing to settle for $50K limits. |
| 66 | 2/18/20 Rodriguez found the Complaint.<br><br>2/21/20 we had not been served yet. I also called Pf's atty and spoke with assitant, who spoke with the atty. I was told they are not willing to accept limits now. |
| 67 | I continued to follow up with the atty even after this point. Attempt to settle. |

| | |
|---|---|
| | 3/2/20 called agains. Spoke with case manager who spoke with the atty. They had nothing else to add.<br><br>I had not received additional treatment records or bills. If I had, I would have evaluated. Still not served with the suit. |
| 68 | 3/11/20, 3/20/20 and 3/30/20: 3 times trying to follow up with Pf's atty. I left messages.<br>3/30/20 spoke with atty that we were [?not?] served 2/27/20 and asked for the notice.<br><br>3/31/20 Nicole Perez notes Complaint received. |
| 70 | Wilkins never breached the tort threshold during my handling. I always tried to evaluate and act in good faith. |
| 72 | Progressive evaluated UM from DOL until CRN filed. I just became an injury adjuster in Nov 2019. I handled BI auto and UM/UIM. It was not my 1st UM. |
| 73 | I started ijury adjusting in Nov 2019 and I got this file Dec 2019.<br><br>Q: What training for cervical epidural steroid injections?<br>A: Training on evaluating. Each claim has different value. |
| 78 | I've no medical training.<br><br>I have reviewed venues and risks in venues. |
| 81 | I consider if the mechanism of injury is consistent with complaints.<br><br>**Ex 8:** Photo of windshield of Mr. Wilkins. |
| 93 | q: Does the UM policy condition UM payment on a release?<br>A: Can I take a break?<br>Answer the question.<br>A: I don't recall. |
| 96 | I didn't consider a partial payment of UM without a release. I don't recall if I was ever trained to do that. I was trained on UM. |
| 97 | We can request an EUO. If claimant refuses, we have the option to refuse coverage. |
| 98 | I don't recall if it's the same for IME.<br><br>I don't recall if I noticed claimant had not returned a signed medical authorization. I never asked for one.<br><br>I know the difference between reactive and proactive claim adjustment. We proactively seek records and reactive is waiting for them to be received. |
| 99 | We were trained to be proactive. I didn't request info from his HCPs.<br><br>I don't recall if I was trained to write a HCP to ask questions.<br><br>I had access to the PIP adjuster's notes. I saw Trinity's bills there. |
| 100 | I don't expect all those bills are related to the MVA. |
| 101 | Some are not related to the MVA and some bills aren't' reasonable.<br>Q: That would be fraud.<br>A: I don't know how to answer. |

| | |
|---|---|
| 102 | Q: Progressive can, like it did here, dispute reasonableness. But they won't provide bills unrelated to MVA without committing fraud.<br>A: Yes. I'll agree it would be fraud. |
| 103 | Q: Agree Wilkins had multiple cervical herniations; his central cord was displaced and radiating pain down his arms.<br>A: He had multi-finding levels in his cervical spine. |
| 104 | Q: The cervical spine has some hard bone and some soft discs.<br>A: Yes.<br>Q: The disc is the shock absorber that lets bones move without grinding on one another.<br>A: Yes.<br><br>I don't recall if we called it a jelly-filled donut. I don't recall if we were trained a disc has a hard fibrous shell and a more gelatinous material inside. |
| 105 | I don't recall if we learned that due to trauma, that fibrous shell can be broken and cause herniation or that the gelatinous material gets outside the hard shell.<br><br>I don't recall if we were trained if disruption occurs, it's not going to get reabsorbed and are likely permanent.<br><br>I don't recall if we were trained that gelatinous materials start touching on nerve roots and put pressure on the cord that has radiating pain down the arms. |
| 106 | I don't recall if we were trained when a nerve root is impinged it sends signals to the arms and causes pain and numbness.<br><br>I don't recall if we were trained when a disc protrudes into the cord that can cause significant pain and loss of bodily function.<br><br>I was trained the purpose of conservative treatment like injections is to reduce the inflammation to the soft tissue surrounding a herniated discs for relief. |
| 109 | I agree the fact he's getting conservative treatment doesn't preclude he'll later get surgery.<br>RFA is more invasive, but I need to look it up for specifics. |
| 110 | I would have looked it up for Wilkins, but not noted because it's for my knowledge. I was trained on RFA. |
| 111 | Q: Injection is with a sizable needle to reduce inflammation.<br>A: Yes.<br><br>I don't know fluoroscopy.<br><br>RFA uses radio waves to create a current that heats a small area of nerve tissue.<br><br>I would consider that in my evaluation. |
| 113 | At my level, we don't send records for medical review. |
| 114 | If I have questions, I ask my supervisor.<br><br>q: Does a herniated disc caused by MVA with radicular complaints meet the tort threshold?<br>A: Depends if we're able to determine if it was caused by the MVA. |
| 115 | q: Is a herniated discs caused by MVA likely permanent? |

| | |
|---|---|
| | A: Possible. |
| 116 | His records don't say he had permanency. |
| 117 | We look at records objectively and not for ways to not pay.<br><br>Q: You shouldn't read records to be the absence of evidence.  You should read records and say they don't say one way or other?<br>A: No.<br><br>Q: Did you think to ask his doctor if there was permanency?<br>A: No.  I was provided with records that didn't say permanency. |
| 118 | Q: But you needed that answer of tort threshold to adjust the loss.<br>A: No.  I didn't think it necessary considering I received the records. |
| 119 | I disagree with a herniation it's likely permanent.<br><br>I was trained to review the facts and evaluate.<br>Q: How would you determine what a jury would award?<br>A: For our numbers to be fair, we don't' have a tool because every claim is evaluated on its facts. |
| 122 | May put more value with those facts.<br><br>Q: The gross bills were $30K for this claim and was 6 months after DOL when you evaluated and he'll live into the future.  He wasn't' at MMI.<br>A: I don't recall if he was MMI.<br><br>I agree my evaluation had a record showing he was to follow up in 1 month. |
| 126 | Q: How did your eval look at his paralyzed stroke in a wheelchair with neck injury?<br>A: a lot of value for the aggravation to the prior injury.<br><br>Q: But to adapt because he's already in a wheelchair and now all these neck complaints making daily living more difficult.<br><br>A: I considered his injuries and treatment. |
| 128 | I described Wilkins as an eggshell Pf.  I considered he was wheelchair-bound with prior injuries.<br><br>12/16/19 eval.<br>Q: Under INJURIES, do you have any record Wilkins had prior herniations?<br>A: I don't believe so. |
| 131 | I didn't know if the injuries were caused by the MVA or if from prior to the MVA. |
| 133 | I don't know if these injuries were new or not.  They could have been prior, or not. |
| 135 | Q: What does FL law make someone liable for activation of an underlying disease or injury preexisting condition like the jury is instructed?<br>A: I agree tort fees are liable for aggravation of preexissting. |
| 138 | The image guidance was used to know what level to put it in.<br><br>I don't recall if I read the consent to an ESI.<br>Q: Wilkins was willing to undergo these injections because pain was enough to take the risk of putting a needle in his cord.<br>A: Yes. |

| | |
|---|---|
| | Ex 1 P 47 Lexi Gorman, supervisor: "CRN alleges Lisa Wilkins…"  I agree it's for Ms. Wilkins. |
| 143 | **Ex 5:** Claim info letter, 12.17.19 $8200 offer.  It didn't condition a release; just an offer to engage in negotiations.  I would have worked out language for a release. |
| 146 | I cut and pasted the medical records from 12/2/19 DOS.  Dr. Saldeen didn't say the herniations were caused by the MVA.  None of his doctors said they were caused by MVA.  Wilkins didn't breach the tort threshold  Therefore, he's not entitled to non-economic damages.  RFA was never scheduled.  No records showed he agreed to RFA.  He only had 2 injections during my time on the file.  No other procedures. |
| 148 | If a doctor opined permanency, I'd expect it to be in the records.  I fairly considered the medical records provided. |
| | Q: Tell me 1 proactive step you took to get facts.  Not sitting at your desk waiting for Atty Sartes to send you records.  A: Reviewed PIP to make sure I wasn't missing anything.  Maybe in PIP the Pf's atty didn't send me. |
| | |

