**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

MONDAMIN WILKINS,

     Plaintiff,

v.                                                                     Case No. 8:24-cv-1793-TPB-AAS

PROGRESSIVE SELECT
INSURANCE COMPANY,

     Defendant.

_____/

**ORDER DENYING "PROGRESSIVE SELECT INSURANCE**
**COMPANY'S MOTION FOR SUMMARY JUDGMENT"**

This matter is before the Court on Defendant "Progressive Select Insurance

Company's Motion for Summary Judgment," filed on July 15, 2025.  (Doc. 36).

Plaintiff Mondamin Wilkins filed a response in opposition on August 19, 2025.  (Doc.

47).  Defendant filed a reply on September 8, 2025.  (Doc. 58).  After reviewing the

motion, response, reply, court file, and record, the Court finds as follows:

**Background**

This first-party statutory bad faith action arises from a two-car accident that

occurred in Pasco County, Florida.  On July 26, 2019, non-party Gayle Ireland failed to

yield and took a left turn, striking Plaintiff's vehicle while he sat in the passenger side

and causing the vehicle to be pushed into a light pole.  Both Plaintiff and his wife Lisa

Wilkins, who was driving the vehicle, were injured, although Plaintiff faced far more

substantial injuries.  Rescue personnel used the "jaws of life" to extract Plaintiff from

the vehicle, and then EMS transported Plaintiff to Trinity Hospital where he was

admitted with complaints of neck, left shoulder, and back pain.  Plaintiff denied any

loss of consciousness, head injury, or headaches.  At the time of the accident, Plaintiff

was 55 years old and weighed 235 pounds.  He was wheelchair bound and had a

history of spinal cord injury with lower extremity weakness, chronic aortic dissection,

and hypertension.  At the hospital, Plaintiff underwent x-rays that showed multilevel

degenerative changes in his cervical spine; mild degenerative changes in his thoracic

spine; multilevel degenerative changes most prominent at L4-S1; and no findings in

the shoulder.  Plaintiff was diagnosed with cervical strain, abrasions, and back/left

shoulder pain, and he was discharged.

Plaintiff was a named insured under an auto policy issued by Defendant

Progressive Select Insurance Company with uninsured motorist coverage in the

amount of $50,000 per person and $100,000 per accident.[1]  Defendant began its

investigation the day of the accident.  On August 6, 2019, Defendant received a letter

of representation and request for statutory insurance disclosures from attorney Peter

Sartes at Tragos, Sartes, Tragos, PLLC ("Tragos").  On August 13, 2019, an adjuster

mailed Plaintiff a letter that enclosed various applications, including a medical

authorization.  On August 27, 2019, Defendant sent statutory insurance disclosures to

Tragos.  On August 29, 2019, Defendant received Plaintiff's PIP application and

treatment and insurance information form, but Plaintiff did not execute and return

the medical authorization.

---

[1] Plaintiff's policy also provided personal injury protection ("PIP") coverage of $10,000, $500 in
MedPay, and contained a work-loss exclusion.

On September 13, 2019, Defendant received a letter from Tragos that requested Defendant open an uninsured motorist ("UM") claim for Plaintiff and requested permission to settle with the tortfeasor's insurance company for the at-fault driver's $10,000 bodily injury policy limits. That day, Defendant opened a UM claim for Plaintiff and Heimy Espinal was assigned to handle the claim. On September 19, 2019, after speaking with Amica, Espinal sent a letter to Tragos advising that because Amica had not offered the bodily injury policy limits, Defendant was unable to waive its UM subrogation right.[2]

On October 23, 2019, Progressive received a time-limit demand from Tragos that demanded the $50,000 UM policy limits be paid to Plaintiff by November 20, 2019. The demand did not include any treatment or billing records.

On October 29, 2019, Defendant received a letter from Tragos that again requested permission for Plaintiff to settle with Amica for the $10,000 bodily injury policy limits. On November 19, 2019, Espinal called Tragos and advised of the missing records. He requested a complete copy of any records. Espinal also learned that Plaintiff would be receiving injections on December 2, 2019. Following this discussion, Espinal sent Tragos a letter that advised Defendant lacked sufficient information to evaluate the UM demand and requested all of Plaintiff's medical and billing records. Later that day, Defendant received an extension for the demand response, through November 29, 2019. Progressive also sent a letter to Tragos that permitted Plaintiff to settle his bodily injury claim with Amica, and it confirmed receipt of the UM demand treatment and billing records.

---

[2] Amica was the insurance company for Ireland, the "at-fault" driver.