**Lexi Gorman 5/5/25**

| | |
|---|---|
| | **Claims Manager w/ 2 entries on 12/16/19 ONLY**  <span style="color:red">NOTE: Progressive is deposing it's own witness</span> |
| 13 | By Dec 2019, I had adjusted/supervised BI 4-5 years.  Our Claims Notes are called *face sheet notes*, electronic. |
| 17 | 12/16/19 are the only entries in this file.  I authorized the evaluation upon new info receiuved by the adjuster Camille Crawford.  I was not her supervisor.  Her supervisor was out of the office, Kristen Rodriguez. |
| 18 | I assisted with time limit demands or uregent requests when she was on paid time off.  I was in Matitland, FL with Crawford and Rodriguez at the time. |
| 20 | We reviewed the records and evaluation.  She received additional records and we reviewed them together that hwat she was documenting had occured per the records.  We discussed her evaluation.  12/16/19 at 126pm: adjuster received additional documents.  Her entry detailed his treatment. |
| 21 | Wilkins had injections in Oct and Dec.  There was a CRN, not a timed demand. |
| 22 | What triggered her evaluation was the authority amount.  Hers was $10K. |

| | |
|---|---|
| | "Received treatment documents; Trinity Spine Ctr 10/24/19-12/2/19." I also reviewed the records. |
| 23 | **Ex 2:** Demand letter 10.10.19<br>12/5/19 fax from Tragos to Progressive with the records. Crawford only entered info re these records that day. |
| 24 | DOS 12/2/19 Dr. Victor Hayes for injection: medial branch blocks. Prior epidural steroid injection.<br><br>Progressive didn't get the 10/28/19 DOS injection. It was not with the Ex 2. |
| 25 | There was no note re surgery with the Dec records, but showed: "follow up: left cervical RFA/radiofreequency ablation, was an option." It wasn't scheduled. It wasn't clear on this record if Wilkins would undergo RFA.<br><br>The 12/12/19 records doesn't have any plans for a ACDF/interior cervical discectomy fusion. |
| 27 | Wilkins had PIP, which wsere not exhausted at this point. He had MedPay with his policy too.<br><br>PIP reflects a change to out of pockets.<br><br>Wilkins had a prior medical history: he was paralyzed, which we considered. |
| 28 | 12/16/19 Crawford had noted prior demands.<br><br>At one point, there was a dmeand for limits. There was an original evaluation and after additional treatment, Crawford updated it. |
| 29 | 12/16/19 Crawford note requests authorization for $13K for evaluation range of $8100-13,144. |
| 30 | In addition to the Dec records, I would have also looked at all records available.<br><br>**Ex 3:** Letter Tragos to Progressive, 12.5.19 with records and this is what I discussed with crawford. |
| 32 | The chiro treatment was at Trinity Health. 7 sessions.<br><br>He also presented to Trinity Spine 9/11/19 to Victor Hayes. I see no permanency. |
| 33 | The plan 9/11/19 was dosepak, continued therapy, potentially injection if pain didn't resolve and ACDF "wasn't" [?sic?] optional if they did not work.<br><br>No injections or surgery was scheduled in Sept. Injections may or may not occur.<br><br>Wilkins returned to Trinity Spine 10/9/19 with Dr. Saldin. |
| 34 | Dr. Saldin listed very similar plans: injections. No permanency given.<br><br>7/16/19 Crawford note: details the treatment. "Based off prior evaluation, CTL/cervical thoracic lumbar; SS/sprain/strain; cervical AGG/aggravation; DDD/degenerative disc disease." |
| 35 | Crawford accepted a sprain/strain with aggravation to the cervical spine and DDD. |
| 36 | Crawford valued $3-5K and for 5 cervical injections at $8K-10K.<br><br>She also apportioned for the low back $3K-5K. |

| | |
|---|---|
| | These are values to resolve the claim. |
| 38 | The tort threshold in FL is that there can be no claim for damages for pain or suffering unless the threshold has been breahced: death, disfigurement, loss of bodily function and a permanent injury. |
| | Wilkins had not breached a tort threshold. He's not entitled to non-econominc dmaages like pain and suffering. |
| 40 | I noted: "multiple injections, eggshell claimant are driving value." Eggshell is predisposed to injuries based on preexisting. |
| | I increased the reserves when I authorized her $13K, to $15K. Reserves holds funds for worst case evaluation. |
| | Doesn't mean the value was at $15K. |
| 51 | UM is kept in the same file as the PIP MedPay file. I can look at diagnostic codes and charges. |
| | The UM adjuster did not ask for a medical authorization. |
| 52 | Q: What about the PIP adjuster? A: It's included in the no-fault application; an assignment of benefits and medical authorization. Q: Can the UM adjuster use that PIP authorization? A: For a 1st party claim, yes, if completed. It was not completed in this file. |
| 53 | Q: Did UM adjuster ask the PIP adjuster to get a signed authorization? A: I don't recall. She could have. |
| 54 | The cervical MRI showed herniations and osteophytes at multi-levels. |
| 58 | It's acceptable for Pf's counsel to just send records without a summary. Atty Sartes did it in hopes it will assist us resolve/pay. |
| 59 | We don't require a demand to pay a UM claim. We investigate and make prompt, fair payments. |
| | I'm not a lawyer. |
| 61 | Q: If Progressive thought there'd be future and pay $25K today, but leave the UM claim open for additional info, and maybe we'll pay up to $50K? A; It could have happened. That is not standard for evaluating claims. |
| 63 | If we want a 2nd opinion, we have tools. That was not done prior to my involvement in this claim. |
| | We accepted an aggravation to cervical. |
| 64 | We didn't have pre-existing records. Q: No good faith basis to dispute the treatment for neck. A: I agree I had no medical evaluation indicating the discs were not from the MVA. |
| 65 | I have significant experience with soft tissue claims. |
| | The doctor didn't give permanency. We did not ask the doctor. We didn't do a record review before my time. |
| 66 | IME was an option. We choose not to at that time. |

| | |
|---|---|
| 67 | The doctor didn't feel the patient was a good candidate for neck surgery based on prior injuries due to risks. |
| 69 | I don't know how big the needle is for injections. I've seen it.<br><br>I consider if somebody has injections is likely experiencing significant pain.<br><br>I wont' say ESI is temporary; it's case-by-case.<br><br>We didn't ask a doctor for future care needs. I can't say what his future care would be with certainty. |
| 71 | There was no permanent injury opined by a doctor. Need it for futures to be recoverable. |
| 72 | Q: If you were to evaluate future pain for Wilkins in Dec 2019, that would be $50K limits?<br>A: I would not have agreed to that at that point. |
| 73 | We made a decision based on info at that time. We don't have a formula to evaluate past and future pain. No computer model. |
| 75 | We did not consider pain and suffering on this claim. |
| 78 | MedPay was $500. So I had $20,500 underneath UM; collateral offsets. Anything over $20,500 is UM. |
| 80 | Typically, attys handle the liens. We consider it, but I don't recall anything about health insurance in this case.<br><br>The claimant's atty handles the insurance lien. It doesn't change the analysis [?sic?]. A health insurance lien is considered in UM analysis. |
| 81 | When paying full policy of UM, Progressive requests a release, but does not have specific hold harmless language. |
| 82 | Wilkins got injections; cervical ESI. 10/28 and 12/2 injections after Crawford's last evaluation, so those were "additional treatment".<br><br>I'm familiar with these procedures. Medial branch block injection on the left C4-6. |
| 85 | I agree for that procedure, a patient hurts pretty bad.<br><br>Q; What's the difference between the block of cervical medial nerve branch and facet joint injection process?<br>A: The placement. |
| 88 | She considered the history and impact. It was a heavy impact. The vehicle was a total loss. I don't know if Jaws of Life was used.<br><br>I can't say this impact is not inconsistent with permanency. I'm not a doctor. |
| 90 | I consider impact for injuries for causation. He got hit hard and makes sense he probably got hurt.<br><br>5 cervical injections, $8-10K. |
| 91 | Q: Where did the adjuster get that number?<br>A: Same consideration as discussed.<br>Q: Subjective experience?<br>A: Yes. |

| | |
|---|---|
| | The 3 level injections are part of the $8-10K. She assigned $3-5K for the low back. No specific treatment. |
| | I was trained how to review medical records and evaluate and was adequately trained as of Dec 2019. |
| 98 | Wilkins policy has language from the tort threshold and it's in the statute. He has to establish a breach for non-economic damages. There was no breach in Dec 2019. |
| 99 | No doctor gave permanency. No loss of bodily function or disfigurement. |
| 100 | CT cervical by Dr. Chang: "No acute bony injury in cervical spine, multi-level degenerative changes." WE considered that. |
| 101 | that means some preexisting. MRI 8/5/19 of cervical by Dr. Timken didn't say caused by the MVA. |
| 104 | I agree radiologists are not clinicians. If someone sustained an injury, it's up to the treating doctor who takes in the entire picture. |
| 105 | We didn't consider an IME in dec 2019. It wasn't a necessary step to move the claim forward; the value was within limits. |
| 109 | No indication of a permanent injury. |
| 114 | In Dec 2019, we didn't seek IME for future bills. |
| 116 | It was uncertain Wilkins needed more treatment. Didn't know if it was related by the MVA. There was no permanency. |
| 117 | If we got additional info, of course we'd consider it. There was no opinion it was related or a permanent injury. We didn't consider non-economics. |
| 118 | It was unknown what extent Wilkins' injuries were related to the MVA. We considered collateral sources such as PIP and BI coverage the tortfeasor maintained. |
| | Q: when a HCP submits bills to PIP for MVA, is it fraud if not related to the MVA? A: I don't know. PIP covers medical bills related to a covered loss. |
| | |