The demand included records from Plaintiff's Trinity Hospital admission the day of the accident, described in more detail above.  It also showed that Plaintiff later presented to Trinity Health Care Center with complaints of headaches, neck pain, left shoulder pain, mid-back and left parascapular pain.  He was treated on eight occasions and was noted as "improved as expected."

The records also showed that Plaintiff underwent an MRI and x-ray of his cervical spine and an x-ray of his thoracic spine at Gulf Coast MRI.  The cervical spine scans showed loss of disc hydration, cervical dextroscoliosis and reversal of lower cervical lordosis, anterolisthesis, no instability in flexion or extension range of motion, disc herniation at C2-3, C4-5, and C6-7 and disc bulge/herniation at C5-C6, but no radiculopathy.  The thoracic MRI showed levoscoliosis, narrowing of disc spaces with hyperkyphosis, and diffuse spondylosis.

The records also showed that Plaintiff presented to Trinity Spine with complaints of neck, arm, and shoulder pain.  Plaintiff was diagnosed as suffering from paraplegic spinal paralysis, muscle spasm, cervical disc disorder, radiculitis, and cervicalgia.  Plaintiff underwent a cervical epidural injection at C4-C6.  Enclosed with the demand were medical bills totaling $9,718.81 that reflected a remaining balance of $9,122.81.  The demand did not specifically state that Plaintiff sustained a permanent injury, provide a permanent impairment rating, or causally relate the cervical MRI findings to the accident.  Plaintiff was not recommended or scheduled for any surgery or future medical procedure, and the demand did not allege that Plaintiff had incurred any out-of-pocket expenses.

On November 25, 2019, a PIP adjuster noted receipt of a fax from Tragos that showed Plaintiff had undergone conservative care on thirteen occasions at Trinity Health from September 13, 2019, through November 7, 2019, the majority of which showed he had "improved as expected." On November 27, 2019, Espinal reviewed the medical records, bills, collateral coverage sources, and he concluded that he would accept Plaintiff's injuries as cervical sprain/strain with aggravation to degenerative disc disease, valued at a range of $3,500 to $7,500. He then calculated Plaintiff's specials at $3,143.09, for a total range of $6,644 - $10,644. Based on the evaluation and available offsets in front of the UM coverage, and Plaintiff's lack of out-of-pocket expenses, Espinal assigned an evaluation range of $1,000 to $3,000 to settle the UM claim. He therefore sent Tragos a letter offering $1,000 to settle the claim. The offer was not accepted.

On November 29, 2019, Defendant received a civil remedy notice ("CRN") dated November 27, 2019. In the CRN, Sartes alleged that Defendant failed to settle Plaintiff's claim when it could and should have done so. No new records were provided at this time. On December 4, 2019, Camille Crawford was assigned to handle the UM claim. She reviewed the file and spoke with a paralegal at Tragos, asking for an earlier fax to be resent. Crawford also sent Tragos a change of adjuster letter and confirmed that Amica had paid the bodily injury policy limits.

On December 10, 2019, Supervisor Krissi Rodriguez received a letter from Tragos enclosing additional records and directing Crawford to review and respond. The records showed that on December 2, 2019, Plaintiff presented to Trinity Spine and underwent a medial branch block at C4-C6 and referenced that on October 28, 2019,

Plaintiff underwent epidural steroid injections at C7-T1 with bilateral medial branch blocks at C4-C7 with reported 20% relief, improved range of motion and headaches that had improved.  The letter noted that Plaintiff would consider left cervical RFA.[3] On December 16, 2019, Crawford evaluated the updated records and ultimately determined an evaluation range of $8,144 - $13,144.  Crawford discussed the evaluation with Supervisor Lexi Gorman, who approved the same.  On December 17, 2019, Crawford offered $8,200 to Plaintiff via telephone and letter, but the offer was not accepted.

On January 6, 2020, Rodriguez noted receipt of a letter from Tragos, which enclosed additional records.  The records showed that on December 18, 2019, Plaintiff presented to Trinity Spine, where he reported 30% relief from the previous injection. It was noted that Plaintiff was continuing his chiropractic care twice per week, and that Plaintiff would consider additional injections and would follow up.  At this time, Plaintiff had incurred total medical bills of $30,982.91, with a remaining balance of $18,305.04.  On January 13, 2020, Crawford evaluated the new records and determined the evaluation range for Plaintiff's UM claim was $7,278 - $12,278. Rodriguez approved the evaluation but maintained the high end of the evaluation range at $13,144.  On the same day, Crawford called Tragos and was advised that Plaintiff was "not coming off of the policy limits," and that even if the policy limits were offered, the attorney would need to speak with Plaintiff prior to acceptance.  On the same day, Crawford sent a letter to Tragos offering $8,200 to settle the UM claim.