**Krissi Rodriguez 6/24/25**

| | |
|---|---|
| | Claims manager Progressive, oversees 5 supervisors, 30-35 adjusters 15 years |
| 12 | No insurance certifications In 2019 she was supervisor in attny repped BIL department |
| 16 | Crawford was on her team Claim assigned to Crawford on 12/4/19 |
| 19 | CRN had been filed but was open |
| 21 | She would have briefly reviewed the additional records received on 12/10/19 |
| 23 | No statement on Dr. Saldin on 12/10 records re permanency |
| 24 | With no proof of permanency they would not consider future meds, or paind and suffering |

| | |
|---|---|
| 25 | Crawford note says she reviewed and evaluated records of 12/10/19 and concluded range was 8144-13144 |
| 26 | At that time still remaining PIP benefits |
| 27 | Crawford met with Ms. Gorman, another supervisor on 12/16 19 to discuss evaluation |
| 28 | Offered $8200 and on 12/17 requested additional documentation, attny said nothing less than limits |
| 29 | Her next entry is 1/6/20, noted mail, which included additional medical records and/or bills-12/31/19 docs came in |
| 30 | He had received 30% relief, and nothing specifically scheduled |
| 32 | 1/13/20 she indicates authority for 13,144 noting updated specials |
| 35 | No indication of permanency and no breach of tort threshold |
| 36 | 1/13/20 Crawford had TC attny, not willing to negotiate below limits, not sure if he was accept limits |
| 37 | She extended the 8200 offer |
| 38 | Entry at PRG 53, 1/20/20 summarizing status and rec on response to CRN |
| 42 | Shoe noted cervical/thoracic sprain , cervical aggravation, DDD, lumbar aggravation, injections 10-28, 12-2 |
| 46 | Note on 2/18/20, res suit filed on 2/11/20 |
| 48 | Her understanding was they were not willing to negotiate or settle for limits |
| 50 | No medical record contained a MD saying permanent |
| 56 | She understands if P had cured CRN, no bad faith |
| 60 | She admits they could have required CME, EUO, record review, |
| 63 | She saw adjusters review medicals, but did not see any one seek other info |
| 64 | She questions relatedness because of DDD |
| 65 | Pg 54 of claim file says the herniations were "accepted injuries" |
| 66 | She had no reason to think doctors were not telling the truth with what they found re herniations |
| 68 | She does not recall date ACDF was mentioned. |
| 70 | The release, full and final would mean there would be no more UM benefits payable |
| 71 | They never asked any doctor about it—"it would be up to the doctor to document it" |
| 75 | "accepted" means it is being considered for evaluation.  She agrees it would mean accepted the yare related—they appear to be related |
| 77 | She accepted that there were medial branch blocks at C4,5,6, |
| 78 | She noted 5 cervical injection, 3 level cervical facet block, one level ERSI, x2, |
| 93 | P trained to affirmatively investigate to better understand fact and evaluation |
| 104 | She is not aware of any partial payments |
| 109 | Since the doctors diod not express permamency that meant to her it was not permanent |
| | |
| | |
| | |
| | |

**Peter Sartes 6/25/25**

| | |
|---|---|
| 18 | 95% plaintiffs BI |
| 34 | MW executed a MA for the firm to obtain his records. |
| 49 | PIP sent app, MA, insurance info and wage authorization |
| 50 | Says P never received a MA, he is not sure if was signed but he presumes it was |
| 53 | If they didn't get MA, they could have called him and he wold have gotten it to them |
| 64 | 10/21/19 sent demand for limits along with records but letter was faxed and not enough pages to have included records |
| 67 | A company can only evaluate based upon what it has, but getting it from Plt attny is not the only way to get info |
| 73 | They may not have calculated OOP because based on MRI, and recommendations they felt case far exceed level of insurance |
| 75 | They didn't wait for Pasco Imaging to provide bill because this clearly exceeded policy |
| 76 | Note indicated he will be undergoing injections and is still treating |
| 81 | The tort threshold was also inserted into the UM policy<br>He put that in letter so adjuster knows they are references for futures |
| 82 | He does not know if any meds used magic language |
| 83 | Dr Hayes record from 9/11/19 states multiple heriations, which he believes clearly shows permanent injuries |
| 85 | He does not believe the magic words are required |
| 86 | He agrees it is his burden to show threshold in a Bi claim but for UM, it is the carrier's obligation to evaluate client and make appropriate tender |
| 87 | Itt is his belief that the records evidenced that MW had permanent injury, |
| 89 | The carriers obligation is to review records, do whatever discovery is necessary<br>Hayes 9/19 he recommends continued therapy, then injection, and if that fails he could be considered an SCDF |
| 99 | Jaime, Linda TC requesting documents, he indicated it sounded like they didn't get the demand and were just sending it on—extension was granted to respond |
| 102 | P had offered $8400 prior to receiving docs, and after offered $1000, it shocked him. |
| 104 | He corrects himself on timeline,j |
| 106 | 11/27/19 he writes them letter same day offer of $1000 is received |
| 107 | CRN was sent that same day |
| 108 | He did CRN to make sure P knew that $1000 offer was not appropriate |
| 109 | He is not sure if CRN set forth cure or demand |
| 110 | CRN states severe and permanent injuries |
| 114 | 12/5/19 letter with summary and addtl meds, including 12/2/19 Trinity record showing injection onf 10/28, 12/2 |
| 116 | Dr. Saldin does not state permanent-and is silent on ACDF but follow up to consider radiofrequency ablation which "burns the nerves" to prevent pain |
| 119 | They did not provide projected future specials<br>On 12/17 Crawford extended offer of $8200 |
| 124 | Asserts privledge re whether MW would have accepted limits |
| 125 | 12/31/19 they sent more records, including 12/18/19  and he reported 30% improvement or relief-they also discussed repeting facet injections versus RFA |
| 127 | 1/13/20 Crawford reoffered $8200 |

| 133 | Objected to question whether he was not willing to settle for $50 |
|-----|---|
| 136 | If P had offered 50K during CRN they would have accepted it because there would be no additional funds to pursue. |
| 139 | Suit filed 2/11/20 |
| 140 | MW never communicated an unwillingness to settle for the limits |
| 143 | During CRN no additional records were sent |
| 146 | He does not dispute that MW was not wiling to settle as of 2/21/20 for limits |
| 147 | From that on , no offer to settle with P for limits |
| 153 | Later demands were above limits |
| 155 | 12/24/20 P offeres 50K for release |
| 156 | That was not a confession of judgment, it is not an unencumbered tender, but conditioned upon releasing  P  (woud eliminate bad faith case) |
| 159 | 12/31/20 letter to Wicker Smith, and questions whether payment being made qithout prejudice for ongoing issus—were they also trying to settled the bad faith claim |
| 164 | He talked with WS generally about release, P claimed they were not aware of any bad faith allegations, they objected to any release, he could not waive MW perfected rights |
| 171 | The Gunn firm was retained in 2/21 |
| 174 | If question is no MA, no one communicated that to his firm, why no EUO, CME, |
| 175 | If P had asked him to get specific language from a doctor he would have done so |
| 177 | P never made an offer not conditioned on full and final settlement |
| 178 | Never an offer for a partial payment |
| 179 | P never followed up on request for MA, never asked for an EUO, never asked for a CME |
| 180 | Other than saying they didn't think they had enough info, no other explanation ever given<br>If P had offered the 50 during the CRN he would have no choice but to accept |
|  |  |
|  |  |
|  |  |
|  |  |

1. Note on pg 40 of claim notes, Prog 40, Espinal is doing eval, notes the 4 herniations, notes the paraplegic condition, allows less than half of the PIP paid specials, and notes severe impact and likely ESI
   a. Then notes that no invasive, chiro only, Pip available---on weakness notes impact and eggshell, where is mention of herniations, or impact of paraplegia
   b. Notes surgery consult on page 49

MONDAMIN WILKINS,

      Plaintiffs,

vs.

PROGRESSIVE SELECT INSURANCE
COMPANY,

      Defendant.

Case No. 8:24-cv-01793-TPB-AAS

## PLAINTIFF'S EXPERT WITNESS DISCLOSURE

Plaintiff, MONDAMIN WILKINS, by and through undersigned counsel, and pursuant to Federal Rule of Civil Procedure 26(a)(2), hereby files his expert witness disclosure as follows:

## RETAINED EXPERTS:

1. Daniel Doucette
Doucette & Associates
16800 W. Greenfield Avenue, Suite 124
Brookfield, WI 53005

A copy of Mr. Doucette's CV and case list are attached to his report, and a statement of his compensation to be paid for study and testimony is contained therein. As discovery is ongoing, Plaintiff, MONDAMIN WILKINS, reserves the right to supplement this disclosure and report.

EXHIBIT

3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been served via e-mail transmission to all known counsel of record this 29th day of April, 2025.

Respectfully submitted,

*s/ L. Delton Gunn V*
Lee D. Gunn, IV, Esq.
Florid Bar Number: 367192
lgunn@gunnlawgroup.com
labramson@gunnlawgroup.com
L. Delton Gunn, Esq.
Florida Bar No.: 1038889
DGunn@gunnlawgroup.com
kfisher@gunnlawgroup.com
**GUNN LAW GROUP, P.A.**
401 E Jackson Street, Suite 3600
Tampa, Florida 33602
Tel: (813) 228-7070
Fax: (813) 228-9400
***Counsel for Plaintiff***

## SERVICE LIST

Megan E. Alexander, Esq.
David M. Angley, Esq.
Austin P. Booth, Esq,
YOUNG, BILL, BOLES, PALMER
DUKE, & THOMPSON, P.A.
401 E Jackson Street, Suite 2950
Tampa, Florida 33602
(813) 603-3066
e-mail:
malexander@flalawyer.net
dangley@flalawyer.net
abooth@flalawyer.net
*Counsel for Progressive American Insurance Co.*



*Forensic Consulting*
*Bad Faith & Insurance Coverage*

**REGARDING:**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**MONDAMIN WILKINS V.**
**PROGRESSIVE SELECT INSURANCE COMPANY**
**CASE NUMBER: 8:24-cv-01793-TPB-AAS**

**PREPARED FOR:**
**L. DELTON GUNN V**
**GUNN LAW GROUP, P.A.**
**410 EAST JACKSON STREET**
**TAMPA, FL 33602**

**PREPARED BY:**
**DOUCETTE & ASSOCIATES, INC.**
**16800 WEST GREENFIELD AVENUE, SUITE 124**
**BROOKFIELD, WI 53005**

**APRIL 29, 2025**

**Daniel R. Doucette, President**

## Introduction

This report represents a statement of my opinions and the basis for those opinions in the matter captioned *Wilkins v. Progressive Select Insurance Company.* All the opinions expressed in this report are opinions that I hold to a reasonable degree of professional certainty and probability. In reaching these opinions, I rely on my substantial experience and educational background, discussed below. A copy of my current *curriculum vitae* is attached as **Exhibit 1**.