---

[3] Left cervical RFA is a medical procedure that stands for cervical radiofrequency ablation for the left side of the neck, and it is used to reduce the ability of nerves to transmit pain.

On January 20, 2020, Crawford reviewed the file again before proposing a CRN response.  On the same day, Rodriguez reviewed the file and agreed with Crawford's proposed CRN response, which was then approved by Manager Edward O'Brien.  On January 21, 2020, Crawford formally responded to Plaintiff's CRN.  The response denied all allegations and noted a dispute as to the value of the claim, along with an intent to continue to seek an amicable resolution.  The CRN 60-day cure period expired on January 26, 2020.

On January 27, 2020, and on February 11, 2020, Crawford followed up with Tragos, but she was informed that Plaintiff was not willing to negotiate further and had filed suit against Defendant.  On February 21, 2020, Crawford called Tragos and was advised that Plaintiff was not willing to settle for the $50,000 UM policy limits.  In litigation, Defendant continued to evaluate Plaintiff's UM claim and on December 24, 2020, based on "new" but unspecified information, Defendant tendered the $50,000 UM policy limits to Plaintiff along with a proposed release.  On January 29, 2021, Plaintiff rejected the tender of UM policy limits and obtained a jury verdict of $936,386.85.  On April 14, 2023, final judgment was entered in favor of Plaintiff.

Plaintiff's one-count complaint seeks recovery for first-party insurance bad faith by Defendant.  The case was originally filed in the Circuit Court of the Sixth Judicial Circuit in and for Pasco County, Florida, but it was removed to this Court on July 30, 2024. (Doc. 1).  Defendant now seeks summary judgment.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  A properly supported motion for summary judgment is not defeated by the existence of a factual dispute.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Only the existence of a genuine issue of material fact will preclude summary judgment.  *Id.*

The moving party bears the initial burden of showing that there are no genuine issues of material fact.  *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing the existence of genuine issues of material fact.  *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593-94 (11th Cir. 1995). If there is a conflict between the parties' allegations or evidence, the nonmoving party's evidence is presumed to be true and all reasonable inferences must be drawn in the nonmoving party's favor.  *Shotz v. City of Plantation*, 344 F.3d 1161, 1164 (11th Cir. 2003).

Though the determination of whether an insurer acted in bad faith generally raises an issue of fact for determination by a jury, the Eleventh Circuit and Florida courts "have granted summary judgment where there is no sufficient evidence from which any reasonable jury could have concluded that there was bad faith on the part of the insurer."  *Pelaez v. GEICO*, 13 F.4th 1243, 1251 (11th Cir. 2021) (quoting *Eres v. Progressive Am. Ins. Co.*, 998 F.3d 1273, 1278 (11th Cir. 2021)).  However, if material issues of fact which would support a jury finding of bad faith remain in dispute, summary judgment is unwarranted.  *Id.*

## Analysis

A first-party bad faith action is brought against an insurer arising from its

handling of a claim made by its own insured, such as a claim for uninsured or underinsured motorist benefits. See *Cadle v. GEICO General Ins. Co.*, 838 F.3d 1113, 1123 (11th Cir. 2016) (explaining that statutory first-party bad faith cause of action "extended the duty of an insurer to act in good faith in handling claims brought by its own insured under a UM policy and exposed the insurer to the consequences of failing to do so"); *Wojciechowski v. Allstate Prop. and Cas. Ins.*, No. 8:14-cv-03176-MSS-TBM, 2016 WL 10732584, at *8 (M.D. Fla. Dec. 27, 2016) (citation omitted). This type of claim exists only by statute – Florida's statute provides a civil remedy when an insured is damaged by the insurer's failure to act in good faith to settle a claim when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for the insurerd's interests. *See* § 624.155, *F.S.*

The determination of whether an insurer acted in bad faith in handling an insured's claims is generally decided under the totality of the circumstances, and each case is decided on its facts. *Cadle*, 838 F.3d at 1123. The focus is on the actions taken by the insurer, considering all of the circumstances known to it at the time of such actions. *Vaughn v. Producers Agric. Ins. Co.*, 111 F. Supp. 3d 1251, 1262-63 (N.D. Fla. 2015).