## Professional Experience

I have approximately 40 years of experience in the insurance world, including 25 years with a multi-line insurance company and approximately 15 years as a trial attorney specializing in insurance-related issues.

I began my insurance career as I entered college. I studied insurance in college and took a position at that time as an intern in the claims department of Milwaukee Insurance Group ("MIG"). I will refer to MIG throughout this report with the understanding that it refers generically to a group of insurance companies originally based in Milwaukee. During the early years, it consisted of a mutual company as parent and primary owner of a publicly traded downstream holding company. The holding company owned multiple operating insurance companies, originally operating in the Midwest, Arizona, and the Southeast, including Florida. Over the years, MIG affiliated with a large NYSE company called "Unitrin/Trinity," now primarily known as Kemper. With this affiliation, our group consisted of more than 40 companies writing insurance in all but a small handful of states.

The MIG internship program consisted of hands-on learning while paired with an experienced claims handler, as well as an educational component which provided opportunities to take AIC (Associate in Claims) courses, CPCU (Chartered Property Casualty Underwriter) courses, and other related insurance courses.

After graduating college and completing the MIG internship program, I entered law school at the University of Wisconsin. During this period, I also worked as an investigator for a specialty plaintiffs' firm. Upon graduation, I returned to MIG, this time as a claim manager/litigation supervisor. That role required me to handle my own caseload, as well as supervise several front-line adjusters. I also oversaw certain litigation matters for MIG in that role.

After several years, I left MIG to join a private law firm, known at that time as Kluwin, Dunphy, Hankin and McNulty and now known as Hinshaw Culbertson (the "Firm").

Initially I handled basic insurance claims, including automobile claims, slip-and-fall claims, etc., as well as most of the insurance coverage questions presented to the Firm. I eventually became the Firm's managing partner and focused my practice on Professional liability and aviation matters.

During this period, I was one of several individuals who helped form a captive legal malpractice company. This company was reinsured in London. The Firm acted as the claims department for the company, which included investigating, defending and, if necessary, trying legal malpractice claims brought against the company's insureds.

I eventually left the Firm to return to MIG, this time as Vice President of Claims and Legal. Over the years, I progressed to the role of Chief Operating Officer, then Chief Executive Officer, and ultimately executive Chairman. Throughout my second tenure at MIG, the claims department reported to me and, until the very end, I also ran the audit and roundtable functions. I was also responsible for purchasing the company's E&O coverage, reinsurance treaties, etc.

Further, I was a member of the Claims Committee of both the NAII (National Association of Independent Insurers, now known as PCI) and NAMIC (National Association of Mutual Insurance Companies). These are industry trade associations that provide a forum for sharing claim-handling techniques, issues, and approaches. In that role, I have gained familiarity with the claim-handling practices of many companies beyond the ones that employed me.

2

I have also taught several insurance related courses, including CIC (Certified Insurance Counselor), attended numerous seminars and courses on insurance and claim issues presented by the Property Loss Research Bureau, PCI, Defense Research Institute, and other organizations. I was active in both writing and speaking across the country on a wide variety of insurance and claim related matters.

In 2012, I retired from MIG and founded Doucette and Associates, a consulting firm offering coverage analysis for insureds in complex losses, as well as expert testimony in bad faith litigation.

I am being compensated on an hourly basis at the rate of $475 per hour and my total compensation will be completely dependent upon the number of hours worked in this matter and no other factor. A list of the cases in which I have testified in the last four years is attached as **Exhibit 2**.

In reaching the opinions and conclusions that are expressed in this report, I reviewed a great deal of information submitted to me by your office. A list of that material is attached as **Exhibit 3**.

At this point no depositions have been taken in this case, and it is my understanding that discovery continues. Therefore, I reserve the right to amend or supplement this report if additional material becomes available.

### Standard of Review

As noted in the introduction, my opinions are from the perspective of an expert in insurance and claims handling and not as a lawyer. However, to properly operate a claim department, one must be familiar with the various legal standards that apply as well as the standard Custom and Practice in the industry. These are many times inter-related.

To determine if the claim handling in this matter was appropriate, one must first understand what the standard for proper claim handling is. An expert should not give opinions on the ultimate question as to whether the company was or was not guilty of bad faith or improper claim handling but rather will

3

discuss whether the company's behavior complied with the Custom and Practice in the industry.

Custom and Practice begins with an understanding of the laws that apply to the insurance industry. Insurance is a heavily regulated industry requiring compliance with a wide range of statutes, case law and administrative regulations. However, many statutory or administrative provisions do not provide enough detail to determine if they have been violated. For instance, various provisions may require a "prompt" investigation, or a "reasonable" investigation. To comply with these types of provisions, the insurance industry has over time developed an understanding of the steps that should be taken to avoid violations or bad faith litigation. These practices are shared and taught in various ways. Custom and Practice consists of the basic steps and behavior that an insurance company should follow or risk the possibility of being found in bad faith. In essence, Custom and Practice is the standard of care generally applied to the insurance industry. In many ways the laws provide "what" must be done, and Custom and Practice provide the "how." My background as an adjuster, claim manager, VP of Claims/Legal, as well as my role as a teacher and participant in numerous industry gatherings has given me an excellent understanding of these customs and practices and how they apply to cases such as this.

### Basic Good Faith Duties of an Insurance Company

In Florida, the general definition of bad faith for an insurance carrier is found in Florida Jury Instruction 404.4 which states as follows:

> "Bad faith on the part of an insurance company is failing to settle a claim when, under all of the circumstances, it could and should have done so had it acted fairly and honestly towards its policyholder and with due regard for their interests."

Even before settlement discussions can take place, an insurer has an obligation to conduct a reasonably thorough and reasonably prompt investigation, and this must be followed by a fair, unbiased review of the evidence. An inadequate investigation can often lead to an incorrect analysis of either damages or liability.

4

"Claims investigations are critical and represent the foundation for the evaluation and assessment of a claim. The key to a proper claim evaluation is to review all the investigation and documentation material and then summarize the key elements of the claims in terms of liability and damages. The claim investigation serves as the basis for the coverage analysis and evaluation of the claim. If the investigation is inadequate or incomplete, then the evaluation may be flawed or incorrect." (Claims Operations: A Practical Guide-International Risk Management Institute, Second Printing, 2012, page 115)

The investigation as well as the evaluation should be fair and unbiased. The textbook for the Associate in Claims designation explains it as follows:

"The investigation should not be biased. Bias in claim handling is a predisposition to a particular outcome. **When investigating claims, claim representatives should pursue all relevant evidence, especially evidence that establishes the claim's legitimacy, without bias.**" (Chapter 3.16 Claim Handling Principles and Practices, AIC Claims Designation Program, The Institutes, 2014 (AIC 30) (emphasis added)

An insurance company is not obligated to accept, as fact, a claim or statement from the claimant, but if it is to deny or resist the claimant's position, it must have relevant reliable information to the contrary. An adjuster cannot speculate, nor substitute his opinion for a medical provider, etc., without a reasonable basis to do so.

It is also an insurance company's obligation to pay undisputed amounts and avoid delaying settlement when the obligation to do so is reasonably clear.

One other important aspect of this matter is that it is a first party claim, that is a claim being made by Progressive's own insured. First, the policy would require Mr. Wilkins to cooperate with the investigation by Progressive which could include signing Medical Authorizations, undergoing a Compulsory

5

Medical Exam, sitting for an Examination Under Oath, and in other reasonable ways respond to questions Progressive might have. Secondly, it focuses the inquiry into the question of whether Progressive "should" have resolved the claim since the "could" was always within its control. If the policy limit offer had been timely made, no agreement on release terms would be necessary since there is no concern about a possible excess verdict being rendered against the insured.

### Brief Summary of Facts

This matter arises from an automobile accident that occurred on July 26, 2019. Mondamin Wilkins was a passenger in a vehicle being driven by his wife, Lisa. Their vehicle was struck in a significant T-bone type of crash by a vehicle operated by Gayle Ireland. Ms. Ireland's vehicle failed to yield the right of way striking the Wilkins vehicle broadside. Ms. Ireland was insured with Amica Insurance under a policy that provided liability limits in the amount of $10,000/$20,000. The Wilkins were insured with Progressive Insurance Company with a policy that provided UM/UIM limits of $50,000/$100,000. Both Lisa and Mondamin sustained significant injuries, but Lisa has resolved her claim, and this report will focus on the handling of the claim presented by Mondamin.

Because of issues unrelated and prior to this accident, Mondamin was a paraplegic and confined to a wheelchair.

From the very beginning both Amica and Progressive agreed that the liability rested with Ms. Ireland, Amica's insured. There were no coverage issues so the only issue facing Progressive was the severity of the injuries sustained by Mondamin.

After the T-bone impact, the Wilkins car was forced into a utility pole and the rescue personnel were required to use a "jaw of life" in order to extract Mondamin. He was transported to the emergency room, where he was treated and released with instructions to see his own physician for follow up.

An MRI performed by Gulf Coast MRI about one week after the accident revealed multiple herniations and bulges in the cervical spine. (Prog 3208) It was reported to Progressive that in addition to the cervical herniations, Mondamin sustained bruising to his forehead and legs, and glass had become imbedded into his forehead.

It was always recognized by Progressive that the impact was significant, and they ultimately totaled the Hyundai Sante Fe that the Wilkins had occupied.

Early in the matter, Mondamin retained the services of the law firm of Tragos, Sartes and Tragos. On September 9. 2019, Mr. Sartes from the firm sent a Letter of Retainer to Progressive and indicated that since the damages would exceed the $10,000 limit of Amica, Progressive should open a UM claim.