The filing of a CRN is a condition precedent to maintain an action for statutory bad faith. *See* § 624.155(3)(a), *F.S.*; *Talat Enters., Inc. v. Aetna Cas. & Sur. Co.*, 753 So. 2d 1278, 1283 (Fla. 2000). The purpose of the notice requirement is to provide the insurer with a 60-day cure period to remedy the alleged statutory violation. *See id.* at 1284. The relevant time period to determine whether an insurer acted in bad faith

when handling a first party UM claim is prior to the expiration of the CRN cure period. *See Cadle*, 838 F.3d at 1126; *Fox Haven of Foxfire Condo. IV Ass'n, Inc. v. Nationwide Mut. Fire. Ins. Co.*, No. 2:13-cv-399-FtM-29CM, 2015 WL 667935, at \*5 (M.D. Fla. 2015); *Alexander v. Gov't Emp.'s Ins. Co.*, No. 3:10-cv-287-J-32JRK, 2012 WL 5382051, at \*3 (M.D. Fla. 2012).

Here, Defendant argues summary judgment is appropriate because it was not presented with any medical records prior to the expiration of the CRN cure period that indicated that Plaintiff suffered from a permanent injury within a reasonable degree of medical probability as a result of the car accident. Although none of the actual medical records specifically stated – using "talismanic" language – that Plaintiff "suffered a permanent injury within a reasonable degree of medical probability" as a result of the accident, the CRN stated through counsel that it was Dr. Majorana's and Dr. Saline's opinions within a reasonable degree of medical certainty that Plaintiff's disability and pain will not be completely diminished with further conservative treatment. In addition, the actual medical records reflected the nature and severity of Plaintiff's injuries, Plaintiff's many attempts at conservative treatment without relief (including branch blocks and injections), and recommendations as to further medical treatment and ongoing care. The Court additionally notes that at least two doctors who treated Plaintiff during the relevant period testified at the underlying state court trial that Plaintiff's injuries were permanent. And in his response in opposition, Plaintiff notes that his proffered bad faith expert in this case, Daniel Douette, has testified at deposition and intends to testify at trial regarding evidence of permanency

in the records available to Defendant during the CRN cure period.[4]

Based on this evidence, a reasonable jury could conclude that Plaintiff suffered
from a permanent injury during the relevant time period, and that Defendant did not
fulfill its duty to investigate and settle Plaintiff's UM claim prior to expiration of the
CRN cure period.  Defendant's actions may be explainable, or even justified, but that
remains a question best resolved by a factfinder at trial.  The motion for summary
judgment is therefore denied as to this ground.

Defendant further argues that it is entitled to summary judgment because, as a
matter of law, the medical information it possessed during the cure period did not
warrant consideration of noneconomic damages.  Defendant argues that Plaintiff was
therefore only entitled to economic damages, which indisputably were not in the
amount of the $50,000 UM policy limits, and Defendant had already provided
adequate compensation.  However, noneconomic damages are available under an
insurance policy if the plaintiff incurs a permanent injury, which must be established
within a reasonable degree of medical probability.  Because the Court has concluded
that a factual issue exists pertaining to whether Defendant had evidence of the
existence of a permanent injury during the CRN cure period, Defendant is likewise not
entitled to summary judgment on this ground.

Finally, Defendant contends that it did not have a realistic opportunity to settle

---

[4] The Court notes that this fact presents a clear distinction with *Cadle*, where the plaintiff's
own expert and UM attorney opined that no evidence of permanency had been presented to
the defendant during the relevant time period.  *See Cadle*, 838 F.3d at 1126 ("The testimony at
her bad-faith trial by both her medical expert and UM attorney confirmed that at no time
during the cure period did Cadle produce to GEICO medical evidence of the permanency of her
injury.").

Plaintiff's UM claim because Plaintiff testified that he was at no time willing to settle

for the UM policy limits.  Caselaw emphasizes that the proper focus of a bad faith

inquiry is on the actions of the insurer rather than on the actions of the insured or the

insured's attorney.  *See Pelaez*, 13 F.4th at 1251 n.6, 1254.  Thus, when the evidence

clearly establishes the insurer acted in bad faith, the insurer may not escape liability

merely because the insured or the claimant may have contributed to the failure to

settle the claim.  *Id.*  At the same time, while the *focus* is on the insurer's conduct, the

conduct of the insured or the claimant is *relevant* as part of the totality of the

circumstances.  *Id.* at 1254.  The factual record appears to show that Plaintiff sent

Defendant a CRN, showing a willingness to settle.  Although other evidence –

including deposition testimony – may contradict Plaintiff's willingness to settle, such

evidence presents factual issues that must be resolved by the jury.  The motion for

summary judgment is denied as to this ground.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED**:

1. "Progressive Select Insurance Company's Motion for Summary Judgment"
   (Doc. 36) is **DENIED**.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this 17th day of

October, 2025.

_____
TOM BARBER
UNITED STATES DISTRICT JUDGE