On September 12, 2019, Mondamin was seen at Stand-Up MRI where the scans were repeated. (Prog 3132) Once again, multiple herniations were found in the cervical spine.

Although Progressive recognized that because of the preexisting paraplegia, Mondamin presented as an "eggshell" plaintiff, they did not appear to recognize the significant complications created by the combination of lower body paralysis and the limitations on motion now present in the upper body as a result of the accident.

In October 2019, Mondamin transitioned his care to Dr. Saldin at Trinity Spine Center. After reviewing the MRIs and past treatment, Dr. Saldin determined that interventional pain injections should start. (Prog 3302)

On October 21, 2019, Mr. Sartes forwarded to Progressive a letter summarizing the facts of the accident, the injuries sustained by Mondamin, the treatment he had received to date, and support for medical specials totaling $9,700. (Prog 2613) He also indicated that Mr. Wilkins would need to continue the injections and noted that Dr. Saldin was considering an ACDF from C4-C7. (Prog 2618). ACDF, Anterior Cervical Discectomy & Fusion, is spinal surgery in which the surgeon removes discs from the neck and then

7

fuses the spine. Mr. Sartes closed the letter by demanding the payment of the $50,000 policy limits and gave them a deadline of November 20, 2019.

On October 28, Mr. Wilkins returned to Trinity where he underwent a Cervical Epidural Steroid Injection. (Prog 3240)

On November 19, 2019, Progressive notified the attorneys that they were waiving their right to subrogation against Ireland allowing Mondamin to accept the $10,000 payment from Amica.

The Tragos firm submitted updated medical records and bills from Trinity on November 18th, 2019, noting that the medicals incurred now amounted to $14,302.98. (Prog 3373)

I would note that within Progressive, the PIP file and the UM file are one and the same, so that any information, bills, or other records that had been obtained as part of the PIP benefit, would be available for review by the UM adjuster.

Thus, on November 27th, 2019, Progressive knew that Mr. Wilkins had been in a significant accident, had sustained 4 herniations to his cervical spine, had incurred over $14,000 in medical bills, had undergone multiple injections for pain, and was being considered for ACDF surgery, its response - Heimy Espinal from Progressive offered to resolve the claims of Mondamin for $1000. (Prog 1078)

At this point the Tragos firm filed a Civil Remedy Notice with the state putting Progressive on notice of a potential bad faith claim in addition to the underlying claim. A CRN gives the insurance company 60 days to resolve the matter. It is a "last chance" opportunity to avoid any potential bad faith claim. The matter was transferred to Camile Crawford within Progressive. The combination of this "last chance" and the transfer to a new adjuster should have provided Progressive with an opportunity to review the matter with a new critical eye, looking for any information that might have been overlooked in the earlier reviews. This would include the notation that Mr. Wilkins was being considered for ACDF and yet no mention is made of the possible surgery. (Prog 0046)

Mr. Tragos forwarded to Ms. Crawford updated records and bills on December 5, 2019, indicating that the total medical bills now amounted to $31,462.98. The records reflected that because of the failure of the more conservative measures, interventional injections were again administered. (Prog 3246)

Crawford reevaluated the injury and came up with a range of $8144-$13,144. She received authorization to offer $13,144. So now with almost $32,000 in bills, multiple herniations, multiple injections and conservative treatment failing, she made an offer of $8200, the very bottom of an unrealistic range. Even with the $20,000 set off (Amica's limits and PIP) she was saying a fair offer reflected a total value of $28,200, a sum that did not even amount to the medical bills incurred. It also does not mention any possibility of future medicals, yet the record was very clear that conservative treatment had failed, and pain injections were the only treatment available.

Treatment continued through early 2020 with multiple additional injections. On April 14, 2020, Ms. Hailman had a call with the attorneys and was informed that the bills now exceeded $40,000. She reevaluated the claim, and this time concluded that the range was between $16,678 and $37,678. She chose to offer $17,000. Throughout this entire time, the Tragos firm consistently indicated that their demand remained at $50,000.

The medical report from Trinity dated June 18, 2020 (Prog 1400) is very telling. Noting the history of injections, and the lack of progress, the doctor notes:

> "I would not recommend surgery he's too high risk. The risks outweigh the potential benefits. Normally I would recommend surgery, but his medical condition precludes it is too risky for him. Recommend RFA as per Dr. Saldin, if that does not help, continued long-term pain management unfortunately."

On July 9, 2020, Ms. Hailman reviews the medical records including the June 18th report mentioned above. Remarkably, she makes no mention of the surgical situation and simply notes that he received additional injections and tolerated the procedure well. She does note that bills are now more than $55,000 and concludes that the case now has a value up to the limits. She requests and receives authority to offer the $50,000. (Prog 0079)

The next day she does indeed make a new offer, not in the amount of the policy limits that had been requested and authorized, but instead makes an offer in the amount of $25,000, less than one-half of the medical bills, and one-half of her authority. Not surprisingly this offer is rejected.

It is worth stressing that through all of this, Progressive had not consulted with, nor received any input from, any medical personnel. There was no record review, no CME, no EUO, not even a request for Medical Authorizations. There was nothing to support the incredibly inadequate valuation used by Progressive. It is not until November 22, 2021, that a CME is finally performed.

The matter went to trial and a verdict in the amount of $936,386 was returned. This litigation alleging bad faith followed.

<u>Opinions</u>

**Progressive failed to settle this matter when it could and should have done so, contrary to the Custom and Practice in the industry.**

**Specifically, Progressive:**

    a. **Failed to properly and thoroughly investigate the claim.**
    b. **Failed to utilize on a timely basis, investigative tools available pursuant to the policy.**
    c. **Exhibited bias and unfair treatment in the way it evaluated the injuries and medical specials.**
    d. **Failed to fully consider all the injuries and symptoms demonstrated by the medical records.**
    e. **Consistently followed a practice of making "low-ball" offers despite evaluations significantly above the offer.**

<u>Discussion</u>

This matter was consistently undervalued throughout the handling of the claim. There was a complete absence of any proactive investigation, and this was compounded by a practice of making "low-ball" offers. Throughout the analysis performed by Progressive, it appears that the records were never thoroughly reviewed. Key elements were never discussed nor evaluated. As

emphasized earlier, an insurance company has an obligation to perform a reasonably thorough investigation, and it must then fairly and objectively review the investigation without showing any signs of bias. That was not done here.

The investigation in this matter appears to consist of sitting back, wait until the lawyer sends something, undervalue the injury and then make an offer reflecting the lowest end of an unreasonably low range.

Although the claim notes recognized that Mr. Wilkins presented as an "eggshell" claimant, there is never any attempt to understand how the cervical injuries Mr. Wilkins sustained complicated his life in view of his prior medical condition. Not only was his lower torso paralyzed, but because of the accident his upper torso was now compromised. It was painful and required constant medical intervention. Something as "simple" as getting to and from the doctor was a far more complex task than one would find in other patients.

There is no mention of the fact that ACDF surgery was mentioned in the early demand letter, and no recognition that the treating physician indicated that if it were not for his prior condition, surgery would have been the preferred course of action. Without surgery, Mondamin was facing a life-long struggle of pain management, injections and other less satisfactory ways of treating the injury. While surgery is expensive, the option is to live with the pain for the rest of one's life. In addition to dealing with the pain, it would also involve constant medical visits to manage that pain. Progressive failed to recognize or appreciate that fact.

The hard line taken by Progressive is difficult to understand given the fact that they had no medical evidence to support it. The CME was not performed until long after any settlement opportunities had come and gone. Progressive has the right to resist a claim, but it must have something relevant and reasonable to support its position. Where is that here? What beyond speculation supports the low values placed upon the claim? There is no reference to input obtained from other managers, attorneys, jury verdict research or any other source that would support such a low value on this significant injury.

This is a first-party claim, meaning that Mr. Wilkins was Progressive's insured. He and his wife had been paying Progressive for the very benefits that they

sought. Because it is the insured seeking payment, Progressive had the right to use several tools that could be used to answer any additional questions about Mondamin's injury, his recovery, medical visits, etc. They had the right to request his Examination Under Oath, a formal proceeding where he would be sworn to tell the truth - much like a deposition. They could have chosen to have a Compulsory Medical Exam performed much earlier to at least receive some professional input into the injury. They did none of that.

I find it very difficult to believe that any experienced adjuster who fairly and honestly evaluated this claim could conclude that the value of the injury was only $45,000. This was a claim with no liability questions, an injured insured with 4 herniations, multiple injections, $59,000 in medical bills, the equivalent of a surgical recommendation, a permanent injury, facing a lifetime of pain - all coupled with an "eggshell" claimant.

The inappropriate valuation coupled with the many low-ball offers reflects a claim very poorly handled and not in keeping with the Custom and Practice in the industry. Every single offer was at the very bottom of the range, a range which itself was inadequate. Consider the very last offer made by Ms. Crawford. In July of 2020, faced with a policy limits demand of $50,000, she reevaluates the case, now with $55,000 in medicals, and concludes that yes indeed, it is worth limits. She obtains authority to make the limit offer, the amount the attorney had been demanding, but instead makes an incredible low-ball offer of $25,000, one-half of the demand, one-half of her authority. I cannot imagine a competent plaintiff's lawyer ever accepting that amount.

### Summary

A company owes its insured an honest and thorough review of the medical support. To fail to even notice the recommendation for surgery, to fail to analyze the impact that this injury would have on someone already suffering

12

from paralysis, to create unrealistic valuations based upon a complete absence of contrary medical evidence, and to consistently make inadequate low-ball offers is contrary to the Custom and Practice in the industry. It is improper and unfair claim handling.

Respectfully submitted,

Daniel R. Doucette

# EXHIBIT 1

**Daniel R. Doucette**
**Doucette & Associates**
*16800 W. Greenfield Avenue, Suite 124*
*Brookfield, WI 53005*
*O: (239) 244-9388*
*C: (262) 391-3246*
[Dan@doucetteassociates.com](mailto:Dan@doucetteassociates.com)

*Former insurance executive and trial lawyer, Mr. Doucette brings to the forensic consulting practice an extensive knowledge of insurance coupled with an intimate knowledge of the court system and trial tactics.*

## Career History

**Doucette & Associates, Brookfield, WI**                    *2012 – Present*

*Mr. Doucette is the principal in Doucette & Associates, a forensic consulting firm, focused on insurance coverage questions and bad faith litigation.*

**Milwaukee Insurance Group, Milwaukee WI**               *1988-2012*
*1974-1976*

*This multi-line group of insurance companies had approximately $250 million of property and casualty premium, a life insurance subsidiary and affiliated businesses. It was a combination of a publicly traded holding company and a mutual insurance company parent. Through acquisitions and mergers, the group went through a number of corporate changes and affiliations. The public holding company and its downstream affiliates were acquired by a NYSE listed company. The mutual insurance company then converted to a holding company and acquired/merged with the First Nonprofit Insurance Group based in Chicago, IL.*

**Chairman**                                                 *2005-2011*
*Mr. Doucette had corporate responsibility for all activity of the group including Milwaukee Insurance Company and First Nonprofit Insurance Company as well as the subsidiaries and affiliates. He was a member of the Claim Review Committee actively involved in reviewing and managing significant claims.*

**Chief Executive Officer**                                  *1991-2005*
*In 1991, Mr. Doucette assumed the CEO role including all P&L responsibility for the principal operations as well as all subsidiaries including the life insurance subsidiary and leasing affiliates.*

**Chief Operating Officer**                                  *1990-1991*
*In 1990, Mr. Doucette assumed full P&L responsibility for the group with the exception, at that time, of the life insurance subsidiary. Responsibilities included all operational reports, all financial reports, as well as the agency operations. During this period, all claim managers reported directly to Mr. Doucette and he remained actively involved in the management of all significant claims.*

*EXHIBIT 1*

### Vice President of Legal – Vice President of Claims      *1988-1990*

*In this position, Mr. Doucette had complete responsibility for all litigation and claim activity on behalf of the group throughout its multiple state operations.*

### Associate Counsel – Litigation Supervisor & Claim Manager      *1974-1976*

*During this period, Mr. Doucette operated as in-house counsel, litigation supervisor and claim manager.*

### McCusker Law Office – Law Clerk/Investigator      *1971-1974*

*While in law school, Mr. Doucette worked for McCusker Law Office, a small, Madison based firm specializing in complex plaintiff cases.*

### College Intern – Claims Adjuster      *1967-1971*

### *Kluwin, Dunphy, Hankin & McNulty (Hinshaw & Culbertson), Milwaukee, WI*

### Managing Partner – Litigator      *1976-1988*

*Mr. Doucette was an active trial litigator and a managing partner of the firm. He specialized in insurance related matters. In addition to his litigation and management activities, Mr. Doucette was an active lecturer, author and active in both state and national bar organizations.*

*In addition, Mr. Doucette acted as the defacto claim manager for a professional liability program underwritten in London.*

## *Education*

### University of Wisconsin, Madison, WI, Juris Doctor      *1971-1974*

### Boston College, Boston, MA      *1967-1971*
*Bachelor of Science in Business Administration with a Major in Accounting-Magna cum Laude*

## *Organizational Involvement*

- *Young President's Organization/World President's Organization – Member 1991 to Present*
- *State Bar of Wisconsin – Member*
- *Defense Research & Trial Lawyers Association – Past Member & Officer*
- *The International Society of Air Safety Investigators – Past Member*
- *International Association of Defense Counsel – Past Member*
- *Lawyer-Pilot Bar Association – Past Member*
- *Marquette University Law School – Past Instructor-Trial Practice*

# EXHIBIT 2

# Doucette Testimony since 1/1/21

| | Venue | State | Case Number | Date | Client |
|---|---|---|---|---|---|
| **Depositions** | | | | | |
| **Rohm** v. State Farm | USDC | State of Florida<br>Souther District/Miami | 20-22078-CIV | 3/10/2021 | Rohm |
| **Valencia** v. Wisconsin Mutual Insurance | Circuit Court<br>Rusk County | State of Wisconsin | 18-cv-83 | 4/23/2021 | Valencia |
| Miller v. **Nodak** | District Court<br>Walsh County | State of North Dakota | 50-2018-CV-00394 | 7/7/2021 | Nodak |
| **Teague** v. State Farm | USDC<br>Middle District | Florida | 3:20-cv-353 | 7/9/2021 | Teague |
| **Moultrop** v. Geico | Circuit Court<br>Palm Beach County | Florida | 50-2009-CA-42658 | 7/12/2021 | Moultrop |
| North Pointe Insurance v. Pollock Logging and **Manning** | USDC<br>Middle District<br>Jacksonville Division | Florida | 3:20-CV-00931 | 7/26/2021 | Manning |
| **Decamp** v. State FArm | USDC<br>Middle District,<br>Tampa Division | Florida | 8:20-cv-01747 | 8/2/2021 | DeCamp |
| **Kutchera** v. State Farm | USDC | Wisconsin | 3:20-cv-00930 | 8/4/2021 | Kutchera |
| Hancock v. **Florida Farm Bureau** | Circuit Court<br>6th Judical Circuit<br>Pasco County | Florida | 2019CA003857 | 9/13/2021 | FFB |
| Auto Owners v. **Sun Valley** | Circuit Court<br>Dane County | Wisconsin | 18-CV-1027 | 11/29/2021 | Sun Valley |
| **Scow** v. Century National | Circuit Court<br>Cook County | Illinois | 2019 L 3745 | 11/30/2021 | Scow |
| **Butterfield** v. New York Life | USDC | Florida | 3:19-cv-01443 | 1/18/2022 | Butterfield |

EXHIBIT 2

Middle District

| | | | | | |
|---|---|---|---|---|---|
| **Laham** v. State Farm | Circuit Court<br>La Crosse County | Wisconsin | 2020CV000036 | 1/21/2022 | Laham |
| Wopshall v. **Travelers** | USDC<br>Southern District | Florida | 2:18-cv-14424 | 2/10/2022 | Travelers |
| **Sauk Creek Condominium** v. Owners Insurance | Circuit Court | Wisconsin | 2018cv000651 | 3/7/2022 | Sauk Creek |
| Kinsale Insurance v. **Pride of St. Lucie** | USDC<br>Southern District | Florida | 2:21-CV-14053 | 4/22/2022 | Pride of St. Lucie |
| Consul v. **Progressive** | USDC<br>Middle District | Florida | 3:21-cv-00505 | 5/16/2022 | Progressive |
| **Seminole Village** v. Auto Owners | Circuit Court<br>Dane County | Wisconsin | 2019CV002598 | 6/9/2022 | Seminole Village |
| **Eck** v. State Farm | USDC<br>Eastern District | Wisconsin | 21-CV-00097 | 6/14/2022 | Eck |
| **Parsons** v. Hartford | USDC<br>Eastern District | Wisconsin | 21-cv-00113 | 7/15/2022 | Parsons |
| **Wood** v. Progressive | USDC<br>Southern District | Florida | 2:21-cv-14172 | 8/19/2022 | Wood |
| American Insurance v. **Pine Terrace** | USDC | Colorado | 1:20-cv-00654 | 9/13/2022 | Pine Terrace |
| Fridman v. **Safeco** | Circuit Court 9th Circuit<br>Orange County , | Florida | 2009-ca-013426 | 11/3/2022 | Safeco |
| Jenkins v. **Prime** | USDC<br>District of Utah | Utah | 2:21-cv-00130 | 1/24/2023 | Prime |
| Erie v. Meridian/**Aks** | Circuit Court<br>Montgomery County | Maryland | 486376-V | 1/25/2023 | Aks |
| **Sacred Heart Health Services**<br>v. MMIC | USDC<br>District of South Dakota | South Dakkota | 4:20-CV-4149 | 2/1/2023 | Sacred Heart/Avera |

| | | | | | |
|---|---|---|---|---|---|
| **Gonzalez** v Progressive and Panaco | Circuit Court Miami-Dade county | State of Florida | 2018-22406 | 2/23/2023 | Gonzalez |
| American Insurance v. **Pine Terrace** | USDC | Colorado | 1:20-cv-00654 | 3/21/2023 | Pine Terrace |
| **The Creeks at Ivy Acres** v. Secura | Circuit Court Outagamie County | Wisconsin | 2019CV001025 | 4/4/2023 | Ivy |
| **Weil** v. GEICO | Circuit Court Miami/Dade | Florida | 2018-011073 | 4/11/2023 | Weil |
| **Ilias** v. USAA | USDC Middle District/Tampa | Florida | 8:20-CV-834 | 6/9/2023 | Ilias |
| **Harbor** v. State Farm | USDC Western District Wisconsin | Wisconsin | 3:22-cv-00237 | 8/2/2023 | Harbor |
| **Ackley** v. Continental | USDC Southern District | Florida | 0:22-cv-60377 | 9/21/2023 | Ackley |
| Murphy v. **Progressive** | USDC Middle District | Florida | 3:22-cv-1074 | 10/27/2023 | Progressive |
| Harmony House v. **Northfield** | Circuit Court 20th Judicial Circuit | Florida Collier County | 11-2022-CA-00198-001 | 12/1/2023 | Northfield |
| Hennessey Bar v. **Mesa Underwriters Speciality Ins** | USDC Middle District | Florida | 22-CV-01791 | 2/26/2024 | MESA |
| **Booth** v. Klinner Insurance and West Bend Insurance | Circuit Court Barron County | Wisconsin | 22-cv-159 | 4/18,4/22/24 | Booth |
| Smart v. **Farmers Mutual of Nebraska** | Circuit Court Minnehana County | South Dakota | 49-CV-20-000249 | 4/29/2024 | Farmers Mutual |
| **Benton United** v. Church Mutual | Circuit Court Lafayett County | Wisconsin | 23-CV-061 | 6/13/2024 | Benton |
| **Oney** v. Progressive | Circuit Court Miami-Dade County | Florida | 2021-013391-CA-01 | 6/14/2024 | Oney |
| **PTI** v. Rivas | Circuit Court Lee County | Florida | 19-CA-002768 | 7/31/2024 | PTI |

| Case | Court | State | Case No. | Date | Party |
|---|---|---|---|---|---|
| **Zakia Raymond** v. State Farm | Circuit Court Milwaukee County | Wisconsin | 23-CV-2587 | 10/21/2024 | Raymond |
| Gonzales v. **PTI** | Circuit Court Charlotte County | Florida | 23003405 | 11/7/2024 | PTI |
| **Campbell** v. Progressive | Circuit Court Highlands County | Florida | 2019-CA-000358 | 11/13/2024 | Campbell |
| Wilshire Insurance v. **Airport Restaurant** and Bates | USDC Middle District | Florida | 6:23-cv-426 | 11/14/2024 | Airport Restaurant |
| **S&R Egg Farm** v. Liberty Mutual Insurance | Circuit Court Waukesha County | Wisconsin | 2023CV1046 | 1/24/2025 | S&R |
| **Moeller** v. Progressive | USDC Middle District | Florida | 8:24cv-519 | 2/11/2025 | Moeller |
| Simpson v. **PTI** | Circuit Court Pinellas County | Florida | 22-002770 | 3/11/2025 | PTI |

# Trial Testimony

| Case | Court | State | Case No. | Date | Party |
|---|---|---|---|---|---|
| **Brink** v. Direct General | USDC Middle District | State of Florida | 8:19-cv-2844 | 3/2/2021 | Brink |
| Horstman v. **State Farm** | Circuit Court | State of South Dakota Lincoln County | 41 CIV 19-000081 | 6/7/2021 | State Farm |
| **Herrera** v. Safeco | USDC Fort Pierce | State of Florida | 20-60135 | 6/28/2021 | Herrara |
| **Moultrop** v. Geico | Circuit Court Palm Beach County | Florida | 50-2009-CA-42658 | 11/9/2021 | Moultrop |
| **Hughes** v. National General | Circuit Court Outagamie County | Wisconsin | 18-CV-833 | 1/23/2022 | Hughes |
| **Sun Valley** v. Auto-Owners | Circuit Court Dane County | Wisconsin | 2018CV001027 | 2/2/2022 | Sun Valley |
| Heikka v. **Safeco** | Circuit Court 7th Circuit, Broward County | Florida | 07-008440-14 | 8/15/2022 | Safeco |

| | | | | | |
|---|---|---|---|---|---|
| Wopshall v. **Travelers** (by video) | USDC Southern District | Florida | 2:18-cv-14424 | 9/9/2022 | Travelers |
| **Brink** v. Direct General | USDC | State of Florida Middle District | 8:19-cv-2844 | 4/17/2023 | Brink |
| **Wood** v. Progressive | USDC | State of Florida Middle District | 21-141172-CIV | 5/24/2023 | Wood |
| **Wood** v. Progressive (Retrial) | USDC | State of Florida Middle District | 21-141172-CIV | 11/13/2023 | Wood |
| **Hancock** v. Florida Farm Bureau | Circuit Court | Pasco County Florida | 2019-CA-003857 | 2/12/2024 | FFB |
| **McNamara** v. GEICO | USDC | State of florida Middle District | 8:17-cv-3600 | 4/17/2024 | McNamara |
| **Oney** v. Progressive (By Videotape) | Circuit Court Miami-Dade County | Florida | 2021-013391-CA-01 | 6/14/2024 | Oney |
| Fridman v. **Safeco** | Circuit Court 9th Circuit Orange County , | Florida | 2009-ca-013426 | 2/7/2025 | Safeco |

# EXHIBIT 3

## Documents Reviewed by Daniel R. Doucette Regarding Wilkins v. Progressive

1-11.27.19 CRN Faxed - 52535
2_CRN Response by Progressive
Claim File (Part 1 of 2)
Claim File (Part 2 of 2)
Complaint and Demand for Jury Trial
Def Progressive's Rule 26 Initial Disclosures
Dkt 4 Def's Answer and Affirmative Defenses
Plt Partial Satisfaction of Judgment
PRG's RRTP - Claim Notes
PRG's RRTP - Combined Emails
PRG's RRTP - Hard File
Progressive's Privilege Log
Dkt 24 - Endorsed Order
Dkt. 22 - Case Management & Scheduling Order

Amica BI Correspondence
Amica - 627 LOR.docx
Amica - 627 LOR.pdf
EXECUTED RELEASE
"Message Sent 32387125 - FAX CONF RELEASE SENT
msg"
Wilkins L- Cert Rec 627

Amica Demand
9.23.19 COMPLETE DEMAND PACKAGE

Auto Policies
    AMICA BI
Wilkins- Amica- Ireland Full Policy
    PROGRESSIVE
Wilkins- Progressive- Full Policy- in booklet form
    Claim19-2189421date20201124
WILKINS JR, MONDAMIN_Coverage_PolicyDocuments_1_12-28-2019
WILKINS JR, MONDAMIN_Coverage_PolicyDocuments_1_12-28-2019
WILKINS JR, MONDAMIN_Coverage_PolicyDocuments_3_11-21-2020
WILKINS JR, MONDAMIN_Coverage_PolicyDocuments_3_11-21-2020

EXHIBIT 3

Civil Remedy
11.27.19 ltr to UMI re CRN
12.5.19 faxed 2nd suppl demand
12.31.2019 3rd suppl ltr to UMI - trinity spine
Filing- Mondamin
Filing-lisa
    UPDATED RECORDS TO ADJUSTER
Fax Message Transmission Result to +1 (877) 2137258 - Sent
Mondamin - Trinity Health Care updated records
Mondamin - Trinity Heath Care updated bill
Mondaminn Trinity Spine updated records and bills

Correspondence
    OC CORRESPONDENCE
1.14.21 Ltr from OC re HIPAA for Client to sign
1.15.21 PDF authorization_for_records_hipaa-signed
3.30.21 Authorization to be signed
3.31.21 Signed AMITA Authorization
6.22.2020 Wilkins 10-DAY LTR.doc
6.22.2020 Wilkins 10-DAY LTR.pdf
8.26.21 Cover Letter for Gulf Coast MRI
Mondamin and Lisa Wilkins v Progressive
Mondamin and Lisa Wilkins v Progressive
PDF copy Letter to Opposing Attorney re Auth_10566441
RE EXTERNAL
Wicker Smith - Correspondence re Proof of service
Wilkins 10-day Draft
Wilkins letter re 50k.pdf
Wilkins letter to OC re 50k.doc
    2.25.2022 ltr with Medicare authorizations
13568759 MEDICARE-Signed
13568759 MEDICARE
    PROGRESSIVE CORRESPONDENCE
7.31.19 Progressive PIP - Faxed LOR
12.17.19 Progressive UM Office 8200.00
personal injury protection page 1 Tony
personal injury protection page 2 Tony
Progressive - PIP APP (tony)
Progressive - PIP DOCS
Progressive PIP - LOR doc
Progressive PIP - LOR pdf
Wilkins check return ltr 4.26.24
Wilkins M- Progressive- confirm offer

Wilkins M- Progressive- waive medpay
Wilkins- Progressive- PIP exhausted
      PROGRESSIVE UMI
1.21.2020 ltr from progressive waiving Subro
10.23.19 ltr to UM ASKING FOR PERMISSION TO SETTLE
2.22.2022 response to demand of 250K - offer of 50K
3.31.2020 ltr from insurer confirming ext to answer complaint
9.9.19 UM LOR AND REQUEST FOR UM PERMISSION TO SETTLE - FAX CONF
9.9.19 UM LOR AND REQUEST FOR UM PERMISSION TO SETTLE
10.23.19 ltr to UM ASKING FOR PERMISSION TO SETTLE
Wilkins M- Progressive new rep
Wilkins M- Progressive- Cert Rec
Wilkins M- Progressive- insufficient info
Wilkins M- Progressive- new rep
Wilkins- Progressive- ext answer
        OFFERS
1.13.202 progressive offer of 8200.00
6.13.2020 OFFER OF 17K
6.15.2020 offer of 17K
RE CLAIM NO 19-2350589 WILKINS
Wilkins M- Progressive- offer UM
Wilkins M- Progressive- offer unchanged
Wilkins M- Progressive- UM offer
      UPDATED RECORDS TO ADJUSTER
Mondamin - Trinity Heath Care updated bill

DEPOSITIONS
2-2-22 Email to Dave--- Depo for Trinity Center billing manager--Phone Call Wilkins case
6.23.2020 Notice Of Taking Deposition of Plaintiffs on 11.2.2020
6.25.20 Amended Notice Of Taking Deposition
Amended Notice Of Taking Deposition
Deposition Location
HAYES CV FROM DEPO FILE
Recs Depo Hayes and Saldin (1)
SALDIN CV FROM DEPO RECORDS
      DR. SALDIN - ELITE SPINE
KS CASES (2)
NOTD FOR 3.22.2022
SALDIN CV
subpoena
      DR. VICTOR HAYES - ELITE SPINE
amended NOTD for 4.14.2022
HAYES CV FROM DEPO FILE
NOTD FOR 3.14.2022

subpoena
VHCASES (1)
    KIRBY DEPO
Notice Of Taking Deposition
    LILES DEPO NOTICE
Notice Of Taking Deposition
RE Wilkins
    MONTANO, JENNIFER -ELITE SPINE
Exhibit 1 NODDT
Exhibit 3 CV for Julie Montano
Exhibit 4 Account Financial History by Service Date
Exhibit
Ltr to Hanes re Obj and MPO - Montano
NOTD FOR 3.24.2022
NOTD FOR 3.24.2022(1)
Objection
SUBPOENA FOR TRIAL
SUBPOENA FOR TRIAL(1)
    OSTER, ANDREW - ELITE SPINE
N-CANCELLATION FOR 2.21.2022 DEPO
NOTD OSTER 2.21.22
Recs Depo Oster
SUBPOENA FOR DEPO
    Trinity Wilkins Recs Depo Oster
Recs Depo Oster
    SCHEDULING EMAILS
Wilkins Mondamin and Lisa vs Progressive Select Insurance Company
    TRINITY HEALTH CARE BILLING AGENT
2.21.2022 notice of cancelation
NOTD FOR 2.22.22

Fee Agreements
EXECUTED TST FEE AGREEMENT
WILKINS__MONDAMIN_-_TST_FEE_AGREEMENT_DOCS

NPNP
4.28.21 Notice Of Completion Or Compliance
6.16.20 Notice Of Production From Non Party (003)
6.24.20 Response NO Obj
9.28.20 Notice of Production From Non Party (1)
9.28.20 Notice Of Production From Non Party (2)
Certificate Of Non-Objection
    2.16.2022
2.16.2022 notice of non party

2.25.2022 REQUEST FOR COPIES.DOCX
2.25.2022 REQUEST FOR COPIES
Certificate Of Non-Objection
Request For Copies
    2.22.2022 Nonparty
3.4.2022 REQUEST FOR COPIES.docx
3.4.2022 REQUEST FOR COPIES
Certificate Of Non-Objection
Notice Of Production From Non Party
Request For Copies
    April 28 2021
FW Wilkins Mondamin and Lisa vs Progressive Select Insurance Company
Notice of Partial Compliance
        DOCS
AdventHealth North Pinellas - Medical Records
AdventHealth Tampa - Radiology Studies Disc
Amica Mutual Insurance Company - Insurance Records
Apollo Medical Group - Medical Reports and Radiology Reports
BayCare HomeCare - Medical Records and Billing Records
Doctors Urgent Care - Medical Records and Billing Records
FastMD - No Records Response
Florida Cardiology Group - Billing Records
Florida Medical Clinic, LLC - No Records Response
Gulf Coast MRI - Medical Records, Billing Records, and Radiology Reports
Humana - Insurance Records and Billing Records
Invoice for Copies
Notice of Partial Compliance
Publix Pharmacy - Pharmacy Records
Tampa Bay Surgical Group - No Records Response
Torbert Emergency Physicians, LLC - Billing Records
Torbert Emergency Physicians, LLC - Medical Records and Radiology Reports
UF Health Shands Hospital - Medical Records and Billing Records
Wal-Mart Pharmacy - No Records Response
    Def NPNP United Health
10970840
Certificate Of Non-Objection
Notice Of Production From Non Party
PDF copy LR to Opposing Attorney enclosing authorizations to be
    Draft
6.24.20 P LW No objection draft
6.24.20 P MW No objection draft
WILKINS M No objection draft
    July 14, 2021
12.14.21 Request for Copies.docx

12.14.21 Request for Copies
Notice of Production from Non-Party
Request For Copies
    July 21, 2021
12.14.21 Request for Copies.docx
12.14.21 Request for Copies
Certificate Of Non-Objection
Notice of Production from Non-Party
Request For Copies
    June 16, 2020
6.16.20 Notice Of Production From Non Party (003)
6.24.20 Response NO Obj
    September 28, 2020
9.28.20 Notice of Production From Non Party (1)
9.28.20 Notice Of Production From Non Party (2)
Request for Copies-Lisa
Request for Copies-Mondamin
    RESPONSE
4.28.21 Notice Of Completion Or Compliance
Notice of Partial Compliance
    DOCS
AdventHealth North Pinellas - Medical Records
AdventHealth Tampa - Radiology Studies Disc
Amica Mutual Insurance Company - Insurance Records
Apollo Medical Group - Medical Reports and Radiology Reports
BayCare HomeCare - Medical Records and Billing Records
Doctors Urgent Care - Medical Records and Billing Records
FastMD - No Records Response
Florida Cardiology Group - Billing Records
Florida Medical Clinic, LLC - No Records Response
Humana - Insurance Records and Billing Records
Invoice for Copies
Notice of Partial Compliance
Publix Pharmacy - Pharmacy Records
Tampa Bay Surgical Group - No Records Response
Torbert Emergency Physicians, LLC - Billing Records
UF Health Shands Hospital - Medical Records and Billing Records
Wal-Mart Pharmacy - No Records Response

Outlook Emails and Calendar Entries
Export-11-12-24
privilege log

UMI Demand

10.21.19 Fax Insurance Adjuster DEMAND

10.21.19 POSTAGE RECEIPT

10.21.19 UMI DEMAND.docx

10.21.19 UMI DEMAND

10.21.2019 COMPLETE DEMAND PACKAGE

10.21.2019 FINAL DEMAND SUMMARY FAX CONF

10.21.2019 FINAL DEMAND SUMMARY

11.18.19 SUPPL TO UMI DEMAND

11.18.19 SUPPLEMENT TO UMI DEMAND

12.5.19 2nd suppl ltr to UMI - trinity spine

12.5.19 faxed 2nd suppl demand

12.31.2019 3rd suppl ltr to UMI - trinity spine.docx

12.31.2019 3rd suppl ltr to UMI - trinity spine

Message Sent 31939729 - fax conf 3rd supp sent

Wilkins M- UM Claim Ntc Cert Rec

    Demand.zip

10.21.19 Fax Insurance Adjuster DEMAND.docx

10.21.19 POSTAGE RECEIPT

10.21.19 UMI DEMAND.docx

10.21.19 UMI DEMAND

10.21.2019 COMPLETE DEMAND PACKAGE

10.21.2019 FINAL DEMAND SUMMARY FAX CONF

10.21.2019 FINAL DEMAND SUMMARY

11.18.19 SUPPL TO UMI DEMAND

11.18.19 SUPPLEMENT TO UMI DEMAND

12.31.2019 3rd suppl ltr to UMI - trinity spine

12.5.19 2nd suppl ltr to UMI - trinity spine

12.5.19 faxed 2nd suppl demand

Message Sent 31939729 - fax conf 3rd supp sent

Wilkins M- UM Claim Ntc Cert Rec

Depositions

    TRANSCRIPTS - LISA

5774544 Wilkins.Lisa 110220_AMICUS.txt

5774544 Wilkins.Lisa 110220.fullprint

5774544 Wilkins.Lisa 110220.fullprint

5774544 Wilkins.Lisa 110220.index

5774544 Wilkins.Lisa 110220.miniprint

5774544 Wilkins.Lisa 110220

5774544 Wilkins.Lisa 110220.txt

TRANSCRIPTS - MONDAMIN
5774544 Wilkins.Mondamin 110220_AMICUS,txt
5774544 Wilkins.Mondamin 110220.full
5774544 Wilkins.Mondamin 110220.fullprint
5774544 Wilkins.Mondamin 110220.miniprint
5774544 Wilkins.Mondamin 110220,ptx
5774544 Wilkins.Mondamin 110220.txt

Dear Mr. Gunn

In Re: Wilkins v. Progressive

Please consider this my supplemental report.

Since the date of my report on April 29, 2025, I have had the opportunity to review additional depositions (and the accompanying exhibits) that were taken after the date of that report, specifically the depositions of Mondamin Wilkins, part 1 and part 2, Lexi Gorman, Camille Crawford, Krissi Rodriguez and Peter Sartes.

I affirm the opinions in my original report and these depositions do not alter or change those opinions.

However, I believe two additional comments are in order.

First, it is noted that Mondamin Wilkins indicated that he was not willing to accept the $50,000 limit. If this were a third-party case, that would be significant testimony. However, this is a first party case, meaning that whether or not he would have accepted the offer is not the issue. In a first party matter, Progressive would have the obligation to make the appropriate offer, even if there was no indication that the insured would accept the offer. As noted by Mr. Sartes, if Progressive had made the appropriate offer during the pendency of the CRN, the case would have ended. There was no third party to pursue and Progressive would have completed its obligations under the policy. Had Progressive made the offer during the 60 days provided by the CRN, there could be no bad faith case.

The second issue is the request/insistence on a release when Progressive did make its inadequate offer. The only point of a release in a first party case such as this is to protect Progressive. There is no insured to protect as there would be in a third-party case. By the time the release had been sent to Mr. Wilkins, the CRN had already been filed and allowed to expire without the offer of the $50,000. Thus, there was a significant potential for a bad faith case. By making an offer contingent upon the release of Progressive, Progressive was putting its own interests ahead of its responsibility to the insured, by demanding that he give up the potential bad faith action, to receive the benefits of the contract that he was entitled to. This could lead to confusion and further delay in receiving the benefits that were already due. That is contrary to the custom and practice in the industry,

Daniel R Doucette

<EXHIBIT
4>